# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>vs.<br><br>**ELMER STEWART RHODES, III,**<br>Defendant. | **CASE NO: 4:22-MJ-11-KPJ** |

## MEMORANDUM OPINION AND ORDER
## OF DETENTION PENDING TRIAL

Defendant Elmer Stewart Rhodes, III ("Defendant") is charged with violating 18 U.S.C. § 2384 (Seditious Conspiracy); 18 U.S.C. § 1512(k) (Conspiracy to Obstruct an Official Proceeding); 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding and Aiding and Abetting); 18 U.S.C. § 372 (Conspiracy to Prevent an Officer from Discharging any Duties); and 18 U.S.C. § 1512(c)(1) (Tampering with Documents or Proceedings). The United States moved to detain Defendant pending trial pursuant to 18 U.S.C. §§ 3142(f)(1) and 3142(f)(2). Upon consideration, the Court finds Defendant must be **DETAINED**.

### I.  LEGAL STANDARD

"The Bail Reform Act provides that a person shall be released pending trial unless a judge finds that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Villaurrutia*, 850 F. App'x 330, 331 (5th Cir. 2021) (per curiam) (quoting 18 U.S.C. § 3142(e)). Only criminal defendants whose charged offenses involve one or more of the following circumstances may be detained pending trial:

1

- a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;
- an offense for which the maximum sentence is life imprisonment or death;
- an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 *et seq.*), the Controlled Substances Import and Export Act (21 U.S.C. § 951 *et seq.*), or chapter 705 of title 46;
- any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more state or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to federal jurisdiction had existed, or a combination of such offenses;
- any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive, or any other dangerous weapon, or involves a failure to register under 18 U.S.C. § 2250;
- any offense if there is a serious risk that such person will flee; or
- any offense if there is a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

18 U.S.C. § 3142(f). In such cases, the Court considers the following factors to determine whether conditions exist that would justify pretrial release:

- the nature and circumstances of the offense charged;
- the weight of the evidence against the person;
- the history and characteristics of the person, including:
  - the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
  - whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law; and
- the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). If, based on the foregoing factors, the Court finds there are no conditions that would "reasonably assure the appearance of the person as required and the safety of any other person and the community," the defendant must be detained pending trial. 18 U.S.C. § 3142(e).

## II. PRETRIAL SERVICES REPORT[1]

Defendant is the founder of Oath Keepers, which purports to be "a non-profit organization comprised of firefighters, military police, and first responders who defend the Constitution."[2] Defendant has been employed by the Oath Keepers since its founding in 2010. Defendant is a graduate of Yale Law School, but was disbarred in 2007. Defendant served in the United States Army from 1983 until he was honorably discharged in 1986.

Defendant has a father in Arizona, with whom he has no contact, and two sisters with whom Defendant remains close. Both sisters reside in Minnesota. Defendant's mother is deceased. Defendant has been married to Tasha Adams since 1996, but is currently estranged from his wife. Ms. Adams filed for divorce in 2018, and the divorce proceeding remains pending. Ms. Adams resides in Montana with the couples' six children. Defendant reports he has telephone contact with his children "every couple of months." Defendant reports that he is currently in a relationship with Kellye SoRelle. According to Pretrial Services, numerous attempts to contact Ms. SoRelle for verification purposes were unsuccessful.

Defendant reports he has resided in Granbury, Texas, with Ms. SoRelle since May 2020. Defendant and Ms. SoRelle reside in an apartment leased by Ms. SoRelle. Defendant also reports that he spends "a considerable amount of time" at a friend's home in Little Elm, Texas. Previously, Defendant resided in Kalispell, Montana (2010–2019), "between Las Vegas, Nevada, and Montana" (2005–2010), Arizona (2004–2005), Connecticut (2001–2004), and spent the "remainder of his life" in Las Vegas, Nevada.

---

[1] A Pretrial Services Report is a concise summary and conclusion of the pretrial investigation pertaining to the pretrial release of the criminal defendant. *See* 18 U.S.C. § 3154.

[2] The information in this section was provided by Defendant in an interview with Pretrial Services. Pretrial Services was able to verify some, but not all, of the information with a third party.

