## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 1:22-cr-00015-APM** |
| **V.** | |
| **ELMER STEWART RHODES, III,** | |
| **DEFENDANT.** | |

**ELMER STEWART RHODES III's MEMORANDUM OF AUTHORITIES
IN SUPPORT OF THE MOTION OF DEFENDANT ELMER STEWART RHODES III
FOR DISCLOSURE OF BRADY EXCULPATORY INFORMATION
AND ISSUANCE OF SUBPOENAs DUCES TECUM TO
WITNESSES EXPECTED TO BE CALLED BY THE PROSECUTION**

Defendant Elmer Stewart Rhodes, III, ("Rhodes") by undersigned counsel, Edward L. Tarpley, Esq., hereby files this corresponding Memorandum of Points and Authorities stating his reasons why his "Motion Of Defendant Elmer Stewart Rhodes For Disclosure Or Brady Exculpatory Information And Issuance Of *Subpoenas Duces Tecum To Witnesses Expected To Be Called By The Prosecution"* should be granted, pursuant to his constitutional rights, civil rights, and rights at law.

## I.    SUMMARY OF CIRCUMSTANCES PERTINENT TO THIS MOTION

This cannot be remedied under *Jencks* or *Brady v. Maryland* unless the Government has already -- unexpectedly -- obtained the witness' communications **_after_** their arrest.

Because the Government almost certainly obtained this type of information only up to the time of each Defendant's arrest, the Government almost certainly does not have this information from the relevant time period.  Therefore, the Government could not produce these communications under any of the governing legal theories, because it does not have them.  A subpoena under Rule 17 is necessary and required.

1

The Government will have obtained communications of these Defendants *before* the Defendants' arrest. But the issue here is impeachment of any testimony by witnesses who have changed their stories in order to buckle to coercion by the Government.

Thus, the focus is on any evidence as to why the witnesses changed their stories and have stated the opposite of what they previously insisted to be the truth.

Defendant Rhodes must conclude that some or all of these witnesses will be called to testify at trial against him.  The Government has placed them on its witness list for trial.

Defendant Rhodes is seeking non-privileged communications from those Oath Keepers who pled guilty up to four months ***prior to*** the time they pled guilty and within 1 month after they pleaded guilty.

Clearly, neither Rhodes nor his counsel have any interest in communications that are unrelated to this case and the Defendants' decision to plead guilty and testify.  Rhodes fully intends for any and all unrelated or personal communications to be kept confidential in perpetuity.

## II.     GOVERNING LAW

Rule 16 of the Federal Rules of Criminal Procedure requires that:

> \* \* \*
>
> Rule 16. Discovery and Inspection
>
> (d) Regulating Discovery. (1) Protective and Modifying Orders. At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal. (2) Failure to Comply. If a party fails to comply with this rule, the court may: (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances.

Rule 17 of the Federal Rules of Criminal Procedure provides: "A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." Fed. R. Crim. P. 17(c)(1).

"Rule 17 provides a limited grant of authority, mentioning pretrial production only in connection with court approval." *US v. Binh Tang Vo*, 78 F.Supp.3d, 171, 178 (D.D.C. 2015) (noting Fed. R. Crim. P. 17(c)(1)); *United States v. Nixon*, 418 U.S. 683, 698-99 (1974). Pretrial production is appropriate where the party issuing the subpoena shows "(1) relevancy; (2) admissibility; [and] (3) specificity." *Nixon*, 418 U.S. at 700.   In the present case, Defendant has met all these requirements.

The Government's obligations under *Brady v. Maryland* are well-known.  Other Defendants have briefed this extensively.  When the Defendant requests <u>*Brady*</u> materials**,**

> "The government cannot meet its *Brady* obligations by providing the defendant with access to 600,000 documents and then claiming that the defendant should have been able to find the exculpatory information in the haystack."

*United States v. Saffarinia, 424 F.Supp.3d 46, 8  (D.D.C.), supported by United States v. Paxson, 861 F.2d 730, 737 (D.C. Cir. 1988).*

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *United States v. Sitzmann*, 74 F.Supp.3d 128, 133-134 (D.D.C. 2014) *quoting Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

If an appeals court determines the suppressed evidence is material, that there is a reasonable likelihood the evidence could have impacted the jury's judgment, then a new trial is required. *Sitzmann*, 74 F.Supp.3d at 134.  However, the defendant must raise at least a colorable claim that the material contains evidence "favorable to him and material to his claim of innocence." *Id.*   A successful *Brady* claim to over-turn a conviction after trial requires that favorable evidence to the accused for exculpatory or impeachment purposes was suppressed by the government which prejudiced the accused. *Id.*  Favorability to the accused requires exculpatory or impeachment value. *Id.*  Suppression by the government can be an intentional or inadvertent failure to disclose the evidence. *Id.* at 137.

> "Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. See *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Such evidence is "evidence favorable to an accused," *Brady*, 373 U.S., at 87, 83 S.Ct., at 1196, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. Cf. *Napue v. Illinois*, 360 U.S.

