IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) ) ) | |
| v. | ) | Case No. 1:22-cr-00015-APM |
| **THOMAS CALDWELL, KELLY MEGGS** | ) ) ) | |
| **Defendants.** | ) ) | |

## SUPPLEMENT AND RENEWED
## JOINT MOTION TO TRANSFER VENUE

COMES NOW, Defendants, jointly, Thomas Caldwell, Kelly Meggs, Kenneth Harrelson and Jessica Watkins, and Stewart Rhodes, by undersigned counsel, and respectfully submit this Motion and Memorandum of Points and Authorities, as a Renewed Motion to Change Venue, based on new evidence, pursuant to Federal Rule of Criminal Procedure 21(a), for Prejudice, to seek a transfer of venue to another district so that they may be tried by an impartial jury as guaranteed by the Fifth and Sixth Amendments to the United States Constitution. As this court previously stated, 'But "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *Id*. Defendants remain free to renew their motion to transfer during or following the voir dire process.' (Order ECF 176, at p. 45)

I. **Legal Argument.**

At the time that these Defendants filed for transfer of venue, ECF 193, this Court expressed skepticism that the D.C. Circuit would follow the holding in *Delaney* and in denying the motion instead relied upon *United States v. Haldeman*. *Id*. at p. 42-43, (*citing United States v. Haldeman*, 559 F.2d 31, 63, n.40 (D.C. Cir. 1976) referring the defendants to the *voir dire*. But we are now beyond *Haldeman*, a 1976 not facing facts based on a parallel committee proceeding which found that,

> In keeping with that approach, a defendant who claims he was denied a fair trial because the jury was not sufficiently "indifferent" generally must sustain that claim "'not as a matter of speculation *but as a demonstrable reality*.'" *United States ex rel. Darcy v. Handy*, 351 U.S. 454, 462, 100 L. Ed. 1331, 76 S. Ct. 965 (1956), *quoting Adams v. United States ex rel. McCann*, 317 U.S. 269, 281, 87 L. Ed. 268, 63 S. Ct. 236 (1942). 29 This demonstration can be made only by reference to the voir dire. In "extreme circumstances," however, prejudice to the defendant's rights may be presumed.
>
> *United States v. Haldeman*, 559 F.2d 31, 60, (D.C. Cir. 1976) (further citations omitted).

Respectfully, Defendants are at the *voir dire* stage, and now have sworn written responses to questionnaires admitting to a majority holding prejudgment bias. These Defendants are merely seeking to avoid an Appeal issue, prevent the argument of local prejudice, and transfer under Rule 21(a) to sister District in which the government has venue, and is only 8 miles away, or to another District where there is no prejudice to the government in doing so, but instead, an inconvenience.

In *Skilling*, the Supreme Court explained presumed prejudice, and observed why it was lacking in that case because a jury took time and did not convict the defendant on all counts, but acquitted him of nine of the counts:

> Finally, and of prime significance, Skilling's jury *acquitted him* of nine insider-trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government. In *Rideau*, *Estes*, and *Sheppard*, in marked contrast, the jury's verdict did not undermine in any way the supposition of juror bias. It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption.

*Skilling*, 561 U.S. at 383 (emphasis added)[1].

Unlike in *Skilling*, J6 trials before juries have resulted in unanimous jury verdicts promptly returned.   While this court previously found that, "Defendants point out that, unlike in *Skilling*, in which the jury acquitted Skilling of multiple charges, each of the January 6th cases that has come before a jury has resulted in a conviction. Defs.' Mot. for Transfer at 16. That is true, but guilty

---

[1] The Supreme Court since *Halderman* has held, when examining a Rule 21 motion to transfer venue, a court should consider (1) the size and characteristics of the community; (2) the nature and extent of pretrial publicity; (3) the proximity between the publicity and the trial; and (4) presumed prejudice.  *Skilling v. U.S.*, 561 U.S. 358, 378-81 (2010).

verdicts are hardly unusual in federal criminal prosecutions." (ECF 176 at 44). The defendants argument, which time has only supported, is that no J6 defendant has been acquitted *on any count, much less any case*- by a jury, to date, in the District of Columbia, but a bench trial led to an acquittal of a J6 defendant.[2] The presumed prejudice case is now based on more than what *Skilling* set forth.