3

Defendant has no reported criminal history. Additionally, Defendant reports that he has not filed "federal income tax" since approximately 2007.

## III. DETENTION HEARING

The Court held a detention hearing on January 24, 2022 (the "Hearing"). The United States was represented by Assistant United States Attorneys Kathryn Rakoczy and Justin Sher. Defendant was represented by James Lee Bright and Philip Linder. Prior to the Hearing, the Government filed a Memorandum in Support of Motion for Detention (the "Government's Brief") (Dkt. 12). Defendant did not file a response. The Court has read and considered the arguments and authorities in the Government's Brief and would have equally considered a response if one had been filed. The Government's Brief contains references to evidence that was not presented during the Hearing.

### A. Government's Evidence

Special Agent Michael Palian ("Agent Palian") of the Federal Bureau of Investigation ("FBI") testified regarding the details of the alleged offenses and the investigation that culminated in Defendant's indictment and subsequent arrest.

In November 2020, shortly after the presidential election, Defendant, as leader of the Oath Keepers, began planning to prevent and/or disrupt the peaceful transition of presidential power. According to Agent Palian, from November 2020 to January 2021, Defendant planned, offered to fund, recruited for, and executed a raid on the United States Capitol. Members of the Oath Keepers, under Defendant's direction, stormed and entered the United States Capitol on January 6, 2021, while Congress convened to certify the results of the 2020 presidential election (the "Raid"). Such members adorned tactical gear, including, but not limited to, helmets, hard knuckle gloves, and goggles. Some members carried non-lethal weapons. At least one member assaulted a law

4

enforcement officer. In addition, Defendant organized armed tactical support teams of other Oath Keepers that were staged in the D.C. area to provide armed support to the Raid on his orders.

The Oath Keepers aimed to prevent certification of the 2020 presidential election results by Congress. Federal agents recovered encrypted messages sent by and between Defendant and his co-conspirators, some of whom are co-defendants in this action, wherein Defendant discussed: (a) the need to intimidate Congress and/or incite violence to prevent the constitutional transfer of power resulting from the election; and (b) plans for executing an armed assault on the federal government. For example, on November 7, 2020, Defendant sent the following message to co-conspirators:

> I am in direct context [sic] with the Serbian author of that video.[3]
>
> His videos are excellent.
>
> Here is his written advice to us:
>
> "What we have done, and what you probably need to do:
> - Peaceful protests, good, well played round 1
> - A complete civil disobedience, they are not your representatives. They are FOREIGN puppet government.
> - Connect with the local police and start organize by neighborhoods to stay safe (we didn't need this step)
> - We swarmed the streets and started confronting the opponents. I know, not nice, but it must be done if the institutions stop to exist.
> - Millions gathered in our capital. There were no barricades strong enough to stop them, nor the police determined enough to stop them.
> - Police and military aligned with the people after few hours of fist-fight
> - We stormed the Parliament
> - And burned down fake state Television!
>   WE WON!
>
> However, we made a mistake. We have not removed ALL of his people from their positions. That was the only mistake.
>
> They are going to fight to the end, you must do the same.

---

[3] Agent Palian testified the message refers to a Serbian video that describes steps taken by Serbian citizens after the election of Slobodan Milosevic.

> Take that glorious flag from the chest. That old flag your ancestors flew while fighting for liberty. Kiss your old Garand, and your Bible.
>
> Do what you need to do.
> You have it in your genes.
> Make your grand-parents proud, and make your future grandsons proud.
> GOD BLESS AMERICA!"

*See* Gov't Ex. 1. In December 2020, Defendant partook in the following exchange:

| | |
|---|---|
| Co-Defendant | "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside ! Scare the hell out of them with about a million surrounding them should do the trick !" |
| Defendant | "I think Congress will screw him over. *The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is [sic] they don't do the right thing.* But I don't think they will listen." |

*See* Gov't Ex. 2 (emphasis added).

In multiple other text messages, Defendant likened the Oath Keepers to early American patriots by comparing the Oath Keepers to the Sons of Liberty and analogizing the post-election socio-political climate to that which preceded the American Revolution. In fact, Agent Palian testified Defendant regularly used the terms "civil war" and "revolution" to describe the Oath Keepers' objectives. In at least one instance, Defendant is alleged to have described the impending "civil war" he was advocating for as having the potential to be massively bloody.