> 264, 269, 79 S.Ct. 1173 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the
> truthfulness and reliability of a given witness may well be determinative of guilt or
> innocence, and it is upon such subtle factors as the possible interest of the witness in
> testifying falsely that a defendant's life or liberty may depend")."

*United States v. Bagley, 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985).*

> *United States v. Sitzmann*, 74 F.Supp.3d 128, 133 (D.D.C. 2014) *[explains]*:
> "[S]uppression by the prosecution of evidence favorable to an accused upon request
> violates due process where the evidence is material to either guilt or punishment,
> irrespective of the good faith or bad faith of the prosecution." *Id*. at 134 (*quoting Brady
> v. Maryland*, 373 U.S. 83, 87 (1963)). And courts in in this jurisdiction disfavor narrow
> readings by prosecutors as to their obligations under *Brady*.

*United States v. Saffarinia,* 424 F.Supp.3d 46, 57 (D.D.C.), supported by *United States v. Paxson,* 861 F.2d 730, 737 (D.C. Cir. 1988) (bracketed explanation added).

Prosecutions alleging conspiracies carry the "inevitable risk of wrongful attribution of responsibility to one or more of the multiple defendants." *Dennis v. United States,* 384 U.S. 855, at 873, 16 L. Ed. 2d 973, 86 S. Ct. 1840 (1966). Under these circumstances, it is imperative the defense, the judge, and the jury be assured "the doors that may lead to truth have been unlocked." *Id.*

> In our adversarial system rarely is the prosecution justified in having "exclusive access
> to a storehouse of relevant fact" and exceptions to this notion must be justified by the
> "clearest and most compelling of considerations."

*Id.* at 873-874.

## III.    ARGUMENT

## A.    WITNESSES ARE LIKELY TO HAVE TOLD FRIENDS AND FAMILY THAT THEY ARE PLEADING GUILTY FALSELY DUE TO COERCION

Stewart Rhodes knows these Oath Keepers. He knows that if they pled guilty, they knew the Oath Keepers engaged in no conspiracy, had no plan to commit any crime, and intended to act lawfully at all times.

And Rhodes knows from knowing them that they must have told friends and family that they were in fact innocent but they had to plead guilty due to the crushing financial burden and other pressures such as incarceration and concern for the needs of their families.

Rhodes has sufficient knowledge of these individuals to be confident that they contemporaneously told their friends and family that they were not pleading guilty because they actually are guilty but to simply

minimize the abuse by the Government.

Rhodes knows these Defendants' positions including interviews given (in effect under 18 USC 1001) under oath to the FBI.  He knows that their plea deal flip-flops are false.

Stewart Rhodes, who personally knows the individuals and knows the truth, personally insists that the Government has pressured and coerced these Oath Keepers members into flipping their previously-documented testimony and will allow them to testify falsely in order to obtain leniency through plea bargains.  Rhodes knows that the witnesses have been encouraged to testify falsely because we have their FBI interviews (made subject to the equivalent of penalty of perjury under 18 U.S.C. 1001) before their decision to plead guilty. Statements suggesting guilt stand out as out of place within the rest of their accounts of innocence.  Canned sentences have been unnaturally grafted in that contradict the bulk of their statements even after their plea deals. Even after pleading guilty, the witnesses clearly establish their own innocence and the innocence of all of the Defendants here, then include scripted statements not in their own "voice" saying the opposite.  The after-plea statements are internally inconsistent and self-contradictory.

## B.      SUBPOENAS MUST BE ISSUED TO OBTAIN POST-ARREST COMMUNICATIONS ABOUT PLEADING GUILTY

However, the Prosecution will likely respond or quietly assume that it need not provide these communications because although the communications may exist they are not sitting on the prosecutor's desk in the offices of the United States Attorney's Office.

Yet the Defendant is entitled to the information for impeachment of a witness against him pursuant to *Brady v. Maryland*.  But the focus here is on communications after their arrest.

Defendant Rhodes respectfully demands both the disclosure and the acquisition by subpoena of communications related to this case of witnesses that will be called by the prosecution, to the extent not a privileged attorney-client confidential communication, for the purpose of impeachment and cross-examination.

Rhodes, knowing these individuals, insists that each of those persons who have pled guilty will almost certainly have emailed, texted, or sent chat messages – some not privileged -- to family, friends, or others

explaining that they are in fact not guilty and their statements of guilt are in fact not true, but that they are forced under the circumstances to escape the coercion, financial pressure, and the fear of lengthy imprisonment. Rhodes contends that these persons will likely have reassured their friends and family that they did not do the things of which they are charged but they have had to play along and say they did, in order to escape further burdens and legal attacks.

Given that the Government has the burden of proving every element of every criminal charge beyond a reasonable doubt, the internal contradictions may render these witnesses inadmissible. Such witnesses who have contradicted themselves should clear a *voir dire* hurdle out of the hearing of the jury to determine if they should be allowed to testify.

Nevertheless, exculpatory information – including information that may be used to cross-examine a witness or impeach a witness in terms of bias or credibility must be disclosed by the Government.