Now Defendants come forward with sworn responses by a jury panel to an agreed upon written questionnaire issued by the court, in cooperation with the government and the defendants, in which the majority, admit to prejudgment bias.

**The instant case has recently been further targeted in the news**.

Most recently, the "Oath Keepers" have been all over the news. While the court barred the admission of what the government alleged constituted "a death list" by Caldwell on a motion in limine, the media promptly published it alleging it was the Oath Keepers Death List.[3] The court barred what the government alleged was "bomb making instructions" found in Ms. Watkins attic, and the media promptly released the alleged instructions again alleging that the Oath Keepers had "attempts to acquire homemade firearms."[4] And most recently, as stated, the Zello Recording tweeted out by the Select Committee, has been picked up by the mainstream news and reported everywhere as the Oath Keepers. After oral argument at Day 1 of the Pretrial hearing before this court on September 14th, over Defendants Joint Motion in Limine on a Zello Recording, on September, 15th, the Select Committee on the Investigation of January 6th ("the Select Committee)

---

[2] JUDGMENT of Acquittal as to MATTHEW MARTIN. Statement of Reasons Not Included. Signed by Judge Trevor N. McFadden on 4/6/2022. CRIMINAL DOCKET FOR CASE #: 1:21-cr-00394-TNM-1.

[3] Oath Keeper had 'death list' naming Georgia election officials leading up to Jan. 6 attack, DOJ says, Yahoo News July 12, 2022 https://news.yahoo.com/oath-keeper-had-death-list-185910359.html

[4] Oath Keeper members brought explosives to DC area around January 6 and had a 'death list,' prosecutors say, CNN by Hannah Rabinowitz and Holmes Lybrand, July 8, 2022.
https://www.cnn.com/2022/07/08/politics/oath-keepers-explosives-death-list-january-6/index.html

tweeted out the subject Recording saying "*The Select Committee has obtained a recording of communications over a walkie-talkie app among Oath Keepers who were inside the Capitol and others who were sharing intelligence from elsewhere.it was the Oath Keepers on the recording.*"[5] This was promptly picked up by numerous other publications, three of which are cited below.[6]

In *Skilling v. United States*, the Supreme Court distinguished *Rideau*, where a trial was conducted in close proximity to prejudicial news coverage, with Skilling's trial, where "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. This factor weighs heavily in favor transferring venue. *Rideau* is on point with the facts of this case where just a week before the jury trial, a "walkie talkie" recording, the Zello recording that the court granted and denied in part, was disclosed by the Committee as having recorded the Oath Keepers and in relation to their intent. *Rideau v. Louisiana*, 373 U.S. 723 (1963). *Rideau* becomes applicable because the highly publicized murder confession in that case was ruled inadmissible, but the jury heard it anyway on the news. *See Id*.

The Zello recording portions that the court ruled inadmissible in this case were now highly publicized by Congress's J6 Committee (after the Court expressed skepticism of admissibility), which the Committee specifically claimed was a recording of the Oath Keepers showing their

---

[5] Committee's twitter: https://twitter.com/January6thCmte/status/1570519072319709184