Evidence gathered during the federal investigation indicates the Oath Keepers—under Defendant's leadership—engaged in extensive planning and coordination prior to the Raid. Defendant personally coordinated with Oath Keepers chapter leaders—including the leaders of the Florida and Alabama chapters—to maximize participation in the Raid. In so doing, Defendant utilized encrypted chats and video conferencing software to maintain confidentiality and avoid

6

detection. Further, Agent Palian testified Defendant recruited individuals to participate in the Raid and, by posting a call to action on the Oath Keeper's website, encouraged Oath Keepers across the country to oppose the peaceful transition of presidential power. Defendant volunteered to pay for hotel rooms, maps, and communications devices for those willing to participate in the Raid.

Defendant also formed and orchestrated what he termed a Quick Reaction Force ("QRF") in support of the Raid. According to Agent Palian, the QRF was comprised of individuals who, when the Raid occurred, were stationed in a Comfort Inn across the Potomac River in Virginia. The QRF, equipped with an extensive arsenal of weaponry brought to the area by Oath Keepers from across the country (including Defendant), was directed to remain in Virginia and join and support/escalate the Raid upon Defendant's orders. In addition to creating, structuring, and providing strategic direction for the QRF, Agent Palian testified that Defendant also contributed firearms, parts, and accessories to its arsenal. Specifically, while *en route* from his home in Texas to Washington, D.C., Defendant purchased over $20,000.00 worth of firearms, firearms-related accessories, and ammunition for use in this operation.

During the Raid, evidence shows Defendant provided coordinating directives to various Oath Keepers members, including instructions to navigate the Capitol grounds. For example, Defendant engaged in the following exchange:

| | | |
|---|---|---|
| Co-Defendant | "We are going to be on the main area Ellipse and would like to have everyone decked out ?" | |
| Defendant | "Call me please" | |
| Defendant | "CALL ME" | |
| Defendant | "Go to SOUTH side of US Capitol" | |
| Defendant | "That's where I am going. To link up with [the operations leader]." | |

7

*See* Gov't Ex. 5. And while Defendant never himself entered the Capitol Building, Defendant was present on the Capitol grounds, coordinated the activities of those Oath Keepers who did enter the Capital Building, staged the QRF, and met with his co-conspirators shortly after they retreated from the Capitol Building. Immediately after the Raid, Defendant and other Oath Keepers leaders met for dinner at a nearby Olive Garden. While dining at Olive Garden, the group learned that law enforcement officers had begun arresting individuals involved in the Raid. Agent Palian testified that upon learning this information, Defendant and the group absconded from Virginia, presumably to avoid detection and arrest.

In the weeks that followed, Defendant continued to characterize the current presidential administration as an "illegitimate regime" and encourage violent opposition thereto. Agent Palian testified Defendant went so far as to state that those fit enough to move, shoot, and communicate should be prepared to do so. At that time, Defendant convened in Texas multiple chapters of the Oath Keepers and purchased an additional $17,000.00 worth of firearms, related parts and equipment, and ammunition. A subsequent search of Defendant's property resulted in the seizure of numerous firearms and related parts and accessories.

Agent Palian testified Defendant poses a risk of flight, highlighting Defendant's limited personal effects and ties to Texas or any other community. Consistent with the Pretrial Services Report, Agent Palian testified that Defendant no longer resides with his family in Montana. Defendant moved to Granbury, Texas, in mid-2020 and has been somewhat of a transient since, living primarily as a house guest and without a permanent residence. Defendant's mail is sent to a post office box, and Defendant rents a storage unit in or near Granbury, Texas, for personal property, including, but not limited to, firearms and related equipment.[4] Agent Palian opined that

---

[4] Agent Palian testified the FBI searched Defendant's storage unit pursuant to a warrant and seized firearms and related equipment.

8

Defendant's limited personal effects and lack of any sort of permanent residence would enable Defendant to quickly flee federal authorities and avoid apprehension. Similarly, the Government proffered Defendant's ability to leverage his nationwide organizational and familial contacts to covertly seek refuge.