The complication here, though, is that the Government has evidently acquired the communications of these possible witnesses up through the time of their arrest. Defendant Rhodes is demanding disclosure of their non-privileged communications after their arrest.

## C.    SUBPOENAS MUST BE ISSUED TO THOSE WHO PLED GUILTY

Rhodes, by counsel moves the Court to issue subpoenas duces tecum to the following persons for any all text messages, emails, chat messages, letters, notes or other correspondence – if not privileged – made up to four (4) months prior to pleading guilty and up to one (1) month following pleading guilty, directly concerning or related to the witnesses' decision to pled guilty, testify to an account of events in this case different than his or her previous account, comments or assurances that he or she is in fact not guilty despite pleading guilty, and/or a decision to testify falsely in this case in order to get the benefits of a plea deal:

1)  Oath Keepers member and former co-Defendant William Todd Wilson

2)  Oath Keepers member and former co-Defendant Jason Dolan

3)  Oath Keepers member and former co-Defendant Joshua James

4)  Oath Keepers member and former co-Defendant Caleb Berry

5)   Oath Keepers member and former co-Defendant Brian Ulrich

6)   Oath Keepers member and former co-Defendant Mark Grods

The subpoena must affirmatively require each witness to obtain their text messages, emails, chat messages or other communications from the appropriate communications company, service provider, and/or their own smart phone (even if in the hands of the Government at the moment) or computer or paper records. Any entirely unrelated messages or communications should not be disclosed and shall remain sealed and confidential.

## D.   CONTEXT AND MATERIALITY

Of course, there are no allegations that Stewart Rhodes committed any violence, damaged any property, or treated any law enforcement officer with anything less than respect anywhere in the District of Columbia around January 5-6, 2021.  Rhodes personally never entered or climbed on the Capitol building itself and never interacted with any law enforcement officers.

There are no factual allegations that Rhodes aided and abetted anyone in the commission of any crime. The Government included boilerplate allegations, like an after-thought, but without any factual allegations to support any aiding and abetting theory.

The Grand Jury in multiple versions of the indictment acknowledges that the Oath Keepers arrived in the area of the U.S. Capitol after the U.S. Capitol Police had already advised the presiding officers of the House and Senate to recess, suspend the Joint Session of Congress, and evacuate the building. The Oath Keepers did not cause a decision to recess that culminated at 2:18 PM, upon reaching the area at 2:26 PM.  This timeline is established by the Grand Jury. The Oath Keepers could not have obstructed an official proceeding prior to when they arrived.

In December 2020, the U.S. Capitol Police issued six permits for demonstrations to be lawfully held on the U.S. Capitol Grounds on the afternoon of January 6, 2021.  Attendees were lawfully authorized to be on the Grounds and to travel to and from and among the permitted demonstration sites.

The records show that the Oath Keepers travelled from the lawful demonstration at the Ellipse to the

Capitol Grounds to assist a lawful demonstration planned at "Lot 8" on the Capitol grounds.  As shown in messaging chats relied upon by the Grand Jury, Stewart Rhodes arrived much later than other Oath Keepers and ordered Oath Keepers who had gone "off mission" to join him at a place away from where there were disturbances happening.  Rhodes then led the Oath Keepers who were "off mission" away from the U.S. Capitol to dinner at Olive Garden, where – according to the D.C. Operation's Leader for the Oath Keepers Michael (Simmons) Greene's FBI interviews in May 2021 – Stewart Rhodes and Michael Greene expressed utter bewilderment about why any of the Oath Keepers entered the U.S. Capitol.

The documents known to the Government show that the Oath Keepers extensively planned, prepared to travel to Washington, D.C., intended to, and did provide volunteer security ("Protective Service Details" or "PSDs") to protect speakers, VIP attendees and crowds attending lawfully permitted demonstrations at the Ellipse, on U.S. Capitol Grounds and provide related logistical support.

## IV.   CONCLUSION

The Court must authorize the Clerk to issue subpoena duces tecums to each of the Oath Keepers members named who pled guilty to obtain their communications not privileged within four months leading up to their guilty plea and one month after their guilty plea.  Of course, only communications concerning or related to their decision to plead guilty should be released and all other private communications restricted.

Dated:   September 19, 2022

> Respectfully Submitted,
> /s/ Edward L. Tarpley Jr.
> Edward L. Tarpley Jr.
> A Professional Law Corporation
> Louisiana Bar ID: 12657
> 819 Johnston Street
> Alexandria, Louisiana 71301
> Phone: 318-487-1460
> Fax: 318-487-1462
> Email: **edwardtarpley@att.net**
>
> *Counsel for Defendant,*
> *Elmer Stewart Rhodes III*

## CERTIFICATE OF SERVICE

On September 19, 2022 the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed and served via the CM/ECF system, which will automatically send electronic notification of such filing to all registered parties.

 _/s/ *Edward L. Tarpley, Jr*
Edward L. Tarpley, Jr.
A Professional Law Corporation
Louisiana Bar No. 12657
819 Johnston Street
Alexandria, Louisiana 71301
Phone: 318-487-1460
Fax:    318-487-1462
Email: **edwardtarpley@att.net**