[6] Jan. 6 Audio: Oath Keepers Vowed to Harm Congress Members, Rolling Stone, by Tim Dickinson, "There's no safe place in the United States for any of these motherfuckers right now" https://www.rollingstone.com/politics/politics-news/oath-keepers-vowed-to-harm-congress-members-jan-6-audio-1234594002/
And
New Jan. 6 audio shows an Oath Keeper relishing the prospect of hurting members of Congress, confident that Trump supported it, committee says, Yahoo News, by Sophia Ankel, September 16, 2022; https://news.yahoo.com/jan-6-audio-shows-oath-124757192.html
and
J6 Committee Posts Oath Keepers' Walkie-Talkie Audio From Insurrection – 'No Safe Place for Any of These MFers'  by David Badash, September 15, 2022
https://www.thenewcivilrightsmovement.com/2022/09/j6-committee-posts-oath-keepers-walkie-talkie-audio-from-insurrection-no-safe-place-for-any-of-these-mfers/

intent. The "government" includes Congress, and that Congress would publicize a recording that the Court signaled would be inadmissible in part, is shocking.

And at the time of the court's prior decision, the court found that, "Now, in particular, media coverage has been heavy due to the ongoing public hearings of the Select Committee to Investigate the January 6th Attack on the United States Capitol. That said, the first group of these Defendants are not scheduled to be tried for another three months. The passage of time may diminish the likelihood of prejudice." (ECF 176 at pp. 43-44).

On top of the incessant negative publicity regarding J6 defendants[7], Congress has convened the Select Committee to Investigate the January 6th Attack on the United States Capitol ("J6 Committee"), which is running parallel to the instant court proceedings now on September 28, 2022. *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952), held that the trial court abused its discretion in not granting a lengthy continuance in light of prejudicial congressional committee hearings.[8]

**Those Respondents that recognize the Defendants but say they can still be fair.**

The Defendants recently commissioned a follow up survey regarding recognition of the

---

[7] They [MAGA Republicans] look at the mob that stormed the United States Capitol on January 6th brutally attacking law enforcement ² not as insurrectionists who placed a dagger to the throat of our democracy, but they look at them as patriots. *See White House Official Transcript of President Biden's Speech: The Continued Battle for the Soul of the nation* @ https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/09/01/remarks-by-president-bidenon-the-continued-battle-for-the-soul-of-the-nation/ (last visited on September 8, 2022)

[8] *Delaney* held: [I]n being brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, whether such publicity were generated by the prosecuting officials or by a congressional committee hearing. In either case he would be put under a heavy handicap in establishing his innocence at the impending trial. Hence, so far as our present problem is concerned, *we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity*.
*Delaney v. United* States, 199 F.2d at 114 (emphasis added).

Oath Keepers. (See Ex. 1, Attached hereto, Supplemental Opinion and Community Attitude Findings). The Key Findings:

> Results from the Supplemental Study show that the DC Community's view of the Oath Keepers is unique among the Test Areas - and is decidedly Unfavorable. **68% of the respondents from the District of Columbia Federal District ("DC Respondents") hold an Unfavorable view of the Oath Keepers, while the other Test Areas range from 36% - 46%.** Additionally, the results show that only 25% of the DC Respondents do not currently harbor a Favorable or Unfavorable view of the Oath Keepers. This is starkly different than the other three Test Areas, where 40% - 53% of respondents do not hold a preconceived opinion about the Oath Keepers. While the Test Areas differ from each other in geographic location, demographic composition and political party alignment, the three other Test Areas produced remarkably similar results on their awareness of and opinion about the Oath Keepers. The DC test area's distribution of awareness and opinion deviates considerably from both the medians and means of those of the four Test Areas, rendering the District of Columbia test area an outlier. Detailed results and comprehensive analysis are forthcoming.

(Ex. 1).

The above report shows that the 68% in DC who hold an unfavorable view of the Oath Keepers is once again an outlier in comparison to three other unrelated jurisdictions. The point of the comparison jurisdictions is to show that political leanings of different areas do not change the results, for example, the Eastern District of Virginia is more liberal than the Northern District of Florida, known to be conservative, but both, in both studies, continue to align in results, while DC is once again show to be an outlier because it was the community impact by the J6 protest. Defendants seek to avoid prejudgment bias where arguably, based on written responses, if you removed everyone who answered under oath, that they were biased, plus everyone who reported knowing of the Oath Keepers, that would only leave about 41 arguably eligible jurors out of 151 based on sworn responses to an agreed upon joint questionnaire issued by the court.