To rebut the Government's contention that Defendant is a flight risk, the defense elicited testimony showing that Defendant has cooperated with federal authorities. For example, in May 2021, Defendant complied with a federal warrant requiring Defendant to provide his cell phone, pass code, and biometric data to federal agents. Agent Palian testified Defendant also volunteered to self-surrender to federal authorities in Washington, D.C., if indicted. On the day of his arrest, Defendant met the arresting officers outside the house where he was residing at the time.

However, Agent Palian further testified that Defendant has already attempted to obstruct justice by destroying potential evidence in the underlying federal investigation. According to Agent Palian, a forensic expert revealed that after Defendant learned that federal agents had begun arresting individuals associated with the Raid, Defendant deleted potentially incriminating messages pertaining to the Raid from his encrypted chats, and encouraged other co-conspirators to do the same, because Defendant believed an FBI informant could access such messages.

### B. Defendant's Proffer of Third-Party Custodians

Defendant offered two willing third-party custodians, the first being Defendant's friend, Brian Bodine. Mr. Bodine testified he met Defendant in March or April 2020 outside of Shelley Luther's hair salon in Dallas, Texas. Mr. Bodine explained that he and Defendant were showing support for Ms. Luther, whose salon had been temporarily closed by the city due to Covid-19. Mr. Bodine testified that, presently, the pair see each other one to three times per month. Mr. Bodine testified that he is not a member of the Oath Keepers, did not participate in the Raid, and was

unaware of Defendant's involvement in orchestrating the Raid until after the Raid occurred. Mr. Bodine testified that he currently lives in a one-bedroom apartment, but is willing to move into a two-bedroom apartment to accommodate Defendant's stay. Mr. Bodine works evenings as a ride share driver and political consultant and is, therefore, often not home in the evenings. Defendant's counsel proffered that Mr. Bodine has agreed to coordinate with others in the community who are willing to help monitor Defendant's compliance with any conditions of release imposed by the Court.

After the Court stated its finding on the record that Mr. Bodine was not an appropriate third-party custodian in this matter, Defendant's cousin, Benjamin,[5] testified as a willing third-party custodian. Benjamin resides on a multi-acre lot in California with his wife and children. Neither Benjamin nor his family members are members of the Oath Keepers, and none participated in the Raid. Benjamin testified that he was unaware of Defendant's involvement in the Raid until after the Raid occurred. Benjamin's in-laws, who are Defendant's aunt and uncle, reside in a separate house approximately 600 feet from Benjamin's home. Benjamin testified that, if released, Defendant could reside with Defendant's aunt and uncle in the second home. According to Benjamin, Defendant's uncle would monitor Defendant while Benjamin is away at work each day. Defendant's aunt and uncle were not present at the hearing and did not offer testimony.

Defendant also admitted several letters written in support of Defendant's release. These letters characterize Defendant as moral, honest, and non-violent. *See* Def. Ex. 1.

### IV. TELEPHONIC HEARING

Shortly after the Hearing, Defendant's estranged wife, Tasha Adams, contacted the Court and requested that she be permitted to offer information to the Court regarding the issue of

---

[5] Benjamin requested not to reveal his last name to maintain confidentiality and preserve his privacy.

10

detention. After conferring with counsel regarding same, on the afternoon of January 24, 2020, the Court conducted a telephonic hearing (the "Telephonic Hearing") with counsel for all parties present and participating. Ms. Adams testified that she married Defendant in 1994, and the couple share six children. Ms. Adams testified she filed for divorce in 2018 due to Defendant's violent tendencies; the divorce proceeding remains pending.

Ms. Adams testified that she fears for her safety and the safety of her six children should Defendant be released. Ms. Adams testified that throughout their marriage, Defendant would often brandish firearms in the family home to control her behavior and that Defendant would physically abuse his children under the guise of participating in "martial arts practice." According to Ms. Adams, Defendant would invite the children to practice martial arts when he was angry; Defendant would then hit the children and claim it was accidental. On occasion, Ms. Adams claimed that Defendant would "lose it." Ms. Adams described one such instance where Defendant choked the couple's daughter; the couple's adult son intervened to forcibly remove Defendant's grip. Ms. Adams testified that Defendant's violence toward the family became more frequent in 2016 and that her greatest fear was that Defendant would murder Ms. Adams and the children before committing suicide.