Now that Defendants are one week from a scheduled jury trial, the initial panel of 151 people shows *over 51% admitting to prejudgment bias*, under oath. (See Joint Submission by the parties.) Each questionnaire stated, "*Your answers will have the effect of a statement under oath*" (Juror Questionnaire, p. 2) and each required a signature where it stated,

CERTIFICATION By signing below, I hereby declare under penalty of perjury that all of the answers to the above questions are true and correct to the best of my knowledge and belief. I have not discussed my answers with others, or received assistance in completing the questionnaire. I have answered all of the above questions myself.

(Juror Questionnaire, p. 14).

The questions 11, 17, 47, 49 that reflect admitted bias under oath:

Q. 11: Is there anything about you that the Court should know that might affect your ability to be a fair and impartial juror in this case?

Q17: Do you have such strong feelings about firearms or the laws concerning firearms that would make it difficult to be a fair and impartial juror in this case?

Q. 47: Have you read, seen, or heard anything about the "Oath Keepers" organization that would affect your ability to be a fair and impartial juror in this case?

Q. 49: Have you read, seen, or heard anything about the defendants-Elmer Stewart Rhodes III, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, or Thomas Caldwell that would affect your ability to be a fair and impartial juror in this case?

These responses, without the same granularity of the questions in the Comparative Multi-District Survey, (Ex. A, ECF 193), nevertheless similarly show that 49% claimed that *they could be fair* in response to Questions 11, 17, 47, 49 or even 65, despite, for example, responding affirmatively to "*Did you have a concern for the safety of yourself, a close friend, or family member on January 6, 2021?*" (Juror Questionnaire, Q 22) or "*Have you read, seen, or heard about any allegations regarding the defendants-Elmer Stewart Rhodes III, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, or Thomas Caldwell-in this case?*" (Juror Questionnaire, Q 48).

The latent bias in this jurisdiction, is now supported by sworn written responses by a jury panel, and the latest targeting of these Defendants in the news and action by the Select Committee. The effect on D.C. has been profound and a jury, *even if they honestly tried*, could not be fair and impartial against the *Rhodes* and *Crowl* defendants, especially visible in the questionnaire written responses.

The Supreme Court in *Irvin* on an appeal, found that: '…No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact

7

requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. *As one of the jurors put it, "You can't forget what you hear and see."'* Irvin v. Dowd, 366 U.S. 717, 728 (1960) (emphasis added)(citing *Shepherd v. Florida*, 341 U.S. 50 (concurring opinion); *Moore v. Dempsey*, 261 U.S. 86).

The Supreme Court in *Murphy v. Fla.*, 421 U.S. 794, 802 (1975), explained that "[i]n a community where most veniremen will admit to a disqualifying prejudice, *the reliability of the others' protestations may be drawn into question*; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it." *Id.* at 803 (emphasis added).

Similarly, the Court of Appeals held, "*The courts need not rest on the assumption that juries can compartmentalize their minds and hear things for one purpose and not for another.*" *Awkard v. United States*, 352 F.2d 641, 645-646 (D.C. Cir. 1965) (emphasis added).

The defense does not dispute that almost half of these prospective jurors will try to be fair. As explained in *Irvin*, "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father." 366 U.S. at 728.

Again, if J6 is equivalent to the Oklahoma City bombing, which Attorney General Garland supervised the prosecution of and agreed to McVeigh's request for a venue change, it would seem that a venue transfer is appropriate for the J6 defendants. *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) (summarily finding that a trial of Oklahoma City bombing suspects in federal court in Oklahoma City (Western District of Oklahoma).