Ms. Adams admitted that she never filed a police report or reported the incidents to friends or family. Ms. Adams testified she applied for a temporary restraining order in 2018 based on Defendant's violent tendencies, but it was denied. Ms. Adams is unsure if Defendant's violent behavior is noted in the divorce petition. Neither Ms. Adams nor the six children have seen Defendant since 2018.

Ms. Adams also testified to Defendant's fear of being "picked up by the feds." According to Ms. Adams, during the time they were married, Defendant installed elaborate escape tunnels in

11

the couple's backyard, hid unregistered cars in the woods, and purchased hundreds of dollars of razor wire, which Defendant intended to install around the perimeter of the property, concealed from view, "in case the feds ever came to his door."

## V. SECTION 3142(g) FACTORS

The Court finds, based on the evidence presented, that the Government has: (a) proven by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community; and (b) proven by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

### A. The Nature and Circumstances of the Charged Offenses and the Weight of the Evidence

The weight of the evidence against Defendant is strong and reveals Defendant's participation in a coordinated attack on government officials within the United States Capitol and that Defendant put in place and controlled armed groups to support and/or further escalate the planned attack. The Raid, as the evidence shows, was expected to be violent. Under Defendant's leadership, members of the Oath Keepers stormed the Capitol grounds and unlawfully entered the Capitol Building wearing tactical gear, such as hard knuckles and helmets, and carrying non-lethal weapons. At least one member of the Oath Keepers assaulted a federal law enforcement officer. Although Defendant did not enter the Capitol Building, Defendant's communications with co-conspirators leading up to, during, and after the Raid (to plan, coordinate, and conduct the Raid), along with Defendant's presence on the Capitol grounds, displayed leadership during the Raid and showed that Defendant encouraged and directed the actions of his co-conspirators.

Further, the evidence shows Defendant planned for a much more violent attack on our nation's capital, both during the Raid and in the weeks that followed. Defendant created,

organized, and funded the QRF, which the evidence shows was intended to provide militaristic support to the Oath Keepers in Washington, D.C., on Defendant's orders. Defendant purchased upwards of $40,000.00 of firearms, ammunition, and firearms-related accessories, parts, and equipment, half of which was used to help equip the QRF and perhaps other members of the Oath Keepers. And Defendant repeatedly referred to the Oath Keepers' actions both in the Raid and in communications thereafter as inciting a revolution or civil war, which, according to those communications, had the potential to be massively bloody.

The evidence also shows Defendant rallied others to participate in the Raid and other future activity. There is evidence that, a few days before the Raid, Defendant published a "call to action" encouraging Oath Keepers across the country to convene in Washington, D.C., to forcefully disrupt Congress's certification of the 2020 election results. Defendant coordinated with Oath Keepers chapter leaders across the country to encourage participation, develop strategy, and ensure preparedness. After the Raid, Defendant continued to convene co-conspirators, encourage violent governmental opposition, purchase additional firearms, ammunition, and accessories, and allude to and advocate for forthcoming civil unrest and armed violence.

Based on the evidence presented, the Court finds that both the nature and circumstances of the charged offenses, along with the weight of the evidence to support such charges, favor detention.

### B. Defendant's History and Characteristics

Defendant is a graduate of Yale Law School and has no prior criminal history. Although these facts would typically weigh in favor of release, the Court questions Defendant's willingness to obey any Court-imposed conditions of supervised release. Defendant himself admits that he has not "filed federal income tax" since 2007. Defendant is a former attorney (presently disbarred from

13

practice) and is surely aware of the federal income tax filing requirements. Further, the evidence indicates that Defendant planned, coordinated, funded, and executed a sophisticated attack on the United States Government. As a former attorney, Defendant surely appreciated the gravity of his actions and the risks involved therewith. Yet, Defendant did not relent. Instead, Defendant armed and coordinated the QRF, provided direction to co-conspirators during the Raid, and continued to advocate for violent governmental opposition in the weeks that followed. Further, although the evidence shows Defendant has at least somewhat complied with the FBI's investigation, the evidence also shows that Defendant: (1) absconded from Virginia shortly after the Raid to avoid detection and arrest; and (2) deleted evidence relating to the Raid and instructed others to do the same. Defendant's actions exhibit an extreme defiance to federal authority that raise doubt as to Defendant's ability and willingness to comply with conditions of release.