'The Supreme Court has stressed repeatedly that the touchstone of the guarantee of an impartial jury is a protection against juror bias.' *United States v. Boney*, 977 F.2d 624, 633 (D.C.

8

Cir. 1992)( the D.C. Circuit remanded the case for an evidentiary hearing where one juror lied about his felony conviction.)

    II.    **The D.C. jury pool is prejudiced against the Oath Keepers**.

Previously Defendants produced three (3) commissioned surveys, including one commissioned by the Federal Public Defenders, showing the prejudgment bias in the jurisdiction. (ECF 193, filed July 18, 2022, Exhibits A-C). In the comparative Multi-District Study, DC is an outlier in its claims that it can be fair despite admitting to prejudgment bias:

| DC Community (% of the whole) | Claims Can Be Fair | Admits Not Fair | Unsure if Fair |
|---|---|---|---|
| Expects to Vote Guilty | 51% | 15% | 8% |
| Expects to Vote Not Guilty | 4% | 1% | 1% |
| Too Early to Decide | 16% | 2% | 4% |
| **FL Middle - Ocala (% of the whole)** | **Claims Can Be Fair** | **Admits Not Fair** | **Unsure if Fair** |
| Expects to Vote Guilty | 20% | 12% | 6% |
| Expects to Vote Not Guilty | 30% | 8% | 5% |
| Too Early to Decide | 10% | 4% | 3% |
| **NC Eastern (% of the whole)** | **Claims Can Be Fair** | **Admits Not Fair** | **Unsure if Fair** |
| Expects to Vote Guilty | 31% | 11% | 7% |
| Expects to Vote Not Guilty | 21% | 8% | 4% |
| Too Early to Decide | 13% | 1% | 4% |
| **VA Eastern (% of the whole)** | **Claims Can Be Fair** | **Admits Not Fair** | **Unsure** |
| Expects to Vote Guilty | 33% | 11% | 6% |
| Expects to Vote Not Guilty | 17% | 4% | 3% |
| Too Early to Decide | 19% | 4% | 3% |

Figure 4 of the Comparative Study, (Ex. A of ECF 193). DC responded that 51% claim in could be fair. (*Id*.) The average of the other three (3) jurisdictions showed that 28% claimed that they can be fair. (*Id.*) The Comparative Multi-District Survey found that:

The Comparative Multi-District Survey in support of the Motion to Transfer Venue, specifically found how the District stands apart from the three comparative jurisdictions, the Eastern District of Virginia, the Eastern District of North Carolina, and the Northern District of

9

Florida in multiple responses. In the survey, granular questions were asked and answered, while the question on whether one can be impartial, is a more general open ended question that does not encompass the same granularity. Respondents in the same survey acknowledged bias while they did not recognize that means that they are biased when they were asked the following questions:

Question 3: *72% of DC Community respondents said that they are likely to find Defendants guilty*– even when given the choice, "It is too early to decide." As seen in the figure below, the average for the three comparative jurisdictions combined is 44.5%[9].

Question 5: *85% of the DC Community characterizes the Events of January 6th as acts that are criminal in nature (insurrection, attack or riot), even when given options to reserve judgment on that question*. Versus the combined average for the other three (3) jurisdictions is 49.7%.

Question 6: *71% of the DC Community believes that all who entered the U.S. Capitol without authorization planned in advance to do so, even when offered options to reserve judgment on that question.* Whereas the combined average of the three (3) other jurisdictions is 45.7%;

Question 9: *Over 40% of the DC Community stated they believe all the Events of January 6th were racially motivated, even when offered options to reserve judgment on that question*. Again, the combined average for the other three (3) states is 17.1%.

The bias in this district is a latent bias, because while people here believe that they can be fair, in the same survey they responded with 71.17% who believe all who entered the U.S. Capitol *planned in advance* to enter the Capitol. (ECF 193, Ex. A, fig. 1) or 71.9% responded that they would be more likely than not to find the defendants guilty. (*Id.*, Ex. B, p.3, ¶. 10). The specific findings of the Survey are consistent with findings of the jury panel's sworn responses:

---

[9] (add the three states together and divide by 3).