Additionally, the evidence shows Defendant is transient and may easily flee from federal authorities and avoid apprehension. Defendant does not have a permanent residence and has not rooted himself in or created ties to any given community. Rather, the evidence shows Defendant has substantial nation-wide contacts, many of whom are members of, or may be affiliated with, the Oath Keepers. He has close family members and community contacts in localities across the country, as set forth in the Pretrial Services Report and exemplified by character references submitted as Defendant's Exhibit 1. And Defendant is the leader of a nation-wide grassroots organization that mobilized and acted in violence under Defendant's leadership and direction. Together, this evidence indicates the breadth of Defendant's network and the ease with which Defendant could covertly seek refuge from federal custody and avoid apprehension if released. This factor weighs in favor of detention.

**C. The Nature and Seriousness of the Danger Posed by Defendant's Release**

It is not unusual for Americans to be disappointed by election results or offput by the functioning of federal, state, or local governments. Indeed, the right for such individuals to peaceably assemble and to petition the government for a redress of grievances is enshrined in the Constitution and is core to American freedom and our system of governance. *See* U.S. CONST. amend. I. Here, the Court is not faced with a peaceable assembly and petitioning, as Defendant's extraordinary actions and the ripple effects that followed are outside the bounds of protected activities. The Court is likewise mindful that Defendant and his co-conspirators have a Second Amendment right to purchase and possess firearms. *See* U.S. CONST. amend. II; *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). That right must be honored in this analysis. Indeed, the purchase and transport of weapons, even in large volumes, is a constitutionally protected activity. However, here, it is not the mere purchase or transport of firearms that weighs in the Court's analysis. Rather it is the totality of the evidence showing Defendant's leadership and strategic involvement in and advocacy for armed and violent actions against the federal government, combined with Defendant's preparedness and ready access to weapons sufficient to carry out such violent activities, that presents a significant risk of harm to others. Thus, Defendant's First and Second Amendment rights can be honored and protected while the Court considers the applicable legal factors and reaches its conclusions as to pretrial detention in light of the totality of the evidence presented.

The evidence shows Defendant orchestrated a large-scale attack on the federal government with the purpose of intimidating, by violence, federal officials and disrupting official governmental proceedings incident to the transfer of power in the Executive Branch following a national election. Defendant covertly organized the Raid remotely, using encrypted chats and other applications.

15

Defendant created, staged, and controlled the QRF as a strategic force to escalate armed violence in support of the Raid upon his request. Defendant concealed his activity from those close to him. And, importantly, Defendant had the means to finance the Oath Keeper's illicit activity by contributing more than $40,000.00 to stock the Oath Keepers' weapons arsenal and offering to underwrite expenses for those willing to participate in the Raid.

Defendant's authoritative role in the conspiracy, access to substantial weaponry, and ability to finance any future insurrection, combined with his continued advocacy for violence against the federal government, gives rise to a credible threat that Defendant's release might endanger others by fostering the planning and execution of additional violent events. This is especially so given Defendant's technical savvy, military training, and familiarity with encrypted communication; it is nearly impossible to effectively monitor communications made through encrypted messaging and video conferencing applications, which Defendant is known to use. Finally, there is some evidence of a propensity towards violence in Defendant's personal relationships.

On balance, the evidence in the record overall indicates Defendant's release could endanger the safety and wellbeing of others. This factor weighs in favor of detention.

## IV. CONCLUSION

For the reasons stated herein, the Government's Motion for detention is **GRANTED**. Defendant shall be detained pending trial and, is thus, remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States, congressional

subpoena,[6] or on request of an attorney for the Government, the person in charge of the corrections facility must deliver Defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

**So ORDERED and SIGNED this 26th day of January, 2022.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

---

[6] During the Hearing, Defendant represented he has been subpoenaed to testify before Congress in February 2022. Defendant shall be permitted to testify if required by congressional subpoena, court order, or as otherwise requested by an attorney for the United States Government.