Figure 1.

(*Id*. at Figure 1). The figure also shows how 40.32% of the District also believe that the protests were racially motivated. (*Id*.)

11

The entire District of Columbia was impacted either personally or tangentially or by DC leadership as a result of the events of J6, not even referring to the media. The latent bias is obvious in this jurisdiction where in the same study in which respondents reported that 71 % of DC would find January 6th defendants guilty of crimes, or 71.17% who believe all who entered the U.S. Capitol *planned in advance* to enter the Capitol that day, also felt that they could still be fair, findings that make clear a fair and impartial jury is not an option.

51% of the Survey Responses claimed that the respondent could be fair, when in fact in the same survey that person responded, with 71% that they believed the J6 defendants planned in advance to enter the Capitol. Now parties have juror statements that include, "*I can see the Capitol, I saw the people and the smoke from my windows*" or "*My cousin was at the Capitol and had to hide*" or because of stated fear at the time, "*I considered getting a gun…*"

As this court knows, the burden is not on the defendants to prove that every single resident of D.C. cannot be fair and impartial. The standard is not to whittle down the D.C. jury pool to the point of finding 12 individuals who will try their best to be fair and impartial despite the barrage of the local leadership's statements, such as the Mayor's litigation or statements by the DC Chief of Police, and that of the Select Committee, which is now to run parallel to the trial. The entire point of the Federal Rule of Criminal Procedure 21(a) exists for the purpose of the avoiding prejudice. The results of three different polls that compared four jurisdictions to DC, previously filed (ECF 193), the *Skilling* Factors analysis, and now over majority of sworn written responses of the jury panel and a Supplemental Report provide compelling proof that overwhelming prejudice exists in D.C., and that a latent bias exists among those who deny their biases.

Moreover, there is no prejudice to the government to transfer this case to another District. These defendants, however, if found guilty on all charges to include Seditious Conspiracy with the likelihood of the government seeking terrorism enhancements, are facing life imprisonment. But if the government were to convict these Defendants on all charges in the Eastern District of Virginia

or another District, these Defendants can no longer argue local prejudicial bias because whether it is the Eastern District of Virginia, as close as it sits, pulls from seven counties in the Commonwealth, or another District. In DC, the leadership, through the Mayor of Washington, D.C., has sued these very defendants, as this court knows, which in and of itself shows bias in the District. (Case 1:21-cv-03267-APM).

Accordingly, the defendants have previously suggested that the Court move the case eight miles from D.C. to the U.S. District Court for the Eastern District of Virginia ("EDVA") for the *convenience* of the government and the court, but would immediately go to other districts as well, such as the Western District of Virginia where Mr. Caldwell resides, or other courts that the court may suggest in order to ensure a fair trial.

Respectfully submitted,

By Counsel:

*/s/* David W. Fischer
David W. Fischer, Esq.
Fischer & Putzi, P.A.
7310 Ritchie Hwy., #300
Glen Burnie, MD 21061
(410) 787-0826
fischerandputzi@hotmail.com

Counsel for Thomas Caldwell

and

*/s/* Juli Zsuzsa Haller
Juli Z. Haller, DC 466921
The Law Offices of Julia Haller
601 Pennsylvania Avenue, N.W.
S. Building, Suite 900
Washington, DC 20004
Telephone: (202) 729-2201
HallerJulia@outlook.com

Counsel for Kelly and Connie Meggs
*And Authorized to sign for by Phillip Linder for Stewart Rhodes; Jonath Crisp for Jessica Watkins and by Brad Geyer for Kenneth Harrelson.*

13

**Certificate of Electronic Service**

    I hereby certify that on September 23, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, with consequent service on all parties of record.

                                         */s/* Juli Z. Haller
                                         Juli Z. Haller, DC 466921