<pre>
 1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
     UNITED STATES OF AMERICA,       )  Criminal Action
 3                                   )  No. 1:22-cr-00015-APM
                         Plaintiff,  )
 4                                   )  Jury Trial - Day 18
     vs.                             )  (afternoon session)
 5                                   )
     ELMER STEWART RHODES III,       )
 6   et al.,                         )  Washington, D.C.
                                     )  October 25, 2022,
 7                     Defendants.   )  Time:  1:10 p.m.
     _____
 8
         Transcript of Jury Trial - Day 18 (afternoon session)
 9                       Held Before
                 The Honorable Amit P. Mehta
10               United States District Judge
     _____
11
                   A P P E A R A N C E S
12
     For the Government:     Kathryn L. Rakoczy
13                           Troy A. Edwards, Jr.
                             Jeffrey S. Nestler
14                           UNITED STATES ATTORNEY'S OFFICE
                             FOR THE DISTRICT OF COLUMBIA
15                           601 D Street, Northwest
                             Washington, D.C. 20579
16
                             Alexandra S. Hughes
17                           Louis J. Manzo
                             U.S. DEPARTMENT OF JUSTICE
18                           950 Pennsylvania Avenue, Northwest
                             Washington, D.C. 20530
19
     For the Defendant Elmer Stewart Rhodes III:
20                           Phillip A. Linder
                             James Lee Bright
21                           Edward L. Tarpley, Jr.
                             BARRETT BRIGHT LASSITER LINDER
22                           3300 Oak Lawn Avenue, Suite 700
                             Dallas, Texas 75219
23
     For the Defendant Kelly Meggs:
24                           Juli Z. Haller
                             LAW OFFICES OF JULIA HALLER
25                           601 Pennsylvania Avenue, Northwest
                             Washington, D.C. 20036
</pre>

1                    A P P E A R A N C E S, continued

2      For the Defendant Kenneth Harrelson:
                            **Bradford L. Geyer**
3                           FORMERFEDSGROUP.COM LCC
                            141 I Route 130 South, Suite 303
4                           Cinnaminson, New Jersey 08077

5      For the Defendant Jessica Watkins:
                            **Jonathan W. Crisp**
6                           CRISP AND ASSOCIATES, LLC
                            4031 North Front Street
7                           Harrisburg, Pennsylvania 17110

8      For the Defendant Thomas Caldwell:
                            **David W. Fischer, Sr.**
9                           FISCHER & PUTZI, P.A.
                            7310 Governor Ritchie Highway
10                          Glen Burnie, Maryland 21061-3065

11     _____

       Stenographic Official Court Reporter:
12                          Nancy J. Meyer
                            Registered Diplomate Reporter
13                          Certified Realtime Reporter
                            333 Constitution Avenue, Northwest
14                          Washington, D.C. 20001
                            202-354-3118
15

16

17

18

19

20

21

22

23

24

25

5220

```
1                        I N D E X

2                                                   PAGE:

3    Witnesses:

4    Whitney Drew

5          Redirect Examination by Mr. Nestler ............. 5226

6    Ryan Salke

7          Direct Examination by Mr. Manzo ................. 5268
           Cross-Examination by Ms. Haller................. 5327
8          Cross-Examination by Mr. Fischer................ 5356
           Cross-Examination by Mr. Crisp.................. 5357
9          Redirect Examination by Mr. Manzo............... 5364

10

11   Exhibits Admitted:

12         Government Exhibit 1.S.656.13.................... 5240
           Government Exhibit 1.S.696.12403................ 5240
13         Government Exhibit 51.S.5599.................... 5249
           Government Exhibit 55.S.5625.................... 5251
14         Government Exhibit 73.P.4....................... 5260
           Government Exhibit 1056.7029.0214.............. 5314
15         Government Exhibit 1056.7209.0258.............. 5364
           Government Exhibit 1077.13...................... 5290
16         Government Exhibit 1085.4....................... 5304
           Government Exhibit 1096.5....................... 5294
17         Government Exhibit 6753......................... 5257
           Government Exhibit 6751......................... 5258
18         Government Exhibit 7077.1....................... 5308
           Government Exhibit 7082......................... 5324
19         Government Exhibit 7083......................... 5317
           Government Exhibit 9007......................... 5323
20         Government Exhibit 9008......................... 5288
           Government Exhibit 9009......................... 5321
21         Government Exhibit 9010......................... 5322

22

           Defendant Meggs KM.59........................... 5354
23

24

25
```

1                    P R O C E E D I N G S

2              (REPORTER'S NOTE:  The morning session of the jury

3    trial was reported by William P. Zaremba who prepared said

4    transcript.)

5              (Proceedings held outside of the jury.)

6              THE COURT:  Counsel, should we take up the issue that

7    we left outstanding?  Doesn't have to do with your testimony,

8    Agent Drew.

9              MS. HUGHES:  Okay.  Pardon me -- the issue is in

10   regards to Officer Christopher Owens.  Ms. Haller has two --

11   you had objections to two videos.  I responded -- Ms. Haller,

12   if you want to address your objections first, I'm happy to go

13   in any order.

14             MS. HALLER:  Your Honor, we would only request that

15   the government proffer the relevance of the videos, since none

16   of the defendants or -- alleged co-conspirators are in the

17   three that I've identified.

18             MS. HUGHES:  So, the officer, Officer Owens, is

19   present in the Senate hallway where Ms. Watkins is pushing down

20   the hallway.  You can hear on the video actually the "Push.

21   Push.  Push."  The three videos, one has been clipped into two,

22   but really it's two -- it's three clips from two body-worn

23   cameras.  One of which is Officer Owens', who's testified; and

24   another is from an officer that is a few officers just behind

25   him.  And it's relevant for establishing that there was a civil

5222

1   disorder that impeded officers responding, and so it's relevant

2   in that Ms. Watkins is literally a few feet away, and you can

3   actually hear what she's actually yelling --

4           THE COURT:  Okay.

5           MS. HUGHES:  -- with the group she is yelling with.

6           MS. HALLER:  I understand what counsel is saying, but

7   not in the ones I've identified.  I -- I didn't identify all

8   your videos, but in 8001, -2 -- I have the email -- you cannot

9   hear or see Watkins.  You can't hear or see any alleged

10  co-conspirator -- any -- any of them from other cases.  So

11  I -- I would dispute the relevance factor because we just don't

12  know why it's relevant.

13          MS. HUGHES:  You can't see Ms. Watkins.  You can --

14  you can hear the commotion that she is a part of.

15          MS. HALLER:  Well, there's no foundation for her

16  being part of that commotion, that specific commotion, because

17  there's no room for her to be in here.  It's a hallway.  So in

18  the hallway, you can see who's there.  There's a -- a woman

19  who's screaming her head off who's got long hair; not

20  Ms. Watkins.  There's a guy with, like, a mask on his nose who

21  is not any of the alleged Oath Keepers.  None of the

22  individuals are Watkins in that frame.  And it's very

23  prejudicial, Your Honor, because it -- it -- they're kind of,

24  truthfully, crazy, and they're -- they're -- they're doing

25  stuff, but that is not these defendants.  And so it's

1    prejudicial because the scene is quite disturbing.

2              THE COURT:  So, I mean, is the representation that --

3    that Ms. Watkins and the others who joined her in that hallway

4    may not be immediately on the body-worn footage, but are some

5    feet back --

6              MS. HUGHES:  Yes.

7              THE COURT:  -- as we've seen in some of the other

8    video?

9              MS. HUGHES:  Precisely, Your Honor.  And it's

10   actually -- it's at this exact time.  So the body-worn

11   camera -- the entirety of these videos take place between

12   2:43 p.m. and 2:47 p.m.; that is the exact time that

13   Ms. Watkins is in this hallway, and the government's evidence

14   pieces this together --

15             THE COURT:  Okay.

16             MS. HUGHES:  -- from various perspectives.

17             THE COURT:  All right.  Well, I mean, I think it's

18   admissible.  I mean, clearly, Ms. Watkins, as I believe all the

19   other defendants -- well, that's not true.

20        Certainly, Ms. Watkins is charged -- she may be the only

21   one, actually -- with aiding and abetting a civil disorder, and

22   so -- am I wrong about that or --

23             MS. HUGHES:  That's correct, Your Honor.

24             THE COURT:  Right.  Yeah.

25        So she's the only one charged with that offense, and so

1    the fact that she's in the midst of a -- what the government

2    contends is civil disorder and contributing to it, I think

3    satisfies the relevance of it and it's not more prejudicial

4    than probative.

5              MS. HUGHES:  I'm sorry, Your Honor, but at 2:43

6    Ms. Watkins is still in the Rotunda.

7              MS. HALLER:  The -- the hallway is -- Ms. Watkins is

8    not in that hallway.

9              THE COURT:  I guess the bottom line is, if the video

10   depicts a period of time when she is in that crowd --

11             MS. HALLER:  That's our objection.

12             MS. HUGHES:  It -- it begins at 2:43 p.m., which is

13   when the officer is walking to the hallway, and so he's going

14   to detail why he was turning this corner.  He goes to the

15   corner.  It is -- the entirety of it, though, is this -- this

16   five-minute period of time.

17             THE COURT:  Okay.  Well, what time is she in the

18   hallway?

19             MS. HUGHES:  2:46.

20             THE COURT:  Okay.  So I assume that the body-worn

21   somehow will show the crowd developing in the hallway?

22             MS. HUGHES:  Correct.

23             THE COURT:  And that she then -- at some point the

24   video shows -- either this one or another one -- her joining in

25   that crowd and what the government intends is pushing forward?

1           MS. HUGHES:  Yes.  And to be clear, this officer does

2      not capture her.  It's other videos that show her perspective

3      of pushing against him, but he's in the first failings of

4      officers.  He's on the first rung.

5           THE COURT:  Got you.  Okay.

6           MS. HALLER:  8002, Your Honor, is between 43 and 45,

7      and Ms. Watkins is nowhere near that hallway at that point, and

8      the entire foundation is lacking.

9           THE COURT:  Hang on.  Here's the issue.  She's

10     charged with aiding and abetting a civil disorder, and it's

11     certainly permissible for the government to show the buildup of

12     the people in that hallway, then presumably argue that she

13     joined that group of people, and then she did what she did.

14          The fact that she is not present for the entire time

15     doesn't make it unduly prejudicial, as the government's theory

16     is, at least, that she joined a crowd and participated in the

17     civil disorder.  So I don't think there's anything problematic

18     about showing the video.  If there is a request that -- well,

19     I'll leave it at that.

20          MS. HUGHES:  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MS. HALLER:  Can we request that it be explained that

23     Ms. Watkins is not in the video at that time?

24          THE COURT:  Well, you can cross-examine the witness.

25          MS. HALLER:  Okay.  Thank you, Your Honor.

5226

1          MS. HUGHES:  Thank you, Your Honor.

2          MR. CRISP:  May I have one moment?

3          THE COURT:  Sure.

4          MR. CRISP:  Thank you.

5          THE COURT:  Thank you.

6          (Proceedings held in the presence of the jury.)

7          THE COURT:  All right.  Please have a seat, everyone.

8     Ladies and gentlemen, welcome back.  I hope everyone had

9     a nice lunch break.

10         A little legal issue we needed to take care of; that's

11    the reason for the slightly delayed start, but we're ready to

12    go.

13         Mr. Nestler.

14         MR. NESTLER:  Thank you, Your Honor.

15                    REDIRECT EXAMINATION

16    BY MR. NESTLER:

17    Q.  Good afternoon, ma'am.

18    A.  Good afternoon.

19    Q.  I'm going to go in order from the cross-examinations for

20    the different questions that people asked you over the past few

21    days.  Okay?

22    A.  Okay.

23    Q.  We'll start with Mr. Caldwell's counsel.  Do you recall him

24    asking you questions about some of the charges Mr. Caldwell was

25    facing?

1   A.  Yes.

2   Q.  And do you recall him asking you a question about

3   Mr. Caldwell facing a charge for obstruction of an official

4   proceeding?

5   A.  Yes.

6   Q.  And conspiring to dislocate members of Congress from

7   performing their duties inside the Capitol Building?

8   A.  Not in those exact terms, but, yes, that's what --

9   Q.  And are you aware that Mr. Caldwell is also charged with

10  aiding and abetting obstruction of an official proceeding?

11  A.  Yes.

12  Q.  And that he's charged with conspiring with others to

13  obstruct an official proceeding?

14  A.  Yes.

15  Q.  And that he's charged with attempting to obstruct an

16  official proceeding?

17  A.  Yes.

18  Q.  And for all of those charges, does a person have to be

19  physically present at the Capitol Grounds to have committed

20  those charges?

21          MR. FISCHER:  Objection.

22          THE COURT:  Sustained.

23  BY MR. NESTLER:

24  Q.  Mr. Caldwell's lawyer asked you about contact between

25  Mr. Caldwell and other members of the conspiracy.  Do you

1    remember that?

2    A.  Yes.

3            MR. NESTLER:  If we can pull up on the screen

4    slide -- or excuse me -- Government Exhibit 6730, Slide 6,

5    please, Ms. Rohde.  It's already in evidence.

6    BY MR. NESTLER:

7    Q.  Who does Mr. Caldwell send a text message to at 9:51 a.m.?

8    A.  Paul Stamey.

9    Q.  And if we -- and who's Paul Stamey again?

10   A.  North Carolina Oath Keepers.

11           MR. NESTLER:  And if we could pull up Government

12   Exhibit 6731, Slide 25.

13   BY MR. NESTLER:

14   Q.  At 2:06 p.m., who does Defendant Caldwell send a message

15   to?

16   A.  Jessica Watkins.

17   Q.  Does this appear to show communications between the two of

18   them?

19   A.  Yes.

20   Q.  Are you aware of communications from Mr. Caldwell to other

21   members of the conspiracy prior to January 6th?

22   A.  Yes.

23   Q.  How about after January 6th?

24   A.  Yes.

25   Q.  Mr. Caldwell's lawyer asked you some questions about the

5229

1    clothes that Mr. Caldwell was wearing on January 6th.  Do you

2    remember that?

3    A.  Yes.

4              MR. NESTLER:  If we could pull up on the screen

5    Government Exhibit 29.P.3, already in evidence, please.

6    BY MR. NESTLER:

7    Q.  What is Mr. Caldwell wearing on the morning of January 6th?

8    A.  In this photo?

9    Q.  Yes.

10   A.  A red --

11   Q.  Sorry.  What's he wearing on his torso?

12   A.  A T-shirt.

13   Q.  What does it say on it?

14   A.  Oath Keepers.

15   Q.  Have you seen that T-shirt before?

16   A.  Yes.

17   Q.  In what circumstances?

18   A.  The -- a large portion of the Florida Oath Keepers were

19   also wearing that T-shirt the morning of January 6th.

20             MR. NESTLER:  Now, if we could pull up on the screen,

21   please, Government Exhibit 22.V.3, already in evidence.

22   BY MR. NESTLER:

23   Q.  This is a video that Defendant Caldwell took on the morning

24   of January 6th of 2021; is that correct?

25   A.  Yes.

1    Q.  And his lawyer asked you some questions about whether this

2    video showed him to be scanning the crowd -- the crowd.  Do you

3    remember that question?

4    A.  I don't remember that question, specifically.

5    Q.  Do you remember questions about this video?

6    A.  Yes.

7            MR. NESTLER:  And if we could play the video and

8    pause it at about 38 seconds.

9            (An audio-visual recording was played.)

10            MR. NESTLER:  You can pause there at 38 seconds.

11    BY MR. NESTLER:

12    Q.  Who was depicted on the screen?

13    A.  In the center, that's Kelly Meggs.

14    Q.  And how far away from the person holding the phone does

15    Kelly Meggs appear to be in this video?

16    A.  He appears to be, roughly, arm distance away.

17    Q.  Can you hear somebody talking during this video?

18    A.  Yes.

19    Q.  Could you tell -- well, can you tell who that was, who was

20    talking during the video?

21    A.  Not specifically myself, no.

22    Q.  Did their voice sound like it was close or far away?

23    A.  To the person making the video?  Close.

24            MR. NESTLER:  And if we could continue playing and

25    stop it right at 42 seconds, please, Ms. Rohde.

```
 1              (An audio-visual recording was played.)
 2              MR. NESTLER:  Right there.
 3    BY MR. NESTLER:
 4    Q.  And who is wearing this pink or purple jacket, here, at 43
 5    seconds?
 6    A.  Ms. Sharon Caldwell.
 7    Q.  And how far away does she appear to be from the person
 8    holding the phone?
 9    A.  Very close.  Right next to.
10    Q.  And how far away does he appear to be from Kelly Meggs?
11    A.  Very close.
12    Q.  Now, Mr. Caldwell's lawyer also asked you about some
13    videos -- well, let's see.  We can pull up Government
14    Exhibit 22.V.2.  He also asked you a question about this video.
15              MR. NESTLER:  And if we could play this forward,
16    Ms. Rohde.
17              (An audio-visual recording was played.)
18              MR. NESTLER:  If we could pause it there, please, at
19    22 seconds.
20    BY MR. NESTLER:
21    Q.  Where is this location where this video is being filmed?
22    A.  This is the west terrace.
23    Q.  And what's visible in this photograph here far off in the
24    distance?
25    A.  The Washington Monument.
```

5232

```
1    Q.  And how about in the foreground of this video, here, at

2    23 seconds?

3    A.  The Reflecting Pool and the Peace Monument.

4    Q.  And are there any humans visible?

5    A.  A lot of humans visible.

6    Q.  And the person who's filming this video, are they at the

7    same level of all these other humans or at an elevated

8    position?

9    A.  They're at an elevated position.

10   Q.  Is the person filming this video closer to the Capitol

11   Building than these other humans or further away from the

12   Capitol Building?

13   A.  They are closer to the Capitol Building.

14           MR. NESTLER:  Okay.  And if we could continue

15   playing, please, Ms. Rohde.

16           (An audio-visual recording was played.)

17   BY MR. NESTLER:

18   Q.  And at the end of that video, Mr. Caldwell's lawyer asked

19   you if you heard Caldwell say anything about leaving or let's

20   go.  Do you remember that question?

21   A.  He did ask me that.

22   Q.  Did you hear that?

23   A.  Not this time again.  I'm sorry.  No.

24   Q.  And are you aware of any messages that Caldwell sent later

25   on January 6th about what he had done around this time on
```

```
1    January 6th?

2    A.  Yes.

3              MR. NESTLER:  If we could pull up on the screen, just

4    for Agent Drew, 22 --

5              MR. FISCHER:  Objection.  Beyond the scope.

6              THE COURT:  Let me see, at least, the exhibit.

7              MR. NESTLER:  Sure.  22.T.27.2883.

8    BY MR. NESTLER:

9    Q.  And have you seen this text message before?

10   A.  Yes.

11   Q.  Who is it from?

12   A.  Mr. Caldwell.

13   Q.  And who is it to?

14   A.  An individual named Jonathan.  I don't know who this person

15   is.

16   Q.  And, approximately, when was this message sent?

17   A.  January 6th, 2021, at 7:38 p.m.

18   Q.  Does this message appear to be a true and correct copy of

19   the message as you saw it from the Cellebrite extraction?

20   A.  Yes.  In the -- yes.

21             MR. NESTLER:  Government would move this into

22   evidence, Your Honor.

23             MR. FISCHER:  Your Honor, objection.  She only

24   covered up to 3:30 p.m.  It is beyond the scope.

25             THE COURT:  Is it just the one page, or is there
```

1    more?

2                    MR. NESTLER:  It's a long message.  It's four pages.

3                    THE COURT:  Can you just flip through the other

4    pages, please.

5                    MR. NESTLER:  Sure.

6                    THE COURT:  Not so fast.  Go back to the second page,

7    please.  Hang on.  Can I read through this for a moment.

8            Okay.  Next page, please.

9            Okay.  Next page.

10               (Bench conference on the record.)

11               MR. FISCHER:  Your Honor, this is Mr. Fischer.

12           The cross -- or the direct examination -- the direct

13   examination only went up to 3:30, we were told, and these are

14   messages that are later, and I think the government's going to

15   do this on all the defendants, so it's beyond the scope.  We

16   have no chance to come back and rebut this.

17               THE COURT:  Well, look, I think two things.  One

18   is -- it is true the message is at 7:38 p.m., and, therefore,

19   beyond the 3:30 time period, but this is a description of

20   conduct prior to 3:30, arguably, and so it pertains to what he

21   says he did earlier in the day.  And insofar as your

22   opportunity to rebut it, I mean, she's going to be recalled to

23   do the 3:30-on time period, so you'll have an opportunity to

24   cross-examine on this document and anything else.

25               MR. BRIGHT:  If she is coming back, Your Honor --

1    excuse me.  I'm sorry.

2            James Lee Bright.

3            Since we were precluded on cross from going beyond the

4    3:30 time period, even if the Honorable Court feels that, yes,

5    this is referencing back to questions that may have been

6    referred to or acts before the 3:30 session, if the government

7    is aware that she's going to be recalled, then they can take up

8    their case in chief again on re- -- on direct with these more

9    appropriately when she's on direct again.

10           I mean, it does set up a false image to the jury, that

11   we have no ability to -- to rebut at this point because we were

12   precluded from going past the 3:30.  It's a setup on all of the

13   defendants.

14           THE COURT:  Well, I wouldn't quite characterize it

15   that way, but, again, this is not -- you know, as I said, the

16   content of this message is not describing conduct that occurs

17   after 3:30.  It's describing conduct prior to 3:30, and so,

18   therefore, is relevant to Mr. Caldwell's actions while he's at

19   the Capitol Building.  And so you're right, as a matter of

20   timing, it's beyond 3:30.  But it does not describe his conduct

21   at that time; it's describing his conduct hours earlier

22   during -- which is what the subject matter of her testimony is

23   about.

24           MR. BRIGHT:  Would the Court consider then that if

25   he's doing this on each one of the defendants, as I anticipate

1    Mr. Nestler will be doing, that this could potentially be one

2    of those rare occasions the Court would consider a request for

3    recross, since it's opening up new material.

4            THE COURT:  I don't think it's opening up new

5    material, and you'll have opportunity when she's recalled to do

6    your 3:30 on forward to deal with these.  I mean, again, if --

7    if -- let me put it this way:  I understand the 3:30 time

8    period was less about communication than it was about conduct.

9    Actions of the defendants -- alleged actions of the defendants

10   up until 3:30 p.m., and that's what this is pertaining to; the

11   actions up until 3:30 p.m.  It's not pertaining to his conduct

12   at 7:38 p.m.  It's what he says he did prior to 3:30.

13           MR. BRIGHT:  I suppose my question was more

14   anticipatory, Your Honor.  I apologize as to Mr. Fischer's

15   objection.  So I may have overstepped my bounds.  And, if so, I

16   apologize.

17           THE COURT:  Okay.  Look, I'll admit it.  As I said,

18   I'll give you an opportunity to cross-examine when she's

19   recalled, but I don't think this is out of bounds in terms of

20   scope of cross-examination.

21           MR. CRISP:  Judge, I had one follow-up.  Can we make

22   sure that they don't think that's me?

23           THE COURT:  I'm sorry.  That they don't think is

24   what?

25           MR. CRISP:  My name is Jonathan, sir.  When they say

```
1    they don't think that's me, I have concerns.  I've seen juries

2    infer different things.  I don't want there to be any

3    questions.

4            THE COURT:  Okay.  Sure.  No problem.

5            (Proceedings held in open court.)

6            THE COURT:  So the objection is overruled.

7    BY MR. NESTLER:

8    Q.  First of all, Jonathan, do you know who that is?

9    A.  No, I do not.

10   Q.  It's not Mr. Crisp over here; correct?

11   A.  I assume that it's not.

12   Q.  Okay.  Thank you.

13       All right.  If we could please publish to the jury.  And

14   let's go through this message briefly, Agent Drew.  What does

15   the first part of this message say?

16   A.  "Hell yeah!  Sharon and I rolled with the Oathkeepers and

17   some other militia."

18           MR. NESTLER:  And then if we go to the next part of

19   the message, and if you could please highlight that portion

20   down at the bottom, Ms. Rohde.

21   BY MR. NESTLER:

22   Q.  What does Caldwell tell Jonathan here in this highlighted

23   portion?

24   A.  "Said let's take the damn capitol."

25           MR. NESTLER:  Thank you.
```

```
 1          We can pull it down.  We'll get into this message again
 2     later.
 3     BY MR. NESTLER:
 4     Q.  Now, moving on from Caldwell's attorney, going on to
 5     Stewart Rhodes's attorney, do you recall him asking you some
 6     questions?
 7     A.  Several, yes.
 8     Q.  Okay.  Let's go to 6731, Slide 20.  And do you recall him
 9     asking you questions about the use of the word "patriots" in
10     this exhibit?
11     A.  Yes.
12     Q.  And suggesting that these were not referring to
13     Oath Keepers, but to other individuals?
14     A.  Yes.
15          MR. BRIGHT:  Objection, Your Honor.  Misstates what I
16     said earlier.
17          THE COURT:  It's overruled.  Go ahead.
18     BY MR. NESTLER:
19     Q.  And so what time did Stewart Rhodes send a message to one
20     of the Signal chats saying "Actual Patriots.  Pissed off
21     patriots"?
22     A.  2:01 p.m. on January 6th.
23     Q.  Okay.  Are you aware of other times where Rhodes or other
24     individuals referred to the Oath Keepers as patriots?
25     A.  Yes.
```

1           MR. NESTLER:  And if we could go to 6860, already in

2      evidence, at Slide 50.

3      BY MR. NESTLER:

4      Q.  And who is this message from?

5      A.  This message is from OK Gator 1 to the OKFL Hangout.

6      Q.  Who is OK Gator 1?

7      A.  Kelly Meggs.

8           MR. NESTLER:  And if we could highlight this portion,

9      Ms. Rohde.

10     BY MR. NESTLER:

11     Q.  What did he say in that sentence?

12     A.  "Patriots are going to stand and we have to lead them!"

13          MR. NESTLER:  So -- okay.  And if we could go to

14     Government Exhibit 1.S.656.13, just for the witness, please.

15     BY MR. NESTLER:

16     Q.  Have you seen this message before?

17     A.  Yes.

18          MR. NESTLER:  Government would move into evidence

19     1.S.656.13.

20          MR. BRIGHT:  No objection.

21          THE COURT:  Basis?

22          MR. BRIGHT:  James Lee Bright.  No objection, Your

23     Honor.

24          THE COURT:  I thought you said -- did object.

25          So 1.S.656.13 will be admitted.

1          (Government Exhibit 1.S.656.13 admitted into

2     evidence.)

3     BY MR. NESTLER:

4     Q.  And when was this message sent?

5     A.  July 24th, 2020.

6     Q.  Who is it from?

7     A.  Stewart Rhodes.

8     Q.  And who's it to?

9     A.  The OKFL Hangout.

10    Q.  How did Stewart Rhodes address the OKFL Hangout group, the

11    very first thing he said?

12    A.  "Greetings Florida patriots."

13          MR. NESTLER:  And if we can now go to 1.S.696.12403.

14    BY MR. NESTLER:

15    Q.  And have you seen this message before?

16    A.  I have.

17          MR. NESTLER:  The government would move this into

18    evidence.

19          THE COURT:  Mr. Bright.

20          MR. BRIGHT:  No objection.

21          THE COURT:  Okay.  1.S.696.12403 is admitted.

22          (Government Exhibit 1.S.696.12403 admitted into

23    evidence.)

24    BY MR. NESTLER:

25    Q.  And on November 4th of 2020, Agent Drew, what date is that

1    in relation to anything important happening in the presidential

2    election cycle?

3    A.   The presidential election.

4    Q.   What did Stewart Rhodes say to the Old Leadership chat?

5    A.   "Now it will depend on the conduct of us patriots."

6    Q.   Do you see the phrase "us patriots"?

7    A.   Yes.

8              MR. NESTLER:  Okay.  We can take that down.

9    BY MR. NESTLER:

10   Q.   Now, Mr. Rhodes's lawyer asked you a few questions about

11   Kellye SoRelle.  Do you remember those questions?

12   A.   Yes.

13   Q.   And, specifically, whether you had ever referred to

14   Kellye SoRelle as a lawyer for the Oath Keepers; is that

15   correct?

16   A.   Yes.

17   Q.   What was your understanding of Kellye SoRelle's

18   relationship to the Oath Keepers group prior to January 6th?

19   A.   Prior to January 6th, my understanding is that Ms. SoRelle

20   was in a physical, intimate relationship with Stewart Rhodes.

21   Q.   Mr. Rhodes's lawyer also asked you questions about

22   Stewart Rhodes's use of cardinal directions, specifically the

23   word "south."  Do you remember that?

24   A.   Yes.

25   Q.   From Stewart Rhodes's location on the west side of the

5242

```
1     Capitol, at times would he have been able to see rioters
2     entering the Capitol Building?
3     A.  From that vantage point, yes.
4     Q.  And how about when he was on the east side of the Capitol?
5     A.  Yes.
6     Q.  His lawyer also asked you several questions about
7     Ed Vallejo offering to activate the QRF but Stewart Rhodes not
8     taking him up on the offer.  Do you remember those questions?
9     A.  I do.
10    Q.  Let's talk about that for a minute.  Have you reviewed
11    surveillance video from the Comfort Inn in Ballston, Virginia?
12    A.  Yes.
13    Q.  And does that reflect that Meggs and Harrelson and other
14    members of the group deposited firearms at that hotel --
15    firearm cases at that hotel?
16              MS. HALLER:  Objection.  Leading.  Lack of
17    foundation.
18              THE COURT:  It's overruled.  Go ahead.
19    BY MR. NESTLER:
20    Q.  From your review of that video, have you seen individuals
21    appearing to deposit firearms cases at that hotel?
22    A.  I recall individuals picking up firearms cases.
23    Q.  And what about messages?  Have you reviewed any messages
24    related to that hotel?
25    A.  Yes.
```

1    Q.  And at the time that Meggs and Harrelson and the other

2    members of the stack entered the Capitol Building, would

3    those messages and that surveillance video reflect that

4    they would have been aware of the presence of firearms at the

5    hotel?

6              MS. HALLER:  Objection.  Compound and -- and facts

7    not in evidence.

8              THE COURT:  Well, that's not the basis on which I was

9    thinking about.  I'm not sure what the -- you're driving at,

10   but it's not clear to me what evidence she would know about

11   what they knew.  So --

12             MR. NESTLER:  Sure.  Sure.

13   BY MR. NESTLER:

14   Q.  Let me ask it this way:  Have you seen messages from Meggs

15   and Harrelson about the QRF hotel?

16   A.  Yes.

17   Q.  Were some of those messages sent before January 6th?

18   A.  Yes.

19   Q.  So on January 6th, when they're at the Capitol Grounds, do

20   those messages reflect they would have been aware of the

21   existence of the QRF hotel?

22             MS. HALLER:  Objection.  Form.

23             THE COURT:  That's overruled.

24   A.  The messages precede January 6th, yes.

25             MR. NESTLER:  So let's go to 6731, please, Ms. Rohde.

5244

1      It's Slide 44, already in evidence.

2      BY MR. NESTLER:

3      Q.  So Mr. Rhodes's lawyer asked you several questions about

4      this message from Ed Vallejo.  Do you remember that?

5      A.  Yes.

6      Q.  And what time did he send this message?

7      A.  2:38 p.m.

8      Q.  And what did he say?

9      A.  "QRF standing by at hotel.  Just say the word..."

10     Q.  Now, what time was the Capitol breached on the east side by

11     members of this conspiracy?

12     A.  2:39 to 2:41.

13     Q.  Around 2:38 p.m. and 51 seconds, would any guns have been

14     needed to physically breach the Capitol Building?

15     A.  No.

16     Q.  And at 2:38 p.m., would any guns have been needed to

17     stop Congress from completing its Joint Session to certify the

18     vote?

19             MS. HALLER:  Objection.

20             THE COURT:  Rephrase the question.

21             MR. NESTLER:  Sure, Your Honor.

22     BY MR. NESTLER:

23     Q.  Can you please explain, Agent Drew, how guns in the hands

24     of these defendants would have helped them breach the building

25     at 2:38 p.m., given where you saw them on surveillance video

5245

1    being?

2              MS. HALLER:  Objection.

3              UNIDENTIFIED ATTORNEY:  Objection.

4              THE COURT:  Sustained.

5    BY MR. NESTLER:

6    Q.  And the -- you watched surveillance video; right?

7    A.  In general, yes.

8    Q.  Okay.  From your review of the surveillance video, were

9    individuals able to breach the building with -- without using

10   firearms?

11   A.  Correct.

12   Q.  And did you see surveillance video reflecting Congress

13   ending its -- or pausing its Joint Session?

14   A.  Correct.

15   Q.  Did individuals need to use firearms in order to cause

16   Congress to pause its session?

17             MS. HALLER:  Objection.

18             THE COURT:  That's overruled.

19   A.  The video that I saw, no.

20   BY MR. NESTLER:

21   Q.  Now, Rhodes's lawyer asked you a couple questions about

22   roads being closed on January 6th, making it hard to navigate

23   through downtown D.C.  Do you remember those questions?

24   A.  Yes.

25   Q.  Have you reviewed any messages from members of the

5246

1    conspiracy discussing alternate forms of transportation in the

2    event roads were closed?

3    A.  Yes.

4    Q.  And what were some of those alternate forms of

5    transportation?

6    A.  Boat.

7    Q.  Now, Rhodes's lawyer also asked you questions about Rhodes

8    planning to speak at an event at -- on January 6th at some

9    point.  Do you remember that?

10   A.  Yes.

11   Q.  Are you aware of any messages about Stewart Rhodes planning

12   to speak at an event on the afternoon of January 6th?

13   A.  Not that I'm aware of.

14   Q.  Are you aware of any video actually showing Stewart Rhodes

15   speaking at an event on the afternoon of January 6th?

16   A.  Not that I'm aware of.

17   Q.  And what does Stewart Rhodes appear to be doing, from the

18   surveillance video you've reviewed, most of the time on the

19   afternoon of January 6th?

20   A.  He appears to be in restricted area on Capitol Grounds.

21   Q.  What does he appear to be holding in his hands?

22   A.  A phone.

23           MR. NESTLER:  Now, if we could pull up, please,

24   Ms. Rohde, Government Exhibit 6731 at Slide 13, already in

25   evidence.

1    BY MR. NESTLER:

2    Q.  Mr. Rhodes's lawyer asked you a few questions about whether

3    Rhodes had directed other individuals to storm the Capitol.  Do

4    you remember that line of questioning?

5    A.  I do.

6    Q.  And here on Slide 13, did Stewart Rhodes at 1:41 p.m. make

7    any reference to storming any government buildings?

8    A.  Yes.

9    Q.  What did he say?

10   A.  He said, "Hey, the founding generation stormed the

11   governors mansion in MA and tarred and feathered his tax

12   collectors."

13   Q.  And as far as you're aware, Agent Drew, are these

14   defendants charged with a crime of storming the

15   Capitol Building?

16   A.  Yes.

17           MS. HALLER:  Objection.  Withdrawn.

18           THE COURT:  I'm sorry?

19           MS. HALLER:  I said withdrawn.

20   BY MR. NESTLER:

21   Q.  Let me ask you again, Agent Drew.  So what is your

22   understanding of the conspiracy charge against these

23   defendants?

24   A.  To oppose by force the presidential transfer of power.

25   Q.  Are they charged specifically with actually storming the

```
 1    Capitol Building?

 2              MR. FISCHER:  Objection.  Already been asked.

 3              THE COURT:  I'm not sure I heard the answer.  She can

 4    answer the question.

 5    A.  Yes.

 6    BY MR. NESTLER:

 7    Q.  You were asked a few questions about not knowing what

 8    Stewart Rhodes was thinking.  Do you remember those

 9    questions?

10    A.  Yes.

11    Q.  And I believe you answered that you only knew what you had

12    read on the messages; is that right?

13    A.  Yes.

14              MR. NESTLER:  And if we could pull up 6731, Slide 68.

15    This is already in evidence.

16    BY MR. NESTLER:

17    Q.  You were asked a question about this.  What does

18    Stewart Rhodes says to DC OP: Jan 6 21 chat at 3:09 p.m.?

19    A.  Mr. Rhodes stated, "Fuck em."

20    Q.  And do the actual screenshots from the phones reflect who

21    Rhodes was responding to when he wrote "Fuck em," as far as you

22    remember?

23    A.  I don't recall specifically who he was responding to at

24    this moment.

25              MR. NESTLER:  Okay.  If we can pull up Government
```

1    Exhibit 51.S.5599, just for Agent Drew.

2    BY MR. NESTLER:

3    Q.  Have you seen this before?

4    A.  Yes.

5    Q.  Is this a screenshot of the -- one of the versions of

6    DC OP: Jan 6 21?

7    A.  Yes.

8            MR. NESTLER:  If we could -- Government moves into

9    evidence, Your Honor.

10           MR. BRIGHT:  Court's indulgence.  Give us a moment to

11   review it.

12         No objection, Your Honor.

13           THE COURT:  Okay.  I'm sorry.  What was the

14   exhibit number?

15           MR. NESTLER:  51.S.5599.

16           THE COURT:  Okay.  51.S.5599 will be admitted.

17           (Government Exhibit 51.S.5599 admitted into

18   evidence.)

19   BY MR. NESTLER:

20   Q.  And so, Agent Drew, when you look at Signal messages on

21   someone's phone, is this one of the formats you could review

22   it?

23   A.  Yes.

24           MR. NESTLER:  And so you can highlight Jim for us,

25   please, Ms. Rohde.

```
1    BY MR. NESTLER:

2    Q.  What does Jim write to this group at 2:57 p.m.?

3    A.  "Nurse just said news is reporting Congress given gas masks

4    and are trying to get out."

5              MR. NESTLER:  And if we could now show just

6    Agent Drew 51.S.5625.

7    BY MR. NESTLER:

8    Q.  Is this also a screenshot from that same extraction from

9    the phone?

10   A.  Yes.

11             MR. NESTLER:  Government moves this into evidence.

12             THE COURT:  Mr. Bright?

13             MS. HALLER:  Your Honor, if we may object.  I object.

14             THE COURT:  Hang on.  Let me hear from Mr. Bright,

15   please.

16             THE COURT REPORTER:  Mr. Bright, I can't hear you.

17             MR. BRIGHT:  James Lee Bright.  Can you blow that up,

18   please.

19             MS. HALLER:  Your Honor, this is a string of messages

20   that are not --

21             THE COURT:  Hang on.  Hang on.

22             MR. BRIGHT:  No objection, Your Honor.

23             THE COURT:  All right.  So, Ms. Haller, what's your

24   objection?

25             MS. HALLER:  No objection, Your Honor.
```

1    THE COURT:  Okay.  So 55.S.525 is admitted.

2    MR. NESTLER:  5625.  Thank you, Your Honor.

3    THE COURT:  5625, excuse me.

4    (Government Exhibit 55.S.5625 admitted into

5    evidence.)

6    MR. NESTLER:  And if we can have both on the screen,

7    please, for the jury.  On the split screen.

8    BY MR. NESTLER:

9    Q.  So if you look at the left side, what does Jim write at

10   2:57 p.m.?

11   A.  "Nurse just said news is reporting Congress given gas masks

12   and are trying to get out."

13   Q.  Now, when Stewart Rhodes at 3:09 p.m. writes to the same

14   thread "Fuck em," is he writing that on a clean slate or

15   responding to somebody?

16   A.  He's responding to Jim.

17   Q.  And so when Rhodes's lawyer asked you about how you

18   couldn't know what was inside of Rhodes's head -- remember

19   that?

20   A.  Yes.

21   Q.  Can you at least know what sentiment Rhodes was responding

22   to when he wrote certain messages?

23   A.  I see the statement that he's responding to, yes.

24   MR. NESTLER:  You can pull that down, please,

25   Ms. Rohde.

5252

```
1    BY MR. NESTLER:

2    Q.  And if we could now move on to Defendant Kelly Meggs's

3    lawyer's questions of you.

4         He asked you some questions about the motto of the

5    Virginia state flag.  Do you remember that?

6    A.  I do.

7              MR. NESTLER:  And if we could pull up on the screen,

8    please, Ms. Rohde, 2521.1.  It's a video already admitted into

9    evidence.

10             THE COURT:  What's that number again, Mr. Nestler?

11             MR. NESTLER:  2521.1.

12   BY MR. NESTLER:

13   Q.  Well, do you recall what the state flag of Virginia is --

14   the motto is on the flag?

15   A.  Yes.

16   Q.  What's that?

17   A.  Sic semper tyrannis.

18   Q.  And do you know what sic semper tyrannis means?

19   A.  Yes.  "Thus always to tyrants."

20   Q.  And how has Rhodes previously referred to Congress as far

21   as you're aware?

22   A.  As tyrants.

23             MR. NESTLER:  And if we could pull up -- we have the

24   video ready, Ms. Rohde, 2521.1.  If we could play this forward,

25   please.
```

```
 1                    (A video recording was played.)

 2              MR. NESTLER:  And if we pause it there at 44 seconds.

 3   BY MR. NESTLER:

 4   Q.  Did you hear Stewart Rhodes make any reference to Virginia

 5   in that clip?

 6   A.  I did not.

 7   Q.  To flags?

 8   A.  No.

 9   Q.  What does somebody say immediately preceding Stewart Rhodes

10   saying they better be shitting their pants?

11   A.  I heard "They ought to be shitting their pants."

12   Q.  And could you tell what direction that person was facing

13   when they said that?

14   A.  The Capitol Building.

15   Q.  And who works inside of the Capitol Building?

16   A.  Congress.

17   Q.  Okay.  And at 2:41 p.m. when this video was filmed, who was

18   inside of the Capitol Building as far as members of this

19   conspiracy?

20   A.  Stack 1 was inside the Capitol Building.

21   Q.  And when we talk about Congress being tyrants --

22              MR. NESTLER:  If we could pull up on the screen 6863,

23   please, already in evidence, Slide 4.

24   BY MR. NESTLER:

25   Q.  Remind us who OK Gator 1 is?
```

```
1    A.  Kelly Meggs.

2              MR. NESTLER:  And if we can go to the bottom sentence

3    there, please, Ms. Rohde.

4    BY MR. NESTLER:

5    Q.  What did Kelly Meggs say on January 1st of 2021 about that

6    word tyrants?

7    A.  "Watching tyrants rule our world!"

8              MR. NESTLER:  And if we could go to 6860, Slide 81,

9    please, already in evidence.

10   BY MR. NESTLER:

11   Q.  What did Kelly Meggs say to the OKFL Hangout chat on

12   December 25th of 2020?

13   A.  He included an image.

14         Would you like me to read the image?

15   Q.  Yes, please.

16   A.  "The tree of liberty must be refreshed from time to time

17   with the blood of patriots and tyrants."

18   Q.  That same word tyrants?

19   A.  Yes.

20             MR. NESTLER:  And if we could go to Government

21   Exhibit 1502, please, Ms. Rohde.  It's a video.  And go to

22   about 4:30 on the counter.  And if we could play this forward

23   for about 20 seconds.

24             (An audio recording was played.)

25             MR. NESTLER:  You can pause it there, please.
```

1    BY MR. NESTLER:

2    Q.  So at 4:42, what did Watchdog say in terms of using that

3    word?

4    A.  Tyrannical government.

5    Q.  And then who responded immediately afterwards?

6    A.  Jessica Watkins.

7    Q.  Now, Kelly Meggs's lawyer also asked you questions about

8    how many messages were exchanged on Signal and elsewhere.  Do

9    you remember that?

10   A.  Yes.

11   Q.  And how you did not read every single message to this jury

12   when you testified last Wednesday -- Thursday?

13   A.  Thursday, yes.

14   Q.  Do people in conspiracies sometimes talk about things that

15   are not about the conspiracy?

16           MS. HALLER:  Objection.

17           THE COURT:  Sustained.

18   BY MR. NESTLER:

19   Q.  And are you aware of any legal requirement that every

20   message exchanged between two people must be on the same topic?

21           MS. HALLER:  Objection.

22           THE COURT:  Rephrase.

23           MR. NESTLER:  Sure.

24   BY MR. NESTLER:

25   Q.  You've reviewed a lot of messages; correct?

```
1    A.  Yes.

2    Q.  What topics do they cover?

3    A.  Politics, breaking news, some conspiracy theories, guns, a

4    lot of different -- family events, Christmas, a lot of

5    different things.

6    Q.  Did you review messages about people coming to D.C.?

7    A.  Yes.

8    Q.  Bringing firearms?

9    A.  Yes.

10   Q.  Attacking the government?

11            MS. HALLER:  Objection.

12            MR. NESTLER:  Withdrawn.

13   BY MR. NESTLER:

14   Q.  Finally, Mr. Geyer -- I'm sorry.  Not finally.  Next,

15   Mr. Geyer on Kenneth Harrelson's behalf asked you some

16   questions about Kenneth Harrelson.  Do you remember that?

17   A.  Yes.

18   Q.  And, specifically, about his alleged lack of social media

19   or online presence; is that right?

20   A.  Yes.

21            MR. NESTLER:  If we go to Government Exhibit 6753,

22   please, and just for the witness.

23   BY MR. NESTLER:

24   Q.  Have you seen this message before, Agent Drew?

25   A.  I have.
```

5257

```
1              MR. NESTLER:  The government would move 6753 into

2    evidence.

3              MR. GEYER:  No objection.

4              THE COURT:  6753 will be admitted.

5              (Government Exhibit 6753 admitted into evidence.)

6    BY MR. NESTLER:

7    Q.  What's the date of this message, Agent Drew?

8    A.  December 6, 2020.

9    Q.  And who was it from?

10   A.  Gator 6.

11   Q.  Who is Gator 6?

12   A.  Kenneth Harrelson.

13   Q.  Who is the message to?

14   A.  OKFL Hangout.

15   Q.  What does Kenneth Harrelson say to the OKFL Hangout?

16   A.  "If you do not have a Proton Email, please go to

17   ProtonMail.com and get a free account so we can have safer

18   communications.  If you have already filled out a vetting form,

19   the vetting team is processing your docs now.  If you haven't

20   filled out a vetting form, please do and return to

21   vettingokfl@protonmail.com."

22   Q.  There's another slide here.  How does it continue?

23   A.  "All members please fill out the mission statement/bio form

24   and return to vettingokfl@protonmail.com.  Thank You."

25   Q.  What is protonmail.com?
```

1    A.  It is an encrypted email service.

2    Q.  What do people do when they send emails?  Do they

3    communicate with one another?

4    A.  Yes.

5          MR. NESTLER:  And if we go to Slide 6751 -- I'm

6    sorry, -- Exhibit 6751, just for Agent Drew.

7    BY MR. NESTLER:

8    Q.  Have you seen this message before?

9    A.  Yes.

10          MR. NESTLER:  We move into evidence 6751.

11          MR. GEYER:  No objection.

12          THE COURT:  6751 will be admitted.

13          (Government Exhibit 6751 admitted into evidence.)

14    BY MR. NESTLER:

15    Q.  And on January 4th of 2021, did OK Gator 1 send a Signal

16    message?

17    A.  Yes.

18    Q.  To what group?

19    A.  OKFL DC OP: Jan 6.

20    Q.  Who is OK Gator 1?

21    A.  Kelly Meggs.

22    Q.  What did Kelly Meggs say to that group?

23    A.  "Gator 6 runs the ground team.  Whippit and GG Sol will

24    assist him especially when we are moving!"

25    Q.  And if you could continue to the next message, please.

1    A.  "Other state leaders can be in direct contact with Gator 6

2    and then you handle your team as he needs."

3    Q.  And remind us again, who was Gator 6?

4    A.  Kenneth Harrelson.

5    Q.  Now, Mr. Harrelson's lawyer also asked you some questions

6    about Kenneth Harrelson not having phone calls logged on the

7    summary exhibit you went over.  Do you remember that?

8    A.  Yes.

9    Q.  And remind us, those phone calls, where are they derived

10   from?

11   A.  The service providers.

12   Q.  Do they reflect phone calls made via Signal?

13   A.  No.

14   Q.  And can you explain to us how phone calls could be made via

15   Signal?

16   A.  The Signal app logs the phone call itself, but it is not

17   reflected on the provider's account.  It uses data.

18   Q.  And how would the FBI be aware that people communicated via

19   a Signal phone call?

20   A.  If we could review in the Signal app of the person's phone.

21   Q.  What if somebody deleted their Signal app?

22   A.  Then we would not know.

23   Q.  What if somebody got rid of their phone?

24   A.  Then we would not know.

25                MR. NESTLER:  If we could pull up on the screen

1   Government Exhibit 73.P.4, just for Agent Drew, please.

2   BY MR. NESTLER:

3   Q.  Have you seen this screenshot before, Agent Drew?

4   A.  Yes.

5   Q.  Generally, what is it?

6   A.  It is a screenshot of a Signal application that shows phone

7   calls.

8           MR. NESTLER:  And can we move into evidence, please,

9   Your Honor, 73.P.4.

10          THE COURT:  All right.  So it's 73?

11          MR. NESTLER:  73.

12          THE COURT:  73.P.4 is admitted.

13          (Government Exhibit 73.P.4 admitted into evidence.)

14          MR. NESTLER:  And if we could display this to the

15   jury, please.

16       If we can zoom in, please, Ms. Rohde.  That's great.

17   BY MR. NESTLER:

18   Q.  And so can you explain to us what we're looking at here?

19   A.  Yes.  This is a screenshot of the Signal application

20   showing calls made to and from an individual within the Signal

21   application.

22   Q.  And when does this reflect Kenneth Harrelson's phone calls

23   to and from Stewart?

24   A.  The dates?

25   Q.  Yes.

5261

```
1    A.  To Stewart Rhodes on March 1st at 5:59 p.m.  Mr. Rhodes
2    called Mr. Harrelson on March 1st at 7:29 p.m.
3    Q.  And was the FBI able to access any Signal phone call
4    records for Mr. Harrelson's phone from the time period around
5    January 6th of 2021?
6    A.  No.
7    Q.  Now, Mr. Harrelson's lawyer also asked you some questions
8    regarding some video taken around the Capitol Building on
9    January 6th of 2021.  Do you remember that?
10   A.  Yes.
11   Q.  And there was a time stamp sort of moving in the upper
12   right corner; is that right?
13   A.  Yes.
14   Q.  Do you know where that time stamp came from?
15   A.  No.
16   Q.  Can you attest to its accuracy?
17   A.  No.
18   Q.  Now, on those videos showing members of the Oath Keepers
19   group entering the building -- is that fair to say? -- at some
20   point?
21   A.  Yes.
22   Q.  Approximately how long did it take for this group of
23   Oath Keepers to enter the building once they started moving
24   into the building?
25              MS. HALLER:  Objection.
```

1    BY MR. NESTLER:

2    Q.  Let me rephrase.

3        Mr. Geyer showed you a video of the doors opening.

4    Remember that?

5    A.  Yes.

6    Q.  And then he showed you video of people entering the

7    building; is that right?

8    A.  Yes.

9    Q.  Did members of the Oath Keepers group immediately enter the

10   building?

11              MS. HALLER:  Objection.

12              THE COURT:  She can answer, if she understands what

13   the question is.

14   A.  Mr. Isaacs entered shortly after the doors were opened.

15   BY MR. NESTLER:

16   Q.  And how about Kelly Meggs, Kenneth Harrelson, and Jessica

17   Watkins?

18   A.  Approximately a minute later.

19   Q.  What were they doing for that minute, as far as you could

20   tell from watching the video?

21   A.  Moving towards the east Capitol doors.

22   Q.  And, finally, let's move to Jessica Watkins's lawyer,

23   Jonathan Crisp.  He asked you some questions about the Zello

24   audio being audible or not on videos taken from Ms. Watkins's

25   phone; is that right?

5263

1    A.  Correct.

2    Q.  And have you actually played those videos yourself?

3    A.  Ms. Watkins's videos, yes.

4    Q.  And when you played them, can you hear the Zello audio?

5    A.  Yes.

6             MR. NESTLER:  If we could pull up, please, Ms. Rohde,

7    Government Exhibit 192.V, for video, 3, already in evidence.

8    BY MR. NESTLER:

9    Q.  When we played this -- when you were last on the stand, we

10   played it as part of a montage; is that correct?

11   A.  Yes.

12   Q.  How would you characterize the sound as part of the

13   montage?

14   A.  It was minimized.  It was quiet.

15            MR. NESTLER:  Let's play it straight from the

16   original video here, Ms. Rohde, if we could.

17            (An audio-visual recording was played.)

18   BY MR. NESTLER:

19   Q.  Could you hear -- could you hear the audio more clearly

20   there?

21   A.  Yes.

22            MR. NESTLER:  And if we could also pull up 193.V.4

23   already in evidence and play it from the beginning, please.

24            (An audio-visual recording was played.)

25   ///

1    BY MR. NESTLER:

2    Q.  Could you hear the Zello audio clearly there on that video?

3    A.  Yes.

4    Q.  Now, Ms. Watkins's lawyer asked you a lot of questions

5    about phone records.  Do you remember that?

6    A.  Yes.

7    Q.  Now -- and is it possible that messages were delayed

8    slightly on receipt by certain recipients?

9    A.  I believe I've seen evidence of that, yes.

10   Q.  Does that fact change that people were trying to

11   communicate with one another?

12   A.  No.

13   Q.  Now, Ms. Watkins's lawyer also asked you a lot of questions

14   about the use of the word "stack."  Do you remember that?

15   A.  Yes.

16   Q.  And what is the purpose of -- in both the military and in

17   law enforcement of -- of keeping one's hand on the shoulder on

18   the person in front?

19   A.  Yes.  It's for, predominantly, accountability.

20            MR. CRISP:  I have to object to this.  The testimony

21   wasn't in the military.  She didn't testify that was what the

22   purpose was in the military.  In fact, she testified to the

23   opposite.

24            THE COURT:  Sorry.  Can you rephrase the question to

25   only ask about one or the other?

1        MR. NESTLER:  Sure.

2    BY MR. NESTLER:

3    Q.  In the military, why would individuals keep their hand on

4    the person in front of them when they're moving?

5    A.  Accountability.  To know who is in front of and who's

6    behind you.

7    Q.  And what about in law enforcement context?

8    A.  Same.  To know who's in front of you, know who's behind

9    you, and know that someone is behind you.

10   Q.  And when you're moving in a stack formation, how are

11   individuals able to communicate with one another?

12   A.  Because you're in very close proximity, verbally.

13   Q.  Are you also able to communicate nonverbally?

14   A.  Yes.

15   Q.  How is that?

16   A.  By squeezing someone's arm, taking or removing your hand

17   off of someone.

18   Q.  Mr. Crisp asked you questions about whether individuals in

19   the military or law enforcement would typically have a firearm

20   with them in moving in a stack formation.  Do you remember

21   that?

22   A.  Yes.

23   Q.  And whether they would have a shield with them; is that

24   correct?  The questions?

25   A.  Yes.

1    Q.  Are you aware of any members of Stack 1 having a shield

2    with him or her at the time they entered the Capitol Building?

3    A.  One individual.

4    Q.  Who's that?

5    A.  James Beeks.

6    Q.  He also asked you several questions about Army manuals; is

7    that right?

8    A.  Yes.  Yes.

9    Q.  Is there an Army manual about how to storm the

10   Capitol Building?

11              MR. FISCHER:  Objection.

12              THE COURT:  Sustained.

13              MR. NESTLER:  Now, if we could pull up Defendant'

14   Watkins's Exhibit 16A.

15        Do you have that one?  And if we could go to the entry

16   about halfway down, Ms. Rohde, at 2:07 p.m.  And if you could

17   just zoom in on that, please, Ms. Rohde.

18   BY MR. NESTLER:

19   Q.  And if you recall, Agent Drew, Mr. Crisp asked you about

20   this message.

21              MR. NESTLER:  If we can display it for the jury,

22   please.  This is Defendant Watkins 16A.

23   BY MR. NESTLER:

24   Q.  And, Agent Drew, do you remember questions about this phone

25   record here?

5267

1    A.  This Cellebrite report, yes.

2    Q.  Yes.

3        And so what does this show?

4    A.  This shows a call from Commander Tom, January 6th, 2021, at

5    2:07 p.m.

6    Q.  And do you know who this call was to as -- based on the

7    cross-examination from Mr. Crisp?

8    A.  Ms. Watkins.

9    Q.  So who is attempting to call who here at 2:07 p.m. on

10   January 6th?

11   A.  Mr. Caldwell is attempting to call Ms. Watkins.

12            MR. NESTLER:  And if we can now go to Government

13   Exhibit 6731 at Slide 25.

14   BY MR. NESTLER:

15   Q.  That was at 2:07 p.m., that phone call; right?

16   A.  Yes.

17   Q.  Now, what time is this text message?

18   A.  2:06 p.m.

19   Q.  And how far before 2:06 p.m. is 2:07 p.m.?

20   A.  One minute.

21   Q.  And who was trying to contact who here?

22   A.  Mr. Caldwell is attempting to contact Ms. Watkins.

23   Q.  And what is he saying to her?

24   A.  "Where are you?  Pence has punked out.  We are screwed.

25   Teargassing" --

5268

1    Q.  Thank you.

2    A.  Excuse me.

3              MR. NESTLER:  No further questions.

4              THE COURT:  Okay.  Agent Drew, thank you for your

5    testimony.  You may step down at last.

6              THE WITNESS:  Thank you, Your Honor.

7              (Witness excused.)

8              THE COURT:  All right.  Mr. Manzo, are you ready with

9    your next witness?

10             MR. MANZO:  If we can call Officer Ryan Salke to the

11   stand.

12             THE COURTROOM DEPUTY:  Before you have a seat, could

13   you please raise your right hand.

14             (Oath administered.)

15             THE WITNESS:  Yes, sir.

16             THE COURTROOM DEPUTY:  Thank you.

17             THE COURT:  Officer Salke, have a seat.

18        Mr. Manzo.

19                      DIRECT EXAMINATION

20   BY MR. MANZO:

21   Q.  Good afternoon, sir.

22             MR. MANZO:  And while we begin our conversation here,

23   I'm going to ask Mr. Nestler to set up 1653 to the side, which

24   is the previously admitted map of the Capitol.

25   ///

```
 1   BY MR. MANZO:

 2   Q.  Sir, could you please introduce yourself to the jury by

 3   stating and spelling your name.

 4   A.  Yes, sir.  My name is Ryan Salke.  It's R-y-a-n S-a-l-k-e.

 5   Q.  Where are you from?

 6   A.  I'm from Durham, Connecticut.

 7   Q.  Where did you go to college?

 8   A.  I went to the Citadel.  It's a military university in

 9   South Carolina.

10   Q.  What did you do after graduating from the Citadel?

11   A.  After graduating from Citadel, I served in the Marine Corps

12   Reserves for nine years, and I joined Charleston City Police

13   Department in Charleston, South Carolina.

14   Q.  What type of roles did you have in the Marines?

15   A.  I was an 03 --

16            THE COURT REPORTER:  I'm sorry.  I was an 03?

17   A.  I was an 0311 infantryman.

18   BY MR. MANZO:

19   Q.  What does it mean to be an 0311 infantryman?

20   A.  It's like a rifleman, like the boots on the ground.  I was

21   with the Fourth LAR unit in Eastover, South Carolina.

22   Q.  What type of training did you receive in the military?

23   A.  I went through recruit training at Parris Island, and then

24   I went to infantry school.

25   Q.  And then with the Charleston Police Department, what type
```

1    of training did you receive there?

2    A.   There's a state academy for South Carolina.  So I went to

3    the state academy, and then Charleston had its own academy as

4    well.

5    Q.   At some point did you decide to leave Charleston?

6    A.   Yes, sir.

7    Q.   Where did you go?

8    A.   I went to the U.S. Capitol Police.

9    Q.   What year was that?

10    A.   That was in 2018.

11    Q.   Do you remember your first day with the U.S. Capitol

12    Police?

13    A.   Yes, sir; I do.

14    Q.   What's that day?

15    A.   It was just like an onboarding.  And then they prepare you

16    to go down to FLETC, which is the Federal Law Enforcement

17    Training Center down in Georgia.

18    Q.   What did you learn down there?

19    A.   It's a three-month process of learning all the duties of

20    being a uniformed federal police officer.

21    Q.   After you finished that training, did you go report back to

22    the U.S. Capitol for your everyday duties?

23    A.   I went back to the U.S. Capitol, and then they have an

24    additional three-month academy held by the U.S. Capitol Police

25    up in Maryland.

5271

1    Q.  What did you learn there?

2    A.  Just the specific duties specifically dealing with the

3    U.S. Capitol and all different things that we have to do here.

4    Q.  And so did you finish all that work in 2018?

5    A.  Yes, sir.

6    Q.  So going from 2018 into 2019, what were your duties at the

7    U.S. Capitol?

8    A.  There's several different spots that we could have

9    throughout the days.  Some were foot patrols, walking around

10   the Capitol areas.  I was specifically assigned to the House

11   division.  So there were standard posts, entrance -- entryways

12   that we'd use magnetometers.  Then we had traffic posts, where

13   we'd control traffic coming in and out of the Capitol area, and

14   we also had just regular mobile units.

15   Q.  Let me stop you right -- for a second there.  When you say

16   magnetometer, what is a magnetometer?

17   A.  It's like what everyone used to get into the courthouse

18   today.  You put your stuff on the X-ray machine and it goes

19   through, and they walk through the magnetometer.

20   Q.  Why did you have those?

21   A.  Just for security and for the Capitol.  So we're able to

22   identify any contraband coming into the area.

23   Q.  Okay.  Let's go forward to the morning of January 6th,

24   2021.  Were you stated -- were you slated to work that morning?

25   A.  No, sir, I was not.

1    Q.  So tell us about that.  What happened?

2    A.  Yes, sir.  So they put out drafts -- we call them drafts.

3    It's, basically, people who have to come into work the next

4    day.  I wasn't selected to go in that day, but I picked it up

5    for one of my buddies.

6    Q.  What was going to be your assignment for January 6th?

7    A.  I was assigned to a CDU unit.  It's a soft squad.  It's the

8    civil disturbance unit.  Soft squad just means we don't have

9    any gear.  We just show up in our regular uniform with our

10   regular police belt on, no additional equipment.

11   Q.  Could you just describe briefly what your uniform consisted

12   of.

13   A.  Yes, sir.  On our belt, the only thing -- you know, we'd

14   have our weapon, our handcuffs, our OC spray, and our baton.

15   Q.  What type of protection did you wear on your torso, if any?

16   A.  We had a body armor made by Point Blank that's rated for, I

17   believe, it's one .45 round center mass, and it's not stab

18   proof.

19   Q.  And just to put that in, kind of, layman's terms, what does

20   one .45 center mass mean?

21   A.  Just one bullet right in the center of your chest.

22   Q.  And what was your understanding when you said it would not

23   be stab proof?  What does that mean?

24   A.  It's not puncture proof.  So you can -- I mean, I guess a

25   knife or anything -- any sharp object can go through it.  It's

5273

1   only rated to stop a bullet.

2   Q.  So the morning of January 6th, where did you report to?

3   A.  I reported to the House division.

4   Q.  Where is that?

5   A.  Just on the House side of the Capitol.  If you're looking

6   at the front of the Capitol, it's on the left side.

7   Q.  Around about what time was that?

8   A.  I would get there about 6:30 because I had to be there by

9   7:00.

10   Q.  6:30 in the morning?

11   A.  Yes, sir.

12   Q.  When you got there, were you assigned to a post for that

13   day?

14   A.  Yes, sir.  I was just -- all the House division -- maybe 15

15   of us, 12 to 15 of us, were all assigned soft squad CDU to the

16   east front of the Capitol.

17   Q.  And just to put it, again, in layman's terms, CDU means

18   civil disturbance unit?

19   A.  Yes, sir.

20   Q.  And looking now at 1653, do you recognize what 1653, the

21   map, is here on the left?

22   A.  Yes, sir.

23   Q.  Could you come down and point on that map to the

24   approximate location of where you were stationed on the morning

25   of January 6th.

1    A.  Yes, sir.  I was right here, right in front of the

2    skylights.

3              THE COURT REPORTER:  Right in front of the skylights?

4              THE WITNESS:  Yes, ma'am.

5              MR. MANZO:  And the witness is pointing to the bottom

6    of 1653, in between the two skylights at the very bottom of the

7    board.

8    BY MR. MANZO:

9    Q.  When you got there, what did you observe?

10   A.  Just a large amount of people standing behind the bike

11   racks.  Nothing unusual to have for demonstrations and whatnot.

12   Q.  And you said bike racks.  Can you describe what a bike rack

13   is.

14   A.  It's like a metal rack with a bunch of poles you see people

15   connect their bikes and everything to.

16   Q.  Why were those set up that day?

17   A.  They used it as -- to set up a police line, and you can

18   actually interlock the -- the ends of them.  There's kind of

19   like hooks that go into a little hole thing, and they all lock

20   together.  So you can't easily take them apart.  You have to --

21   you have to have multiple people to pick them up and unlock

22   them from each other.

23   Q.  What's a police line?

24   A.  A police line is basically something we set up and make it

25   known -- there's either writing on it or we verbally tell you

1    this is the police line.  If you cross it, you will be

2    arrested.

3    Q.  So pointing at 1653, the morning of January 6th, you were

4    down in between the two skylights; is that fair to say?

5    A.  Yes, sir.

6    Q.  And as that morning progressed into the early afternoon,

7    can you describe the crowd?

8    A.  Yes, sir.  At first, you know, it was just a normal crowd,

9    like I stated, and throughout the morning, just people would be

10   playing videos of, I guess, different things going on in the

11   floor -- the Senate or House Floor, and then Trump speaking at

12   the White House; and maybe playing it over their megaphones,

13   and you would just hear comments.

14   Q.  And so when you say people were playing it over the

15   megaphone, could you describe that a little bit more.

16   A.  Yes, sir.  So, I mean, I specifically remember one

17   gentleman standing on -- there's -- kind of something just like

18   that skylight, there's a big flowerpot, and he was standing on

19   top of that, and he had his phone playing with his megaphone

20   on.  And he would be yelling out different things of what's

21   going on.  And things would make him mad, and then everybody

22   else would start yelling as well.

23   Q.  So let's unpack that a little bit.  At some point, did the

24   crowd become more agitated?

25   A.  Yes, sir; they did.

1    Q.  Do you know what caused that?

2    A.  I heard when the gentleman said something along the lines

3    of, you know, Pence isn't backing Trump, down with Pence, kill

4    Pence, F Pence, just all things along that line.

5    Q.  And after that, what happened?

6    A.  So I would say, also, right before this, before I heard the

7    gentleman saying that, is when I heard on the radio screams of

8    officers on the West Front.

9    Q.  So let's unpack that a little bit.  So were you on

10   East Front or the West Front?

11   A.  I was on the East Front the entirety of the day.

12   Q.  And what do you mean when you heard screams from officers

13   on the West Front?

14   A.  We slowly started to hear, you know, people that said

15   there's an increasing an amount of people coming up to the

16   West Front, and then it turned into people screaming for an

17   officer down and we need assistance and whatnot.  And then it

18   just became completely inaudible.  You can't -- you couldn't

19   understand anything going on.

20   Q.  So let's pull up now what's been previously admitted as

21   Harrelson Exhibit 3.

22            MR. MANZO:  Can we go to 13:53 on Harrelson

23   Exhibit 3.

24   BY MR. MANZO:

25   Q.  When you ref- -- and I'm going to direct your attention --

5277

1          MR. MANZO:  Actually, Ms. Rohde, can you go back to

2     the very start of this for one second.

3     BY MR. MANZO:

4     Q.  I'm going to direct your attention to the bottom of this

5     exhibit, to the lower right-hand corner.  Do you recognize

6     the -- the skylights in this video?

7     A.  Yes, sir.  Those are the skylights to the Capitol Visitors

8     Center.

9     Q.  And can you just circle those.  You should have a touch

10    screen in front of you.

11    A.  Okay.  Yes, sir.

12          MR. MANZO:  Just for the record, the agent [sic] has

13    circled the two skylights in the lower right-hand corner, and

14    we're at the zero mark.

15    BY MR. MANZO:

16    Q.  And are those the skylights on --

17    A.  Yes; those are the same ones.

18    Q.  -- the board there?

19          MR. MANZO:  Okay.  Ms. Rohde, can we now go back to

20    13:57.

21    BY MR. MANZO:

22    Q.  Do you recognize, right here, the general area of the lower

23    right camera where we're looking at?

24    A.  Yes, sir; I do.

25    Q.  What are we looking at here?

1    A.  We're looking at -- it's kind of hard to tell, but you

2    could see the bike racks that are -- go along that line, and

3    you can see all the -- us, the officers, are on one side and

4    the rest of the public is on the other side of it.

5    Q.  And you mentioned before somebody on a megaphone kind of

6    relaying events, and you said they were on a flowerpot.  Do you

7    recognize where the flowerpot is, approximately, in this video?

8    A.  Yes, sir; I do.

9    Q.  Can you put an X on it.

10   A.  Yes, sir.  It's actually this -- this whole area right here

11   is actually a flowerpot where people are standing up on.

12          MR. MANZO:  Just for the record, the witness has put

13   an X in the top center portion of the lower right-hand corner

14   of this Harrelson exhibit at 13:57.

15   BY MR. MANZO:

16   Q.  Sir, can you identify your approximate location in this

17   exhibit.

18   A.  Yes, sir.  Approximately right in this area.

19   Q.  And so you're circling the left side of the police line in

20   the lower right-hand corner?

21   A.  Yes, sir.

22   Q.  When -- when you were there, could you describe the crowd

23   just directly in front of you as -- as kind of the mood

24   shifted?

25   A.  Yes, sir.  As it progressed, people began pulling on the

5279

```
1    bike racks.  Everybody was -- started yelling the different
2    chants, like I stated before, the different things about Pence;
3    and drain the swamp; and this is our house, let's take it;
4    things along those lines.
5    Q.  You mentioned earlier that you started hearing reports over
6    your radio about what was going on on the west side?
7    A.  Yes, sir.
8    Q.  Why didn't you go help your fellow officers on the west
9    side?
10   A.  Because we had to stay where we were at because it had the
11   potential of the same thing happening on our side.
12            MR. MANZO:  So let's go to 14:35 now, please.  And
13   we'll play it forward to 14:43.
14            (A video recording was played.)
15            MR. MANZO:  And, Ms. Rohde, can you just back it up
16   to 14:30.  Thank you.
17   BY MR. MANZO:
18   Q.  Looking here at the lower right-hand corner of the screen,
19   what's going on here?
20            (A video recording was played.)
21   A.  Right now, it just seems people still haven't became
22   agitated yet.  They're just hanging out talking.
23   BY MR. MANZO:
24   Q.  At some point did you become aware of whether other
25   individuals were moving in from your left?
```

5280

1    A.  Yes, sir; I did.

2    Q.  So looking up at the top left-hand camera here in this

3    government -- or in Harrelson Exhibit 3, were you aware that

4    people -- that other rioters were coming in from the left as

5    you were standing looking at the bike racks in front of you?

6    A.  Yes, sir; I did notice them break through on that side.

7    Q.  Why didn't -- did you call for help?

8    A.  No, sir.  Every unit on the Capitol was already being

9    utilized, besides the fact that the radio was very unusable due

10   to the fact of officers screaming.

11          MR. MANZO:  Can we now go forward to 15 minutes on

12   this video.

13   A.  And, also, sir, if I can; I mean, being that close to

14   everybody, barely could hear the radio on full blast already at

15   this time.

16   BY MR. MANZO:

17   Q.  So we're going to go forward from 15 minutes here to 15:23.

18          (A video recording was played.)

19   BY MR. MANZO:

20   Q.  I'm going to direct your attention to the lower right here

21   as this video plays from 15 minutes to 15:23.

22          (A video recording was played.)

23          MR. MANZO:  Can you stop it at 15:23.

24   BY MR. MANZO:

25   Q.  Officer Salke, what is going on here?

5281

1    A.   Right now, a crowd started trying to break the fences apart

2    and started fighting over the fence.  There's some individuals

3    who were just trying to get the fence back so we could re-set

4    up the police line.

5    Q.   Is it possible for you to actually identify yourself in

6    this video, to the best that you can?

7    A.   Yes, sir.  If you -- you can start playing a little, I

8    should be able to circle myself.

9             (A video recording was played.)

10   A.   Yes, sir; I see myself.

11            MR. MANZO:  Can you stop it.

12   BY MR. MANZO:

13   Q.   And try and circle yourself there.  It's very small.

14   A.   I have the black beanie on my head right there.

15            MR. MANZO:  And just for the record, the witness has

16   circled an officer almost directly above the single officer at

17   the bottom of the frame of the lower right-hand corner of

18   Harrelson Exhibit 3.

19   BY MR. MANZO:

20   Q.   What were you thinking at this moment?  Do you remember?

21   A.   Just -- my only thought was to get the bike rack back so we

22   could put our police line back in check, and hoping that the

23   other individuals were stopped that had already got through on

24   the left side.

25   Q.   The person who was pulling on the bike rack, why didn't you

1    arrest that person?

2    A.  It wasn't -- I wasn't able to.  It wasn't practical.  There

3    was too many people.  If we tried to effect an arrest, it

4    wouldn't have worked.

5    Q.  On a normal day, what would you have done?

6    A.  There wouldn't have been a crowd of people able to

7    interrupt with that action.  I would have been able to place

8    them under arrest.

9    Q.  Would your police actions have been different but for the

10   rest of the people around?

11              MS. HALLER:  Objection.

12              THE COURT:  It's overruled.  You can answer.

13   BY MR. MANZO:

14   Q.  Did the people around you affect your ability to be --

15   A.  Yes, sir; a hundred percent.

16   Q.  And, again, why didn't you call for backup?

17   A.  Again, everyone on the Hill available was there at that

18   time due to the screams of the officers and after putting the

19   code over that there's an officer down.  Regardless of what

20   agency you're at, if an officer down call goes down, anybody

21   not -- available and not on a required post will be out there,

22   no matter what.

23   Q.  Have you had officer down calls before?

24   A.  I have; yes, sir.

25   Q.  What have you done in those situations?

5283

1    A.  No matter what you are doing, unless -- at the Capitol,

2    it's a little bit different situation because there are posts

3    that you cannot leave due to security purposes.  Anybody not on

4    one of those posts immediately leaves, and some of those posts

5    are able to actually be broken down to get as much manpower as

6    possible out there to the situation.

7            MR. MANZO:  I want to go forward now from 15:23 to

8    15:45, please.

9            (A video recording was played.)

10           MR. MANZO:  Can you pause it.

11   BY MR. MANZO:

12   Q.  So what happened just between 15:23 and 15:45?

13   A.  The bike racks come apart in multiple places, and we're

14   unable to hold everybody behind the police line.

15   Q.  What did you do as a result?

16   A.  At this point, I let go of the fence, turned around, and

17   ran to the steps of the east Capitol Rotunda steps, which is in

18   that bottom left picture.

19   Q.  As you were running, did you invite the people to come

20   follow you?

21   A.  No, sir; I did not invite anybody to follow me.

22   Q.  At any point did you tell the people who were tearing the

23   bike racks apart, come on in?

24   A.  No, sir; never did that.

25   Q.  Why not?

1    A.  Because I was there to protect the people -- protect the

2    House and make sure nobody got past the police line, which

3    didn't work.

4    Q.  So when you were retreating, what were you thinking that

5    you were going to do next?

6    A.  To establish a line at the bottom steps of the Capitol so

7    nobody would be able to walk up.

8    Q.  Why a line?

9    A.  We had the two stanchions on either side, and we were able

10   to make the line there so we could protect and start a new --

11   hold the rest of the line so people knew clearly don't pass

12   here because you will be arrested.

13   Q.  Looking at the top left-hand video in Harrelson Exhibit 3,

14   do you see the individuals come through the police line from

15   the left?

16   A.  Yes, sir; I do.

17   Q.  And now looking at the bottom right-hand video, why didn't

18   you just try and hold that bike rack for dear life?

19            MS. HALLER:  Objection.

20            THE COURT:  Overruled.

21   A.  Because, again, sir, it broke off in many places, not just

22   the bike rack I was at.  And my number -- I mean, the number

23   one priority of all of us is that these individuals don't get

24   to the Capitol.

25            MR. MANZO:  Okay.  Can we play it forward now from

1    15:45 to 16:50.

2    BY MR. MANZO:

3    Q.  And I'm going to direct your attention to follow the -- the

4    bottom right-hand camera.

5                  (A video recording was played.)

6    BY MR. MANZO:

7    Q.  Now, I'll direct your attention to the bottom left-hand

8    camera.

9                  MR. MANZO:  Can you pause it there, actually.  Can

10    you go back 1 second, if you can, Ms. Rohde, and pause it

11    there.

12    BY MR. MANZO:

13    Q.  Okay.  Sir, looking here at 16:35 in the bottom left-hand

14    camera, do you see any individuals at the very top of the

15    Capitol steps?

16    A.  Yes, sir; I do.

17    Q.  Do you recognize what unit they're from?

18    A.  Yes, sir; I do.

19    Q.  What unit?

20    A.  They're with the emergency response team unit, also known

21    as a common SWAT team for the Capitol.

22    Q.  And what are their duties?

23    A.  Their duties are to respond to critical incidents anywhere

24    on Capitol Grounds.

25    Q.  Do you know what types of weapons that they hold, if any?

5286

1    A.  Yes, sir.  I know they have machine guns and similar

2    weapons.

3    Q.  At the very, kind of, middle of the steps, here, now in the

4    bottom left-hand camera, do you see other officers?

5    A.  Yes, sir; I do.

6    Q.  Who are they?

7    A.  They're other U.S. Capitol Police officers who are right

8    above the line.

9    Q.  Now, I heard you say before that you wanted to form a new

10   line; is that correct?

11   A.  Yes, sir.

12   Q.  Why would you form a new line on the steps?

13   A.  To start a new level of protection.

14   Q.  Did the edge of the steps mean anything to you?

15   A.  Yes, sir.  We were able to go side to side; you know, that

16   way completely closing it off so nobody could walk up to the

17   Capitol.

18   Q.  And can you just draw on the lower left-hand corner here,

19   kind of, the edge of the steps for the jury.

20   A.  Yes, sir.  One edge there and the other edge right here.

21   Q.  Thank you.

22          MR. MANZO:  And, Ms. Rohde, can we play it forward

23   now just to 16:50.

24          (A video recording was played.)

25   ///

1    BY MR. MANZO:

2    Q.  Looking now at 16:50, what are the officers doing in the

3    lower left-hand video?

4    A.  Starting to establish a line and telling people to get

5    back, stay back, and just -- we're just trying to organize

6    ourselves.

7    Q.  Did you see, as you were retreating, the officers at the

8    top of the steps?

9    A.  Yes, sir; I saw the ERT team.

10   Q.  What did you think when you saw them?

11   A.  That they -- God forbid, we got pushed up that far, that

12   there was a plan in place.

13          MR. MANZO:  Now, can we go to Government

14   Exhibit 9008.

15   BY MR. MANZO:

16   Q.  Do you recognize Government Exhibit 9008?

17   A.  Yes.

18   Q.  Who is in Government Exhibit 9008?

19   A.  That's me with the beanie and the white mask on.

20   Q.  And when was this picture taken?

21   A.  This was right at -- where that video footage we just

22   looked at.  It's right when we formed that police line on the

23   steps.

24          MR. MANZO:  Your Honor, at this time, I would seek to

25   move into evidence Government Exhibit 9008.

```
1                    THE COURT:  All right.  9 --
2                    MS. HALLER:  Your Honor, if we may pick up.
3                    (Bench conference on the record.)
4                    MS. HALLER:  Your Honor, we would object on the
5       grounds that this does not relate to the time or the place of
6       these defendants and is, therefore, prejudicial.
7                    THE COURT:  Okay.
8                    MR. MANZO:  They're literally charging through this
9       line.
10                   THE COURT:  I know.  Well, this is -- this is a
11      depiction of the buildup to the entry into the Capitol, and so
12      it's relevant to show that time line through this officer's
13      testimony, and -- and it's appropriate and it's not unduly
14      prejudicial.
15                   (Proceedings held in open court.)
16                   THE COURT:  The objection is overruled.
17                   MR. MANZO:  Your Honor, I seek permission to admit
18      and publish.
19                   THE COURT:  You may.
20                   (Government Exhibit 9008 admitted into evidence.)
21      BY MR. MANZO:
22      Q.  And, Officer -- actually, it's Deputy Salke now; right?
23      A.  Yes, sir.
24      Q.  Where do you work now?
25      A.  I work for the New Hanover County Sheriff's in Wilmington,
```

1    North Carolina.

2    Q.  When did you end up going down there?

3    A.  I started there in November of last year.

4    Q.  So turning back to 9008 here, can you circle yourself on

5    this photo.

6    A.  Yes, sir.

7    Q.  And what's going on here in 9008?

8    A.  As I stated, this was when we established the line, and

9    this is the first group of protesters, rioters that attempted

10   to push through us.

11            MR. MANZO:  Can we now go to 1077.13.

12            (A video recording was played.)

13            MR. MANZO:  I'm going to pause it here.

14   BY MR. MANZO:

15   Q.  Do you recognize where we are in 1077.13?

16   A.  Yes, sir.  We're at the east Capitol Rotunda steps.

17   Q.  Do you recognize where you would be in this video?

18   A.  Yes, sir.  I recognize where I would be.  I can't see

19   myself at this exact moment.

20   Q.  But is this -- does this fairly and accurately portray the

21   moments on -- that we just talked about on the east Capitol

22   steps?

23   A.  Yes, sir, it does.

24            MR. MANZO:  Your Honor, at this point, I seek to move

25   into evidence 1077.13.

1          MS. HALLER:  Subject to the same objection previously

2   stated.

3          THE COURT:  The objection is overruled.

4          1077.13 is admitted.

5          (Government Exhibit 1077.13 admitted into evidence.)

6   BY MR. MANZO:

7   Q.  Can you circle across the screen the line of officers on

8   1077.13.

9   A.  Yes, sir.  The line is right here.  You can see the top of

10  their helmets too.

11  Q.  And can you put an X, approximately, where you would be in

12  this line.

13  A.  Yes, sir.  I'm right behind this flag area.

14          MR. MANZO:  And just for the record, the witness

15  circled horizontally the line of officers kind of at the top of

16  the screen, then put an X behind the blue Trump flag in the

17  middle, notating where he would be on this video if he was

18  available.

19          Can we now play 1077.13 forward to the end here.  It's a

20  1-minute-and-22-second video.  I believe there's sound here.

21          (An audio-visual recording was played.)

22          MR. MANZO:  Pause it there, actually.

23  BY MR. MANZO:

24  Q.  Deputy Salke, looking at this video, pausing at 35, what do

25  the individuals in the video appear to be doing?

1    A.  Everybody, including the people right in front of us, are

2    all starting to do their heave-ho, and basically the whole

3    crowd is just trying to push together to push the line -- first

4    line of people against us.

5    Q.  When you were standing at that line, what were you

6    thinking?

7    A.  Just trying to push back as hard as I could.  Not going to

8    let them get to the top.

9    Q.  Why didn't you want to let people get to the top?

10   A.  Because if I let them get to the top then, I mean, they

11   would have access to one of the main doors to enter the

12   Capitol.

13   Q.  Did you understand what was going on inside the Capitol

14   that day?

15   A.  Yes, sir.  I knew that they were doing a vote inside on the

16   House or Senate Floor.

17              MR. MANZO:  Can we play it forward now from

18   36 seconds to the end of this video --

19   A.  And, also, sir, I knew the Vice President of the United

20   States was in the Capitol.

21   BY MR. MANZO:

22   Q.  Was the Vice President of the United States being in the

23   Capitol that day mean anything to you?

24   A.  Yes, sir, it did.  It's a higher-level security all around

25   for all of the officers and -- along with Secret Service

1      agents.

2      Q.  How did you know that the Vice President was going to be

3      inside the building?

4      A.  Because I was in there in the morning when his motorcade

5      pulled up and he went inside.

6      Q.  Did you see the motorcade pull up?

7      A.  Yes, sir; I did.

8      Q.  Where did it pull up?

9      A.  Right -- in the beginning of all these videos so far, it

10     pulls up right onto the East Front.

11     Q.  So just out in the open?

12     A.  Yes, sir.

13          MR. MANZO:  Can we go forward now from 36 seconds to

14     the end of the video here.

15          (An audio-visual recording was played.)

16     BY MR. MANZO:

17     Q.  What happened at the end of that exhibit there?

18     A.  They were able to push through us and head up the steps.

19     Q.  What were you thinking when the line -- or when the

20     individuals pushed through you on that line?

21     A.  Once they pushed through, my first thought was just to get

22     to the Capitol doors.

23     Q.  Let me ask the question.  Why didn't you -- did you have

24     handcuffs that day?

25     A.  Yes, sir, I did.

1    Q.  Why didn't you pull out your handcuffs and start arresting

2    people?

3    A.  There were too many people.  Also, as soon as I detain

4    somebody, their safety and security is a hundred percent on me,

5    and it's not possible to effect an arrest nor keep somebody

6    safe and secure after cuffing them in the middle of a riot.

7    Q.  And that's when you said the safety and security of the

8    individual you were arresting, that's on you, once you put

9    those cuffs on?

10   A.  Yes, sir; a hundred percent.

11   Q.  Were you armed?

12   A.  Yes, sir, I was.

13   Q.  Did that affect your ability -- or did you -- that affect

14   your thought process on -- on engaging with an individual

15   person?

16   A.  Nothing different yet at this point, sir.  Just as part of

17   being a law enforcement officer.  I was an officer for about

18   four or -- five or six years at this point.

19   Q.  When you got to the top of the steps, did there come a time

20   where you considered unholstering your weapon?

21   A.  Yes, sir.  One time throughout this day, yes, sir.

22   Q.  What caused that?

23   A.  A flash-bang was thrown at my feet.

24   Q.  What is a flash-bang?

25   A.  A flash-bang is a type of, like, concussion grenade.  It

1    makes a loud noise and a flash, and it's disorienting for about

2    15 to 30 seconds.

3    Q.  Is a flash-bang commercially available?

4    A.  No, sir; it's not.

5    Q.  And when you say "it's disorienting," can you tell the jury

6    what it's like to get hit with a flash-bang?

7    A.  You kind of just can't, like, hear or see anything, and

8    just have to regroup yourself.  And also at the same time

9    getting pepper sprayed and hit from people.  So it's just a lot

10   going on at one time.

11            MR. MANZO:  Can we now go to 1096.5.

12            (An audio-visual recording was played.)

13            MR. MANZO:  Pause it here.

14   BY MR. MANZO:

15   Q.  And do you recognize 1096.5, generally?

16   A.  Yes, sir; I do.

17   Q.  And does it fairly and accurately portray the events at the

18   east Capitol steps on January 6th?

19   A.  Yes, sir; it does.

20            MR. MANZO:  And, Your Honor, at this point, we seek

21   to admit 1096.5.

22            THE COURT:  Okay.  1096 --

23            MS. HALLER:  No objection.

24            THE COURT:  1096.5 will be admitted.

25            (Government Exhibit 1096.5 admitted into evidence.)

5295

```
 1                    MR. MANZO:  Can we play it forward here.

 2                    (An audio-visual recording was played.)

 3     BY MR. MANZO:

 4     Q.  Deputy Salke, do you recognize the song that's being sung

 5     here at -- from 0 to 9 seconds?

 6     A.  Yes, sir; I do.

 7     Q.  What song is it?

 8     A.  National Anthem.

 9     Q.  What were you thinking when you're hearing people singing

10     the National Anthem?

11     A.  Completely ironic.

12     Q.  Why?

13     A.  They just stormed the Capitol steps and somehow think

14     that's patriotic.

15                    MR. MANZO:  Can we go forward from 9 seconds.

16                    (An audio-visual recording was played.)

17                    MR. MANZO:  If you can pause it here.

18     BY MR. MANZO:

19     Q.  I'm going to direct your attention to the middle of the

20     screen, and I just circled the middle of the screen there at

21     22 seconds.  What is that?

22     A.  That's one of the U.S. Capitol Police shields.

23     Q.  Who had possession of those shields to start the day?

24     A.  Our hard squad units.  As I mentioned before, there's a

25     soft squad CDU team, civil disturbance unit, and there's a hard
```

5296

1    squad civil disturbance unit team.  The hard squad unit has

2    full gear.  You know, they have a helmet, a whole chest plate,

3    kind of like all arm -- arm protection, leg protection, and

4    just all the gear available.

5    Q.  Who has possession of this shield at this point here at

6    22 seconds?

7    A.  Just one of the rioters.

8            MR. MANZO:  Can we play it forward now.

9            (An audio-visual recording was played.)

10           MR. MANZO:  Can you pause it there.

11   BY MR. MANZO:

12   Q.  Do you hear people screaming anything here at -- from

13   22 seconds to 42 seconds?

14   A.  I do, yes, sir.

15   Q.  What did you hear?

16   A.  I hear people screaming "Let them out."

17   Q.  What did that mean to you?  Do you remember hearing that at

18   all?

19   A.  I do not.  No, sir.

20           MR. MANZO:  Can we go forward now from 42 seconds.

21           (An audio-visual recording was played.)

22           MR. MANZO:  Pause it here.

23   BY MR. MANZO:

24   Q.  At 49 seconds, do you recognize who the individuals are in

25   the center of the frame?

5297

1    A.  Yes, sir.  He was one of the sergeants assigned to the

2    House division team.  He was our sergeant for the soft squad

3    CDU unit that day.

4    Q.  Is he making any motions with his hand or expressing

5    anything on his face?

6    A.  Yes, sir.  He just got sprayed.

7    Q.  And when you say "sprayed," what do you mean?

8    A.  He just got OC spray, bear -- I'm not sure what kind of

9    spray it was.  I know at the end of the day, bear spray cans

10   and multiple different brands of OC spray were found.

11   Q.  Did you hear this individual say to anyone, come on inside

12   the Capitol?

13   A.  No, sir, he did not say that.

14            MR. MANZO:  Can we go forward now at 49 seconds.

15            (An audio-visual recording was played.)

16            MR. MANZO:  Pause it here at 54.

17   BY MR. MANZO:

18   Q.  Were there other individuals behind that sergeant?

19   A.  Yes, sir.  There's still two individuals at the door.

20   Q.  And were there other individuals that followed the sergeant

21   off to the side here?

22   A.  Yes, sir; there is.

23   Q.  Do you know their names?

24   A.  I do not recall their names; no, sir.

25   Q.  Do you know what was causing them to leave the door?

1    A.  Yes, sir.  While we were there at the door -- I can't tell

2    you how many times -- but approximately 8 to 12 times just

3    nonstop stream of spray.

4    Q.  A stream of spray?

5    A.  A stream of OC spray we were getting hit with; yes, sir.

6    Q.  Have you ever been sprayed by a civilian before?

7    A.  Never been a civilian; no, sir.

8    Q.  What does it feel like to get sprayed?

9    A.  Takes your breath away, takes your vision away for a short

10   period of time, and just completely disorienting.

11   Q.  Now, I asked you before about the sergeant who was sprayed.

12   Did you hear either the other two officers invite people into

13   the Capitol?

14   A.  No, sir; they did not.

15               MS. HALLER:  Objection.

16               THE COURT:  It's overruled.

17               MR. MANZO:  Can we play it forward now.

18               (An audio-visual recording was played.)

19   BY MR. MANZO:

20   Q.  Did you just hear somebody yell right before 1:20?

21   A.  Yes, sir; I did.

22   Q.  What did he yell?

23   A.  I heard someone yell "You did your job."

24               MS. HALLER:  Objection.

25               THE COURT:  It's overruled.

1    BY MR. MANZO:

2    Q.   What was your job that day?

3    A.   U.S. Capitol Police officer to affect -- to defend all

4    property and people of the U.S. Capitol.

5    Q.   So at this time were you still intent on trying to hold

6    that door?

7    A.   Yes, sir.

8              MR. MANZO:   All right.   Can we go forward now.

9              (An audio-visual recording was played.)

10             MR. MANZO:   Can you now just go to the final frame,

11   Ms. Rohde.

12   BY MR. MANZO:

13   Q.   Do you recognize anyone in this frame?

14   A.   Yes, sir; I do.

15   Q.   Who do you recognize?

16   A.   Officer Carrion and myself.

17   Q.   Can you circle Officer Carrion.

18   A.   Yes, sir.

19   Q.   And can you circle yourself.

20   A.   Yes, sir.

21   Q.   What were you doing here at 1:31 in this exhibit?

22   A.   Right now, this is right after we were continuously pepper

23   sprayed and flash-banged.   I stuck a flagpole between the two

24   door handles of the Capitol, and there's also individuals

25   inside the Capitol.

1    Q.  Did you come to work with the flagpole that day?

2    A.  Yes, sir; I did.

3    Q.  Okay.  Let me ask you:  Deputy, did you actually come to

4    work with a flagpole that day?

5    A.  Did I come to work with it?  No, sir.

6    Q.  How did you get that flagpole?

7    A.  I found it on the ground after it was hit right above our

8    head and broke.  So as soon as it fell, I picked it up and

9    figured I should -- could stick it between the door handles

10   because, as I stated, people were trying to push from the

11   inside.

12   Q.  What were you thinking when it was just you and

13   Officer Carrion left here at 1:31?

14          MS. HALLER:  Objection.  I'm sorry.  Form.

15          THE COURT:  It's overruled.

16   BY MR. MANZO:

17   Q.  What were you thinking here at 1:31?

18   A.  Same thing.  It's my job.  I wasn't going to move.  I mean,

19   especially now, we were the last two.  I know it was just

20   myself and Officer Carrion left, but I'm not going to walk away

21   until I physically get removed from the situation.

22   Q.  Now, looking through those windows of the east Capitol

23   doors here, can you see anything?

24   A.  Yes, sir.  I can see the back of another Capitol Police

25   officer's jacket.

5301

1    Q.  And when you were standing at the doors, did you peek back

2    through those doors into the inside of the Capitol?

3    A.  Yes, sir.  A couple moments before this when -- right when

4    it was just Officer Carrion and myself left, when I get hit

5    with the spray one time, I turned around to wipe it away.  As I

6    was holding the handle and I saw the rioters inside the

7    Capitol, that was the first time I realized that they were

8    already inside.

9    Q.  What did that mean to you to see those rioters inside the

10   Capitol?

11   A.  Well, one, obviously, I was disappointed they were already

12   inside; and then, two, now I had even a bigger fight in front

13   of me.  Because not only did we have the substantial amount of

14   people right behind us, but also the people inside, and now

15   they're both working to try to get the doors open.

16   Q.  Did you observe anyone breaking any of the windows or the

17   doors, in general, around about this time?

18   A.  No, sir; not at this time.

19   Q.  When did you see people breaking the doors, if ever?

20   A.  Yes, sir.  I did -- there was an individual hitting that --

21   it's actually right out of the frame here, but the left window

22   panel.  I saw an individual hitting that with something.  I

23   honestly don't remember what it was.

24   Q.  Did you arrest that person?

25   A.  No, sir.

1    Q.  Why not?

2    A.  Same reasoning as before.  I was just unable to effectively

3    make an arrest in the middle of a riot without compromising the

4    person that I'm detaining, along with the safety of just me and

5    one other officer left.

6    Q.  At some point when you were -- had the flag in the door and

7    you're holding with Officer Carrion, at some point did one of

8    the handles of the door come off?

9    A.  Yes, sir.  The handle came off as I was holding it.

10   Q.  Do you remember around about what time that was?

11   A.  I did not, sir.  If the time was on here, I could tell you,

12   but my whole time recollection that day, I don't remember.

13   Q.  Did you rip that handle off in anger?

14   A.  No, sir.  It came off due to the force of the people

15   outside pulling and inside pushing and trying to hold them

16   together and...

17          MR. MANZO:  Okay.  Your Honor, this could be a good

18   time to stop, or we could keep going.

19          THE COURT:  This is a good time for our afternoon

20   break.

21          Okay.  Ladies and gentlemen, a little after 3 o'clock.

22   So we will resume at 3:20.  Enjoy your break.  We will see

23   you-all shortly.

24          (Proceedings held outside the presence of the jury.)

25          THE COURT:  Okay.  Officer Salke, you can step down,

5303

1    and I'll just ask you not to discuss your testimony with anyone

2    over the break.  Okay?

3             THE WITNESS:  Yes, Your Honor.  Thank you.

4             THE COURT:  Thank you.

5         Thank you, everyone.  See you shortly.

6             (Recess taken.)

7             THE COURT:  Be seated, everyone.  Thank you.

8         Mr. Manzo, do you want to bring Officer Salke back in.

9    I think we have everyone ready to go.  There he is.  Okay.

10        Officer Salke, you can come back up.

11            THE WITNESS:  Thank you, Your Honor.

12            (Proceedings held in the presence of the jury.)

13            THE COURT:  Okay.  Please have a seat, everyone.

14        Welcome back.

15        Mr. Manzo.

16            MR. MANZO:  Thank you, Your Honor.

17            Ms. Rohde, can we pull up 1085.4 for the witness.

18   BY MR. MANZO:

19   Q.  Deputy, do you recognize what's on your screen and been

20   marked as 1085.4?

21   A.  Yes, sir; I do.

22   Q.  What, generally, are we looking at here?

23   A.  We're looking at the entryway to the east Capitol Rotunda

24   door.

25   Q.  And where would you be in this still frame?

5304

```
1    A.   Yes, sir.   Right -- you want me to mark it?

2    Q.   You can tell it verbally.

3    A.   Just right in the entryway.

4    Q.   Is this a fair and accurate portrayal of you on the east

5    Capitol -- in front of the east Capitol door on January 6th?

6    A.   Yes, sir; it is.

7            MR. MANZO:   Your Honor, I would seek to move into

8    evidence 1085.4.

9            MR. FISCHER:   No objection.

10           THE COURT:   All right.   It will be admitted.

11           (Government Exhibit 1085.4 admitted into evidence.)

12   BY MR. MANZO:

13   Q.   I'm going to play this forward from 0 to 2:47 and then ask

14   you a series of questions afterwards so we're not starting and

15   stopping.

16   A.   Yes, sir.

17           (An audio-visual recording was played.)

18           MR. MANZO:   Pause it there.   If we can pause it at --

19   at 2:38.

20   BY MR. MANZO:

21   Q.   Do you recognize what's going on behind the doors right

22   now?

23   A.   Yes, sir.   This looks like the moment in time the doors

24   opened.

25           MR. MANZO:   Okay.   Now can we go back to 30 seconds,
```

1    and just play it forward for about 5 seconds.

2            (An audio-visual recording was played.)

3            MR. MANZO:  You can pause it.

4    BY MR. MANZO:

5    Q.  I'm going to circle this individual here.  And then do you

6    see where he goes next at 34 seconds?

7    A.  Yes, sir.

8    Q.  Where does he go?

9    A.  It's the same individual from a video we saw earlier.  He

10   exits to the right.

11   Q.  Is that the sergeant you were describing?

12   A.  Yes, sir; it is.

13           MR. MANZO:  And then can we go forward to 1:25.  And

14   then I'm going to circle this object here at the top.

15   BY MR. MANZO:

16   Q.  What is this object here at the top of 1:24?

17   A.  It's one of the USCP shields.

18           MR. MANZO:  And then can we go forward -- or back to

19   about 30 seconds.

20   BY MR. MANZO:

21   Q.  And when you see yourself visible, please just speak up

22   here and we'll pause it.  Okay?

23   A.  Yes, sir.

24           (An audio-visual recording was played.)

25   A.  Yes, sir.

1              MR. MANZO:  And if we just go back, maybe, 1 second

2     to 52 seconds.

3     A.  Yes, sir; I can see myself there.

4     BY MR. MANZO:

5     Q.  Can you circle yourself on the screen, here, at 53 seconds.

6     A.  Yes, sir.

7     Q.  You just circled the officer to the far right of this

8     frame.

9              Can you tell the jury any -- any objects that you got

10    hit with as you were standing in front of those east doors?

11    A.  Yes, sir.  I know we were hit with frozen water bottles,

12    different objects people were finding, and this is also where I

13    found the end of that flagpole.

14    Q.  And that's the flagpole that you stuck into the door?

15    A.  Yes, sir.  And people also had batons, I guess, that they

16    picked up from officers that were thrown; along with once they

17    dumped their can of OC spray at us, they would then throw them

18    at us.

19    Q.  On a normal day, if somebody sprayed you with an OC can and

20    then threw it at you, what would happen?

21    A.  They would be on the ground and arrested.

22             MS. HALLER:  Objection.

23             THE COURT:  It's overruled.

24    BY MR. MANZO:

25    Q.  Why weren't you able to do that here?

1    A.  There was too many people.  I can't effectively arrest

2    hundreds of people by myself.

3    Q.  What were you thinking standing at the doors, here, at

4    53 seconds?

5    A.  The same thing, sir.  It's the job I signed up to do.  Just

6    try to keep those doors closed.

7    Q.  At the end of this video -- or not the end, but where we

8    left off at about 2:37, I believe, you said that the doors

9    opened from the inside; is that right?

10   A.  Yes, sir.  The doors opened from the inside.

11   Q.  Please describe how you saw that happen, to the jury.

12   A.  Yes, sir.  As I stated before, after we -- I got sprayed

13   one time, I told Officer Carrion that I saw other rioters were

14   inside.  And they began pushing on those doors and doing the

15   same heave-ho technique, and that's how it ended up being

16   pushed in from the inside.

17          MR. MANZO:  Can we now go to 7077.1.

18   BY MR. MANZO:

19   Q.  And do you recognize 7077.1 here, what we're looking at?

20   A.  Yes, sir.  This is another view of the doors being opened

21   for the first time.

22   Q.  And do you actually see yourself in this video?

23   A.  Yes, sir; I do.

24          MR. MANZO:  And, Your Honor, at this point, I would

25   seek to admit into evidence 7077.1.

5308

```
 1                  MS. HALLER:  No objection.
 2                  THE COURT:  Okay.  7077.1 will be admitted.
 3                  (Government Exhibit 7077.1 admitted into evidence.)
 4                  MR. MANZO:  And, Ms. Rohde, can we play it forward
 5       now to 28 seconds.
 6                  (An audio-visual recording was played.)
 7       BY MR. MANZO:
 8       Q.  Do you recognize yourself here at 28 seconds?
 9       A.  Yes, sir.
10       Q.  Can you circle yourself on the screen.
11       A.  Yes, sir.
12       Q.  And for the record, you just circled the officer in the
13       middle of the screen with the black winter hat on.
14                  Were there any other officers around you?
15       A.  Yes, sir.  In this screen I also see Officer Adams, who is
16       a hard squad CDU unit.
17       Q.  What were you thinking at this moment when you saw the
18       member of the hard squad?
19       A.  We were -- almost all the Capitol Police officers are
20       trained in hard squad.  And part of that training is that we
21       put all of the gear on to see how to maneuver and whatnot in
22       it.  And after being in that and training in that gear, if I
23       was lying on the ground by myself, it's kind of a little hard
24       to get up, so.
25       Q.  Let's just stop you right there.  So if you laid on the
```

1    ground in the courthouse with all the gear on, you're saying

2    you would have a hard time getting up?

3    A.  Yes, sir.  It's not the easiest thing to get up in.

4    Q.  So what were you thinking when you saw a member of the hard

5    squad here?

6    A.  That if Officer Adams went down to the ground, that there's

7    no doubt in my mind he wouldn't be able to get up and he could

8    be trampled and possibly killed.

9    Q.  What were you trying to do here at 28 seconds?

10   A.  Right now, I'm literally bear-hugging him so he does not

11   fall over.

12   Q.  You said earlier that you were -- the only time you

13   considered unholstering your weapon is when the flash-bang went

14   off; right?

15   A.  Yes.  That's the only time that day that my hand went on my

16   weapon.

17   Q.  Were you concerned about your weapon during this process

18   here?

19   A.  Yes, sir.  In the entirety of the day, every time I'm

20   dealing with individuals, I always, you know, try to keep my

21   elbow down on it.  And in the majority of the time, I'd have to

22   use two hands to defend myself, I would always keep my elbow at

23   least down locking my gun in its place.

24          MR. MANZO:  Okay.  Now, can we play this exhibit

25   forward now, just start to finish, one time, from 00 to 55

5310

```
1     seconds.
2              (An audio-visual recording was played.)
3     BY MR. MANZO:
4     Q.  I just paused at 38 seconds.  What can you hear on the
5     video at this point?
6     A.  They're doing their little heave-ho thing again.
7     Q.  When you say "doing their little heave-ho thing," what do
8     you mean by that?
9     A.  The whole crowd -- both sides are trying to push each
10    other.  And, in turn, they're just fighting against each other,
11    which kind of helped because it was at a standstill right there
12    at the door.
13             MR. MANZO:  You can play it forward now to the end.
14             (An audio-visual recording was played.)
15    BY MR. MANZO:
16    Q.  Okay.  Can we now go to 1085.4, which you've previously
17    talked about here, and go to 2:47, and we're going to play to
18    5:10.  I'm going to ask you some questions at the end of this.
19    Okay?
20    A.  Yes, sir.
21             (An audio-visual recording was played.)
22             MR. MANZO:  Pause it right here.
23    BY MR. MANZO:
24    Q.  And stopping at 5:10, do you see the two people in the
25    middle of the frame here?
```

1    A.  Yes, sir; I do.

2    Q.  Can you describe what they're doing.

3    A.  They're moving in stack formation.

4    Q.  What is a stack formation?

5    A.  Going through the Marine Corps infantry school and along

6    with FLETC, the Federal Law Enforcement Training Center, it's a

7    technique we use before we enter a building, while we're

8    clearing houses, passing past any unknown threshold, or moving

9    through a densely populated area.

10   Q.  And what's the purpose or goal of using a stack formation?

11   A.  The main purpose in moving through in a densely populated

12   area is to keep in contact with the rest of the members of your

13   team and to not allow anybody to cross between you.

14   Q.  Did you hear any alarm bells going off in the previous clip

15   that we showed?

16   A.  No, sir.  It's kind of funny watching the videos, I -- I

17   mean, it's almost the only thing I could hear in the video.

18   But yet that day, all I could hear were just people chanting

19   their stuff.

20   Q.  Did anyone who was going through the doors as you're

21   standing there offer to help you in any way?

22   A.  No, sir; never.

23   Q.  Does that sound like a stupid question?

24   A.  Yes, sir; it does.

25   Q.  Why?

1    A.  Because they were -- just spent over an hour spraying us

2    and trying to hit us to get us out of the way.  So no, nobody

3    was trying to help us.

4    Q.  At any point when you were hugging the hard officer there,

5    did you tell people to come on in?

6    A.  No, sir; never.  And the people were literally, like,

7    ripping the helmet off of him.  And also during this time is

8    when the individual put his hand on my neck to try to push me,

9    and I elbowed him in the face.

10   Q.  And can you just describe that for the jury.

11   A.  Yes, sir.  During that time -- you can't see it at the

12   exact moment, but when I was trying to hold him and thinking

13   about my weapon -- as you stated as well -- and someone, I

14   guess, tried to push me or grab me by the neck.  And since the

15   door was right behind me, I just put my elbow back as hard as I

16   could and hit him in the face, and then his head hit the door,

17   and I don't know what happened to him.

18   Q.  When you were at the doors at the east Capitol there, did

19   you have any magnetometer -- magnetometers --

20   A.  Magnetometers.

21   Q.  -- magnetometers in your hand?

22   A.  No, sir; I did not.

23   Q.  Why not?

24   A.  Because that's not an entryway.  That's never supposed to

25   be used at the Capitol; so that equipment is never there.

1    Q.  And an individual who does go through an approved entryway

2    at the Capitol, what happens to them as they're going through?

3    A.  Same thing as everyone did here today.  You put -- take

4    everything out your pockets -- metal, electronics -- put it on

5    the belt.  That all goes through, gets scanned, and then you

6    walk through the metal detector.

7    Q.  And why do you do that at the U.S. Capitol?

8    A.  It's for security purposes.  There's numerous contraband

9    items that aren't allowed in the Capitol or the House office

10   buildings.

11   Q.  Now, I want to direct your attention to a bit of a

12   different subject here.  Do you remember an interaction with a

13   dog?

14   A.  Yes, sir; I do.

15   Q.  And you smiled when you just said that.  Why did you smile?

16   A.  Yes, sir.  I remember it happening, and I told my family

17   about it.  Just that I thought it was the most ridiculous thing

18   almost out of that day of seeing.  And just after time has been

19   on -- it's almost two years, I didn't even -- wasn't sure if

20   that actually really happened, and when I saw the video the

21   other day, it was just crazy to see.

22   Q.  And when you say "the other day," that's when we met a

23   couple days ago?

24   A.  Yes, sir.

25            MR. MANZO:  Can -- Ms. Rohde, can we pull up

```
 1      1056.7029.0214.  I'm going to pause it here, briefly.

 2      BY MR. MANZO:

 3      Q.  Do you recognize where you are in this video?

 4      A.  Yes, sir; I see myself.

 5      Q.  And where are you -- where does this video depict,

 6      generally?

 7      A.  This is the -- again, the east Capitol Rotunda door

 8      entrance.

 9              MR. MANZO:  And, Your Honor, I seek to move this into

10      evidence.

11              MS. HALLER:  No objection.

12              THE COURT:  Okay.  It's admitted.

13              (Government Exhibit 1056.7029.0214 admitted into

14      evidence.)

15      BY MR. MANZO:

16      Q.  Deputy, could you circle yourself in this video, as best

17      you can.

18      A.  Yes, sir.

19              MR. MANZO:  And just for the record, the witness

20      circled the officer second to the left at the doors, and the

21      individual has a winter hat on and is facing outward.

22              And, Ms. Rohde, can you now play this video forward.

23              (A video recording was played.)

24      BY MR. MANZO:

25      Q.  Now, I want to stop you right there at 6 seconds.  What are
```

1    you doing at 6 seconds?  I'm just going to circle this

2    interaction here.

3    A.  Yes, sir.  At this moment I'm creating space between myself

4    and the individual with the tactical gear on per se.  He has a

5    helmet and vest on, and the reason I did that was because

6    clearly he's dressed different than a lot of the other members

7    of the riot who just have the red hats on and whatnot and not

8    completely decked out in gear.  So when I saw that, obviously,

9    it draws my attention to and it's more of a threat to me.  So I

10   pushed him away to create space, and I just looked him up and

11   down and checked for weapons.

12   Q.  And so why didn't you try and arrest any of these people as

13   they're coming through the door?

14   A.  Same reason as before, sir.  It isn't possible or

15   practical, and there's very limited officers and an immense

16   amount of people.

17   Q.  So now that you weren't able to arrest somebody, what were

18   you trying to accomplish by this interaction?

19   A.  At this point, the most I'm trying to do -- while I'm still

20   trying to stop people from coming in, which is almost

21   impossible right now, I'm just trying to eliminate as many

22   threats as I can.  Because in my head I'm thinking that no

23   weapons are the Capitol right now and I'll do anything I can to

24   stop any more from coming in.

25   Q.  At any point, were you telling these people, come on in?

5316

```
1    A.  Never, sir.  And, also, I stated before they had tactical
2    gear on, but they also had gas masks on, which really made them
3    stand out.
4              MR. MANZO:  Can we play it forward now from
5    6 seconds.
6              (A video recording was played.)
7              MR. MANZO:  Pause it right here at 30 seconds.
8    BY MR. MANZO:
9    Q.  Where are you looking at this moment?
10   A.  Looking at this intelligent man that brought his dog with
11   him to a riot.
12             MR. MANZO:  Can you play it forward, please.
13             (A video recording was played.)
14   BY MR. MANZO:
15   Q.  What are you directing this man at this point, at
16   40 seconds?
17   A.  Right now, I'm telling him he's not the brightest group of
18   the bunch; why did he try bringing his dog.  And he's the only
19   person that day that I tried to move over to the side; not for
20   anything to do with the individual, but purely for the dog's
21   sake, so the dog didn't get killed.
22   Q.  What was your concern about the dog coming in the Capitol?
23   A.  That he would get trampled by the vast amount of people.
24   Q.  Now, at some point were U.S. Capitol Police officers and
25   other law enforcement agencies able to regain control of the
```

1    east doors?

2    A.  Yes, sir; we were.

3            MR. MANZO:  Can you -- can we now pull up 7083.

4    BY MR. MANZO:

5    Q.  And, actually, this is before we're going to get to the

6    regaining control of the east doors.  But do you recognize

7    Government Exhibit 7083 here as being the same camera looking

8    out at the east Capitol doors?

9    A.  Yes, sir; I do.  It's the same place.

10   Q.  And do you recognize yourself in this video?

11   A.  Yes, sir; I do see myself.

12           MR. MANZO:  Your Honor, at this point I would seek to

13   move 7083 into evidence.

14           MS. HALLER:  No objection.

15           THE COURT:  7083 will be admitted.

16           (Government Exhibit 7083 admitted into evidence.)

17   BY MR. MANZO:

18   Q.  Sir, can you circle yourself on 7083.

19   A.  Yes, sir.

20           MR. MANZO:  And just for the record, the witness

21   circled the officer in the winter hat at the right standing at

22   the east doors.

23           Ms. Rohde, can we play 7083 forward.

24           (A video recording was played.)

25           MR. MANZO:  Pause it there at 15 --

```
1              MR. GEYER:  Objection, Your Honor.
2              THE COURT:  There's not even a question pending.  Can
3     we hear the question first?
4              MR. GEYER:  Excuse me?
5              THE COURT:  There's not a question pending.  Can I
6     hear the question first?
7              MR. GEYER:  Sorry, Your Honor.
8     BY MR. MANZO:
9     Q.  What happened here in this interaction on 7083?
10             THE COURT:  All right.  Now, do you have an
11    objection?
12             MR. GEYER:  Objection.  Leading.
13             (Bench conference on the record.)
14             MR. GEYER:  We just went back in the time machine
15    again.  My client exited well prior to the dog/man -- okay --
16    incident with, you know, the dog.
17             THE COURT:  Oh, I see what you're saying.
18          Mr. Manzo, did Mr. Harrelson exit before the dog came
19    in?
20             MR. MANZO:  I believe he did exit.  He's free to
21    cross-examine.  I didn't understand the --
22             THE COURT:  Okay.  I guess you can either do it now
23    or later.  I'm not sure whether this officer has a clear
24    recollection of the time line of events of that day, but, you
25    know, Mr. Manzo, if you can --
```

```
 1              MR. MANZO:  I can re-present it.

 2              THE COURT:  -- orient in a way so that the jury

 3      doesn't think this is after the dog showed up.

 4              MR. MANZO:  I can re-present it.

 5              THE COURT:  And, Mr. Geyer, if he just says it

 6      formally, do you have any problem with that?

 7              MR. GEYER:  Sure.  No, that's fine.

 8          Thank you, Your Honor.

 9              THE COURT:  Thanks.

10              (Proceedings held in open court.)

11      BY MR. MANZO:

12      Q.  Deputy Salke, before I ask you questions about this, I just

13      want to be clear that 7083 is before the dog incident.  Do you

14      understand that?

15      A.  Yes, sir; it is.

16              MR. MANZO:  Okay.  Can we play it forward now from

17      the start of 7083 again.

18              (A video recording was played.)

19              MR. MANZO:  And pause it right here at 14 seconds.

20      BY MR. MANZO:

21      Q.  Do you see the individual who was just leaving in front of

22      you?

23      A.  Yes, sir; I do.

24      Q.  Did that individual touch you?

25      A.  Yes, sir; he did.
```

1    Q.  How many times?

2    A.  Approximately five times.

3    Q.  With how many hands?

4    A.  Both hands.

5    Q.  Where did he touch you?

6    A.  Right on the chest where my vest would be at.

7    Q.  Do you have any independent recollection of this aside from

8    watching the video?

9    A.  I do not.  Just the video.

10   Q.  What were you wearing on your chest that day?

11   A.  All I had on was -- my jacket was open at this point, and I

12   had my bulletproof vest on and a T-shirt under it.

13   Q.  If somebody in a normal day had touched you five times in

14   your torso, what would you have done?

15   A.  Uniform or not in uniform, he would be on the ground, sir,

16   and being detained.

17   Q.  Do you remember that person having any conversation with

18   you as you left?

19   A.  No, sir; I do not.

20   Q.  At any point, did you tell that person anything, to the

21   best of your memory?

22   A.  No, sir.

23   Q.  Okay.  Now, going forward, eventually were officers with

24   the U.S. Capitol Police and other law enforcement agencies able

25   to start flushing individuals out through those east doors?

5321

```
1    A.  Yes, sir; we were.

2    Q.  And I want to pull up Government Exhibit 9009.  What are we

3    looking at here in Government Exhibit 9009?

4    A.  This is me standing there, and the individual kept

5    trying to open the doors and then just whacked my hand

6    with a -- whatever makeshift flagpole they had on there.

7    And this is right before we were able to secure them for the

8    day.

9           MR. MANZO:  And, Your Honor, at this point, I seek to

10   move in Government Exhibit 9009.

11          MS. HALLER:  Objection for the reason stated earlier

12   because of the time frame, but other than that.

13          THE COURT:  All right.  9009 will be admitted.  Just

14   make sure it's oriented in terms of time, Mr. Manzo.

15          (Government Exhibit 9009 admitted into evidence.)

16   BY MR. MANZO:

17   Q.  And, Deputy Salke, was this near the end of the day as you

18   were able to secure those east doors?

19   A.  Yes, sir.

20   Q.  And can you just circle yourself in 9009.

21   A.  Yes, sir.

22          MR. MANZO:  Just for the record, the witness circled

23   the individual -- the officer facing outward in the center of

24   the frame.

25          And can we go to 9010.
```

1    BY MR. MANZO:

2    Q.  What are we looking at here in 9010?

3    A.  Some of the rioters still wouldn't leave, and they were

4    trying to pull open the door.  So myself and another officer

5    were there, and I would slowly let the door open and spray them

6    in the face with the pepper spray and then close it again.

7    Q.  And is this near the end of the day as -- the final push to

8    try to get people out of the building here?

9    A.  Yes, sir; same time.

10              MR. MANZO:  I would seek to move in 9010.

11              MS. HALLER:  No objection.

12              THE COURT:  Okay.  9010 will be admitted.

13              (Government Exhibit 9010 admitted into evidence.)

14    BY MR. MANZO:

15    Q.  And can you circle where you would be in 9010.

16    A.  Yes, sir.  I'm just holding this door.

17              MR. MANZO:  And for the record, the witness pointed

18    to the window on the left at the east doors here.

19          And then can we pull up 9007.

20    BY MR. MANZO:

21    Q.  What are we looking here at in 9007?

22    A.  Same time frame, sir, during -- when the protesters were

23    still right outside the door and right after we got those doors

24    shut.

25              MR. MANZO:  And, Your Honor, at this point I would

1    seek to move in 9007.

2              MS. HALLER:  Subject only to the time.

3              THE COURT:  Okay.  It will be admitted.

4              (Government Exhibit 9007 admitted into evidence.)

5    BY MR. MANZO:

6    Q.  And, Deputy, can you circle yourself in 9007.

7    A.  Yes, sir.

8              MR. MANZO:  And for the record, the witness circled

9    the individual on the left.

10   BY MR. MANZO:

11   Q.  Do you remember what you were thinking about in this frame?

12   A.  Hoping they would leave, sir, so we could get the Capitol

13   completely secured.

14             MR. MANZO:  Ms. Rohde, can we now pull up 7082.

15   BY MR. MANZO:

16   Q.  Do you recognize 7082?

17   A.  Yes, sir; I do.

18   Q.  And either here or in a second, do you recognize yourself

19   in this video?

20   A.  I do see myself now.

21   Q.  Is this the east doors around about 4:56 p.m.?

22   A.  Yes, sir; it is.

23             MR. MANZO:  Your Honor, at this time, I would seek to

24   move into evidence 7082.

25             MS. HALLER:  No objection.

5324

```
 1              THE COURT:  All right.  7082 is admitted.

 2              (Government Exhibit 7082 admitted into evidence.)

 3    BY MR. MANZO:

 4    Q.  So, eventually, did -- once enough individuals were pushed

 5    out of the building, did you and other officers come up with a

 6    plan of how to secure these doors?

 7    A.  Yes, sir.  There's actually, like, two doors there; that

 8    one opens outward and then the other opens inward.

 9    Q.  So let's break that down for a second.  So it's an air

10    lock; is that fair to say?

11    A.  Yes, sir.

12    Q.  So the inner doors that -- that touch the inside of the

13    Capitol, they open out?

14    A.  Correct.

15    Q.  And the outer doors open in?

16              MS. HALLER:  Leading.

17              THE COURT:  It's overruled.

18    A.  Yes, sir.  As I already stated, there's two doors, open two

19    different ways.

20    BY MR. MANZO:

21    Q.  Explain how the doors work.

22    A.  Yes, sir.  The doors that open this way, and then standing

23    on the other side, and they still open the other way.

24    Q.  Okay.  So did you come up with a plan?

25    A.  Yes, sir, we did.  In order to secure, we took furniture
```

1    and anything we could find to stuff between the two doors; that

2    way you couldn't open them from either direction.

3    Q.  Why weren't you just out there trying to stop people from

4    coming inside?  What did the furniture accomplish that officers

5    couldn't individually?

6    A.  Well, first, we were already doing that for a long period

7    of time and being attacked and pepper sprayed, but with

8    this option, nobody had to be outside with the crowd anymore.

9    We were able to effectively -- a hundred percent secure the

10   doors.

11             MR. MANZO:  Can we play it forward now.  It's a

12   52-second video.

13   BY MR. MANZO:

14   Q.  And you can tell the jury what's going on here as it goes

15   forward.

16             (A video recording was played.)

17   A.  Right now, there's a hard squad unit that's -- a few of

18   those members are going outside the door so we can effectively

19   move the people away and get those doors shut.

20             Appears in the video those doors are being shut now.

21             And now we begin getting furniture and any items we

22   could find to put in there to wedge the doors closed.

23             (A video recording was played.)

24             MR. MANZO:  And can you go to the final frame there,

25   Ms. Rohde.

1    BY MR. MANZO:

2    Q.  Can you identify yourself here at 51 seconds?

3    A.  Yes, sir.  I'm over here.

4           MR. MANZO:  Just for the record, the witness has

5    circled the officer just inside the doors farthest to the

6    right.

7    BY MR. MANZO:

8    Q.  All right.  So after you were able to finally secure these

9    doors, what did you do?

10   A.  Yes, sir.  I headed inside the Capitol and -- this is the

11   first time I was in the Capitol besides being a few steps in

12   front from being pushed in.  And as I began to walk through the

13   Capitol, not even 15 feet, I saw one of my friends, another

14   officer, who was on the Capitol division, and he was holding up

15   an IV bag.  And there was an individual on the ground, someone

16   that was part of the riot, a civilian that came in, and they

17   were on the ground getting CPR from the three other officers.

18   And I had a quick conversation with my friend, the officer that

19   was there.

20   Q.  And without explaining what that conversation was, what

21   were you able to observe?

22   A.  I was able to see the individual that appeared, clearly,

23   deceased.  But due to all the rioters and people, no emergency

24   services were able to get into the building.  And we're not

25   medical technicians and we can't declare anybody deceased, so.

5327

1    Q.  So if you can't declare somebody deceased, what do you as

2    an officer have to do?

3    A.  We just continue doing any lifesaving measures that we've

4    been taught, which is CPR for this instance, and they'd been

5    doing CPR for hours on end.

6    Q.  And was this person -- did it appear to be having some kind

7    of cardiac event or --

8    A.  Yes, sir, it was a --

9             THE COURT:  Hang on.  Mr. Manzo, let's move forward,

10   please.

11            MR. MANZO:  No further questions.

12            THE COURT:  All right.  Thank you.

13         Mr. Linder?

14            MR. LINDER:  No questions, Your Honor.

15            MS. HALLER:  Yes, Your Honor.

16            THE COURT:  Ms. Haller.

17                        CROSS-EXAMINATION

18   BY MS. HALLER:

19   Q.  Good afternoon, sir.

20   A.  Good afternoon, ma'am.

21   Q.  I'm Juli Haller.  I represent one of the defendants sitting

22   there named Mr. Kelly Meggs.

23   A.  Okay.

24   Q.  Thank you for your time today.

25            And let me just, at the outset, say thank you for your

1    service.  You acted with honor.  I have seen a lot of video,

2    and we are very grateful for your service.

3    A.  Thank you, ma'am.

4    Q.  Let's go back a little bit.  I think a few times on direct

5    you said there were too many people.  You weren't able to make

6    arrests because there were too many people; correct?  You

7    didn't -- I believe you said it at least three times on direct

8    when you were asked why you didn't arrest someone, and you

9    responded there were too many people, it was not practical, it

10   was not effective considering the situation.

11   A.  Yes, ma'am.  That I was completely responsible for their

12   safety after doing that; yes, ma'am.

13   Q.  And it's also fair to say that there were not enough police

14   in relation to the amount of people at those locations that you

15   were at?

16   A.  I don't know any agency establishment in this country or

17   any that has that amount of people to effectively protect and

18   arrest thousands of people.

19   Q.  Okay.  Let's go back a second.  You worked with the

20   Capitol Police at that time for how long?

21   A.  It was right about four years, ma'am.

22   Q.  Okay.  And you had been there for other large events, such

23   as inaugurations?

24   A.  Yes, ma'am, many large events.

25   Q.  Okay.  And you understand that the Capitol sees hundreds of

5329

1    people enter every day?

2    A.  I work there so, yes, ma'am, I do know that.

3    Q.  Of course.

4         And that there have been prior protests and -- lots of

5    times at the U.S. Capitol during those four years?

6    A.  It sounds like you're referring to this as like those, and

7    it wasn't.

8    Q.  I'm not making a comparison, sir --

9    A.  Okay.

10   Q.  -- I'm just trying to bring awareness to the fact that lots

11   of people --

12   A.  Yes, ma'am.

13   Q.  -- is a daily event at the Capitol.

14   A.  Yes, ma'am; a hundred percent.

15   Q.  I'm not suggesting that there weren't more people --

16   A.  Okay.

17   Q.  -- that day.

18   A.  Yes, ma'am.

19   Q.  I think we all understand there were a lot of people there.

20   So I'm not trying to diminish that fact.

21   A.  Yes, ma'am.

22   Q.  What I would like to talk about, though, is that there

23   were -- there was a presidential rally on the mall that day,

24   and you were aware of that; correct?

25   A.  I knew there was something going on at the White House.

1    That's about my knowledge of that.

2    Q.  Okay.  The U.S. Capitol Police issued protocols for that

3    day.  And -- and I'm going to show you a document, with the

4    Court's indulgence.  Let me just see how I can connect real

5    fast.  Bear with me.

6         So, first, I'm going to show you --

7         MS. HALLER:  Can we show just the witness the

8    document.

9    BY MS. HALLER:

10   Q.  I'm going to show you a U.S. Capitol Police demonstration

11   document and ask you if -- well, you can see it's dated

12   January 6th, '21?

13   A.  Yes, ma'am; I do see that.

14   Q.  And it relates to an area of the Capitol Grounds, and it's

15   a permit for an event or rally on the Capitol Grounds on

16   January 6th; correct?

17   A.  Yes, ma'am.

18   Q.  And coming with this permit would be Capitol Police

19   protocols related to the fact that -- hang on -- that,

20   essentially, it's signed off and -- and approved by people in

21   the Capitol Police force; correct?

22   A.  Yes, ma'am.  This report approved for 50 people.  Yes,

23   ma'am.

24   Q.  Yes.  And this is dated January 6th; correct?

25   A.  Yes, ma'am; it said that first.

```
 1              MS. HALLER:  When -- can we publish -- any objection?
 2              MR. MANZO:  Objection.  Foundation.
 3    BY MS. HALLER:
 4    Q.  Do you recognize the document, sir?  Are you familiar with
 5    these types of documents?
 6    A.  From you showing this to me now, yes, ma'am.
 7    Q.  Are you familiar with the process of permit applications
 8    with the U.S. Capitol Police?
 9    A.  I'm not trained in permit applications at all.
10    Q.  Okay.  Have you seen any ever?
11    A.  I have seen permit applications.
12    Q.  Okay.  So is it a fair and accurate representation of a
13    permit application such as that which you have seen?
14              MR. MANZO:  Objection.  Personal knowledge.  He's not
15    seen it himself.
16              THE COURT:  I know.  Is there any objection to its
17    authenticity?
18              MR. MANZO:  I don't think it's proper for somebody to
19    comment on something he's never seen.
20              MS. HALLER:  Okay.  We won't publish it to the jury.
21    BY MS. HALLER:
22    Q.  But, in essence, I'm going to ask you, were you given any
23    specific protocols based on the permits and rallies that were
24    scheduled for that day on Capitol Grounds?
25    A.  No, ma'am.
```

5332

```
1              THE COURT:  Sorry, Ms. Haller.  Hang on.  What's the
2      exhibit number on that document you just showed?
3              MS. HALLER:  Well, I would make it KM -- I would mark
4      it as KM.43.
5              THE COURT:  I think we're on 55 for you.
6              THE COURTROOM DEPUTY:  56.
7              THE COURT:  56.
8              MS. HALLER:  Oh, I'm sorry.  56.  KM.56.  Thank you.
9              THE COURT:  Go ahead, Ms. Haller.
10             MS. HALLER:  With the Court's indulgence.
11     BY MS. HALLER:
12     Q.  Okay.  There were -- it's fair to say, like, based on the
13     questions you were asked and -- and having been at the --
14     A.  Riot.
15     Q.  -- at the Capitol on January 6th that you were aware that
16     there were other permits issued as well as the one we just
17     looked at?
18     A.  Honestly, I thought you were referring to bulletins.  We,
19     like, get issued bulletins that kind of describe what's going
20     on.  I've never seen what people, like, apply for.
21     Q.  I see.  Okay.  Well, thank you for explaining that.
22     A.  Yes, ma'am.
23     Q.  So the bulletins, did you receive bulletins that day?
24     A.  They -- they put out a bulletin if there's an event going
25     on with basic -- it's similar to what you showed.  It just
```

5333

1    says, you know, the amount of people, basically, that are

2    coming and what the event is for.

3    Q.   Okay.  Would it sound familiar if I told you Ali Alexander

4    had such a permit?

5    A.   I have no idea who that is.

6    Q.   Okay.  Various groups -- over six or seven -- had permits

7    for the Capitol Grounds that day; would that be fair to say?

8    A.   Honestly, I would say no, just because the events that took

9    place, I wouldn't think these people have permits.

10   Q.   I'm not suggesting every individual or any individuals had

11   permits to necessarily be up on the stairs, but I'm talking

12   about the Capitol Grounds right now.

13   A.   I don't know anybody -- I don't know anything about

14   permits.

15   Q.   Okay.  Let's switch gears.

16        MS. HALLER:  As for Exhibit 56, is that admitted?

17   No, not admitted.  Okay.

18   BY MS. HALLER:

19   Q.   It's fair to say that there was a -- the people that were

20   on the stairs and around you that day ran the gamut; would that

21   be fair to say?

22   A.   Can you just rephrase it a different way.

23   Q.   Meaning, there were all types of people; there were

24   peaceful people and there were aggressive people?

25   A.   I didn't see any in my -- in these videos that we watched

5334

1    for the past few hours.

2    Q.  Okay.  Well, going back to the day itself, not the videos

3    that you prepared with the government counsel on.  I'm simply

4    asking you for your specific recollection for the day.  I'm not

5    asking you -- I understand that you prepared with government

6    counsel; is that correct?

7    A.  For an hour, yes, ma'am.

8    Q.  And he played videos for you during that hour; correct?

9    A.  Yes, ma'am.  The ones we watched.

10   Q.  Okay.  And he brought those videos to you to refresh your

11   recollection for the events of that day; correct?

12   A.  Yes, ma'am; correct.

13   Q.  Okay.  I'm just trying to go back in that day and ask you a

14   very simple question.  There were different types of people

15   there that day; would that be fair to say?  Meaning there were

16   people that were peaceful as well as people who were

17   aggressive?

18   A.  I'm not saying that; no, ma'am.

19   Q.  Okay.

20   A.  Everybody that I saw tried to get into the Capitol.  So I

21   wouldn't call that peaceful.

22   Q.  Okay.  I'm going to show you a video, sir.

23   A.  Yes, ma'am.

24   Q.  And you can tell me if -- let me just pause it because it

25   started playing.

1          MR. MANZO:  Objection, Your Honor.

2          THE COURT:  Hang on.

3          MS. HALLER:  Just for the witness.

4          MR. MANZO:  Still --

5          THE COURT:  Hang on.  I understand.  But let her see

6    if she can establish a foundation.  If she can't, then I'll

7    hear your objection.

8          Ms. Haller.

9    BY MS. HALLER:

10   Q.  Okay.  Officer Salke -- I'm sorry.  Is it Deputy Salke?

11   A.  Yes, ma'am; deputy.

12   Q.  Deputy Salke, earlier you were shown video of the Capitol

13   stairs; correct?

14   A.  Yes, ma'am.

15   Q.  And how you moved back the line and you were trying to hold

16   the line; is that correct?

17   A.  Correct.  Yes, ma'am.

18   Q.  And initially you started out by where you said there were

19   two sunroofs or -- what did you call them?

20   A.  The skylights where the bike racks were.  Yes, ma'am.

21   Q.  Skylights.

22        And then you moved back from the skylights and you held

23   the first line of the stairs?

24   A.  Correct.

25   Q.  And eventually you held the higher stairs; correct?

```
1    A.  Yes, ma'am.

2    Q.  And then at a point you're holding the door?

3    A.  Yes, ma'am.

4    Q.  And -- and that's the area where you remained for the rest

5    of the day; correct?

6    A.  Yes, ma'am; it was.

7    Q.  Okay.  So what I'm going to ask you about is that time

8    period related to people on the stairs, and I'm going to see if

9    you can identify the other Capitol Police officer who's in this

10   video.  And I'm going to mark it as KM.56.

11              THE COURTROOM DEPUTY:  57.

12              MS. HALLER:  -7.

13          Any objection?  It --

14              MR. MANZO:  As long as --

15              THE COURT:  It's been marked.

16          Hang on.  It's been marked.  Let's show it to him, and

17   then we'll see whether it's admissible.

18              THE WITNESS:  I don't know the officer.

19   BY MS. HALLER:

20   Q.  Okay.  Do you -- have you ever seen him before?

21   A.  No, ma'am.  There's over a thousand, 1500 officers.

22   Q.  So it's fair to say he is a U.S. Capitol Police officer;

23   correct?

24              THE COURT:  I think he just said he doesn't know who

25   he is.
```

```
 1              MS. HALLER:  Okay.

 2   BY MS. HALLER:

 3   Q.  Is this the east side of the Capitol?

 4   A.  Yes, ma'am; it is.

 5   Q.  Okay.  And do you have any reason to believe it's not a

 6   fair and accurate representation of this location on the east

 7   side of the Capitol?

 8   A.  It's on the east side of the Capitol.  I'm not sure what

 9   you're saying.

10   Q.  I mean, it appears to be a fair and accurate representation

11   of the location; correct?

12   A.  Of the east side of the Capitol, yes, ma'am.

13   Q.  On January 6th; correct?

14   A.  Yes, ma'am, on January 6th.

15              MS. HALLER:  Okay.  I would like to move in KM.57,

16   Your Honor.

17              MR. MANZO:  Objection.  Foundation.  Personal

18   knowledge.

19              THE COURT:  Objection is sustained.

20              MS. HALLER:  The witness has testified to a number of

21   videos and --

22              THE COURT:  Ms. Haller, if you've got an argument to

23   make, come up to the phone.  Please don't make it at the

24   lectern.  If you want to be heard, I'm happy to hear you.

25              MS. HALLER:  Oh, on the video?
```

5338

```
 1                    THE COURT:  Sure.

 2                    MS. HALLER:  Well, it relates --

 3                    THE COURT:  No.  At the phone, Ms. Haller, not at the

 4      lectern.

 5                    (Bench conference on the record.)

 6                    THE COURT:  Let me just be clear here.  The reason

 7      this isn't coming in through this witness is he cannot

 8      establish the foundation for the videos.  Specifically, he

 9      cannot say that what is on the video is a fair and accurate

10      depiction of what happened that day at this instance.  It's not

11      enough for him to just say the background is similar and

12      accurate to what the Capitol looks like.  He has to be in a

13      position to say the events depicted in the video are either

14      what he observed or a fair and accurate depiction of what he

15      observed, and he cannot do that.

16                    MS. HALLER:  Can he -- may I respond, Your Honor?

17                    THE COURT:  Sure.

18                    MS. HALLER:  This officer in the video leads up the

19      same -- group of individuals who are with the defendants and he

20      already testified to -- to -- they showed videos where the

21      defendants were up the stairs.

22                    THE COURT:  Ms. Haller, you're missing my point.  You

23      can show this video through the right witness.

24                    MS. HALLER:  Understood.

25                    THE COURT:  Okay?
```

```
 1                  MS. HALLER:  Yes.
 2                  MR. FISCHER:  Your Honor, may defense counsel have
 3      30 seconds for a brief consult with the group?
 4                  THE COURT:  Sure.
 5                  MR. FISCHER:  Thank you.
 6                  (Proceedings held in open court.)
 7                  THE COURT:  Everybody just sit and stretch for a
 8      moment.  Defense counsel wants to consult amongst themselves
 9      for 30 seconds.
10                  (Off the record.)
11                  THE COURT:  All right.  Ms. Haller.
12                  MS. HALLER:  Yes, Your Honor.
13      BY MS. HALLER:
14      Q.  Okay.  Thank you, sir, for that clarification.
15            And if you bear with me, I'm --
16      A.  Yes, ma'am.
17      Q.  -- going to change gears.
18                  MS. HALLER:  With the Court's indulgence, I'm just
19      looking for the right --
20      BY MS. HALLER:
21      Q.  Okay.  Sir, I'm going to bring you back for a moment to
22      inside the Capitol because we had some discussions on that, and
23      I'm going to show you a video when you spoke about the first
24      breach and when the doors were first opened.
25            So I'm going to show you CCTV that I'm going to mark as
```

1    Exhibit 58, which I believe is the same CCTV video that was

2    shown from Camera 7029, and I'm going to show this just to the

3    witness.

4              THE COURT:  Hang on.  If there's no objection, you

5    can show it to the jury.

6    BY MS. HALLER:

7    Q.  Okay.  Sir, taking a look at this video, we are -- just to

8    orient you, the time on the video is not clear.  Excuse me.

9    It's actually on -- when you open it.  So we'll catch it as it

10   opens.  19 hours and 17 minutes and 47 seconds.  This is

11   Camera 7029 over the interior doors by the Rotunda.  Do you

12   recognize the doors, sir?

13   A.  What do you mean by "19 hours"?  I'm sorry.

14   Q.  Oh, that's how they do the time on the CCTV.

15   A.  Okay.

16   Q.  So this film starts at 19 hours, 17 minutes, but the only

17   orientation you would have to time on this type of camera is

18   how many minutes you're into the video.  So right now we're

19   only 34 seconds into the video --

20   A.  Yes, ma'am.

21   Q.  -- but that's 34 seconds after 19 hours, 17 minutes.  So at

22   this time, how would you describe the doors?

23   A.  Those doors are closed, and I also do not know if those are

24   the doors that I'm at by this.

25   Q.  I'm sorry.  This -- let me represent to you, for your

1    orientation, that this is CCTV from the interior of the Capitol

2    by the Rotunda doors.

3    A.    The --

4    Q.    This is Camera 7029, the same camera you were shown by

5    government counsel.

6    A.    Yes, ma'am.  If it's the east Capitol Rotunda door, I just

7    can't tell from this.

8    Q.    Yes, sir; the east Capitol --

9    A.    Yes, ma'am.

10    Q.    -- Rotunda doors.  Yes.

11          But I would point out the glass windows.  How do they

12    look?

13    A.    Like glass windows.

14    Q.    It's fair to say they're not broken; correct?

15    A.    Yes, ma'am; it is.

16    Q.    And at -- if I fast-forward and we go to -- let me back up

17    for a second.  At 2 -- at --

18          (A video recording was played.)

19    BY MS. HALLER:

20    Q.    Did you see what just happened?

21    A.    Yes, ma'am.

22    Q.    What happened?

23    A.    There's a bunch of people outside.

24    Q.    Okay.  Someone broke the window; correct?

25    A.    There's many panels.  They broke -- it appears they broke

1    one of the panels.

2    Q.  Yes.  Thank you, sir.  That's what I'm asking.

3         As for the individual who broke that panel, have you

4    been able to identify him?

5    A.  I can't see anybody outside, ma'am; no.

6    Q.  Okay.  Are you aware that he's been identified, the person

7    who broke it?

8    A.  I have not followed anything to do with this.

9    Q.  Okay.  Is it fair to say this is at 19 hours, 17 minutes

10   plus 2 minutes and now 35 seconds.  So we're looking at 2:17

11   plus 2 minutes.  So 2:19 p.m., plus?

12   A.  Whatever time it is.  I have no idea how this video works.

13   Q.  All right.  So at --

14         MS. HALLER:  Oh, yeah.  That would be great.  Thank

15   you.

16   BY MS. HALLER:

17   Q.  She's going to pull up the video with the time stamp.  I'm

18   going to take you to 3:05.  Now, what do you notice about this

19   room?  It's empty; correct?

20   A.  It looks empty; yes, ma'am.

21   Q.  And there are no police inside it; correct?

22   A.  In this little view, I do not see any officers.

23   Q.  In this view, yes.  I appreciate that.

24         And you'll see now that there's a second window that's

25   been struck; is that fair to say?

1    A.  Looks like something's up with the left window.

2            (A video recording was played.)

3    BY MS. HALLER:

4    Q.  Yes.  And now we're -- you can look at the bottom of the

5    video 2 minutes and 37 seconds into this camera.

6            MS. HALLER:  Can you override it, or how do you do

7    it?

8    BY MS. HALLER:

9    Q.  She's going to just substitute the video so you can see the

10   clock on the CCTV --

11   A.  I can see it now.

12   Q.  -- so you don't have to do your math, which is good for

13   everybody.

14           MS. HALLER:  Okay.  Thank you.

15       All right.  So now if we go to 3:05 seconds -- or

16   3 minutes forward from this point.

17           THE COURT:  Ms. Haller, can we --

18           MS. HALLER:  Yes, Your Honor.

19           THE COURT:  Maybe the government can bring it up if

20   you can't.

21   BY MS. HALLER:

22   Q.  If we go back to my screen for a moment.  I'll just keep

23   going while Elizabeth tries to see if we can -- okay.  So if we

24   go forward now 6 minutes -- or -- hang on.  Let me back up.

25       All right.  So this is now 2 minutes and 37 seconds into

```
 1    this video.  Okay?

 2    A.  All right.

 3    Q.  Do you see that?

 4    A.  I do; yes, ma'am.

 5    Q.  And see that -- this would be fair to say it's a single

 6    protester and no police in the room; correct?

 7    A.  In this -- this exact depiction of this camera, no, I do

 8    not see any police officer.

 9    Q.  And when he tried to push the door, he couldn't open it,

10    could he?

11    A.  No, ma'am.

12    Q.  Okay.  And why is that?  Do you know?

13    A.  Because I'm on the other side getting crushed and sprayed

14    in the face.

15    Q.  Well, I'm going to show you the next scene then, sir, if

16    you're doing that all by yourself.

17    A.  I didn't say I was doing it all by myself.

18    Q.  Okay.  Hang on.

19         Now, here comes another individual.  Do you recognize

20    this individual?

21    A.  No, ma'am.

22    Q.  Okay.  And he pushes on it; right?

23    A.  Looks like it.

24    Q.  And he doesn't get it open; correct?

25    A.  Doesn't appear so.
```

1    Q.   Now, it appears -- what's he doing?

2    A.   I have no idea what he's doing.

3    Q.   Can you just describe it for me.

4    A.   He's in the camera view pushing on the door.

5    Q.   And look at how he opens it.  Let me replay that for you.

6    It doesn't look like it took a lot of effort, does it?

7    A.   Okay.

8    Q.   Watch.

9    A.   Do you have a question?

10   Q.   Yes.  Does it appear that it took a lot of effort?

11   A.   I have no idea how much effort he put on it.  I'm looking

12   at a video.

13   Q.   Earlier you said you were pushing on it.  So I'm just

14   trying to clarify if you're --

15   A.   I -- I guess I'm not that strong.

16   Q.   Sir, I'm not doubting your strength.  I'm -- I'm simply

17   trying to point out that the door just appears to be open;

18   would that be fair to say?

19   A.   The door opens; yes, ma'am.

20   Q.   On the video, does it appear he's speaking to someone and

21   then it opens?  Would you know --

22   A.   I'm sorry?

23   Q.   -- who he's speaking to?

24   A.   I have no idea what you are referring to right now.

25   Q.   Okay.  Can you identify the man here in the suit?

1    A.  Ma'am, I do not know anybody there except the officers next

2    to me.

3    Q.  I believe the man in the suit is an officer.  So I just

4    didn't know if you may know him.

5    A.  I -- I honestly don't see an officer in a suit right now.

6    Sorry.

7    Q.  Okay.  Well, is it fair to say that the first breach of

8    those doors took place at 2:24 p.m.?

9    A.  The doors opened for a very short amount of time; very

10   minimal people, as seen in this video, are in -- came through

11   or are inside right now.

12   Q.  Okay.  But it's fair to say that it's 2:34 p.m.?

13   A.  I have no idea what time it is.  I'm looking at this video.

14           THE COURT:  Ms. Haller, he doesn't have the clock,

15   so.

16   BY MS. HALLER:

17   Q.  I will move on, sir.

18           As -- as one can see, this is at 19 hours, 17 minutes,

19   and 47 seconds, and that would be UTC time, which is minus five

20   for Washington, D.C., which puts us at 2:17 minutes and 47

21   seconds.  Then you do the two minutes --

22           THE COURT:  Ms. Haller, come on.

23           MS. HALLER:  I'm sorry.

24   BY MS. HALLER:

25   Q.  I thought because you worked at the Capitol --

1          THE COURT:  Hang on.  Ms. Haller, he said he does not

2     know about the timing on the cameras.  If you've got something

3     that shows the time --

4          MS. HALLER:  I --

5          THE COURT:  -- put it up there, but don't ask him a

6     math question.

7          MS. HALLER:  I do, Your Honor.  It --

8          THE COURT:  Well, then put it up.

9          MS. HALLER:  It is on the screen.  It's when it

10     opens, when you hold --

11          THE COURT:  Ms. Haller.

12          MS. HALLER:  Okay.  I will ask if Ms. Whitenmeyer

13     (phonetic) could put it up on the screen with the CCTV.

14          THE COURT:  Please do that.  And if Ms. Whitenmeyer

15     can't do that, then perhaps government counsel can bring it up,

16     because I assume they've got the same video.

17          MS. HALLER:  Yes, sir.

18          (A video recording was played.)

19     BY MS. HALLER:

20     Q.  Now, looking at the screen in front of you, is it fair to

21     say it says 2:22?

22     A.  Yes, ma'am; I do see that.

23     Q.  Okay.  Great.

24          And at this point in time, you already have two broken

25     panes; would that be fair to say?

1    A.   Looks like it; yes, ma'am.

2    Q.   And the doors have not yet been breached; is that correct?

3    A.   No, ma'am, I don't think -- you just went -- I'm not sure

4    where we are.

5    Q.   Yes, I did go back.

6    A.   Okay.  No, ma'am.

7    Q.   And now we're at 2:23 p.m. -- 13, so -- just give it a few

8    seconds.

9              MS. HALLER:  Can we fast-forward.

10   BY MS. HALLER:

11   Q.   Okay.  So this is where it starts playing at 2:24.  He

12   attempts to open the door.  He can't.

13         I'm sorry.  We're repeating.  I just want you to have

14   the time for your own awareness.

15   A.   Yes, ma'am.  You can see the flash-bang that just went off,

16   I believe, or a smoke bomb that just went off.

17              (A video recording was played.)

18   BY MS. HALLER:

19   Q.   So now the individual that ran there to the door is a man

20   in the suit I was trying to ask you about, but maybe you don't

21   recognize him.

22   A.   I haven't seen the man in the suit; no, ma'am.

23              (A video recording was played.)

24   BY MS. HALLER:

25   Q.   And now we're at 2:25 p.m.; is that fair to say?

1    A.  Yes, ma'am.  Clock says that.

2    Q.  And so you -- you're on the other side of this door;

3    correct?

4    A.  Yes, ma'am.  One of many officers.

5    Q.  And would you know who that officer is who just came in?  I

6    know it's hard to see.  I just don't know if --

7    A.  I just know he's a hard squad unit since he has the gear

8    on, but that's all I could say about him.

9    Q.  Okay.  And you testified earlier about the hard squad

10   units.  Are they normally used in protester situations?

11   A.  Yes, ma'am.  There's usually always at least one hard squad

12   unit on standby for any large-scale event.

13   Q.  Okay.  And so at this point, you're assuming hard squad has

14   been called in to help the situation?

15   A.  Yes, ma'am.  There's hard squad units that were at the

16   Capitol that were able to be deployed, but due to the amount of

17   people, you know, other units weren't able to get up, if that

18   makes sense.

19   Q.  Okay.  And the officers weren't already there at the

20   Capitol?

21   A.  I'm sorry, ma'am.  Which officers?

22   Q.  The hard -- the hard squad units.

23   A.  There are hard squad units at the Capitol; yes, ma'am.

24   Q.  Okay.  Now we're looking at 2:26 p.m., but it's fair to say

25   these doors get closed again; right?

1    A.  If we watch the video, I would assume they would --

2    Q.  I mean, in your recollection, or if you haven't seen the

3    video, but the video shows -- I just -- I'm trying to move us

4    along --

5    A.  Yes, ma'am.  No.  I understand.

6    Q.  -- because the video is at 2:26, and more protest- -- and I

7    can tell you from having seen the video that more protesters

8    come in.  But do these doors close, if you know?

9    A.  Yes, ma'am; we do get them closed again.  I'm sorry.  I

10   just didn't know what the video -- this video showed.

11   Q.  So --

12              (A video recording was played.)

13   BY MS. HALLER:

14   Q.  So it closes right now.  And it's 2:27 p.m.; correct?

15   A.  Yes, ma'am.

16   Q.  Can you be seen in this video right here?  Are you inside

17   now?  I mean, the officer right there by the door, is that you?

18   A.  I believe so; yes, ma'am.

19              (A video recording was played.)

20   BY MS. HALLER:

21   Q.  And now you're going back outside; would that be fair to

22   say?

23   A.  Yes, ma'am.  Yes, I'm attempting to ram the people as you

24   can see me run out.

25              (A video recording was played.)

5351

```
1    BY MS. HALLER:

2    Q.  And so now the doors are closed?

3           THE COURT:  Ms. Haller, can we get on the phone,

4    please.

5           (Bench conference on the record.)

6           THE COURT:  Okay.  So you'll forgive me, but I don't

7    know what you're trying to accomplish, but I can tell you this:

8    The more you show these videos, the worse off it is for your

9    clients.  So the more you want to show people running through

10   these doors, go for it, but let me tell you, every second they

11   are listening to this officer and watching these videos, it's

12   not helping your case.  So you can go on for long as you want,

13   but I'd suggest you get to your points quickly and move on so

14   we can get him off the witness stand.  Because, let me tell

15   you, they believe every single word he has to say.

16           MS. HALLER:  Thank you, sir.

17           (Proceedings held in open court.)

18   BY MS. HALLER:

19   Q.  Okay.  So now that you've got the doors closed, we're going

20   to fast-forward because I want to move you along, sir.  And I

21   think if we get to -- I'm just going to pull it up on mine.

22   Oh, I think it -- she's going to do it.  Sorry.  Everybody can

23   see my stuff.

24           MS. HALLER:  With the Court's indulgence, it will

25   just be one moment.
```

5352

```
1    BY MS. HALLER:
2    Q.  We'll go back over the same video that government counsel
3    had introduced related to the time period when the deputy was
4    inside the doors at about 2:57 -- or 2:57 -- starting at 2:52.
5    But really 2:57 is what we're going to focus on.
6              THE COURT:  If there's a specific video that
7    government has shown, can we ask for that particular video to
8    be brought up, Mr. Manzo?
9              MS. HALLER:  You know, JC, just go to my computer.  I
10   can play it.  It's fine.
11   BY MS. HALLER:
12   Q.  Sir, I'm going to show you what's going to be marked as
13   K- -- I think it's already been marked, but just -- for
14   efficiency, we'll make it 58, KM --
15             THE COURT:  We're on 59.
16             MS. HALLER:  59.
17   BY MS. HALLER:
18   Q.  Looking at this video, sir, to orient you, we have tried
19   to circle the officers, and I'm -- and this is -- as you can
20   see from the CCTV, it's at 2:40 p.m., and I'm going to take
21   you to the next time frame that I think you talked about
22   earlier.
23             And this is 2:52 p.m., as you can see.
24             MS. HALLER:  No, it's okay.  I have it up.  It's
25   okay.
```

1   BY MS. HALLER:

2   Q.  So I'm just going to play this for you and see if I can

3   orient you.

4           (A video recording was played.)

5   BY MS. HALLER:

6   Q.  Do you recognize that this is by the exit doors?

7   A.  It's the opposite camera view of this one.

8   Q.  That's right.

9   A.  Yes, ma'am.

10  Q.  Okay.  And I'm going to take you back to this one because

11  it might be easier to orient you with that.  Would that be

12  correct?

13  A.  Yes, ma'am.

14  Q.  And this one now shows 2:55 p.m.; correct?

15          And I'm just going to ask if you can show us where you

16  are in this video, because I believe you're by the door on the

17  right.

18          (A video recording was played.)

19  A.  I thought all the officers were circled in the blue.

20  BY MS. HALLER:

21  Q.  We got a few of them, but, unfortunately, we didn't get a

22  circle around the one I think is you; would that be fair to

23  say?

24          MR. MANZO:  I don't know if it was meant to be

25  admitted.

1            MS. HALLER:  Oh, has -- this is already moved in as

2    an exhibit.  So my assumption was that it was already

3    published.  But you --

4            THE COURT:  You marked it as a new exhibit.  So I did

5    not know if it was already admitted.  So it's admitted.  Please

6    show it to the jury.

7            (Defendant Meggs KM.59 admitted into evidence.)

8            MS. HALLER:  Thank you, Your Honor.

9    BY MS. HALLER:

10   Q.  Now, referring to where you're standing by the door, I'm

11   going to ask you if you can identify -- let me fast-forward

12   this for you, if I can.  See the officer in the dark blue hat?

13   A.  I do see that; yes, ma'am.

14   Q.  Would you know who that is?

15   A.  I do not.  I just know that it's a motor uniform, meaning

16   he rides a motorcycle.

17   Q.  Okay.  And do you recognize -- earlier you had testified

18   that no one helped you; correct?  Or helped you that day;

19   correct?

20           What I want to see is if you recognize how the

21   individual in the helmet is chatting with the woman in the

22   motorcycle helmet.  And I believe you're standing over further

23   by the door, if that's you.  So I'm not sure if you can see

24   this interaction.  And now you watch the man in the helmet, and

25   you can see he's waving people out, and she's standing back

1    here behind him.  Would that be correct?  She moved back?

2    A.  The person --

3    Q.  Do you want me to replay it?

4    A.  I see the person in the helmet; yes, ma'am.

5    Q.  Yeah.  So she moved back, and now the man in the beige

6    helmet is standing there, and he's standing very close to the

7    other officer.  Do you see that?

8    A.  I see an individual with the tactical helmet standing next

9    to an officer.

10   Q.  And he's standing there chatting and he's got his arm --

11   and he was waving people out?

12   A.  I'm not agreeing with that.  I don't see it or I don't know

13   he's chatting with anybody.

14   Q.  All right.  But it's fair to say that it appears that it's

15   peaceful?

16   A.  Nothing in this is peaceful to me, ma'am.  They're inside

17   the U.S. Capitol.

18        MS. HALLER:  Okay.  Well, thank you, sir.  I have no

19   more questions.  But I appreciate your service and -- and for

20   everything you did that day.

21        THE WITNESS:  Yes, ma'am.

22        THE COURT:  All right.  Anyone else from the defense

23   side?

24        MR. GEYER:  No questions, Your Honor.

25        MR. FISCHER:  I just have a couple, Your Honor.

```
1            THE COURT:  Mr. Fischer.

2            MR. FISCHER:  Thank you.

3                      CROSS-EXAMINATION

4    BY MR. FISCHER:

5    Q.  Deputy, just a couple of questions.  So at some point on

6    January 6th, Congress was evacuated; is that correct?

7    A.  Like -- I'm sorry.  Like completely out of the building?

8    Q.  The members of Congress were evacuated from the Congress at

9    one point; correct?

10   A.  I'm -- I honestly don't understand what you're asking.  I'm

11   sorry.

12            THE COURT:  Mr. Fischer, if you can -- if you mean

13   the chambers as opposed to -- I think that's where the

14   confusion is.

15   BY MR. FISCHER:

16   Q.  Where the chambers -- where the members of Congress were

17   meeting, they were evacuated; is that right?

18   A.  I believe one of the chambers was completely empty, but I

19   know the other one, like, they barricaded themselves in.

20   Q.  But as far as the members of Congress, the -- the

21   Congress -- the congressman and -women and the senators, they

22   were evacuated at some point?

23   A.  Maybe -- I honestly don't know.  Maybe at the very end, but

24   I know the majority of the time that they -- the ones that

25   didn't go down to --
```

5357

```
1    Q.  Well, I don't want to get to where they went --

2    A.  Okay.

3    Q.  -- for security reasons, but --

4    A.  So they weren't -- I'm sorry, sir.  I just took evacuated

5    as left the Capitol area, that -- they never left the Capitol,

6    to my knowledge.

7    Q.  Okay.  Well, sir, the -- the --

8           MR. FISCHER:  You know, Your Honor, actually I'll

9    just stand-down.

10          THE COURT:  All right.

11          MR. FISCHER:  Thank you for your service.

12          THE WITNESS:  Thank you.

13          THE COURT:  Thank you, Mr. Fischer.

14          MR. CRISP:  I have some questions.  Thank you.

15                      CROSS-EXAMINATION

16   BY MR. CRISP:

17   Q.  Good afternoon, sir.

18   A.  Good afternoon, sir.

19   Q.  All right.  I want to talk about that shield that you were

20   going over in your direct.  It was being tossed back -- or

21   handed back, I guess.

22        That was not a ballistic shield; right?  That was a

23   polycarbonate?

24   A.  Yes, sir.

25   Q.  Okay.  So it wasn't something you would use to stop a -- a
```

1    round by -- by -- by a round, I mean a shot from a gun.

2    A.  I would say yes and no.  It wouldn't effectively stop it,

3    but if I had that in my hand, I would put it between me and the

4    bullet.

5    Q.  So my question is a little bit different.  That's not the

6    shield you're going to grab to say I'm going to use it as a

7    ballistic shield?

8    A.  No, sir.  Maybe the ERT team, the SWAT team has them, but

9    we don't have ballistic shields.

10    Q.  So my question is the shield that we saw in the video that

11    was being handed back is not a ballistic shield?

12    A.  No, sir.

13    Q.  Okay.  So that's what you would -- you refer to them as

14    just, strictly, riot shields?

15    A.  Yes, sir.  We just call them shields.

16    Q.  You have different kinds of shields in your field of work.

17    You have a ballistic shield, which is designed to stop a round;

18    right?

19    A.  In my field of work, yes, but not here at the U.S. Capitol;

20    I never used one of those.

21    Q.  Thank you.

22         And then you have riot shields that are less secure --

23    A.  Correct.

24    Q.  -- that you would use to try to push individuals back?

25    A.  Yes, sir.

5359

1    Q.  Okay.  Now, the other thing you talked about is when you

2    were standing at the top of the steps -- or when you were

3    outside the door, you talked about how loud it was.  Do you

4    remember that?

5    A.  Yes, sir.

6    Q.  And it was so loud you said you couldn't hear your

7    walkie-talkie on full blast?

8    A.  Yes, sir.

9    Q.  Okay.  And then one final area I want to kind of touch on

10   is pertaining to the stack.  You referenced it as a stack

11   formation; right?

12   A.  Yes, sir.

13   Q.  Do you know what that was in reference to?  Just so we can

14   orient ourselves to that.

15   A.  Yes, sir.  The gentleman that had the tactical gear on in

16   the video, I know he had his hand on, like, the back of the

17   gentleman in front of him.

18   Q.  Okay.  Now, when we're talking about military stacks,

19   they're used for room clearing procedures; right?

20   A.  Yes, sir; that's one of the things.

21   Q.  Okay.  You were talking about in the context of both your

22   Marine Corps service; right?

23   A.  Correct.

24   Q.  And you were an infantry officer?

25   A.  I was not an officer.  No, sir.

1    Q.  Okay.  I'm sorry.  You said you went to the Citadel?

2    A.  Yes, sir.

3    Q.  And did you graduate from the Citadel?

4    A.  I did; yes, sir.  I just didn't take a commission because I

5    enlisted my -- between my freshman and sophomore year.

6    Q.  Okay.  So you were some kind of ed delay?

7    A.  I'm sorry?

8    Q.  Enlisted -- delay.  So you didn't go in as an ROTC

9    candidate or -- or commissioned through the Citadel?

10   A.  No, sir.  I just enlisted; yes, sir.

11   Q.  So you served for about how long?

12   A.  For nine years in the reserves.

13   Q.  Okay.  The entire time as infantry?

14   A.  Yes, sir.

15   Q.  All right.  And did you serve -- it was all reserve time;

16   there was no active duty?

17   A.  No, sir; just training.  But no, I was reserve the whole

18   time.

19   Q.  All right.  Did you do any training out at Pendleton?

20   A.  I did not go to Pendleton; no, sir.

21   Q.  Okay.  When we're talking about a stack, we're talking

22   about a -- just a single-file line that can be two, it can be

23   ten individuals.  Right?

24   A.  Yes, sir.

25   Q.  Okay.  And when you're talking about using a stack in the

5361

1    military context, you're talking about them in CQB clearing

2    procedures typically?

3                THE COURT REPORTER:  Say that again.

4                MR. CRISP:  Charlie, Bravo [sic], Quebec clearing

5    procedures.

6    BY MR. CRISP:

7    Q.  Yes?

8    A.  It's one thing to be used for; yes, sir.

9    Q.  Okay.

10               THE COURT:  Hold on.  Sorry.  Can you ask him what

11   the acronym means so the jurors understand.

12               MR. CRISP:  Absolutely.

13   BY MR. CRISP:

14   Q.  Sir, what does CQB stands for?

15   A.  Close quarter combat scenarios.

16   Q.  Or battle?

17   A.  Or battle.

18   Q.  And you said there's other context in which you were

19   trained in the military for using a stack formation.

20   A.  For entering buildings, entering rooms, passing thresholds;

21   yes, sir.

22   Q.  Okay.

23   A.  Along with the reasons I said for law enforcement.

24   Q.  Okay.  So you're treating it as somewhat different.  So

25   let's talk about when you want to enter into a building in a

1    military context, because that's what you were talking about in

2    -- in the context of this stack here that you identified.

3    A.  I was just speaking to my knowledge of the stack formation

4    with the military and with FLETC, with the Federal Law

5    Enforcement Training Center.  In policing, the stack -- I

6    mentioned moving through a dense population of people, such an

7    active shooter at a school with a bunch of kids running towards

8    me.  I'd be in that stack.  So we stay in contact with officers

9    in front of us, and we're able to push the people aside as we

10    continue towards the threat.

11    Q.  Okay.  So you were referencing it strictly as a -- in a law

12    enforcement training capacity, not in a Marine Corps capacity?

13    A.  I just -- all my knowledge over the years, that's what I

14    think a stack is.

15    Q.  Okay.  And I just want to be clear.  So you're talking

16    about putting your hand in front of somebody in front of you

17    navigating through a crowd with something that you learned and

18    trained on in FLETC?

19    A.  Along with in infantry school, yes, sir.

20    Q.  Okay.  And you did that in a stack formation with

21    weapons -- that's your testimony -- in the military?

22    A.  Outside a door in a stack formation with my weapon; yes,

23    sir.

24    Q.  Going into the entry point, maintaining your hand on the

25    person in front of you; that's what you're saying?

1    A.  No.  You've just added that on to it.  I didn't say that.

2    Q.  Well, that's what I'm trying to understand.

3    A.  Okay.

4    Q.  Because going through an entry control point -- ECP; right?

5    You're telling me you're going to have your hand on the

6    shoulder in front of the person in front of you?

7    A.  I did not say that; no, sir.  You're asking me what a stack

8    formation was.

9    Q.  Uh-huh.

10   A.  I gave you my definition of stack formation.

11   Q.  Okay.  When you are entering a control point --

12   A.  Yes, sir.

13   Q.  -- you're not going to put your hand on the person in front

14   of you as you're entering the control point, are you?

15   A.  Not as they were entering the threshold; no, sir.

16   Q.  Okay.  And in the military context, you're standing outside

17   the ECP, and you're lined up parallel to the ECP, you're

18   typically not holding onto the person in front of you; right?

19   A.  Okay.  Yes, sir.

20   Q.  Am I correct?

21   A.  Yes, sir.

22   Q.  Okay.

23             MR. CRISP:  Thank you, sir.

24             THE COURT:  Mr. Manzo, any redirect?

25             MR. MANZO:  One minute.

```
 1          Ms. Rohde, can we pull up 1056.7209.0258.  And can we
 2     take a --
 3                    REDIRECT EXAMINATION
 4     BY MR. MANZO:
 5     Q.  Sir, do you recognize where you are in this?
 6     A.  Yes, sir; I do.
 7     Q.  And is this the east doors here?
 8     A.  Yes, sir; east Capitol Rotunda doors.
 9               MR. MANZO:  Your Honor, I seek to move in
10     1056.7209.0258.
11               MS. HALLER:  No objection.
12               THE COURT:  Okay.  It will be admitted.
13               (Government Exhibit 1056.7209.0258 admitted into
14     evidence.)
15     BY MR. MANZO:
16     Q.  Okay.  I want to direct your attention to this person right
17     here in the hard hat.  Do you see that person?
18     A.  Yes, sir; I do.
19     Q.  Did that person help you in any way?
20     A.  No, sir.  I have zero knowledge of that person right there.
21     Q.  Did anyone help you in any way?
22     A.  No, sir; nobody helped me.
23     Q.  What would have been helpful for you on January 6th?
24     A.  If nobody showed up.
25     Q.  Let's say people showed up.  If people showed up and there
```

1    was a big riot going on, what would have been helpful for you?

2    A.  Stand there at the door with us, not let anyone through the

3    door.

4    Q.  Did anyone do that?

5    A.  No, sir.

6              MR. MANZO:  Okay.  No further questions.

7              THE COURT:  Okay.  Deputy Salke, thank you very much

8    for your time and your testimony.  Safe travels home, sir.

9              THE WITNESS:  Thank you, Your Honor.

10             (Witness excused.)

11             THE COURT:  Mr. Nestler?

12             MR. NESTLER:  Yes, Your Honor.

13             THE COURT:  I thought you were going to get up and

14   say something.

15             MR. NESTLER:  I was ready to stand up and stretch,

16   Judge.

17             THE COURT:  Let's all stand up and stretch and walk

18   out.  It's ten after five.  We've come to the close of our day.

19   We'll start again at 9:30.  Thank you all for your time and

20   attention.

21        Again, same reminders as before.  No media, no

22   communicating about the case, and no independent research.

23        We look forward to seeing you in the morning.  Thank

24   you, everyone.

25             (Proceedings held outside the presence of the jury.)

1          THE COURT:  All right.  Have a quick seat, everybody.

2          So, Mr. Nestler, who do we have on tap for tomorrow?

3          MR. NESTLER:  We're going to continue that list that

4    we emailed to the Court last night with MPD Officer Christopher

5    Owens, United States Secret Service Special Agent Lanelle Hawa;

6    and Architect of the Capitol employee Jason McIntyre.

7          THE COURT:  Okay.  So you expect that we should get

8    to Officer Dunn probably tomorrow afternoon?

9          MR. NESTLER:  I -- those officers should be -- our

10   witnesses should be fairly short, one would hope.  So, yes, we

11   could get to Officer Dunn or Special Agent Lazarus tomorrow

12   afternoon, depending on which order they get called in.

13         THE COURT:  Okay.  All right.

14         All right.  Anything else we need to discuss before we

15   adjourn for the day?

16         MR. NESTLER:  No, Your Honor.  But just to be clear,

17   we do plan to have those officers available for us tomorrow

18   afternoon so we can progress.

19         THE COURT:  As we talked about, Ms. Haller will take

20   the cross-examination of those officers, and we'll move

21   forward.

22         MS. HALLER:  I'm sorry.  I can't hear you.

23         THE COURT:  I said, as we talked about with -- with

24   respect to Officer Dunn and officer -- excuse me -- Special

25   Agent Lazarus, if they're called tomorrow, I don't know whether

1    Mr. Woodward will be here by tomorrow afternoon or not.  But if

2    he's not, you know, you ought to be prepared to cross-examine

3    him.

4            MS. HALLER:  I understand, Your Honor.  But I would

5    renew our request for a few days -- I would renew our request

6    for a few days because he's in an acute situation and he won't

7    be by next Monday for certain.

8            THE COURT:  I can't -- I cannot adjourn the trial.

9    Look, I am a hundred percent sympathetic to where Mr. Woodward

10   is at.  I feel terrible about all this, but I can't adjourn

11   this trial until he's fully healed and ready to come back when

12   you are also available as counsel for Mr. Meggs.

13           MS. HALLER:  Dare I say, Your Honor, I'm simply

14   pointing out that Mr. Rhodes isn't available anyways.  So these

15   are the witnesses that I --

16           THE COURT:  Mr. Rhodes has agreed to waive --

17   Mr. Rhodes has agreed to waive his presence for these

18   witnesses.

19           MS. HALLER:  Understood, Your Honor.  But these

20   witnesses aren't going to take all week next week, and

21   Mr. Rhodes won't be available next week.

22           THE COURT:  So, Ms. Haller, you've got one of two

23   choices.

24           MS. HALLER:  Yes, sir.

25           THE COURT:  You can either prepare to cross-examine

```
 1    those witnesses --

 2              MS. HALLER:  I will.

 3              THE COURT:  -- or you can decide not to.

 4              MS. HALLER:  Understood, Your Honor.

 5              THE COURT:  Okay?

 6              MS. HALLER:  I'm just making the request, but thank

 7    you, Your Honor.

 8              THE COURT:  All right.  Thank you.

 9          Have a good evening, everyone.

10              (Proceedings were concluded at 4:53 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5369

1          <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3               I, Nancy J. Meyer, Registered Diplomate Reporter,

4      Certified Realtime Reporter, do hereby certify that the above

5      and foregoing constitutes a true and accurate transcript of my

6      stenograph notes and is a full, true, and complete transcript

7      of the proceedings to the best of my ability.

8

9                         Dated this 25th day of October, 2022.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

5370

**'**

**'21** [1] - 5330:12

# 0

**0** [2] - 5295:5, 5304:13
**00** [1] - 5309:25
**03** [2] - 5269:15, 5269:16
**0311** [2] - 5269:17, 5269:19

# 1

**1** [9] - 5239:5, 5239:6, 5253:20, 5253:25, 5258:15, 5258:20, 5266:1, 5285:10, 5306:1
**1-minute-and-22-second** [1] - 5290:20
**1.S.656.13** [4] - 5239:14, 5239:24, 5239:25, 5240:1
**1.S.656.13.................**
**..** [1] - 5220:12
**1.S.696.12403** [3] - 5240:13, 5240:21, 5240:22
**1.S.696.12403...........**
**.....** [1] - 5220:12
**1056.7029.0214** [2] - 5314:1, 5314:13
**1056.7029.0214.**
**......** [1] - 5220:14
**1056.7209.0258** [3] - 5364:1, 5364:10, 5364:13
**1056.7209.0258.........**
**......** [1] - 5220:15
**1077.13** [7] - 5289:11, 5289:15, 5289:25, 5290:4, 5290:5, 5290:8, 5290:19
**1077.13.....................**
**..** [1] - 5220:15
**1085.4** [5] - 5303:17, 5303:20, 5304:8, 5304:11, 5310:16
**1085.4......................**
**..** [1] - 5220:16
**1096** [1] - 5294:22
**1096.5** [5] - 5294:11, 5294:15, 5294:21, 5294:24, 5294:25
**1096.5..................**
**..** [1] - 5220:16
**12** [2] - 5273:15, 5298:2
**13** [3] - 5246:24,

5247:6, 5348:7
**13:53** [1] - 5276:22
**13:57** [2] - 5277:20, 5278:14
**14** [1] - 5319:19
**14:30** [1] - 5279:16
**14:35** [1] - 5279:12
**14:43** [1] - 5279:13
**15** [8] - 5273:14, 5273:15, 5280:11, 5280:17, 5280:21, 5294:2, 5317:25, 5326:13
**1500** [1] - 5336:21
**1502** [1] - 5254:21
**15:23** [5] - 5280:17, 5280:21, 5280:23, 5283:7, 5283:12
**15:45** [3] - 5283:8, 5283:12, 5285:1
**1653** [5] - 5268:23, 5273:20, 5274:6, 5275:3
**16:35** [1] - 5285:13
**16:50** [3] - 5285:1, 5286:23, 5287:2
**16A** [2] - 5266:14, 5266:22
**17** [5] - 5340:10, 5340:16, 5340:21, 5342:9, 5346:18
**19** [6] - 5340:10, 5340:13, 5340:16, 5340:21, 5342:9, 5346:18
**192.V** [1] - 5263:7
**193.V.4** [1] - 5263:22
**1:20** [1] - 5298:20
**1:24** [1] - 5305:16
**1:25** [1] - 5305:13
**1:31** [3] - 5299:21, 5300:13, 5300:17
**1:41** [1] - 5247:6
**1st** [3] - 5254:5, 5261:1, 5261:2

# 2

**2** [6] - 5222:8, 5341:17, 5342:10, 5342:11, 5343:5, 5343:25
**20** [2] - 5238:8, 5254:23
**2018** [3] - 5270:10, 5271:4, 5271:6
**2019** [1] - 5271:6
**2020** [4] - 5240:5, 5240:25, 5254:12, 5257:8

**2021** [8] - 5229:24, 5233:17, 5254:5, 5258:15, 5261:5, 5261:9, 5267:4, 5271:24
**21** [2] - 5248:18, 5249:6
**22** [5] - 5231:19, 5233:4, 5295:21, 5296:6, 5296:13
**22.T.27.2883** [1] - 5233:7
**22.V.2** [1] - 5231:14
**22.V.3** [1] - 5229:21
**23** [1] - 5232:2
**24th** [1] - 5240:5
**25** [2] - 5228:12, 5267:13
**2521.1** [3] - 5252:8, 5252:11, 5252:24
**25th** [1] - 5254:12
**28** [3] - 5308:5, 5308:8, 5309:9
**29.P.3** [1] - 5229:5
**2:01** [1] - 5238:22
**2:06** [3] - 5248:14, 5267:18, 5267:19
**2:07** [5] - 5266:16, 5267:5, 5267:9, 5267:15, 5267:19
**2:17** [2] - 5342:10, 5346:20
**2:19** [1] - 5342:11
**2:22** [1] - 5347:21
**2:23** [1] - 5348:7
**2:24** [2] - 5346:8, 5348:11
**2:25** [1] - 5348:25
**2:26** [2] - 5349:24, 5350:6
**2:27** [1] - 5350:14
**2:34** [1] - 5346:12
**2:37** [1] - 5307:8
**2:38** [5] - 5244:7, 5244:13, 5244:16, 5244:25, 5304:19
**2:39** [1] - 5244:12
**2:40** [1] - 5352:20
**2:41** [2] - 5244:12, 5253:17
**2:43** [3] - 5223:12, 5224:5, 5224:12
**2:46** [1] - 5224:19
**2:47** [3] - 5223:12, 5304:13, 5310:17
**2:52** [2] - 5352:4, 5352:23
**2:55** [1] - 5353:14
**2:57** [5] - 5250:2, 5251:10, 5352:4,

5352:5

# 3

**3** [8] - 5263:7, 5276:21, 5276:23, 5280:3, 5281:18, 5284:13, 5302:21, 5343:16
**30** [6] - 5294:2, 5304:25, 5305:19, 5316:7, 5339:3, 5339:9
**34** [3] - 5305:6, 5340:19, 5340:21
**35** [2] - 5290:24, 5342:10
**36** [2] - 5291:18, 5292:13
**37** [2] - 5343:5, 5343:25
**38** [3] - 5230:8, 5230:10, 5310:4
**3:05** [2] - 5342:18, 5343:15
**3:09** [2] - 5248:18, 5251:13
**3:20** [1] - 5302:22
**3:30** [15] - 5233:24, 5234:13, 5234:19, 5234:20, 5235:4, 5235:6, 5235:12, 5235:17, 5235:20, 5236:6, 5236:7, 5236:10, 5236:11, 5236:12
**3:30-on** [1] - 5234:23

# 4

**4** [1] - 5253:23
**40** [1] - 5316:16
**42** [3] - 5230:25, 5296:13, 5296:20
**43** [2] - 5225:6, 5231:4
**44** [2] - 5244:1, 5253:2
**45** [3] - 5225:6, 5272:17, 5272:20
**47** [3] - 5340:10, 5346:19, 5346:20
**49** [2] - 5296:24, 5297:14
**4:30** [1] - 5254:22
**4:42** [1] - 5255:2
**4:53** [1] - 5368:10
**4:56** [1] - 5323:21
**4th** [2] - 5240:25, 5258:15

# 5

**5** [1] - 5305:1
**50** [2] - 5239:2, 5330:22
**51** [2] - 5244:13, 5326:2
**51.S.5599** [4] - 5249:1, 5249:15, 5249:16, 5249:17
**51.S.5599...................**
**..** [1] - 5220:13
**51.S.5625** [1] - 5250:6
**52** [1] - 5306:2
**52-second** [1] - 5325:12
**5226** [1] - 5220:5
**5240** [2] - 5220:12, 5220:12
**5249** [1] - 5220:13
**5251** [1] - 5220:13
**5257** [1] - 5220:17
**5258** [1] - 5220:17
**5260** [1] - 5220:14
**5268** [1] - 5220:7
**5288** [1] - 5220:9
**5290** [1] - 5220:15
**5294** [1] - 5220:16
**53** [2] - 5306:5, 5307:4
**5304** [1] - 5220:16
**5308** [1] - 5220:18
**5314** [1] - 5220:14
**5317** [1] - 5220:19
**5321** [1] - 5220:20
**5322** [1] - 5220:21
**5323** [1] - 5220:19
**5324** [1] - 5220:18
**5327** [1] - 5220:7
**5354** [1] - 5220:22
**5356** [1] - 5220:8
**5357** [1] - 5220:8
**5364** [2] - 5220:9, 5220:15
**54** [1] - 5297:16
**55** [2] - 5309:25, 5332:5
**55.S.525** [1] - 5251:1
**55.S.5625** [1] - 5251:4
**55.S.5625................**
**..** [1] - 5220:13
**56** [4] - 5332:6, 5332:7, 5332:8, 5333:16
**5625** [2] - 5251:2, 5251:3
**57** [1] - 5336:11
**58** [2] - 5340:1, 5352:14
**59** [2] - 5352:15, 5352:16

5371

**5:10** [2] - 5310:18, 5310:24
**5:59** [1] - 5261:1

## 6

**6** [14] - 5228:4, 5248:18, 5249:6, 5257:8, 5257:10, 5257:11, 5258:19, 5258:23, 5259:1, 5259:3, 5314:25, 5315:1, 5316:5, 5343:24
**6730** [1] - 5228:4
**6731** [6] - 5228:12, 5238:8, 5243:25, 5246:24, 5248:14, 5267:13
**6751** [5] - 5258:5, 5258:6, 5258:10, 5258:12, 5258:13
**6751**.......................
    [1] - 5220:17
**6753** [4] - 5256:21, 5257:1, 5257:4, 5257:5
**6753**.......................
    [1] - 5220:17
**68** [1] - 5248:14
**6860** [2] - 5239:1, 5254:8
**6863** [1] - 5253:22
**6:30** [2] - 5273:8, 5273:10
**6th** [39] - 5228:21, 5228:23, 5229:1, 5229:7, 5229:19, 5229:24, 5232:25, 5233:1, 5233:17, 5238:22, 5241:18, 5241:19, 5243:17, 5243:19, 5243:24, 5245:22, 5246:8, 5246:12, 5246:15, 5246:19, 5261:5, 5261:9, 5267:4, 5267:10, 5271:23, 5272:6, 5273:2, 5273:25, 5275:3, 5294:18, 5304:5, 5330:12, 5330:16, 5330:24, 5332:15, 5337:13, 5337:14, 5356:6, 5364:23

## 7

**7** [1] - 5336:12
**7029** [3] - 5340:2, 5340:11, 5341:4

**7077.1** [5] - 5307:17, 5307:19, 5307:25, 5308:2, 5308:3
**7077.1**.......................
    [1] - 5220:18
**7082** [5] - 5323:14, 5323:16, 5323:24, 5324:1, 5324:2
**7082**.......................
    [1] - 5220:18
**7083** [10] - 5317:3, 5317:7, 5317:13, 5317:15, 5317:16, 5317:18, 5317:23, 5318:9, 5319:13, 5319:17
**7083**.......................
    [1] - 5220:19
**73** [2] - 5260:10, 5260:11
**73.P.4** [4] - 5260:1, 5260:9, 5260:12, 5260:13
**73.P.4**.......................
    [1] - 5220:14
**7:00** [1] - 5273:9
**7:29** [1] - 5261:2
**7:38** [3] - 5233:17, 5234:18, 5236:12

## 8

**8** [1] - 5298:2
**8001** [1] - 5222:8
**8002** [1] - 5225:6
**81** [1] - 5254:8

## 9

**9** [3] - 5288:1, 5295:5, 5295:15
**9007** [5] - 5322:19, 5322:21, 5323:1, 5323:4, 5323:6
**9007**.......................
    [1] - 5220:19
**9008** [7] - 5287:14, 5287:16, 5287:18, 5287:25, 5288:20, 5289:4, 5289:7
**9008**.......................
    [1] - 5220:20
**9009** [6] - 5321:2, 5321:3, 5321:10, 5321:13, 5321:15, 5321:20
**9009**.......................
    [1] - 5220:20
**9010** [6] - 5321:25, 5322:2, 5322:10, 5322:12, 5322:13,

5322:15
**9010**.......................
    [1] - 5220:21
**9:30** [1] - 5365:19
**9:51** [1] - 5228:7

## A

**a.m** [1] - 5228:7
**abetting** [3] - 5223:21, 5225:10, 5227:10
**ability** [3] - 5235:11, 5282:14, 5293:13
**able** [32] - 5242:1, 5245:9, 5261:3, 5265:11, 5265:13, 5271:21, 5281:8, 5282:2, 5282:7, 5282:7, 5283:5, 5284:7, 5284:9, 5286:15, 5292:18, 5306:25, 5309:7, 5315:17, 5316:25, 5320:24, 5321:7, 5321:18, 5325:9, 5326:8, 5326:21, 5326:22, 5326:24, 5328:5, 5342:4, 5349:16, 5349:17, 5362:9
**absolutely** [1] - 5361:12
**academy** [4] - 5270:2, 5270:3, 5270:24
**access** [2] - 5261:3, 5291:11
**accomplish** [1] - 5315:18, 5325:4, 5351:7
**account** [2] - 5257:17, 5259:17
**accountability** [2] - 5264:19, 5265:5
**accuracy** [1] - 5261:16
**accurate** [7] - 5304:4, 5331:12, 5337:6, 5337:10, 5338:9, 5338:12, 5338:14
**accurately** [2] - 5289:20, 5294:17
**acronym** [1] - 5361:11
**acted** [1] - 5328:1
**action** [1] - 5282:7
**actions** [5] - 5235:18, 5236:9, 5236:11, 5321:20
**activate** [1] - 5242:7
**active** [2] - 5360:16, 5362:7
**acts** [1] - 5235:6

**actual** [1] - 5248:20
**Actual** [1] - 5238:20
**acute** [1] - 5367:6
**Adams** [2] - 5308:15, 5309:6
**added** [1] - 5363:1
**additional** [2] - 5270:24, 5272:10
**address** [2] - 5221:12, 5240:10
**adjourn** [3] - 5366:15, 5367:8, 5367:10
**administered** [1] - 5268:14
**admissible** [2] - 5223:18, 5336:17
**admit** [4] - 5236:17, 5288:17, 5294:21, 5307:25
**admitted** [46] - 5239:25, 5240:1, 5240:21, 5240:22, 5249:16, 5249:17, 5251:1, 5251:4, 5252:8, 5257:4, 5257:5, 5258:12, 5258:13, 5260:12, 5260:13, 5268:24, 5276:20, 5288:20, 5290:4, 5290:5, 5294:24, 5294:25, 5304:10, 5304:11, 5308:2, 5308:3, 5314:12, 5314:13, 5317:15, 5317:16, 5321:13, 5321:15, 5322:12, 5322:13, 5323:3, 5323:4, 5324:1, 5324:2, 5333:16, 5333:17, 5353:25, 5354:5, 5354:7, 5364:12, 5364:13
**Admitted** [1] - 5220:11
**affect** [4] - 5282:14, 5293:13, 5299:3
**afternoon** [16] - 5226:17, 5226:18, 5246:12, 5246:15, 5246:19, 5268:21, 5275:6, 5302:19, 5327:19, 5327:20, 5357:17, 5357:18, 5366:8, 5366:12, 5366:18, 5367:1
**afterwards** [2] - 5255:5, 5304:14
**agencies** [2] - 5316:25, 5320:24
**agency** [2] - 5282:20,

5328:16
**Agent** [21] - 5221:8, 5233:4, 5237:14, 5240:25, 5244:23, 5247:13, 5247:21, 5249:1, 5249:20, 5250:6, 5256:24, 5257:7, 5258:6, 5260:1, 5260:3, 5266:19, 5266:24, 5268:4, 5366:5, 5366:11, 5366:25
**agent** [1] - 5277:12
**agents** [1] - 5292:1
**aggressive** [2] - 5333:24, 5334:17
**agitated** [2] - 5275:24, 5279:22
**ago** [1] - 5313:23
**agreed** [2] - 5367:16, 5367:17
**agreeing** [1] - 5355:12
**ahead** [3] - 5238:17, 5242:18, 5332:9
**aiding** [3] - 5223:21, 5225:10, 5227:10
**air** [1] - 5324:9
**alarm** [1] - 5311:14
**Alexander** [1] - 5333:3
**Ali** [1] - 5333:3
**alleged** [5] - 5221:16, 5222:9, 5222:21, 5236:9, 5256:18
**allow** [1] - 5311:13
**allowed** [1] - 5313:9
**almost** [6] - 5281:16, 5308:19, 5311:17, 5313:18, 5313:19, 5315:20
**alternate** [2] - 5246:1, 5246:4
**amount** [10] - 5274:10, 5276:15, 5301:13, 5315:16, 5316:23, 5328:14, 5328:17, 5333:1, 5346:9, 5349:16
**and..** [1] - 5302:16
**anger** [1] - 5302:13
**answer** [4] - 5248:3, 5248:4, 5262:12, 5282:12
**answered** [1] - 5248:11
**Anthem** [2] - 5295:8, 5295:10
**anticipate** [1] - 5235:25
**anticipatory** [1] - 5236:14

5372

**anyways** [1] - 5367:14
**apart** [4] - 5274:20,
5281:1, 5283:13,
5283:23
**apologize** [2] -
5236:14, 5236:16
**app** [3] - 5259:16,
5259:20, 5259:21
**appear** [12] - 5228:17,
5230:15, 5231:7,
5231:10, 5233:18,
5246:17, 5246:21,
5290:25, 5327:6,
5344:25, 5345:10,
5345:20
**appeared** [1] -
5326:22
**appearing** [1] -
5242:21
**application** [4] -
5260:6, 5260:19,
5260:21, 5331:13
**applications** [3] -
5331:7, 5331:9,
5331:11
**apply** [1] - 5332:20
**appreciate** [2] -
5342:23, 5355:19
**appropriate** [1] -
5288:13
**appropriately** [1] -
5235:9
**approved** [3] - 5313:1,
5330:20, 5330:22
**approximate** [2] -
5273:24, 5278:16
**Architect** [1] - 5366:6
**area** [13] - 5246:20,
5271:13, 5271:22,
5277:22, 5278:10,
5278:18, 5290:13,
5311:9, 5311:12,
5330:14, 5336:4,
5357:5, 5359:9
**areas** [1] - 5271:10
**arguably** [1] - 5234:20
**argue** [1] - 5225:12
**argument** [1] -
5337:22
**arm** [5] - 5230:16,
5265:16, 5296:3,
5355:10
**armed** [1] - 5293:11
**armor** [1] - 5272:16
**Army** [2] - 5266:6,
5266:9
**arrest** [11] - 5282:1,
5282:3, 5282:8,
5293:5, 5301:24,
5302:3, 5307:1,

5315:12, 5315:17,
5328:8, 5328:18
**arrested** [3] - 5275:2,
5284:12, 5306:21
**arresting** [2] - 5293:1,
5293:8
**arrests** [1] - 5328:6
**aside** [2] - 5320:7,
5362:9
**assigned** [5] -
5271:10, 5272:7,
5273:12, 5273:15,
5297:1
**assignment** [1] -
5272:6
**assist** [1] - 5258:24
**assistance** [1] -
5276:17
**assume** [4] - 5224:20,
5237:11, 5347:16,
5350:1
**assuming** [1] -
5349:13
**assumption** [1] -
5354:2
**attacked** [1] - 5325:7
**attacking** [1] -
5256:10
**attempted** [1] - 5289:9
**attempting** [5] -
5227:15, 5267:9,
5267:11, 5267:22,
5350:23
**attempts** [1] - 5348:12
**attention** [10] -
5276:25, 5277:4,
5280:20, 5285:3,
5285:7, 5295:19,
5313:11, 5315:9,
5364:16, 5365:20
**attest** [1] - 5261:16
**ATTORNEY** [1] -
5245:3
**attorney** [2] - 5238:4,
5238:5
**audible** [1] - 5262:24
**audio** [28] - 5230:9,
5231:1, 5231:17,
5232:16, 5254:24,
5262:24, 5263:4,
5263:17, 5263:19,
5263:24, 5264:2,
5290:21, 5292:15,
5294:12, 5295:2,
5295:16, 5296:9,
5296:21, 5297:15,
5298:18, 5299:9,
5304:17, 5305:2,
5305:24, 5308:6,
5310:2, 5310:14,

5310:21
**audio-visual** [23] -
5230:9, 5231:1,
5231:17, 5232:16,
5263:17, 5263:24,
5290:21, 5292:15,
5294:12, 5295:2,
5295:16, 5296:9,
5296:21, 5297:15,
5298:18, 5299:9,
5304:17, 5305:2,
5305:24, 5308:6,
5310:2, 5310:14,
5310:21
**authenticity** [1] -
5331:17
**available** [9] -
5282:17, 5282:21,
5290:18, 5294:3,
5296:4, 5366:17,
5367:12, 5367:14,
5367:21
**aware** [21] - 5227:9,
5228:20, 5232:24,
5235:7, 5238:23,
5243:4, 5243:20,
5246:11, 5246:13,
5246:14, 5246:16,
5247:13, 5252:21,
5255:19, 5259:18,
5266:1, 5279:24,
5280:3, 5329:24,
5332:15, 5342:6
**awareness** [2] -
5329:10, 5348:14

# B

**background** [1] -
5338:11
**backing** [1] - 5276:3
**backup** [1] - 5282:16
**bag** [1] - 5326:15
**ballistic** [5] - 5357:22,
5358:7, 5358:9,
5358:11, 5358:17
**Ballston** [1] - 5242:11
**bang** [7] - 5293:23,
5293:24, 5293:25,
5294:3, 5294:6,
5309:13, 5348:15
**banged** [1] - 5299:23
**barely** [1] - 5280:14
**barricaded** [1] -
5356:19
**based** [3] - 5267:6,
5331:23, 5332:12
**basic** [1] - 5332:25
**basis** [2] - 5239:21,
5243:8

**baton** [1] - 5272:14
**batons** [1] - 5306:15
**battle** [2] - 5361:16,
5361:17
**beanie** [2] - 5281:14,
5287:19
**bear** [5] - 5297:8,
5297:9, 5309:10,
5330:5, 5339:15
**bear-hugging** [1] -
5309:10
**became** [2] - 5276:18,
5279:21
**become** [2] - 5275:24,
5279:24
**Beeks** [1] - 5266:5
**began** [3] - 5278:25,
5307:14, 5326:12
**begin** [2] - 5268:22,
5325:21
**beginning** [2] -
5263:23, 5292:9
**begins** [1] - 5224:12
**behalf** [1] - 5256:15
**behind** [13] - 5221:24,
5265:6, 5265:8,
5265:9, 5274:10,
5283:14, 5290:13,
5290:16, 5297:18,
5301:14, 5304:21,
5312:15, 5355:1
**beige** [1] - 5355:5
**bells** [1] - 5311:14
**belt** [3] - 5272:10,
5272:13, 5313:5
**Bench** [5] - 5234:10,
5288:3, 5318:13,
5338:5, 5351:5
**best** [3] - 5281:6,
5314:16, 5320:21
**better** [1] - 5253:10
**between** [15] -
5223:11, 5225:6,
5227:24, 5228:17,
5255:20, 5274:6,
5275:4, 5283:12,
5299:23, 5300:9,
5311:13, 5315:3,
5325:1, 5358:3,
5360:5
**beyond** [6] - 5233:5,
5233:24, 5234:15,
5234:19, 5235:3,
5235:20
**big** [2] - 5275:18,
5365:1
**bigger** [1] - 5301:12
**bike** [3] - 5274:10,
5274:12, 5278:2,
5279:1, 5280:5,

5281:21, 5281:25,
5283:13, 5283:23,
5284:18, 5284:22,
5335:20
**bikes** [1] - 5274:15
**bit** [7] - 5275:15,
5275:23, 5276:9,
5283:2, 5313:11,
5328:4, 5358:5
**black** [2] - 5281:14,
5308:13
**Blank** [1] - 5272:16
**blast** [2] - 5280:14,
5359:7
**blood** [1] - 5254:17
**blow** [1] - 5250:17
**blue** [3] - 5290:16,
5353:19, 5354:12
**board** [2] - 5274:7,
5277:18
**boat** [1] - 5246:6
**body** [5] - 5221:22,
5223:4, 5223:10,
5224:20, 5272:16
**body-worn** [4] -
5221:22, 5223:4,
5223:10, 5224:20
**bomb** [1] - 5348:16
**boots** [1] - 5269:20
**bottom** [15] - 5224:9,
5237:20, 5254:2,
5274:5, 5274:6,
5277:4, 5281:17,
5283:18, 5284:6,
5284:17, 5285:4,
5285:7, 5285:13,
5286:4, 5343:4
**bounds** [2] - 5236:15,
5236:19
**brands** [1] - 5297:10
**Bravo** [1] - 5361:4
**breach** [5] - 5244:14,
5244:24, 5245:9,
5339:24, 5346:7
**breached** [2] -
5244:10, 5348:2
**break** [7] - 5226:9,
5280:6, 5281:1,
5302:20, 5302:22,
5303:2, 5324:9
**breaking** [3] - 5256:3,
5301:16, 5301:19
**breath** [1] - 5298:9
**brief** [1] - 5339:3
**briefly** [3] - 5237:14,
5272:11, 5314:1
**BRIGHT** [10] -
5234:25, 5235:24,
5236:13, 5238:15,

5373

5239:20, 5239:22,
5240:20, 5249:10,
5250:17, 5250:22
**bright** [2] - 5240:19,
5250:14
**Bright** [5] - 5235:2,
5239:22, 5250:12,
5250:16, 5250:17
**brightest** [1] - 5316:17
**bring** [5] - 5303:8,
5329:10, 5339:21,
5343:19, 5347:15
**bringing** [2] - 5256:8,
5316:18
**broke** [7] - 5284:21,
5300:8, 5341:24,
5341:25, 5342:3,
5342:7
**broken** [3] - 5283:5,
5341:14, 5347:24
**brought** [3] - 5316:10,
5334:10, 5352:8
**buddies** [1] - 5272:5
**Building** [17] - 5227:7,
5232:11, 5232:12,
5232:13, 5235:19,
5242:2, 5243:2,
5244:14, 5247:15,
5248:1, 5253:14,
5253:15, 5253:18,
5253:20, 5261:8,
5266:2, 5266:10
**building** [14] -
5244:24, 5245:9,
5261:19, 5261:23,
5261:24, 5262:7,
5262:10, 5292:3,
5311:7, 5322:8,
5324:5, 5326:24,
5356:7, 5361:25
**buildings** [3] - 5247:7,
5313:10, 5361:20
**buildup** [2] - 5225:11,
5288:11
**bullet** [3] - 5272:21,
5273:1, 5358:4
**bulletin** [1] - 5332:24
**bulletins** [4] -
5332:18, 5332:19,
5332:23
**bulletproof** [1] -
5320:12
**bunch** [4] - 5274:14,
5316:18, 5341:23,
5362:7

## C

**Caldwell** [17] -
5226:24, 5227:3,

5227:9, 5227:25,
5228:7, 5228:14,
5228:20, 5229:1,
5229:7, 5229:23,
5231:6, 5232:19,
5232:24, 5233:12,
5237:22, 5267:11,
5267:22
**Caldwell's** [7] -
5226:23, 5227:24,
5228:25, 5231:12,
5232:18, 5235:18,
5238:4
**camera** [14] - 5223:11,
5277:23, 5280:2,
5285:4, 5285:8,
5285:14, 5286:4,
5317:7, 5340:17,
5341:4, 5343:5,
5344:7, 5345:4,
5353:7
**Camera** [3] - 5340:2,
5340:11, 5341:4
**cameras** [2] - 5221:23,
5347:2
**candidate** [1] - 5360:9
**cannot** [6] - 5222:8,
5283:3, 5338:7,
5338:9, 5338:15,
5367:8
**cans** [1] - 5297:9
**capacity** [2] - 5362:12
**capitol** [1] - 5237:24
**Capitol** [131] - 5227:7,
5227:19, 5232:10,
5232:12, 5232:13,
5235:19, 5242:1,
5242:2, 5242:4,
5243:2, 5243:19,
5244:10, 5244:14,
5246:20, 5247:3,
5247:15, 5248:1,
5253:14, 5253:15,
5253:18, 5253:20,
5261:8, 5262:21,
5266:2, 5266:10,
5268:24, 5270:8,
5270:11, 5270:22,
5270:23, 5270:24,
5271:3, 5271:7,
5271:10, 5271:13,
5271:21, 5273:5,
5273:6, 5273:16,
5277:7, 5280:8,
5283:1, 5283:17,
5284:6, 5284:24,
5285:15, 5285:21,
5285:24, 5286:7,
5286:17, 5288:11,
5289:16, 5289:21,

5291:12, 5291:13,
5291:20, 5291:23,
5292:22, 5294:18,
5295:13, 5295:22,
5297:12, 5298:13,
5299:3, 5299:4,
5299:24, 5299:25,
5300:22, 5300:24,
5301:2, 5301:7,
5301:10, 5303:23,
5304:5, 5308:19,
5312:18, 5312:25,
5313:2, 5313:7,
5313:9, 5314:7,
5315:23, 5316:22,
5316:24, 5317:8,
5320:24, 5323:12,
5324:13, 5326:10,
5326:11, 5326:13,
5326:14, 5328:20,
5328:25, 5329:5,
5329:13, 5330:2,
5330:10, 5330:14,
5330:15, 5330:18,
5330:21, 5331:8,
5331:24, 5332:15,
5333:7, 5333:12,
5334:20, 5335:12,
5336:9, 5336:22,
5337:3, 5337:7,
5337:8, 5337:12,
5338:12, 5339:22,
5341:1, 5341:6,
5341:8, 5346:25,
5349:16, 5349:20,
5349:23, 5355:17,
5357:5, 5358:19,
5364:8, 5366:6
**capture** [1] - 5225:2
**cardiac** [1] - 5327:7
**cardinal** [1] - 5241:22
**care** [1] - 5226:10
**Carolina** [6] - 5228:10,
5269:9, 5269:13,
5269:21, 5270:2,
5289:1
**Carrion** [7] - 5299:16,
5299:17, 5300:13,
5300:20, 5301:4,
5302:7, 5307:13
**case** [3] - 5235:8,
5351:12, 5365:22
**cases** [4] - 5222:10,
5242:15, 5242:21,
5242:22
**catch** [1] - 5340:9
**caused** [2] - 5276:1,
5293:22
**causing** [1] - 5297:25
**CCTV** [7] - 5339:25,

5340:1, 5340:14,
5341:1, 5343:10,
5347:13, 5352:20
**CDU** [6] - 5272:7,
5273:15, 5273:17,
5295:25, 5297:3,
5308:16
**Cellebrite** [2] -
5233:19, 5267:1
**center** [7] - 5230:13,
5272:17, 5272:20,
5272:21, 5278:13,
5296:25, 5321:23
**Center** [4] - 5270:17,
5277:8, 5311:6,
5362:5
**certain** [3] - 5251:22,
5264:8, 5367:7
**certainly** [2] -
5223:20, 5225:11
**certify** [1] - 5244:17
**chambers** [3] -
5356:13, 5356:16,
5356:18
**chance** [1] - 5234:16
**change** [2] - 5264:10,
5339:17
**chanting** [1] - 5311:18
**chants** [1] - 5279:2
**characterize** [2] -
5235:14, 5263:12
**charge** [2] - 5227:3,
5247:22
**charged** [8] - 5223:20,
5223:25, 5225:10,
5227:9, 5227:12,
5227:15, 5247:14,
5247:25
**charges** [3] - 5226:24,
5227:18, 5227:20
**charging** [1] - 5288:8
**Charleston** [5] -
5269:12, 5269:13,
5269:25, 5270:3,
5270:5
**Charlie** [1] - 5361:4
**chat** [3] - 5241:4,
5248:18, 5254:11
**chats** [1] - 5238:20
**chatting** [3] - 5354:21,
5355:10, 5355:13
**check** [1] - 5281:22
**checked** [1] - 5315:11
**chest** [4] - 5272:21,
5296:2, 5320:6,
5320:10
**chief** [1] - 5235:8
**choices** [1] - 5367:23
**Christmas** [1] - 5256:4
**Christopher** [2] -

5221:10, 5366:4
**circle** [19] - 5277:9,
5281:8, 5281:13,
5289:4, 5290:7,
5299:17, 5299:19,
5305:5, 5305:14,
5306:5, 5308:10,
5314:16, 5315:1,
5317:18, 5321:20,
5322:15, 5323:6,
5352:19, 5353:22
**circled** [12] - 5277:13,
5281:16, 5290:15,
5295:20, 5306:7,
5308:12, 5314:20,
5317:21, 5321:22,
5323:8, 5326:5,
5353:19
**circling** [1] - 5278:19
**circumstances** [1] -
5229:17
**Citadel** [5] - 5269:8,
5269:10, 5269:11,
5360:1, 5360:3,
5360:9
**City** [1] - 5269:12
**civil** [9] - 5221:25,
5223:21, 5224:2,
5225:10, 5225:17,
5272:8, 5273:18,
5295:25, 5296:1
**civilian** [2] - 5298:6,
5298:7, 5326:16
**clarification** [1] -
5339:14
**clarify** [1] - 5345:14
**clean** [1] - 5251:14
**clear** [8] - 5225:1,
5243:10, 5318:23,
5319:13, 5338:6,
5340:8, 5362:15,
5366:16
**clearing** [4] - 5311:8,
5359:19, 5361:1,
5361:4
**clearly** [6] - 5223:18,
5263:19, 5264:2,
5284:11, 5315:6,
5326:22
**client** [1] - 5318:15
**clients** [1] - 5351:9
**clip** [2] - 5253:5,
5311:14
**clipped** [1] - 5221:21
**clips** [1] - 5221:22
**clock** [3] - 5343:10,
5346:14, 5349:1
**close** [11] - 5230:22,
5230:23, 5231:9,
5231:11, 5265:12,

5374

5280:13, 5322:6,
5350:8, 5355:6,
5361:15, 5365:18
**closed** [9] - 5245:22,
5246:2, 5307:6,
5325:22, 5340:23,
5349:25, 5350:9,
5351:2, 5351:19
**closer** [2] - 5232:10,
5232:13
**closes** [1] - 5350:14
**closing** [1] - 5286:16
**clothes** [1] - 5253:1
**co** [2] - 5221:16,
5222:10
**co-conspirator** [1] -
5222:10
**co-conspirators** [1] -
5221:16
**code** [1] - 5282:19
**collectors** [1] -
5247:12
**college** [1] - 5269:7
**combat** [1] - 5361:15
**Comfort** [1] - 5242:11
**coming** [14] - 5234:25,
5256:6, 5271:13,
5271:22, 5276:15,
5280:4, 5315:13,
5315:20, 5315:24,
5316:22, 5325:4,
5330:18, 5333:2,
5338:7
**Commander** [1] -
5267:4
**comment** [1] -
5331:19
**comments** [1] -
5275:13
**commercially** [1] -
5294:3
**commission** [1] -
5360:4
**commissioned** [1] -
5360:9
**committed** [1] -
5227:19
**common** [1] - 5285:21
**commotion** [3] -
5222:14, 5222:16
**communicate** [4] -
5258:3, 5264:11,
5265:11, 5265:13
**communicated** [1] -
5259:18
**communicating** [1] -
5365:22
**communication** [1] -
5236:8
**communications** [3] -

5228:17, 5228:20,
5257:18
**comparison** [1] -
5329:8
**completely** [9] -
5276:18, 5286:16,
5295:11, 5298:10,
5315:8, 5323:13,
5328:11, 5356:7,
5356:18
**completing** [1] -
5244:17
**compound** [1] -
5243:6
**compromising** [1] -
5302:3
**computer** [1] - 5352:9
**concern** [1] - 5316:22
**concerned** [1] -
5309:17
**concerns** [1] - 5237:1
**concluded** [1] -
5368:10
**concussion** [1] -
5293:25
**conduct** [8] - 5234:20,
5235:16, 5235:17,
5235:20, 5235:21,
5236:8, 5236:11,
5241:5
**conference** [5] -
5234:10, 5288:3,
5318:13, 5338:5,
5351:5
**confusion** [1] -
5356:14
**Congress** [15] -
5227:6, 5244:17,
5245:12, 5245:16,
5250:3, 5251:11,
5252:20, 5253:16,
5253:21, 5356:6,
5356:8, 5356:16,
5356:20, 5356:21
**congressman** [1] -
5356:21
**connect** [2] - 5274:15,
5330:4
**Connecticut** [1] -
5269:6
**consider** [2] -
5235:24, 5236:2
**considered** [2] -
5293:20, 5309:13
**considering** [1] -
5328:10
**consisted** [1] -
5272:11
**conspiracies** [1] -
5255:14

**conspiracy** [8] -
5227:25, 5228:21,
5244:11, 5246:1,
5247:22, 5253:19,
5255:15, 5256:3
**conspirator** [1] -
5222:10
**conspirators** [1] -
5221:16
**conspiring** [2] -
5227:6, 5227:12
**consult** [2] - 5339:3,
5339:8
**contact** [6] - 5227:24,
5259:1, 5267:21,
5267:22, 5311:12,
5362:8
**contends** [1] - 5224:2
**content** [1] - 5235:16
**context** [7] - 5265:7,
5359:21, 5361:1,
5361:18, 5362:1,
5362:2, 5363:16
**continue** [7] -
5230:24, 5232:14,
5257:22, 5258:25,
5327:3, 5362:10,
5366:3
**continuously** [1] -
5299:22
**contraband** [2] -
5271:22, 5313:8
**contributing** [1] -
5224:2
**control** [6] - 5271:13,
5316:25, 5317:6,
5363:4, 5363:11,
5363:14
**conversation** [4] -
5268:22, 5320:17,
5326:18, 5326:20
**copy** [1] - 5233:18
**corner** [10] - 5224:14,
5224:15, 5261:12,
5277:5, 5277:13,
5278:13, 5278:20,
5279:18, 5281:17,
5286:18
**Corps** [4] - 5269:11,
5311:5, 5359:22,
5362:12
**correct** [51] - 5223:23,
5224:22, 5229:24,
5233:18, 5237:10,
5241:15, 5245:11,
5245:14, 5255:25,
5263:1, 5263:10,
5265:24, 5286:10,
5324:14, 5328:6,
5329:24, 5330:16,

5330:21, 5330:24,
5334:6, 5334:8,
5334:11, 5334:12,
5335:13, 5335:16,
5335:17, 5335:24,
5335:25, 5336:5,
5336:23, 5337:11,
5337:13, 5341:14,
5341:24, 5342:19,
5342:21, 5344:6,
5344:24, 5348:2,
5349:3, 5350:14,
5353:12, 5353:14,
5354:18, 5354:19,
5355:1, 5356:6,
5356:9, 5358:23,
5359:23, 5363:20
**counsel** [11] - 5221:6,
5222:6, 5226:23,
5334:3, 5334:6,
5339:2, 5339:8,
5341:5, 5347:15,
5352:2, 5367:12
**counter** [1] - 5254:22
**country** [1] - 5328:16
**County** [1] - 5288:25
**couple** [5] - 5245:21,
5301:3, 5313:23,
5355:25, 5356:5
**course** [1] - 5329:3
**court** [5] - 5237:5,
5288:15, 5319:10,
5339:6, 5351:17
**COURT** [166] - 5221:6,
5222:4, 5223:2,
5223:7, 5223:15,
5223:17, 5223:24,
5224:9, 5224:17,
5224:20, 5224:23,
5225:5, 5225:9,
5225:21, 5225:24,
5226:3, 5226:5,
5226:7, 5227:22,
5233:6, 5233:25,
5234:3, 5234:6,
5234:17, 5235:14,
5236:4, 5236:17,
5236:23, 5237:4,
5237:6, 5238:17,
5239:21, 5239:24,
5240:19, 5240:21,
5242:18, 5243:8,
5243:23, 5244:20,
5245:4, 5245:18,
5247:18, 5248:3,
5249:13, 5249:16,
5250:12, 5250:14,
5250:16, 5250:21,
5250:23, 5251:1,
5251:3, 5252:10,

5255:17, 5255:22,
5257:4, 5258:12,
5260:10, 5260:12,
5262:12, 5264:24,
5266:12, 5268:4,
5268:8, 5268:17,
5269:16, 5274:3,
5282:12, 5284:20,
5288:1, 5288:7,
5288:10, 5288:16,
5288:19, 5290:3,
5294:22, 5294:24,
5298:16, 5298:25,
5300:15, 5302:19,
5302:25, 5303:4,
5303:7, 5303:13,
5304:10, 5306:23,
5308:2, 5314:12,
5317:15, 5318:2,
5318:5, 5318:10,
5318:17, 5318:22,
5319:2, 5319:5,
5319:9, 5321:13,
5322:12, 5323:3,
5324:1, 5324:17,
5327:9, 5327:12,
5327:16, 5331:16,
5332:1, 5332:5,
5332:7, 5332:9,
5335:2, 5335:5,
5336:15, 5336:24,
5337:19, 5337:22,
5338:3, 5338:3,
5338:6, 5338:17,
5338:22, 5338:25,
5339:4, 5339:7,
5339:11, 5340:4,
5343:17, 5343:19,
5346:14, 5346:22,
5347:1, 5347:5,
5347:8, 5347:11,
5347:14, 5351:3,
5351:6, 5352:6,
5352:15, 5354:4,
5355:22, 5356:1,
5356:12, 5357:10,
5357:13, 5361:3,
5361:10, 5363:24,
5364:12, 5365:7,
5365:11, 5365:13,
5365:17, 5366:1,
5366:7, 5366:13,
5366:19, 5366:23,
5367:8, 5367:16,
5367:22, 5367:25,
5368:3, 5368:5,
5368:8
**Court** [4] - 5235:4,
5235:24, 5236:2,
5366:4
**Court's** [5] - 5249:10,

5375

**5330**:4, **5332**:10, **5339**:18, **5351**:24
**courthouse** [2] - 5271:17, 5309:1
**COURTROOM** [4] - 5268:12, 5268:16, 5332:6, 5336:11
**cover** [1] - 5256:2
**covered** [1] - 5233:24
**CPR** [3] - 5326:17, 5327:4, 5327:5
**CQB** [2] - 5361:1, 5361:14
**crazy** [2] - 5222:24, 5313:21
**create** [1] - 5315:10
**creating** [1] - 5315:3
**crime** [1] - 5247:14
**crisp** [4] - 5237:10, 5265:18, 5266:19, 5267:7
**Crisp** [1] - 5262:23
**CRISP** [12] - 5226:2, 5226:4, 5236:21, 5236:25, 5264:20, 5357:14, 5357:16, 5361:4, 5361:6, 5361:12, 5361:13, 5363:23
**Crisp**.................. [1] - 5220:8
**critical** [1] - 5285:23
**cross** [14] - 5225:24, 5226:19, 5234:12, 5234:24, 5235:3, 5236:18, 5236:20, 5267:7, 5275:1, 5311:13, 5318:21, 5366:20, 5367:2, 5367:25
**CROSS** [3] - 5327:17, 5356:3, 5357:15
**Cross** [1] - 5220:7, 5220:8, 5220:8
**cross-examination** [3] - 5236:20, 5267:7, 5366:20
**Cross-Examination** [3] - 5220:7, 5220:8, 5220:8
**CROSS-EXAMINATION** [3] - 5327:17, 5356:3, 5357:15
**cross-examinations** [1] - 5226:19
**cross-examine** [6] - 5225:24, 5234:24, 5236:18, 5318:21, 5367:2, 5367:25

**crowd** [16] - 5224:10, 5224:21, 5224:25, 5225:16, 5230:2, 5275:7, 5275:8, 5275:24, 5278:22, 5281:1, 5282:6, 5291:3, 5310:9, 5325:8, 5362:17
**crushed** [1] - 5344:13
**cuffing** [1] - 5293:6
**cuffs** [1] - 5293:9
**cycle** [1] - 5241:2

**D**

**D.C** [3] - 5245:23, 5256:6, 5346:20
**daily** [1] - 5329:13
**damn** [1] - 5237:24
**dare** [1] - 5367:13
**dark** [1] - 5354:12
**data** [1] - 5259:17
**date** [2] - 5240:25, 5257:7
**dated** [2] - 5330:11, 5330:24
**dates** [1] - 5260:24
**days** [5] - 5226:21, 5271:9, 5313:23, 5367:5, 5367:6
**DC** [3] - 5248:18, 5249:6, 5258:19
**deal** [1] - 5236:6
**dealing** [2] - 5271:2, 5309:20
**dear** [1] - 5284:18
**deceased** [3] - 5326:23, 5326:25, 5327:1
**December** [2] - 5254:12, 5257:8
**decide** [2] - 5270:5, 5368:3
**decked** [1] - 5315:8
**declare** [2] - 5326:25, 5327:1
**defend** [1] - 5299:3, 5309:22
**Defendant** [6] - 5220:22, 5228:14, 5229:23, 5252:2, 5266:22, 5354:7
**Defendant'** [1] - 5266:13
**defendants** [15] - 5221:16, 5222:25, 5223:19, 5234:15, 5235:13, 5235:25, 5236:9, 5244:24, 5247:14, 5247:23,

5288:6, 5327:21, 5338:19, 5338:21
**defense** [3] - 5339:2, 5339:8, 5355:22
**definition** [1] - 5363:10
**delay** [2] - 5360:6, 5360:8
**delayed** [2] - 5226:11, 5264:7
**deleted** [1] - 5259:21
**demonstration** [1] - 5330:10
**demonstrations** [1] - 5274:11
**dense** [1] - 5362:6
**densely** [2] - 5311:9, 5311:11
**Department** [2] - 5269:13, 5269:25
**depict** [1] - 5314:5
**depicted** [2] - 5230:12, 5338:13
**depiction** [4] - 5288:11, 5338:10, 5338:14, 5344:7
**depicts** [1] - 5224:10
**deployed** [1] - 5349:16
**deposit** [1] - 5242:21
**deposited** [1] - 5242:14
**Deputy** [7] - 5288:22, 5290:24, 5300:3, 5319:12, 5321:17, 5323:6, 5335:10
**DEPUTY** [4] - 5268:12, 5268:16, 5332:6, 5336:11
**deputy** [8] - 5295:4, 5303:19, 5314:16, 5335:11, 5335:12, 5352:3, 5356:5, 5365:7
**derived** [1] - 5259:9
**describe** [12] - 5235:20, 5272:11, 5274:12, 5275:7, 5275:15, 5278:22, 5307:11, 5311:2, 5312:10, 5332:19, 5340:22, 5345:3
**describing** [4] - 5235:16, 5235:17, 5235:21, 5305:11
**description** [1] - 5234:19
**designed** [1] - 5358:17
**detail** [1] - 5224:14

**detain** [1] - 5293:3
**detained** [1] - 5320:16
**detaining** [1] - 5302:4
**detector** [1] - 5313:6
**developing** [1] - 5224:21
**different** [23] - 5226:20, 5237:2, 5256:4, 5256:5, 5271:3, 5271:8, 5275:10, 5275:20, 5279:1, 5279:2, 5282:9, 5283:2, 5293:16, 5297:10, 5306:12, 5313:12, 5315:6, 5324:19, 5333:22, 5334:14, 5358:5, 5358:16, 5361:24
**diminish** [1] - 5329:20
**Direct** [1] - 5220:7
**DIRECT** [1] - 5268:19
**direct** [16] - 5234:12, 5235:8, 5235:9, 5259:1, 5276:25, 5277:4, 5280:20, 5285:3, 5285:7, 5295:19, 5313:11, 5328:4, 5328:7, 5357:20, 5364:16
**directed** [1] - 5247:3
**directing** [1] - 5316:15
**direction** [2] - 5253:12, 5325:2
**directions** [1] - 5241:22
**directly** [2] - 5278:23, 5281:16
**disappointed** [1] - 5301:11
**discuss** [2] - 5303:1, 5366:14
**discussing** [1] - 5246:1
**discussions** [1] - 5339:22
**dislocate** [1] - 5227:6
**disorder** [5] - 5222:1, 5223:21, 5224:2, 5225:10, 5225:17
**disorienting** [3] - 5294:1, 5294:5, 5298:10
**display** [2] - 5260:14, 5266:21
**dispute** [1] - 5222:11
**distance** [2] - 5230:16, 5231:24
**disturbance** [4] - 5272:8, 5273:18,

5295:25, 5296:1
**disturbing** [1] - 5223:1
**division** [5] - 5271:11, 5273:3, 5273:14, 5297:2, 5326:14
**docs** [1] - 5257:19
**document** [6] - 5234:24, 5330:3, 5330:8, 5330:11, 5331:4, 5332:2
**documents** [1] - 5331:5
**dog** [9] - 5313:13, 5316:10, 5316:18, 5316:21, 5316:22, 5318:16, 5318:18, 5319:3, 5319:13
**dog's** [1] - 5316:20
**dog/man** [1] - 5318:15
**done** [4] - 5232:25, 5282:5, 5282:25, 5320:14
**door** [38] - 5297:19, 5297:25, 5298:1, 5299:6, 5299:24, 5300:9, 5302:6, 5302:8, 5303:24, 5304:5, 5306:14, 5310:12, 5312:15, 5312:16, 5314:7, 5315:13, 5322:4, 5322:5, 5322:16, 5322:23, 5325:18, 5336:2, 5341:6, 5344:9, 5345:4, 5345:17, 5345:19, 5348:12, 5348:19, 5349:2, 5350:17, 5353:16, 5354:10, 5354:23, 5359:3, 5362:22, 5365:2, 5365:3
**doors** [67] - 5262:3, 5262:14, 5262:21, 5291:11, 5292:22, 5300:23, 5301:1, 5301:2, 5301:15, 5301:17, 5301:19, 5304:21, 5304:23, 5306:10, 5307:3, 5307:6, 5307:8, 5307:10, 5307:14, 5307:20, 5311:20, 5312:18, 5314:20, 5317:1, 5317:6, 5317:8, 5317:22, 5320:25, 5321:5, 5321:18, 5322:18, 5322:23, 5323:21,

5324:6, 5324:7,
5324:12, 5324:15,
5324:18, 5324:21,
5324:22, 5325:1,
5325:10, 5325:19,
5325:20, 5325:22,
5326:5, 5326:9,
5339:24, 5340:11,
5340:12, 5340:22,
5340:23, 5340:24,
5341:2, 5341:10,
5346:8, 5346:9,
5348:2, 5349:25,
5350:8, 5351:2,
5351:10, 5351:19,
5352:4, 5353:6,
5364:7, 5364:8
**doubt** [1] - 5309:7
**doubting** [1] - 5345:16
**down** [28] - 5221:19,
5237:20, 5238:1,
5241:8, 5251:24,
5266:16, 5268:5,
5270:16, 5270:17,
5270:18, 5273:23,
5275:4, 5276:3,
5276:17, 5282:19,
5282:20, 5282:23,
5283:5, 5289:2,
5302:25, 5309:6,
5309:21, 5309:23,
5315:11, 5324:9,
5356:25, 5357:9
**downtown** [1] -
5245:23
**drafts** [2] - 5272:2
**drain** [1] - 5279:3
**draw** [1] - 5286:18
**draws** [1] - 5315:9
**dressed** [1] - 5315:6
**Drew** [19] - 5220:4,
5221:8, 5233:4,
5237:14, 5240:25,
5244:23, 5247:13,
5247:21, 5249:1,
5249:20, 5250:6,
5256:24, 5257:7,
5258:6, 5260:1,
5260:3, 5266:19,
5266:24, 5268:4
**driving** [1] - 5243:9
**due** [6] - 5280:9,
5282:18, 5283:3,
5302:14, 5326:23,
5349:16
**dumped** [1] - 5306:17
**Dunn** [3] - 5366:8,
5366:11, 5366:24
**Durham** [1] - 5269:6
**during** [9] - 5230:17,

5230:20, 5235:22,
5309:17, 5312:7,
5312:11, 5322:22,
5329:5, 5334:8
**duties** [7] - 5227:7,
5270:19, 5270:22,
5271:2, 5271:6,
5285:22, 5285:23
**duty** [1] - 5360:16

# E

**early** [1] - 5275:6
**easier** [1] - 5353:11
**easiest** [1] - 5309:3
**easily** [1] - 5274:20
**east** [31] - 5242:4,
5244:10, 5262:21,
5273:16, 5283:17,
5289:16, 5289:21,
5294:18, 5300:22,
5303:23, 5304:4,
5304:5, 5306:10,
5312:18, 5314:7,
5317:1, 5317:6,
5317:8, 5317:22,
5320:25, 5321:18,
5322:18, 5323:21,
5337:3, 5337:6,
5337:8, 5337:12,
5341:6, 5341:8,
5364:7, 5364:8
**East** [3] - 5276:10,
5276:11, 5292:10
**Eastover** [1] - 5269:21
**ECP** [3] - 5363:4,
5363:17
**ed** [1] - 5360:6
**Ed** [2] - 5242:7,
5244:4
**edge** [4] - 5286:14,
5286:19, 5286:20
**effect** [2] - 5282:3,
5293:5
**effective** [1] - 5328:10
**effectively** [6] -
5302:2, 5307:1,
5325:9, 5325:18,
5328:17, 5358:2
**efficiency** [1] -
5352:14
**effort** [3] - 5345:6,
5345:10, 5345:11
**either** [9] - 5224:24,
5274:25, 5284:9,
5298:12, 5318:22,
5323:18, 5325:2,
5338:13, 5367:25
**elbow** [3] - 5309:21,
5309:22, 5312:15

**elbowed** [1] - 5312:9
**election** [2] - 5241:2,
5241:3
**electronics** [1] -
5313:4
**elevated** [2] - 5232:7,
5232:9
**eliminate** [1] -
5315:21
**Elizabeth** [1] -
5343:23
**elsewhere** [1] - 5255:8
**em** [3] - 5248:19,
5248:21, 5251:14
**email** [2] - 5222:8,
5258:1
**Email** [1] - 5257:16
**emailed** [1] - 5366:4
**emails** [1] - 5258:2
**emergency** [2] -
5285:20, 5326:23
**employee** [1] - 5366:6
**empty** [3] - 5342:19,
5342:20, 5356:18
**encrypted** [1] - 5258:1
**end** [16] - 5232:18,
5289:2, 5290:19,
5291:18, 5292:14,
5292:17, 5297:9,
5306:13, 5307:7,
5310:13, 5310:18,
5321:17, 5322:7,
5327:5, 5356:22
**ended** [1] - 5307:15
**ending** [1] - 5245:13
**ends** [1] - 5274:18
**enforcement** [8] -
5264:17, 5265:7,
5265:19, 5293:17,
5316:25, 5320:24,
5361:23, 5362:12
**Enforcement** [3] -
5270:16, 5311:6,
5362:5
**engaging** [1] -
5293:14
**enjoy** [1] - 5302:22
**enlisted** [3] - 5360:5,
5360:8, 5360:10
**enter** [6] - 5261:23,
5262:9, 5291:11,
5311:7, 5329:1,
5361:25
**entered** [3] - 5243:2,
5262:14, 5266:2
**entering** [8] - 5242:2,
5261:19, 5262:6,
5361:20, 5363:11,
5363:14, 5363:15
**entire** [3] - 5225:8,

5225:14, 5360:13
**entirety** [4] - 5223:11,
5224:15, 5276:11,
5309:19
**entrance** [2] -
5271:11, 5314:8
**entry** [4] - 5266:15,
5288:11, 5362:24,
5363:4
**entryway** [4] -
5303:23, 5304:3,
5312:24, 5313:1
**entryways** [1] -
5271:11
**equipment** [2] -
5272:10, 5312:25
**ERT** [2] - 5287:9,
5358:8
**especially** [2] -
5258:24, 5300:19
**essence** [1] - 5331:22
**essentially** [1] -
5330:20
**establish** [4] - 5284:6,
5287:4, 5335:6,
5338:8
**established** [1] -
5289:8
**establishing** [1] -
5221:25
**establishment** [1] -
5328:16
**evacuated** [5] -
5356:6, 5356:8,
5356:17, 5356:22,
5357:4
**evening** [1] - 5368:9
**event** [10] - 5246:2,
5246:8, 5246:12,
5246:15, 5327:7,
5329:13, 5330:15,
5332:24, 5333:2,
5349:12
**events** [9] - 5256:4,
5278:6, 5294:17,
5318:24, 5328:22,
5328:24, 5333:8,
5334:11, 5338:13
**eventually** [3] -
5320:23, 5324:4,
5335:25
**everyday** [1] - 5270:22
**evidence** [51] -
5223:13, 5228:5,
5229:5, 5229:21,
5233:22, 5239:2,
5239:18, 5240:2,
5240:18, 5240:23,
5243:7, 5243:10,
5244:1, 5246:25,

5248:15, 5249:9,
5249:18, 5250:11,
5251:5, 5252:9,
5253:23, 5254:9,
5257:2, 5257:5,
5258:10, 5258:13,
5260:8, 5260:13,
5263:7, 5263:23,
5264:9, 5287:25,
5288:20, 5289:25,
5290:5, 5294:25,
5304:8, 5304:11,
5307:25, 5308:3,
5314:10, 5314:14,
5317:13, 5317:16,
5321:15, 5322:13,
5323:4, 5323:24,
5324:2, 5354:7,
5364:14
**exact** [6] - 5223:10,
5223:12, 5227:8,
5289:19, 5312:12,
5344:7
**examination** [5] -
5234:12, 5234:13,
5236:20, 5267:7,
5366:20
**EXAMINATION** [6] -
5226:15, 5268:19,
5327:17, 5356:3,
5357:15, 5364:3
**Examination** [6] -
5220:5, 5220:7,
5220:7, 5220:8,
5220:8, 5220:9
**examinations** [1] -
5226:19
**examine** [6] - 5225:24,
5234:24, 5236:18,
5318:21, 5367:2,
5367:25
**except** [1] - 5346:1
**exchanged** [2] -
5255:8, 5255:20
**excuse** [7] - 5228:4,
5235:1, 5251:3,
5268:2, 5318:4,
5340:8, 5366:24
**excused** [2] - 5268:7,
5365:10
**Exhibit** [68] - 5220:12,
5220:12, 5220:13,
5220:13, 5220:14,
5220:14, 5220:15,
5220:15, 5220:16,
5220:16, 5220:17,
5220:17, 5220:18,
5220:18, 5220:19,
5220:19, 5220:20,
5220:20, 5220:21,

5377

5228:4, 5228:12, 5229:5, 5229:21, 5231:14, 5239:14, 5240:1, 5240:22, 5246:24, 5249:1, 5249:17, 5251:4, 5254:21, 5256:21, 5257:5, 5258:6, 5258:13, 5260:1, 5260:13, 5263:7, 5266:14, 5267:13, 5276:21, 5276:23, 5280:3, 5281:18, 5284:13, 5287:14, 5287:16, 5287:18, 5287:25, 5288:20, 5290:5, 5294:25, 5304:11, 5308:3, 5314:13, 5317:7, 5317:16, 5321:2, 5321:3, 5321:10, 5321:15, 5322:13, 5323:4, 5324:2, 5333:16, 5340:1, 5364:13

**exhibit** [13] - 5233:6, 5238:10, 5249:14, 5259:7, 5277:5, 5278:14, 5278:17, 5292:17, 5299:21, 5309:24, 5332:2, 5354:2, 5354:4

**Exhibits** [1] - 5220:11

**existence** [1] - 5243:21

**exit** [3] - 5318:18, 5318:20, 5353:6

**exited** [1] - 5318:13

**exits** [1] - 5305:10

**expect** [1] - 5366:7

**explain** [4] - 5244:23, 5259:14, 5260:18, 5324:21

**explained** [1] - 5225:22

**explaining** [2] - 5326:20, 5332:21

**expressing** [1] - 5297:4

**extraction** [2] - 5233:19, 5250:8

## F

**face** [5] - 5297:5, 5312:9, 5312:16, 5322:6, 5344:14

**facing** [5] - 5226:25, 5227:3, 5253:12, 5314:21, 5321:23

**fact** [9] - 5224:1,

5225:14, 5264:10, 5264:22, 5280:9, 5280:10, 5329:10, 5329:20, 5330:19

**factor** [1] - 5222:11

**facts** [1] - 5243:6

**failings** [1] - 5225:3

**fair** [30] - 5261:19, 5275:4, 5304:4, 5324:10, 5328:13, 5331:12, 5332:12, 5333:7, 5333:19, 5333:21, 5334:15, 5336:22, 5337:6, 5337:10, 5338:9, 5338:14, 5341:14, 5342:9, 5342:25, 5344:5, 5345:18, 5346:7, 5346:12, 5347:20, 5347:25, 5348:25, 5349:24, 5350:21, 5353:22, 5355:14

**fairly** [3] - 5289:20, 5294:17, 5366:10

**fall** [1] - 5309:11

**false** [1] - 5235:10

**familiar** [3] - 5331:4, 5331:7, 5333:3

**family** [2] - 5256:4, 5313:16

**far** [15] - 5230:14, 5230:22, 5231:7, 5231:10, 5231:23, 5247:13, 5248:21, 5252:20, 5253:18, 5262:19, 5267:19, 5287:11, 5292:9, 5306:7, 5356:20

**farthest** [1] - 5326:5

**fast** [6] - 5234:6, 5330:5, 5341:16, 5348:9, 5351:20, 5354:11

**fast-forward** [4] - 5341:16, 5348:9, 5351:20, 5354:11

**FBI** [2] - 5259:18, 5261:3

**feathered** [1] - 5247:11

**Federal** [3] - 5270:16, 5311:6, 5362:4

**federal** [1] - 5270:20

**feet** [4] - 5222:2, 5223:5, 5293:23, 5326:13

**fell** [1] - 5300:8

**fellow** [1] - 5279:8

**fence** [3] - 5281:2,

5281:3, 5283:16

**fences** [1] - 5281:1

**few** [14] - 5221:24, 5222:2, 5226:20, 5241:10, 5247:2, 5248:7, 5325:17, 5326:11, 5328:4, 5334:1, 5348:7, 5353:21, 5367:5, 5367:6

**field** [2] - 5358:16, 5358:19

**fight** [1] - 5301:12

**fighting** [2] - 5281:2, 5310:10

**figured** [1] - 5300:9

**file** [1] - 5360:22

**fill** [1] - 5257:23

**filled** [2] - 5257:18, 5257:20

**film** [1] - 5340:16

**filmed** [2] - 5231:21, 5253:17

**filming** [2] - 5232:6, 5232:10

**final** [4] - 5299:10, 5322:7, 5325:24, 5359:9

**finally** [4] - 5256:14, 5262:22, 5326:8

**fine** [2] - 5319:7, 5352:10

**finish** [2] - 5271:4, 5309:25

**finished** [1] - 5270:21

**firearm** [2] - 5242:15, 5265:19

**firearms** [7] - 5242:14, 5242:21, 5242:22, 5243:4, 5245:10, 5245:15, 5256:8

**first** [23] - 5221:12, 5225:3, 5225:4, 5237:8, 5237:15, 5240:11, 5270:11, 5275:8, 5289:9, 5291:3, 5292:21, 5301:7, 5307:21, 5318:3, 5318:6, 5325:6, 5326:11, 5330:6, 5330:25, 5335:23, 5339:23, 5339:24, 5346:7

**Fischer** [4] - 5234:11, 5356:1, 5356:12, 5357:13

**FISCHER** [15] - 5227:21, 5233:5, 5233:23, 5234:11, 5248:2, 5266:11,

5304:9, 5339:2, 5339:5, 5355:25, 5356:2, 5356:4, 5356:15, 5357:8, 5357:11

**Fischer's** [1] - 5236:14

**Fischer**................ [1] - 5220:8

**five** [6] - 5224:16, 5293:18, 5320:2, 5320:13, 5346:19, 5365:18

**five-minute** [1] - 5224:16

**flag** [6] - 5252:5, 5252:13, 5252:14, 5290:13, 5290:16, 5302:6

**flagpole** [2] - 5299:23, 5300:1, 5300:4, 5300:6, 5306:13, 5306:14, 5321:6

**flags** [1] - 5253:7

**flash** [9] - 5293:23, 5293:24, 5293:25, 5294:1, 5294:3, 5294:6, 5299:23, 5309:13, 5348:15

**flash-bang** [7] - 5293:23, 5293:24, 5293:25, 5294:3, 5294:6, 5309:13, 5348:15

**flash-banged** [1] - 5299:23

**FLETC** [4] - 5270:16, 5311:6, 5362:4, 5362:18

**flip** [1] - 5234:3

**floor** [1] - 5275:11

**Floor** [2] - 5275:11, 5291:16

**Florida** [2] - 5229:18, 5240:12

**flowerpot** [4] - 5275:18, 5278:6, 5278:7, 5278:11

**flushing** [1] - 5320:25

**focus** [1] - 5352:5

**follow** [4] - 5236:21, 5283:20, 5283:21, 5285:3

**follow-up** [1] - 5236:21

**followed** [2] - 5297:20, 5342:8

**foot** [1] - 5271:9

**footage** [2] - 5223:4, 5287:21

**forbid** [1] - 5287:11

**force** [3] - 5247:24, 5302:14, 5330:21

**foreground** [1] - 5232:1

**forgive** [1] - 5351:6

**form** [7] - 5243:22, 5257:18, 5257:20, 5257:23, 5286:9, 5286:12, 5300:14

**formally** [1] - 5319:6

**formation** [12] - 5265:10, 5265:20, 5311:3, 5311:4, 5311:10, 5359:11, 5361:19, 5362:3, 5362:20, 5362:22, 5363:8, 5363:10

**formats** [1] - 5249:21

**formed** [1] - 5287:22

**forms** [2] - 5246:1, 5246:4

**forward** [46] - 5224:25, 5231:15, 5236:6, 5252:24, 5254:22, 5271:23, 5279:13, 5280:11, 5280:17, 5283:7, 5284:25, 5286:22, 5290:19, 5291:17, 5292:13, 5295:1, 5295:15, 5296:8, 5296:20, 5297:14, 5298:17, 5299:8, 5304:13, 5305:1, 5305:13, 5305:18, 5308:4, 5309:25, 5310:13, 5314:22, 5316:4, 5316:12, 5317:23, 5319:16, 5320:23, 5325:11, 5325:15, 5327:9, 5341:16, 5343:16, 5343:24, 5348:9, 5351:20, 5354:11, 5365:23, 5366:21

**foundation** [7] - 5222:15, 5225:8, 5242:17, 5331:2, 5335:6, 5337:17, 5338:8

**founding** [1] - 5247:10

**four** [4] - 5234:2, 5293:18, 5328:21, 5329:5

**Fourth** [1] - 5269:21

**frame** [15] - 5222:22, 5281:17, 5296:25, 5299:10, 5299:13, 5301:21, 5303:25,

5378

5306:8, 5310:25,
5321:12, 5321:24,
5322:22, 5323:11,
5325:24, 5352:21
**free** [2] - 5257:17,
5318:20
**freshman** [1] - 5360:5
**friend** [1] - 5326:18
**friends** [1] - 5326:13
**front** [27] - 5264:18,
5265:4, 5265:5,
5265:8, 5273:6,
5273:16, 5274:1,
5274:3, 5277:10,
5278:23, 5280:5,
5291:1, 5301:12,
5304:5, 5306:10,
5319:21, 5326:12,
5347:20, 5359:17,
5362:9, 5362:16,
5362:25, 5363:6,
5363:13, 5363:18
**Front** [7] - 5276:8,
5276:10, 5276:11,
5276:13, 5276:16,
5292:10
**frozen** [1] - 5306:11
**Fuck** [3] - 5248:19,
5248:21, 5251:14
**full** [3] - 5280:14,
5296:2, 5359:7
**fully** [1] - 5367:11
**funny** [1] - 5311:16
**furniture** [3] -
5324:25, 5325:4,
5325:21

## G

**gamut** [1] - 5333:20
**gas** [3] - 5250:3,
5251:11, 5316:2
**Gator** [10] - 5239:5,
5239:6, 5253:25,
5257:10, 5257:11,
5258:15, 5258:20,
5258:23, 5259:1,
5259:3
**gear** [11] - 5272:9,
5296:2, 5296:4,
5308:21, 5308:22,
5309:1, 5315:4,
5315:8, 5316:2,
5349:7, 5359:15
**gears** [2] - 5333:15,
5339:17
**general** [3] - 5245:7,
5277:22, 5301:17
**generally** [4] - 5260:5,
5294:15, 5303:22,

5314:6
**generation** [1] -
5247:10
**gentleman** [5] -
5275:17, 5276:2,
5276:7, 5359:15,
5359:17
**gentlemen** [2] -
5226:8, 5302:21
**Georgia** [1] - 5270:17
**Geyer** [4] - 5256:14,
5256:15, 5262:3,
5319:5
**GEYER** [9] - 5257:3,
5258:11, 5318:1,
5318:4, 5318:7,
5318:12, 5318:14,
5319:7, 5355:24
**GG** [1] - 5258:23
**given** [4] - 5244:25,
5250:3, 5251:11,
5331:22
**glass** [2] - 5341:11,
5341:13
**goal** [1] - 5311:10
**God** [1] - 5287:11
**government** [19] -
5221:15, 5224:1,
5224:25, 5225:11,
5233:21, 5235:6,
5240:17, 5247:7,
5255:4, 5256:10,
5257:1, 5280:3,
5334:3, 5334:5,
5341:5, 5343:19,
5347:15, 5352:2,
5352:7
**Government** [62] -
5220:12, 5220:12,
5220:13, 5220:13,
5220:14, 5220:14,
5220:15, 5220:15,
5220:16, 5220:16,
5220:17, 5220:17,
5220:18, 5220:18,
5220:19, 5220:19,
5220:20, 5220:20,
5220:21, 5228:4,
5228:11, 5229:5,
5229:21, 5231:13,
5239:14, 5239:18,
5240:1, 5240:22,
5246:24, 5248:25,
5249:8, 5249:17,
5250:11, 5251:4,
5254:20, 5256:21,
5257:5, 5258:13,
5260:1, 5260:13,
5263:7, 5267:12,
5287:13, 5287:16,

5287:18, 5287:25,
5288:20, 5290:5,
5294:25, 5304:11,
5308:3, 5314:13,
5317:7, 5317:16,
5321:2, 5321:3,
5321:10, 5321:15,
5322:13, 5323:4,
5324:2, 5364:13
**government's** [3] -
5223:13, 5225:15,
5234:14
**governors** [1] -
5247:11
**grab** [2] - 5312:14,
5358:6
**graduate** [1] - 5360:3
**graduating** [2] -
5269:10, 5269:11
**grateful** [1] - 5328:2
**great** [3] - 5260:16,
5342:14, 5347:23
**greetings** [1] -
5240:12
**grenade** [1] - 5293:25
**ground** [10] - 5258:23,
5269:20, 5300:7,
5306:21, 5308:23,
5309:1, 5309:6,
5320:15, 5326:15,
5326:17
**grounds** [1] - 5288:5
**Grounds** [9] -
5227:19, 5243:19,
5246:20, 5285:24,
5330:14, 5330:15,
5331:24, 5333:7,
5333:12
**group** [15] - 5222:5,
5225:13, 5240:10,
5241:18, 5242:14,
5250:2, 5258:18,
5258:22, 5261:19,
5261:22, 5262:9,
5289:9, 5316:17,
5338:19, 5339:3
**groups** [1] - 5333:6
**guess** [8] - 5224:9,
5272:24, 5275:10,
5306:15, 5312:14,
5318:22, 5345:15,
5357:21
**gun** [2] - 5309:23,
5358:1
**guns** [5] - 5244:13,
5244:16, 5244:23,
5256:3, 5286:1
**guy** [1] - 5222:20

## H

**hair** [1] - 5222:19
**halfway** [1] - 5266:16
**Haller** [20] - 5221:10,
5221:11, 5250:23,
5327:16, 5327:21,
5332:1, 5332:9,
5335:8, 5337:22,
5338:3, 5338:22,
5339:11, 5343:17,
5346:14, 5346:22,
5347:1, 5347:11,
5351:3, 5366:19,
5367:22
**HALLER** [125] -
5221:14, 5222:6,
5222:15, 5224:7,
5224:11, 5225:6,
5225:22, 5225:25,
5242:16, 5243:6,
5243:22, 5244:19,
5245:2, 5245:17,
5247:17, 5247:19,
5250:13, 5250:19,
5250:25, 5255:16,
5255:21, 5256:11,
5261:25, 5262:11,
5282:11, 5284:19,
5288:2, 5288:4,
5290:1, 5294:23,
5298:15, 5298:24,
5300:14, 5306:22,
5308:1, 5314:11,
5317:14, 5321:11,
5322:11, 5323:2,
5323:25, 5324:16,
5327:15, 5327:18,
5330:7, 5330:9,
5331:1, 5331:3,
5331:20, 5331:21,
5332:3, 5332:8,
5332:10, 5332:11,
5333:16, 5333:18,
5335:3, 5335:9,
5336:12, 5336:19,
5337:1, 5337:2,
5337:15, 5337:20,
5337:25, 5338:2,
5338:16, 5338:18,
5338:24, 5339:1,
5339:12, 5339:13,
5339:18, 5339:20,
5340:6, 5341:19,
5342:14, 5342:16,
5343:3, 5343:6,
5343:8, 5343:14,
5343:18, 5343:21,
5346:16, 5346:23,
5346:24, 5347:4,
5347:7, 5347:9,

5347:12, 5347:17,
5347:19, 5348:9,
5348:10, 5348:18,
5348:24, 5350:13,
5350:20, 5351:1,
5351:16, 5351:18,
5351:24, 5352:1,
5352:9, 5352:11,
5352:16, 5352:17,
5352:24, 5353:1,
5353:5, 5353:20,
5354:1, 5354:8,
5354:9, 5355:18,
5364:11, 5366:22,
5367:4, 5367:13,
5367:19, 5367:24,
5368:2, 5368:4,
5368:6
**Haller**................. [1] -
5220:7
**hallway** [13] - 5221:19,
5221:20, 5222:17,
5222:18, 5223:3,
5223:13, 5224:7,
5224:8, 5224:13,
5224:18, 5224:21,
5225:7, 5225:12
**hand** [30] - 5264:17,
5265:3, 5265:16,
5268:13, 5277:5,
5277:13, 5278:13,
5278:20, 5279:18,
5280:2, 5281:17,
5284:13, 5284:17,
5285:4, 5285:7,
5285:13, 5286:4,
5286:18, 5287:3,
5297:4, 5309:15,
5312:8, 5312:21,
5321:5, 5358:3,
5359:16, 5362:16,
5362:24, 5363:5,
5363:13
**handcuffs** [3] -
5272:14, 5292:24,
5293:1
**handed** [2] - 5357:21,
5358:11
**handle** [4] - 5259:2,
5301:6, 5302:9,
5302:13
**handles** [3] - 5299:24,
5300:9, 5302:8
**hands** [5] - 5244:23,
5246:21, 5309:22,
5320:3, 5320:4
**hang** [15] - 5225:9,
5234:7, 5250:14,
5250:21, 5327:9,
5330:19, 5332:1,

5379

5335:2, 5335:5,
5336:16, 5340:4,
5343:24, 5344:18,
5347:1
**hanging** [1] - 5279:22
**Hangout** [6] - 5239:5,
5240:9, 5240:10,
5254:11, 5257:14,
5257:15
**Hanover** [1] - 5288:25
**happy** [2] - 5221:12,
5337:24
**hard** [25] - 5245:22,
5278:1, 5291:7,
5295:24, 5295:25,
5296:1, 5308:16,
5308:18, 5308:20,
5308:23, 5309:2,
5309:4, 5312:4,
5312:15, 5325:17,
5349:6, 5349:7,
5349:9, 5349:11,
5349:13, 5349:15,
5349:22, 5349:23,
5364:17
**Harrelson** [17] -
5242:13, 5243:1,
5243:15, 5256:16,
5257:12, 5257:15,
5259:4, 5259:6,
5261:2, 5262:16,
5276:21, 5276:22,
5278:14, 5280:3,
5281:18, 5284:13,
5318:18
**Harrelson's** [5] -
5256:15, 5259:5,
5260:22, 5261:4,
5261:7
**hat** [5] - 5308:13,
5314:21, 5317:21,
5354:12, 5364:17
**hats** [1] - 5315:7
**Hawa** [1] - 5366:5
**head** [7] - 5222:19,
5251:18, 5281:14,
5292:18, 5300:8,
5312:16, 5315:22
**headed** [1] - 5326:10
**healed** [1] - 5367:11
**hear** [34] - 5221:20,
5222:3, 5222:9,
5222:14, 5230:17,
5232:22, 5250:14,
5250:16, 5253:4,
5263:4, 5263:19,
5264:2, 5275:13,
5276:14, 5280:14,
5294:7, 5296:12,
5296:15, 5296:16,

5297:11, 5298:12,
5298:20, 5310:4,
5311:14, 5311:17,
5311:18, 5318:3,
5318:6, 5335:7,
5337:24, 5359:6,
5366:22
**heard** [10] - 5232:19,
5248:3, 5253:11,
5276:2, 5276:6,
5276:7, 5276:12,
5286:9, 5298:23,
5337:24
**hearing** [3] - 5279:5,
5295:9, 5296:17
**heave** [4] - 5291:2,
5307:15, 5310:6,
5310:7
**heave-ho** [4] - 5291:2,
5307:15, 5310:6,
5310:7
**held** [13] - 5221:5,
5226:6, 5237:5,
5270:24, 5288:15,
5302:24, 5303:12,
5319:10, 5335:22,
5335:25, 5339:6,
5351:17, 5365:25
**Hell** [1] - 5237:16
**helmet** [9] - 5296:2,
5312:7, 5315:5,
5354:21, 5354:22,
5354:24, 5355:4,
5355:6, 5355:8
**helmets** [1] - 5290:10
**help** [7] - 5279:8,
5280:7, 5311:21,
5312:3, 5349:14,
5364:19, 5364:21
**helped** [5] - 5244:24,
5310:11, 5354:18,
5364:22
**helpful** [2] - 5364:23,
5365:1
**helping** [1] - 5351:12
**higher** [2] - 5291:24,
5335:25
**higher-level** [1] -
5291:24
**highlight** [3] -
5237:19, 5239:8,
5249:24
**highlighted** [1] -
5237:22
**Hill** [1] - 5282:17
**himself** [1] - 5331:15
**hit** [10] - 5294:6,
5294:9, 5298:5,
5300:7, 5301:4,
5306:10, 5306:11,

5312:2, 5312:16
**hitting** [2] - 5301:20,
5301:22
**ho** [4] - 5291:2,
5307:15, 5310:6,
5310:7
**hold** [10] - 5283:14,
5284:11, 5284:18,
5285:25, 5299:5,
5302:15, 5312:12,
5335:15, 5347:10,
5361:10
**holding** [10] -
5230:14, 5231:8,
5246:21, 5301:6,
5302:7, 5302:9,
5322:16, 5326:14,
5336:2, 5363:18
**hole** [1] - 5274:19
**home** [1] - 5365:8
**honestly** [6] -
5301:23, 5332:18,
5333:8, 5346:5,
5356:10, 5356:23
**Honor** [69] - 5221:14,
5222:23, 5223:9,
5223:23, 5224:5,
5225:6, 5225:20,
5225:25, 5226:1,
5226:14, 5233:22,
5233:23, 5234:11,
5234:25, 5236:14,
5238:15, 5239:23,
5244:21, 5249:9,
5249:12, 5250:13,
5250:19, 5250:22,
5250:25, 5251:2,
5260:9, 5268:6,
5287:24, 5288:2,
5288:4, 5288:17,
5289:24, 5294:20,
5302:17, 5303:3,
5303:11, 5303:16,
5304:7, 5307:24,
5314:9, 5317:12,
5318:1, 5318:7,
5319:8, 5321:9,
5322:25, 5323:23,
5327:14, 5327:15,
5335:1, 5337:16,
5338:16, 5339:2,
5339:12, 5343:18,
5347:7, 5354:8,
5355:24, 5355:25,
5357:8, 5364:9,
5365:9, 5365:12,
5366:16, 5367:4,
5367:13, 5367:19,
5368:4, 5368:7
**honor** [1] - 5328:1

**Honorable** [1] -
5235:4
**hooks** [1] - 5274:19
**hope** [2] - 5226:8,
5366:10
**hoping** [2] - 5281:22,
5323:12
**horizontally** [1] -
5290:15
**hotel** [8] - 5242:14,
5242:15, 5242:21,
5242:24, 5243:5,
5243:15, 5243:21,
5244:9
**hour** [3] - 5312:1,
5334:7, 5334:8
**hours** [9] - 5235:21,
5327:5, 5334:1,
5340:10, 5340:13,
5340:16, 5340:21,
5342:9, 5346:18
**house** [1] - 5279:3
**House** [11] - 5271:10,
5273:3, 5273:5,
5273:14, 5275:11,
5275:12, 5284:2,
5291:16, 5297:2,
5313:9, 5329:25
**houses** [1] - 5311:8
**hugging** [2] - 5309:10,
5312:4
**HUGHES** [15] -
5221:9, 5221:18,
5222:5, 5222:13,
5223:6, 5223:9,
5223:16, 5223:23,
5224:5, 5224:12,
5224:19, 5224:22,
5225:1, 5225:20,
5226:1
**humans** [4] - 5232:4,
5232:5, 5232:7,
5232:11
**hundred** [6] - 5282:15,
5293:4, 5293:10,
5325:9, 5329:14,
5367:9
**hundreds** [2] - 5307:2,
5328:25

# I

**idea** [6] - 5333:5,
5342:12, 5345:2,
5345:11, 5345:24,
5346:13
**identified** [4] -
5221:17, 5222:7,
5342:6, 5362:2
**identify** [9] - 5222:7,

5271:22, 5278:16,
5281:5, 5326:2,
5336:9, 5342:4,
5345:25, 5354:11
**image** [3] - 5235:10,
5254:13, 5254:14
**immediately** [5] -
5223:4, 5253:9,
5255:5, 5262:9,
5283:4
**immense** [1] - 5315:15
**impeded** [1] - 5222:1
**important** [1] - 5241:1
**impossible** [1] -
5315:21
**inaudible** [1] -
5276:18
**inaugurations** [1] -
5328:23
**incident** [2] - 5318:16,
5319:13
**incidents** [1] -
5285:23
**included** [1] - 5254:13
**including** [1] - 5291:1
**increasing** [1] -
5276:15
**independent** [2] -
5320:7, 5365:22
**individual** [29] -
5233:14, 5260:20,
5266:3, 5293:8,
5293:14, 5297:11,
5301:20, 5301:22,
5305:5, 5305:9,
5312:8, 5313:1,
5314:21, 5315:4,
5316:20, 5319:21,
5319:24, 5321:4,
5321:23, 5323:9,
5326:15, 5326:22,
5333:10, 5342:3,
5344:19, 5344:20,
5348:19, 5354:21,
5355:8
**individually** [1] -
5325:5
**individuals** [31] -
5222:22, 5238:13,
5238:24, 5242:20,
5242:22, 5245:9,
5245:15, 5247:3,
5265:3, 5265:11,
5265:18, 5279:25,
5281:2, 5281:23,
5284:14, 5284:23,
5285:14, 5290:25,
5292:20, 5296:24,
5297:18, 5297:19,
5297:20, 5299:24,

5380

5309:20, 5320:25,
5324:4, 5333:10,
5338:19, 5358:24,
5360:23
**indulgence** [5] -
5249:10, 5330:4,
5332:10, 5339:18,
5351:24
**infantry** [5] - 5269:24,
5311:5, 5359:24,
5360:13, 5362:19
**infantryman** [2] -
5269:17, 5269:19
**infer** [1] - 5237:2
**Inn** [1] - 5242:11
**inner** [1] - 5324:12
**inside** [33] - 5227:7,
5251:18, 5253:15,
5253:18, 5253:20,
5291:13, 5291:15,
5292:3, 5292:5,
5297:11, 5299:25,
5300:11, 5301:2,
5301:6, 5301:8,
5301:9, 5301:12,
5301:14, 5302:15,
5307:9, 5307:10,
5307:14, 5307:16,
5324:12, 5325:4,
5326:5, 5326:10,
5339:22, 5342:21,
5346:11, 5350:16,
5352:4, 5355:16
**insofar** [1] - 5234:21
**instance** [2] - 5327:4,
5338:10
**intelligent** [1] -
5316:10
**intends** [1] - 5224:25
**intent** [1] - 5299:5
**interaction** [5] -
5313:12, 5315:2,
5315:18, 5318:9,
5354:24
**interior** [2] - 5340:11,
5341:1
**interlock** [1] - 5274:18
**interrupt** [1] - 5282:7
**intimate** [1] - 5241:20
**introduce** [1] - 5269:2
**introduced** [1] -
5352:3
**invite** [3] - 5283:19,
5283:21, 5298:12
**inward** [1] - 5324:8
**ironic** [1] - 5295:11
**Isaacs** [1] - 5262:14
**Island** [1] - 5269:23
**issue** [4] - 5221:6,
5221:9, 5225:9,

5226:10
**issued** [3] - 5330:2,
5332:16, 5332:19
**items** [2] - 5313:9,
5325:21
**itself** [2] - 5259:16,
5334:2
**IV** [1] - 5326:15

## J

**jacket** [3] - 5231:4,
5300:25, 5320:11
**James** [4] - 5235:2,
5239:22, 5250:17,
5266:5
**Jan** [3] - 5248:18,
5249:6, 5258:19
**January** [41] -
5228:21, 5228:23,
5229:1, 5229:7,
5229:19, 5229:24,
5232:25, 5233:1,
5233:17, 5238:22,
5241:18, 5241:19,
5243:17, 5243:19,
5243:24, 5245:22,
5246:8, 5246:12,
5246:15, 5246:19,
5254:5, 5258:15,
5261:5, 5261:9,
5267:4, 5267:10,
5271:23, 5272:6,
5273:2, 5273:25,
5275:3, 5294:18,
5304:5, 5330:12,
5330:16, 5330:24,
5332:15, 5337:13,
5337:14, 5356:6,
5364:23
**Jason** [1] - 5366:6
**JC** [1] - 5352:9
**Jessica** [4] - 5228:16,
5255:6, 5262:16,
5262:22
**Jim** [4] - 5249:24,
5250:2, 5251:9,
5251:16
**job** [4] - 5298:23,
5299:2, 5300:18,
5307:5
**joined** [4] - 5223:3,
5225:13, 5225:16,
5269:12
**joining** [1] - 5224:24
**Joint** [2] - 5244:17,
5245:13
**Jonathan** [5] -
5233:14, 5236:25,
5237:8, 5237:22,

5262:23
**judge** [1] - 5236:21
**Judge** [1] - 5365:16
**Juli** [1] - 5327:21
**July** [1] - 5240:5
**juries** [1] - 5237:1
**jurors** [1] - 5361:11
**jury** [23] - 5221:2,
5221:5, 5226:6,
5235:10, 5237:13,
5251:7, 5255:11,
5260:15, 5266:21,
5269:2, 5286:19,
5294:5, 5302:24,
5303:12, 5306:9,
5307:11, 5312:10,
5319:2, 5325:14,
5331:20, 5340:5,
5354:6, 5365:25

## K

**keep** [8] - 5265:3,
5293:5, 5302:18,
5307:6, 5309:20,
5309:22, 5311:12,
5343:22
**Keepers** [11] -
5222:21, 5228:10,
5229:14, 5229:18,
5238:13, 5238:24,
5241:14, 5241:18,
5261:18, 5261:23,
5262:9
**keeping** [1] - 5264:17
**Kelly** [13] - 5230:13,
5230:15, 5231:10,
5239:7, 5252:2,
5254:1, 5254:5,
5254:11, 5255:7,
5258:21, 5258:22,
5262:16, 5327:22
**Kellye** [3] - 5241:11,
5241:14, 5241:17
**Kenneth** [8] - 5256:15,
5256:16, 5257:12,
5257:15, 5259:4,
5259:6, 5260:22,
5262:16
**kept** [1] - 5321:4
**kids** [1] - 5362:7
**kill** [1] - 5276:3
**killed** [2] - 5309:8,
5316:21
**kind** [20] - 5222:23,
5272:19, 5274:18,
5275:17, 5278:1,
5278:5, 5278:23,
5286:3, 5286:19,
5290:15, 5294:7,

5296:3, 5297:8,
5308:23, 5310:11,
5311:16, 5327:6,
5332:19, 5359:9,
5360:6
**kinds** [1] - 5358:16
**KM** [2] - 5332:3,
5352:14
**KM.43** [1] - 5332:4
**KM.56** [2] - 5332:8,
5350:10
**KM.57** [1] - 5337:15
**KM.59** [1] - 5354:7
**KM.59........................
...** [1] - 5220:22
**knife** [1] - 5272:25
**knowing** [1] - 5248:7
**knowledge** [7] -
5330:1, 5331:14,
5337:18, 5357:6,
5362:3, 5362:13,
5364:20
**known** [2] - 5274:25,
5285:20

## L

**lack** [2] - 5242:16,
5256:18
**lacking** [1] - 5225:8
**Ladies** [1] - 5302:21
**ladies** [1] - 5226:8
**laid** [1] - 5308:25
**Lanelle** [1] - 5366:5
**LAR** [1] - 5269:21
**large** [5] - 5229:18,
5274:10, 5328:22,
5328:24, 5349:12
**large-scale** [1] -
5349:12
**last** [6] - 5255:12,
5263:9, 5268:5,
5289:3, 5300:19,
5366:4
**law** [8] - 5264:17,
5265:7, 5265:19,
5293:17, 5316:25,
5320:24, 5361:23,
5362:11
**Law** [3] - 5270:16,
5311:6, 5362:4
**lawyer** [20] - 5227:24,
5228:25, 5230:1,
5231:12, 5232:18,
5241:10, 5241:14,
5241:21, 5242:6,
5244:3, 5245:21,
5246:7, 5247:2,
5251:17, 5255:7,
5259:5, 5261:7,

5262:22, 5264:4,
5264:13
**lawyer's** [1] - 5252:3
**layman's** [2] -
5272:19, 5273:17
**Lazarus** [2] - 5366:11,
5366:25
**lead** [1] - 5239:12
**leaders** [1] - 5259:1
**Leadership** [1] -
5241:4
**leading** [3] - 5242:16,
5318:12, 5324:16
**leads** [1] - 5338:18
**learn** [2] - 5270:18,
5271:1
**learned** [1] - 5362:17
**learning** [1] - 5270:19
**least** [6] - 5225:16,
5233:6, 5251:21,
5309:23, 5328:7,
5349:11
**leave** [6] - 5255:19,
5270:5, 5283:3,
5297:25, 5322:3,
5323:12
**leaves** [1] - 5283:4
**leaving** [2] - 5232:19,
5319:21
**lectern** [2] - 5337:24,
5338:4
**Lee** [3] - 5235:2,
5239:22, 5250:17
**left** [30] - 5221:7,
5251:9, 5273:6,
5273:21, 5278:19,
5279:25, 5280:2,
5280:4, 5281:24,
5283:18, 5284:13,
5284:15, 5285:7,
5285:13, 5286:4,
5286:18, 5287:3,
5300:13, 5300:20,
5301:4, 5301:21,
5302:5, 5307:8,
5314:20, 5320:18,
5322:18, 5323:9,
5343:1, 5357:5
**left-hand** [7] - 5280:2,
5284:13, 5285:7,
5285:13, 5286:4,
5286:18, 5287:3
**leg** [1] - 5296:3
**legal** [2] - 5226:10,
5255:19
**less** [2] - 5236:8,
5358:22
**level** [3] - 5232:7,
5286:13, 5291:24
**liberty** [1] - 5254:16

5381

**life** [1] - 5284:18
**lifesaving** [1] - 5327:3
**limited** [1] - 5315:15
**Linder** [1] - 5327:13
**LINDER** [1] - 5327:14
**line** [40] - 5224:9,
5247:4, 5274:17,
5274:23, 5274:24,
5275:1, 5276:4,
5278:2, 5278:19,
5281:4, 5281:22,
5283:14, 5284:2,
5284:6, 5284:8,
5284:10, 5284:11,
5284:14, 5286:8,
5286:10, 5286:12,
5287:4, 5287:22,
5288:9, 5288:12,
5289:8, 5290:7,
5290:9, 5290:12,
5290:15, 5291:3,
5291:4, 5291:5,
5292:19, 5292:20,
5318:24, 5335:15,
5335:16, 5335:23,
5360:22
**lined** [1] - 5363:17
**lines** [2] - 5276:2,
5279:4
**list** [1] - 5366:3
**listening** [1] - 5351:11
**literally** [4] - 5222:2,
5288:8, 5309:10,
5312:6
**location** [6] - 5231:21,
5241:25, 5273:24,
5278:16, 5337:6,
5337:11
**locations** [1] -
5328:14
**lock** [2] - 5274:19,
5324:10
**locking** [1] - 5309:23
**logged** [1] - 5259:6
**logs** [1] - 5259:16
**look** [11] - 5234:17,
5236:17, 5249:20,
5251:9, 5340:7,
5341:12, 5343:4,
5345:5, 5345:6,
5365:23, 5367:9
**looked** [3] - 5287:22,
5315:10, 5332:17
**looking** [31] - 5260:18,
5273:5, 5273:20,
5277:23, 5277:25,
5278:1, 5279:18,
5280:2, 5280:5,
5284:13, 5284:17,
5285:13, 5287:2,

5290:24, 5300:22,
5303:22, 5303:23,
5307:19, 5316:9,
5316:10, 5317:7,
5321:3, 5322:2,
5322:21, 5339:19,
5342:10, 5345:11,
5346:13, 5347:20,
5349:24, 5352:18
**looks** [6] - 5304:23,
5338:12, 5342:20,
5343:1, 5344:23,
5348:1
**loud** [3] - 5294:1,
5359:3, 5359:6
**lower** [1] - 5277:5,
5277:13, 5277:22,
5278:13, 5278:20,
5279:18, 5280:20,
5281:17, 5286:18,
5287:3
**lunch** [1] - 5226:9
**lying** [1] - 5308:23

## M

**MA** [1] - 5247:11
**ma'am** [73] - 5226:17,
5274:4, 5327:20,
5328:3, 5328:11,
5328:12, 5328:21,
5328:24, 5329:2,
5329:12, 5329:14,
5329:18, 5329:21,
5330:13, 5330:17,
5330:22, 5330:23,
5330:25, 5331:6,
5331:25, 5332:22,
5334:7, 5334:9,
5334:12, 5334:18,
5334:23, 5335:11,
5335:14, 5335:17,
5335:20, 5336:1,
5336:3, 5336:6,
5336:21, 5337:4,
5337:12, 5337:14,
5339:16, 5340:20,
5341:6, 5341:9,
5341:15, 5341:21,
5342:5, 5342:20,
5344:4, 5344:11,
5344:21, 5345:19,
5346:1, 5347:22,
5348:1, 5348:3,
5348:6, 5348:15,
5348:22, 5349:1,
5349:4, 5349:11,
5349:15, 5349:21,
5349:23, 5350:5,
5350:9, 5350:15,
5350:18, 5350:23,

5353:9, 5353:13,
5354:13, 5355:4,
5355:16, 5355:21
**machine** [3] -
5271:18, 5286:1,
5318:14
**mad** [1] - 5275:21
**magnetometer** [4] -
5271:16, 5271:19,
5312:19
**magnetometers** [4] -
5271:12, 5312:19,
5312:20, 5312:21
**main** [2] - 5291:11,
5311:11
**maintaining** [1] -
5362:24
**majority** [2] - 5309:21,
5356:24
**makeshift** [1] - 5321:6
**mall** [1] - 5329:23
**man** [8] - 5316:10,
5316:15, 5345:25,
5346:3, 5348:19,
5348:22, 5354:24,
5355:5
**maneuver** [1] -
5308:21
**manpower** [1] -
5283:5
**mansion** [1] - 5247:11
**manual** [1] - 5266:9
**manuals** [1] - 5266:6
**Manzo** [11] - 5220:7,
5268:8, 5268:18,
5303:8, 5303:15,
5318:18, 5318:25,
5321:14, 5327:9,
5352:8, 5363:24
**MANZO** [174] -
5268:10, 5268:20,
5268:22, 5269:1,
5269:18, 5274:5,
5274:8, 5276:22,
5276:24, 5277:1,
5277:3, 5277:12,
5277:15, 5277:19,
5277:21, 5278:12,
5278:15, 5279:12,
5279:15, 5279:17,
5279:23, 5280:11,
5280:16, 5280:19,
5280:23, 5280:24,
5281:11, 5281:12,
5281:15, 5281:19,
5282:13, 5283:7,
5283:10, 5283:11,
5284:25, 5285:2,
5285:6, 5285:9,
5285:12, 5286:22,

5287:1, 5287:13,
5287:15, 5287:24,
5288:8, 5288:17,
5288:21, 5289:11,
5289:13, 5289:14,
5289:24, 5290:6,
5290:14, 5290:22,
5290:23, 5291:17,
5291:21, 5292:13,
5292:16, 5294:11,
5294:13, 5294:14,
5294:20, 5295:1,
5295:3, 5295:15,
5295:17, 5295:18,
5296:8, 5296:10,
5296:11, 5296:20,
5296:22, 5296:23,
5297:14, 5297:16,
5297:17, 5298:17,
5298:19, 5299:1,
5299:8, 5299:10,
5299:12, 5300:16,
5302:17, 5303:16,
5303:18, 5304:7,
5304:12, 5304:18,
5304:20, 5304:25,
5305:3, 5305:4,
5305:13, 5305:15,
5305:18, 5305:20,
5306:1, 5306:4,
5306:24, 5307:17,
5307:18, 5307:24,
5308:4, 5308:7,
5309:24, 5310:3,
5310:13, 5310:15,
5310:22, 5310:23,
5313:25, 5314:2,
5314:9, 5314:15,
5314:19, 5314:24,
5316:4, 5316:7,
5316:8, 5316:12,
5316:14, 5317:3,
5317:4, 5317:12,
5317:17, 5317:20,
5317:25, 5318:8,
5318:20, 5319:1,
5319:4, 5319:11,
5319:16, 5319:19,
5319:20, 5321:9,
5321:16, 5321:22,
5322:1, 5322:10,
5322:14, 5322:17,
5322:20, 5322:25,
5323:5, 5323:8,
5323:10, 5323:14,
5323:15, 5323:23,
5324:3, 5324:20,
5325:11, 5325:13,
5325:24, 5326:1,
5326:4, 5326:7,
5327:11, 5331:2,

5331:14, 5331:18,
5335:1, 5335:4,
5336:14, 5337:17,
5353:24, 5363:25,
5364:4, 5364:9,
5364:15, 5365:6
**Manzo**.............. [1] -
5220:9
**map** [3] - 5268:24,
5273:21, 5273:23
**March** [2] - 5261:1,
5261:2
**Marine** [4] - 5269:11,
5311:5, 5359:22,
5362:12
**Marines** [1] - 5269:14
**mark** [5] - 5277:14,
5304:1, 5332:3,
5336:10, 5339:25
**marked** [6] - 5303:20,
5336:15, 5336:16,
5352:12, 5352:13,
5354:4
**Maryland** [1] -
5270:25
**mask** [2] - 5222:20,
5287:19
**masks** [3] - 5250:3,
5251:11, 5316:2
**mass** [2] - 5272:17,
5272:20
**material** [2] - 5236:3,
5236:5
**math** [2] - 5343:12,
5347:6
**matter** [4] - 5235:19,
5235:22, 5282:22,
5283:1
**McIntyre** [1] - 5366:6
**mean** [29] - 5223:2,
5223:17, 5223:18,
5234:22, 5235:10,
5236:6, 5269:19,
5272:20, 5272:23,
5272:24, 5275:16,
5276:12, 5280:13,
5284:22, 5286:14,
5291:10, 5291:23,
5296:17, 5297:7,
5300:18, 5301:9,
5310:8, 5311:17,
5337:10, 5340:13,
5350:2, 5350:17,
5356:12, 5358:1
**meaning** [3] -
5333:23, 5334:15,
5354:15
**means** [4] - 5252:18,
5272:8, 5273:17,
5361:11

5382

**meant** [1] - 5353:24
**measures** [1] - 5327:3
**media** [2] - 5256:18, 5365:21
**medical** [1] - 5326:25
**meeting** [1] - 5356:17
**megaphone** [3] - 5275:15, 5275:19, 5278:5
**megaphones** [1] - 5275:12
**Meggs** [17] - 5220:22, 5230:13, 5230:19, 5231:10, 5239:7, 5242:13, 5243:1, 5243:14, 5254:1, 5254:5, 5254:11, 5258:21, 5258:22, 5262:16, 5327:22, 5354:7, 5367:12
**Meggs's** [2] - 5252:2, 5255:7
**member** [2] - 5308:18, 5309:4
**members** [18] - 5227:6, 5227:25, 5228:21, 5242:14, 5243:2, 5244:11, 5245:25, 5253:18, 5257:23, 5261:18, 5262:9, 5266:1, 5311:12, 5315:6, 5325:18, 5356:8, 5356:16, 5356:20
**memory** [1] - 5320:21
**mentioned** [4] - 5278:5, 5279:5, 5295:24, 5362:6
**message** [31] - 5228:7, 5228:14, 5233:9, 5233:16, 5233:18, 5233:19, 5234:2, 5234:18, 5235:16, 5237:14, 5237:15, 5237:19, 5238:1, 5238:19, 5239:4, 5239:5, 5239:16, 5240:4, 5240:15, 5244:4, 5244:6, 5255:11, 5255:20, 5256:24, 5257:7, 5257:13, 5258:8, 5258:16, 5258:25, 5266:20, 5267:17
**messages** [19] - 5232:24, 5234:14, 5242:23, 5243:3, 5243:14, 5243:17, 5243:20, 5243:24,

5245:25, 5246:11, 5248:12, 5249:20, 5250:19, 5251:22, 5255:8, 5255:25, 5256:6, 5264:7
**met** [1] - 5313:22
**metal** [3] - 5274:14, 5313:4, 5313:6
**middle** [8] - 5286:3, 5290:17, 5293:6, 5295:19, 5295:20, 5302:3, 5308:13, 5310:25
**midst** [1] - 5224:1
**might** [1] - 5353:11
**military** [14] - 5264:16, 5264:21, 5264:22, 5265:3, 5265:19, 5269:8, 5269:22, 5359:18, 5361:1, 5361:19, 5362:1, 5362:4, 5362:21, 5363:16
**militia** [1] - 5237:17
**mind** [1] - 5309:7
**mine** [1] - 5351:21
**minimal** [1] - 5346:10
**minimized** [1] - 5263:14
**minus** [1] - 5346:19
**minute** [6] - 5224:16, 5242:10, 5262:18, 5262:19, 5267:20, 5363:25
**minutes** [17] - 5280:11, 5280:17, 5280:21, 5340:10, 5340:16, 5340:18, 5340:21, 5342:9, 5342:10, 5342:11, 5343:5, 5343:16, 5343:24, 5343:25, 5346:18, 5346:20, 5346:21
**missing** [1] - 5338:22
**mission** [1] - 5257:23
**misstates** [1] - 5238:15
**mobile** [1] - 5271:14
**moment** [15] - 5226:2, 5234:7, 5248:24, 5249:10, 5281:20, 5289:19, 5304:23, 5308:17, 5312:12, 5315:3, 5316:9, 5339:8, 5339:21, 5343:22, 5351:25
**moments** [2] - 5289:21, 5301:3
**Monday** [1] - 5367:7

**montage** [2] - 5263:10, 5263:13
**month** [2] - 5270:19, 5270:24
**Monument** [2] - 5231:25, 5232:3
**mood** [1] - 5278:23
**morning** [14] - 5221:2, 5229:7, 5229:19, 5229:23, 5271:23, 5271:24, 5273:2, 5273:10, 5273:24, 5275:3, 5275:6, 5275:9, 5292:4, 5365:23
**most** [3] - 5246:18, 5313:17, 5315:19
**motions** [1] - 5297:4
**motor** [1] - 5354:15
**motorcade** [2] - 5292:4, 5292:6
**motorcycle** [2] - 5354:16, 5354:22
**motto** [2] - 5252:4, 5252:14
**move** [28] - 5233:21, 5239:18, 5240:17, 5252:2, 5257:1, 5258:10, 5260:8, 5262:22, 5287:25, 5289:24, 5300:18, 5304:7, 5314:9, 5316:19, 5317:13, 5321:10, 5322:10, 5323:1, 5323:24, 5325:19, 5327:9, 5337:15, 5346:17, 5350:3, 5351:13, 5351:20, 5364:9, 5366:20
**moved** [5] - 5335:15, 5335:22, 5354:1, 5355:1, 5355:5
**moves** [2] - 5249:8, 5250:11
**moving** [13] - 5238:4, 5258:24, 5261:11, 5261:23, 5262:21, 5265:4, 5265:10, 5265:20, 5279:5, 5311:3, 5311:8, 5311:11, 5362:6
**MPD** [1] - 5366:4
**multiple** [3] - 5274:21, 5283:13, 5297:10
**must** [2] - 5254:16, 5255:20

### N

**name** [3] - 5236:25, 5269:3, 5269:4
**named** [2] - 5233:14, 5327:22
**names** [2] - 5297:23, 5297:24
**National** [2] - 5295:8, 5295:10
**navigate** [1] - 5245:22
**navigating** [1] - 5362:17
**near** [3] - 5225:7, 5321:17, 5322:7
**necessarily** [1] - 5333:11
**neck** [2] - 5312:8, 5312:14
**need** [3] - 5245:15, 5276:17, 5366:14
**needed** [3] - 5226:10, 5244:14, 5244:16
**needs** [1] - 5259:2
**Nestler** [7] - 5220:5, 5226:13, 5236:1, 5252:10, 5268:23, 5365:11, 5366:2
**NESTLER** [134] - 5226:14, 5226:16, 5227:23, 5228:3, 5228:6, 5228:11, 5228:13, 5229:4, 5229:6, 5229:20, 5229:22, 5230:7, 5230:10, 5230:11, 5230:24, 5231:2, 5231:3, 5231:15, 5231:18, 5231:20, 5232:14, 5232:17, 5233:3, 5233:7, 5233:8, 5233:21, 5234:2, 5234:5, 5237:7, 5237:18, 5237:21, 5237:25, 5238:3, 5238:18, 5239:1, 5239:3, 5239:8, 5239:10, 5239:13, 5239:15, 5239:18, 5240:3, 5240:13, 5240:14, 5240:17, 5240:24, 5241:8, 5241:9, 5242:19, 5243:12, 5243:13, 5243:25, 5244:2, 5244:21, 5244:22, 5245:5, 5245:20, 5246:23, 5247:1, 5247:20, 5248:6, 5248:14,

5248:16, 5248:25, 5249:2, 5249:8, 5249:15, 5249:19, 5249:24, 5250:1, 5250:5, 5250:7, 5250:11, 5251:2, 5251:6, 5251:8, 5251:24, 5252:1, 5252:7, 5252:11, 5252:12, 5252:23, 5253:2, 5253:3, 5253:22, 5253:24, 5254:2, 5254:4, 5254:8, 5254:10, 5254:20, 5254:25, 5255:1, 5255:18, 5255:23, 5255:24, 5256:12, 5256:13, 5256:21, 5256:23, 5257:1, 5257:6, 5258:5, 5258:7, 5258:10, 5258:14, 5259:25, 5260:2, 5260:8, 5260:11, 5260:14, 5260:17, 5262:1, 5262:15, 5263:6, 5263:8, 5263:15, 5263:18, 5263:22, 5264:1, 5265:1, 5265:2, 5266:13, 5266:18, 5266:21, 5266:23, 5267:12, 5267:14, 5268:3, 5365:12, 5365:15, 5366:3, 5366:9, 5366:16
**never** [11] - 5283:24, 5298:7, 5311:22, 5312:6, 5312:24, 5312:25, 5316:1, 5331:19, 5332:20, 5357:5, 5358:20
**New** [1] - 5288:25
**new** [7] - 5236:3, 5236:4, 5284:10, 5286:9, 5286:12, 5286:13, 5354:4
**news** [3] - 5250:3, 5251:11, 5256:3
**next** [17] - 5231:9, 5234:8, 5234:9, 5237:18, 5256:14, 5258:25, 5268:9, 5272:3, 5284:5, 5305:6, 5344:15, 5346:1, 5352:21, 5355:8, 5367:7, 5367:20, 5367:21
**nice** [1] - 5226:9
**night** [1] - 5366:4

5383

**nine** [2] - 5269:12, 5360:12
**nobody** [7] - 5284:2, 5284:7, 5286:16, 5312:2, 5325:8, 5364:22, 5364:24
**noise** [1] - 5294:1
**none** [2] - 5221:15, 5222:21
**nonstop** [1] - 5298:3
**nonverbally** [1] - 5265:13
**normal** [4] - 5275:8, 5282:5, 5306:19, 5320:13
**normally** [1] - 5349:10
**North** [2] - 5228:10, 5289:1
**nose** [1] - 5222:20
**notating** [1] - 5290:17
**NOTE** [1] - 5221:2
**nothing** [3] - 5274:11, 5293:16, 5355:16
**notice** [2] - 5280:6, 5342:18
**November** [2] - 5240:25, 5289:3
**nowhere** [1] - 5225:7
**number** [6] - 5249:14, 5252:10, 5284:22, 5332:2, 5337:20
**numerous** [1] - 5313:8
**nurse** [2] - 5250:3, 5251:11

**O**

**o'clock** [1] - 5302:21
**Oath** [12] - 5222:21, 5228:10, 5229:14, 5229:18, 5238:13, 5238:24, 5241:14, 5241:18, 5261:18, 5261:23, 5262:9, 5268:14
**Oathkeepers** [1] - 5237:16
**object** [8] - 5239:24, 5250:13, 5264:20, 5272:25, 5288:4, 5305:14, 5305:16
**objection** [62] - 5224:11, 5227:21, 5233:5, 5233:23, 5236:15, 5237:6, 5238:15, 5239:20, 5239:22, 5240:20, 5242:16, 5243:6, 5243:22, 5244:19, 5245:2, 5245:3,

5245:17, 5247:17, 5248:2, 5249:12, 5250:22, 5250:24, 5250:25, 5255:16, 5255:21, 5256:11, 5257:3, 5258:11, 5261:25, 5262:11, 5266:11, 5282:11, 5284:19, 5288:16, 5290:1, 5290:3, 5294:23, 5298:15, 5298:24, 5300:14, 5304:9, 5306:22, 5308:1, 5314:11, 5317:14, 5318:1, 5318:11, 5318:12, 5321:11, 5322:11, 5323:25, 5331:1, 5331:2, 5331:14, 5331:16, 5335:1, 5335:7, 5336:13, 5337:17, 5337:19, 5340:4, 5364:11
**objections** [2] - 5221:11, 5221:12
**objects** [2] - 5306:9, 5306:12
**observe** [3] - 5274:9, 5301:16, 5326:21
**observed** [2] - 5338:14, 5338:15
**obstruct** [2] - 5227:13, 5227:15
**obstruction** [2] - 5227:3, 5227:10
**obviously** [2] - 5301:11, 5315:8
**OC** [6] - 5272:14, 5297:8, 5297:10, 5298:5, 5306:17, 5306:19
**occasions** [1] - 5236:2
**occurs** [1] - 5235:16
**offense** [1] - 5223:25
**offer** [2] - 5242:8, 5311:21
**offering** [1] - 5242:7
**office** [1] - 5313:9
**Officer** [24] - 5221:10, 5221:18, 5221:23, 5268:10, 5268:17, 5280:25, 5288:22, 5299:16, 5299:17, 5300:13, 5300:20, 5301:4, 5302:7, 5302:25, 5303:8, 5303:10, 5307:13, 5308:15, 5309:6, 5335:10, 5366:4,

5366:8, 5366:11, 5366:24
**officer** [43] - 5221:18, 5221:24, 5224:13, 5225:1, 5270:20, 5276:17, 5281:16, 5282:19, 5282:20, 5282:23, 5293:17, 5299:3, 5302:5, 5306:7, 5308:12, 5312:4, 5314:20, 5317:21, 5318:23, 5321:23, 5322:4, 5326:5, 5326:14, 5326:18, 5327:2, 5336:9, 5336:18, 5336:22, 5338:18, 5344:8, 5346:3, 5346:5, 5349:5, 5350:17, 5351:11, 5354:12, 5355:7, 5355:9, 5359:24, 5359:25, 5366:24
**officer's** [2] - 5288:12, 5300:25
**officers** [38] - 5221:24, 5222:1, 5225:4, 5276:8, 5276:12, 5278:3, 5279:8, 5280:10, 5282:18, 5286:4, 5286:7, 5287:2, 5287:7, 5290:7, 5290:15, 5291:25, 5298:12, 5306:16, 5308:14, 5308:19, 5315:15, 5316:24, 5320:23, 5324:5, 5325:4, 5326:17, 5336:21, 5342:22, 5346:1, 5349:4, 5349:19, 5349:21, 5352:19, 5353:19, 5362:8, 5366:9, 5366:17, 5366:20
**official** [4] - 5227:3, 5227:10, 5227:13, 5227:16
**OK** [5] - 5239:5, 5239:6, 5253:25, 5258:15, 5258:20
**OKFL** [7] - 5239:5, 5240:9, 5240:10, 5254:11, 5257:14, 5257:15, 5258:19
**Old** [1] - 5241:4
**onboarding** [1] - 5270:15
**once** [5] - 5261:23, 5292:21, 5293:8,

5306:16, 5324:4
**one** [69] - 5221:21, 5221:23, 5223:21, 5223:25, 5224:24, 5226:2, 5233:25, 5234:17, 5235:25, 5236:1, 5236:21, 5238:19, 5249:5, 5249:21, 5258:3, 5264:11, 5264:25, 5265:11, 5266:3, 5266:15, 5267:20, 5272:5, 5272:17, 5272:20, 5272:21, 5275:16, 5277:2, 5278:3, 5283:4, 5284:23, 5286:20, 5291:11, 5293:21, 5294:10, 5295:22, 5296:7, 5297:1, 5301:5, 5301:11, 5302:5, 5302:7, 5305:17, 5307:13, 5309:25, 5324:8, 5326:13, 5327:21, 5332:16, 5342:1, 5346:18, 5349:4, 5349:11, 5351:25, 5353:7, 5353:10, 5353:14, 5353:22, 5354:18, 5356:9, 5356:18, 5356:19, 5358:20, 5359:9, 5359:20, 5361:8, 5363:25, 5366:10, 5367:22
**one's** [1] - 5264:17
**ones** [4] - 5222:7, 5277:17, 5334:9, 5356:24
**online** [1] - 5256:19
**OP** [3] - 5248:18, 5249:6, 5258:19
**open** [22] - 5237:5, 5288:15, 5292:11, 5301:15, 5319:10, 5320:11, 5321:5, 5322:4, 5322:5, 5324:13, 5324:15, 5324:18, 5324:22, 5324:23, 5325:2, 5339:6, 5340:9, 5344:9, 5344:24, 5345:17, 5348:12, 5351:17
**opened** [7] - 5262:14, 5304:24, 5307:9, 5307:10, 5307:20, 5339:24, 5346:9
**opening** [3] - 5236:3,

5236:4, 5262:3
**opens** [7] - 5324:8, 5340:10, 5345:5, 5345:19, 5345:21, 5347:10
**opportunity** [4] - 5234:22, 5234:23, 5236:5, 5236:18
**oppose** [1] - 5247:24
**opposed** [1] - 5356:13
**opposite** [2] - 5264:23, 5353:7
**option** [1] - 5325:8
**order** [5] - 5221:13, 5226:19, 5245:15, 5324:25, 5366:12
**organize** [1] - 5287:5
**orient** [6] - 5319:2, 5340:8, 5352:18, 5353:3, 5353:11, 5359:14
**orientation** [2] - 5340:17, 5341:1
**oriented** [1] - 5321:14
**original** [1] - 5263:16
**ought** [2] - 5253:11, 5367:2
**ourselves** [2] - 5287:6, 5359:14
**outer** [1] - 5324:15
**outset** [1] - 5327:25
**outside** [13] - 5221:5, 5302:15, 5302:24, 5322:23, 5325:8, 5325:18, 5341:23, 5342:5, 5350:21, 5359:3, 5362:22, 5363:16, 5365:25
**outstanding** [1] - 5221:7
**outward** [3] - 5314:21, 5321:23, 5324:8
**override** [1] - 5343:6
**overruled** [14] - 5237:6, 5238:17, 5242:18, 5243:23, 5245:18, 5282:12, 5284:20, 5288:16, 5290:3, 5298:16, 5298:25, 5300:15, 5306:23, 5324:17
**overstepped** [1] - 5236:15
**Owens** [3] - 5221:10, 5221:18, 5366:5
**Owens'** [1] - 5221:23
**own** [2] - 5270:3, 5348:14

5384

# P

**p.m** [42] - 5223:12, 5224:12, 5228:14, 5233:17, 5233:24, 5234:18, 5236:10, 5236:11, 5236:12, 5238:22, 5244:7, 5244:13, 5244:16, 5244:25, 5247:6, 5248:18, 5250:2, 5251:10, 5251:13, 5253:17, 5261:1, 5261:2, 5266:16, 5267:5, 5267:9, 5267:15, 5267:18, 5267:19, 5323:21, 5342:11, 5346:8, 5346:12, 5348:7, 5348:25, 5349:24, 5350:14, 5352:20, 5352:23, 5353:14, 5368:10
**page** [4] - 5233:25, 5234:6, 5234:8, 5234:9
**PAGE** [1] - 5220:2
**pages** [2] - 5234:2, 5234:4
**panel** [2] - 5301:22, 5342:3
**panels** [2] - 5341:25, 5342:1
**panes** [1] - 5347:25
**pants** [2] - 5253:10, 5253:11
**parallel** [1] - 5363:17
**pardon** [1] - 5221:9
**Parris** [1] - 5269:23
**part** [9] - 5222:14, 5222:16, 5237:15, 5237:18, 5263:10, 5263:12, 5293:16, 5308:20, 5326:16
**participated** [1] - 5225:16
**particular** [1] - 5352:7
**pass** [1] - 5284:11
**passing** [2] - 5311:8, 5361:20
**past** [5] - 5226:20, 5235:12, 5284:2, 5311:8, 5334:1
**patriotic** [1] - 5295:14
**patriots** [8] - 5238:9, 5238:21, 5238:24, 5239:12, 5240:12, 5241:5, 5241:6, 5254:17
**Patriots** [1] - 5238:20

**patrols** [1] - 5271:9
**Paul** [2] - 5228:8, 5228:9
**pause** [26] - 5230:8, 5230:10, 5231:18, 5245:16, 5253:2, 5254:25, 5283:10, 5285:9, 5285:10, 5289:13, 5290:22, 5294:13, 5295:17, 5296:10, 5296:22, 5297:16, 5304:18, 5305:3, 5305:22, 5310:22, 5314:1, 5316:7, 5317:25, 5319:19, 5334:24
**paused** [1] - 5310:4
**pausing** [2] - 5245:13, 5290:24
**Peace** [1] - 5232:3
**peaceful** [5] - 5333:24, 5334:16, 5334:21, 5355:15, 5355:16
**peek** [1] - 5301:1
**Pence** [6] - 5267:24, 5276:3, 5276:4, 5279:2
**pending** [2] - 5318:2, 5318:5
**Pendleton** [2] - 5360:19, 5360:20
**people** [99] - 5225:12, 5225:13, 5226:20, 5255:14, 5255:20, 5256:6, 5258:2, 5259:18, 5262:6, 5264:10, 5272:3, 5274:10, 5274:14, 5274:21, 5275:9, 5275:14, 5276:14, 5276:15, 5276:16, 5278:11, 5278:25, 5279:21, 5280:4, 5282:3, 5282:6, 5282:10, 5282:14, 5283:19, 5283:22, 5284:1, 5284:11, 5287:4, 5291:1, 5291:4, 5291:9, 5293:2, 5293:3, 5294:9, 5295:9, 5296:12, 5296:16, 5298:12, 5299:4, 5300:10, 5301:14, 5301:19, 5302:14, 5306:12, 5306:15, 5307:1, 5307:2, 5310:24, 5311:18, 5312:5, 5312:6,

5315:12, 5315:16, 5315:20, 5315:25, 5316:23, 5322:8, 5325:3, 5325:19, 5326:23, 5328:5, 5328:6, 5328:9, 5328:14, 5328:17, 5328:18, 5329:1, 5329:11, 5329:15, 5329:19, 5330:20, 5330:22, 5332:20, 5333:1, 5333:9, 5333:19, 5333:23, 5333:24, 5334:14, 5334:16, 5336:8, 5341:23, 5346:10, 5349:17, 5350:23, 5351:9, 5354:25, 5355:11, 5362:6, 5362:9, 5364:25
**pepper** [4] - 5294:9, 5299:22, 5322:6, 5325:7
**per** [1] - 5315:4
**percent** [6] - 5282:15, 5293:4, 5293:10, 5325:9, 5329:14, 5367:9
**performing** [1] - 5227:7
**perhaps** [1] - 5347:15
**period** [11] - 5224:10, 5224:16, 5234:19, 5234:23, 5235:4, 5236:8, 5261:4, 5298:10, 5325:6, 5336:8, 5352:3
**permissible** [1] - 5225:11
**permission** [1] - 5288:17
**permit** [7] - 5330:15, 5330:18, 5331:7, 5331:9, 5331:11, 5331:13, 5333:4
**permits** [6] - 5331:23, 5332:16, 5333:6, 5333:9, 5333:11, 5333:14
**person** [30] - 5227:18, 5230:14, 5230:23, 5231:7, 5232:6, 5232:10, 5233:14, 5253:12, 5264:18, 5265:4, 5281:25, 5282:1, 5293:15, 5301:24, 5302:4, 5316:19, 5320:17, 5320:20, 5327:6, 5342:6, 5355:2,

5355:4, 5362:25, 5363:6, 5363:13, 5363:18, 5364:16, 5364:17, 5364:19, 5364:20
**person's** [1] - 5259:20
**personal** [2] - 5331:14, 5337:17
**perspective** [1] - 5225:2
**perspectives** [1] - 5223:16
**pertaining** [3] - 5236:10, 5236:11, 5359:10
**pertains** [1] - 5234:20
**phone** [25] - 5230:14, 5231:8, 5246:22, 5249:21, 5250:9, 5259:6, 5259:9, 5259:12, 5259:14, 5259:16, 5259:19, 5259:20, 5259:23, 5260:6, 5260:22, 5261:3, 5261:4, 5262:25, 5264:5, 5266:24, 5267:15, 5275:19, 5337:23, 5338:3, 5351:3
**phones** [1] - 5248:20
**phonetic** [1] - 5347:13
**photo** [2] - 5229:8, 5289:5
**photograph** [1] - 5231:23
**phrase** [1] - 5241:6
**physical** [1] - 5241:20
**physically** [3] - 5227:19, 5244:14, 5300:21
**pick** [2] - 5274:21, 5288:2
**picked** [3] - 5272:4, 5300:8, 5306:16
**picking** [1] - 5242:22
**picture** [2] - 5283:18, 5287:20
**pieces** [1] - 5223:14
**pink** [1] - 5231:4
**pissed** [1] - 5238:20
**place** [8] - 5223:11, 5282:7, 5287:12, 5288:5, 5309:23, 5317:9, 5333:9, 5346:8
**places** [2] - 5283:13, 5284:21
**plan** [4] - 5287:12, 5324:6, 5324:24, 5366:17

**planning** [2] - 5246:8, 5246:11
**plate** [1] - 5296:2
**play** [28] - 5230:7, 5231:15, 5252:24, 5254:22, 5263:15, 5263:23, 5279:13, 5284:25, 5286:22, 5290:19, 5291:17, 5295:1, 5296:8, 5298:17, 5304:13, 5305:1, 5308:4, 5309:24, 5310:13, 5310:17, 5314:22, 5316:4, 5316:12, 5317:23, 5319:16, 5325:11, 5352:10, 5353:2
**played** [56] - 5230:9, 5231:1, 5231:17, 5232:16, 5253:1, 5254:24, 5263:2, 5263:4, 5263:9, 5263:10, 5263:17, 5263:24, 5279:14, 5279:20, 5280:18, 5280:22, 5281:9, 5283:9, 5285:5, 5286:24, 5289:12, 5290:21, 5292:15, 5294:12, 5295:2, 5295:16, 5296:9, 5296:21, 5297:15, 5298:18, 5299:9, 5304:17, 5305:2, 5305:24, 5308:6, 5310:2, 5310:14, 5310:21, 5314:23, 5316:6, 5316:13, 5317:24, 5319:18, 5325:16, 5325:23, 5334:8, 5341:18, 5343:2, 5347:18, 5348:17, 5348:23, 5350:12, 5350:19, 5350:25, 5353:4, 5353:18
**playing** [9] - 5230:24, 5232:15, 5275:10, 5275:12, 5275:14, 5275:19, 5281:7, 5334:25, 5348:11
**plays** [1] - 5280:21
**plus** [3] - 5342:10, 5342:11
**pockets** [1] - 5313:4
**point** [45] - 5224:23, 5225:7, 5235:11, 5242:3, 5246:9, 5261:20, 5270:5,

5385

5273:23, 5275:23,
5279:24, 5283:16,
5283:22, 5289:24,
5293:16, 5293:18,
5294:20, 5296:5,
5302:6, 5302:7,
5307:24, 5310:5,
5312:4, 5315:19,
5315:25, 5316:15,
5316:24, 5317:12,
5320:11, 5320:20,
5321:9, 5322:25,
5336:2, 5338:22,
5341:11, 5343:16,
5345:17, 5347:24,
5349:13, 5356:5,
5356:9, 5356:22,
5362:24, 5363:4,
5363:11, 5363:14
**Point** [1] - 5272:16
**pointed** [1] - 5322:17
**pointing** [3] - 5274:5,
5275:3, 5367:14
**points** [1] - 5351:13
**poles** [1] - 5274:14
**police** [18] - 5270:20,
5272:10, 5274:17,
5274:23, 5274:24,
5275:1, 5278:19,
5281:4, 5281:22,
5282:9, 5283:14,
5284:2, 5284:14,
5287:22, 5328:13,
5342:21, 5344:6,
5344:8
**Police** [20] - 5269:12,
5269:25, 5270:8,
5270:12, 5270:24,
5286:7, 5295:22,
5299:3, 5300:24,
5308:19, 5316:24,
5320:24, 5328:20,
5330:2, 5330:10,
5330:18, 5330:21,
5331:8, 5336:9,
5336:22
**policing** [1] - 5362:5
**politics** [1] - 5256:3
**polycarbonate** [1] -
5357:23
**Pool** [1] - 5232:3
**populated** [2] -
5311:9, 5311:11
**population** [1] -
5362:6
**portion** [5] - 5229:18,
5237:19, 5237:23,
5239:8, 5278:13
**portray** [2] - 5289:20,
5294:17

**portrayal** [1] - 5304:4
**position** [3] - 5232:8,
5232:9, 5338:13
**possession** [2] -
5295:23, 5296:5
**possible** [5] - 5264:7,
5281:5, 5283:6,
5293:5, 5315:14
**possibly** [1] - 5309:8
**post** [2] - 5273:12,
5282:21
**posts** [5] - 5271:11,
5271:12, 5283:2,
5283:4
**potential** [1] - 5279:11
**potentially** [1] -
5236:1
**power** [1] - 5247:24
**practical** [3] - 5282:2,
5315:15, 5328:9
**precede** [1] - 5243:24
**preceding** [1] - 5253:9
**precisely** [1] - 5223:9
**precluded** [2] -
5235:3, 5235:12
**predominantly** [1] -
5264:19
**prejudicial** [6] -
5222:23, 5223:1,
5224:3, 5225:15,
5288:6, 5288:14
**prepare** [2] - 5270:15,
5367:25
**prepared** [4] - 5221:3,
5334:3, 5334:5,
5367:2
**presence** [7] - 5226:6,
5243:4, 5256:19,
5302:24, 5303:12,
5365:25, 5367:17
**present** [5] - 5221:19,
5225:14, 5227:19,
5319:1, 5319:4
**President** [3] -
5291:19, 5291:22,
5292:2
**presidential** [4] -
5241:1, 5241:3,
5247:24, 5329:23
**presumably** [1] -
5225:12
**previous** [1] - 5311:14
**previously** [5] -
5252:20, 5268:24,
5276:20, 5290:1,
5310:16
**priority** [1] - 5284:23
**probative** [1] - 5224:4
**problem** [2] - 5237:4,
5319:6

**problematic** [1] -
5225:17
**procedures** [3] -
5359:19, 5361:2,
5361:5
**proceeding** [4] -
5227:4, 5227:10,
5227:13, 5227:16
**Proceedings** [11] -
5221:5, 5226:6,
5237:5, 5288:16,
5302:24, 5303:12,
5319:10, 5339:6,
5351:17, 5365:25,
5368:10
**process** [4] - 5270:19,
5293:14, 5309:17,
5331:7
**processing** [1] -
5257:19
**proffer** [1] - 5221:15
**progress** [1] - 5366:18
**progressed** [2] -
5275:6, 5278:25
**proof** [3] - 5272:18,
5272:23, 5272:24
**proper** [1] - 5331:18
**property** [1] - 5299:4
**protect** [4] - 5284:1,
5284:10, 5328:17
**protection** [4] -
5272:15, 5286:13,
5296:3
**protest** [1] - 5350:6
**protester** [2] - 5344:6,
5349:10
**protesters** [3] -
5289:9, 5322:22,
5350:7
**protests** [1] - 5329:4
**protocols** [3] - 5330:2,
5330:19, 5331:23
**Proton** [1] - 5257:16
**ProtonMail.com** [1] -
5257:17
**protonmail.com** [1] -
5257:25
**provider's** [1] -
5259:17
**providers** [1] -
5259:11
**proximity** [1] -
5265:12
**public** [1] - 5278:4
**publish** [4] - 5237:13,
5288:18, 5331:1,
5331:20
**published** [1] - 5354:3
**pull** [32] - 5228:3,
5228:11, 5229:4,

5229:20, 5231:13,
5233:3, 5238:1,
5246:23, 5248:14,
5248:25, 5251:24,
5252:7, 5252:23,
5253:22, 5259:25,
5263:6, 5263:22,
5266:13, 5276:20,
5292:6, 5292:8,
5293:1, 5303:17,
5313:25, 5317:3,
5321:2, 5322:4,
5322:19, 5323:14,
5342:17, 5351:21,
5364:1
**pulled** [1] - 5292:5
**pulling** [3] - 5278:25,
5281:25, 5302:15
**pulls** [1] - 5292:10
**puncture** [1] - 5272:24
**punked** [1] - 5267:24
**purely** [1] - 5316:20
**purple** [1] - 5231:4
**purpose** [4] - 5264:16,
5264:22, 5311:10,
5311:11
**purposes** [2] - 5283:3,
5313:8
**Push** [1] - 5221:20
**push** [15] - 5221:21,
5289:10, 5291:3,
5291:7, 5292:18,
5300:10, 5310:9,
5312:8, 5312:14,
5322:7, 5344:9,
5358:24, 5362:9
**pushed** [7] - 5287:11,
5292:20, 5292:21,
5307:16, 5315:10,
5324:4, 5326:12
**pushes** [1] - 5344:22
**pushing** [7] - 5221:19,
5224:25, 5225:3,
5302:15, 5307:14,
5345:4, 5345:13
**puts** [1] - 5346:20
**putting** [2] - 5282:18,
5362:16

## Q

**QRF** [4] - 5242:7,
5243:15, 5243:21,
5244:9
**quarter** [1] - 5361:15
**Quebec** [1] - 5361:4
**questioning** [1] -
5247:4
**questions** [46] -
5226:20, 5226:24,

5228:25, 5230:1,
5230:5, 5235:5,
5237:3, 5238:6,
5238:9, 5241:10,
5241:11, 5241:21,
5242:6, 5242:8,
5244:3, 5245:21,
5245:23, 5246:7,
5247:2, 5248:7,
5248:9, 5252:3,
5252:4, 5255:7,
5256:16, 5259:5,
5261:7, 5262:23,
5264:4, 5264:13,
5265:18, 5265:24,
5266:6, 5266:24,
5268:3, 5304:14,
5310:18, 5319:12,
5327:11, 5327:14,
5332:13, 5355:19,
5355:24, 5356:5,
5357:14, 5365:6
**quick** [2] - 5326:18,
5366:1
**quickly** [1] - 5351:13
**quiet** [1] - 5263:14
**quite** [2] - 5223:1,
5235:14

## R

**rack** [6] - 5274:12,
5274:14, 5281:21,
5281:25, 5284:18,
5284:22
**racks** [8] - 5274:11,
5274:12, 5278:2,
5279:1, 5280:5,
5283:13, 5283:23,
5335:20
**radio** [4] - 5276:7,
5279:6, 5280:9,
5280:14
**raise** [1] - 5268:13
**rallies** [1] - 5331:23
**rally** [2] - 5329:23,
5330:15
**ram** [1] - 5350:23
**ran** [3] - 5283:17,
5333:20, 5348:19
**rare** [1] - 5236:2
**rated** [2] - 5272:16,
5273:1
**ray** [1] - 5271:18
**re** [4] - 5235:8, 5281:3,
5319:1, 5319:4
**re-present** [2] -
5319:1, 5319:4
**re-set** [1] - 5281:3
**read** [4] - 5234:7,

5386

5248:12, 5254:14, 5255:11
**ready** [6] - 5226:11, 5252:24, 5268:8, 5303:9, 5365:15, 5367:11
**real** [1] - 5330:4
**realized** [1] - 5301:7
**really** [4] - 5221:22, 5313:20, 5316:2, 5352:5
**reason** [6] - 5226:11, 5315:5, 5315:14, 5321:11, 5337:5, 5338:6
**reasoning** [1] - 5302:2
**reasons** [2] - 5357:3, 5361:23
**rebut** [3] - 5234:16, 5234:22, 5235:11
**recalled** [4] - 5234:22, 5235:7, 5236:5, 5236:19
**receipt** [1] - 5264:8
**receive** [3] - 5269:22, 5270:1, 5332:23
**Recess** [1] - 5303:6
**recipients** [1] - 5264:8
**recognize** [31] - 5273:20, 5277:5, 5277:22, 5278:7, 5285:17, 5287:16, 5289:15, 5289:17, 5289:18, 5294:15, 5295:4, 5296:24, 5299:13, 5299:15, 5303:19, 5304:21, 5307:19, 5308:8, 5314:3, 5317:6, 5317:10, 5323:16, 5323:18, 5331:4, 5340:12, 5344:19, 5348:21, 5353:6, 5354:17, 5354:20, 5364:5
**recollection** [6] - 5302:12, 5318:24, 5320:7, 5334:4, 5334:11, 5350:2
**record** [18] - 5234:10, 5266:25, 5277:12, 5278:12, 5281:15, 5288:3, 5290:14, 5308:12, 5314:19, 5317:20, 5318:13, 5321:22, 5322:17, 5323:8, 5326:4, 5338:5, 5339:10, 5351:5
**recording** [51] -

5230:9, 5231:1, 5231:17, 5232:16, 5253:1, 5254:24, 5263:17, 5263:24, 5279:14, 5279:20, 5280:18, 5280:22, 5281:9, 5283:9, 5285:5, 5286:24, 5289:12, 5290:21, 5292:15, 5294:12, 5295:2, 5295:16, 5296:9, 5296:21, 5297:15, 5298:18, 5299:9, 5304:17, 5305:2, 5305:24, 5308:6, 5310:2, 5310:14, 5310:21, 5314:23, 5316:6, 5316:13, 5317:24, 5319:18, 5325:16, 5325:23, 5341:18, 5343:2, 5347:18, 5348:17, 5348:23, 5350:12, 5350:19, 5350:25, 5353:4, 5353:18
**records** [2] - 5261:4, 5265:3
**recross** [1] - 5236:3
**recruit** [1] - 5269:23
**red** [2] - 5229:10, 5315:7
**redirect** [1] - 5363:24
**REDIRECT** [2] - 5226:15, 5364:3
**Redirect** [2] - 5220:5, 5220:9
**ref** [1] - 5276:25
**refer** [1] - 5358:13
**reference** [3] - 5247:7, 5253:4, 5359:13
**referenced** [1] - 5359:10
**referencing** [2] - 5235:5, 5362:11
**referred** [4] - 5235:6, 5238:24, 5241:13, 5252:20
**referring** [5] - 5238:12, 5329:6, 5332:18, 5345:24, 5354:10
**reflect** [6] - 5242:13, 5243:3, 5243:20, 5248:20, 5259:12, 5260:22
**reflected** [1] - 5259:17
**reflecting** [1] - 5245:12
**Reflecting** [1] - 5232:3

**refresh** [1] - 5334:10
**refreshed** [1] - 5254:16
**regain** [1] - 5316:25
**regaining** [1] - 5317:6
**regarding** [1] - 5261:8
**regardless** [1] - 5282:19
**regards** [1] - 5221:10
**regroup** [1] - 5294:8
**regular** [3] - 5271:14, 5272:9, 5272:10
**relate** [1] - 5288:5
**related** [4] - 5242:24, 5330:19, 5336:8, 5352:3
**relates** [1] - 5330:14, 5338:2
**relation** [2] - 5241:1, 5328:14
**relationship** [2] - 5241:18, 5241:20
**relaying** [1] - 5278:6
**relevance** [3] - 5221:15, 5222:11, 5224:3
**relevant** [5] - 5221:25, 5222:1, 5222:12, 5235:18, 5288:12
**remained** [1] - 5336:4
**remember** [38] - 5228:1, 5229:2, 5230:3, 5230:4, 5230:5, 5232:20, 5241:11, 5241:23, 5242:8, 5244:4, 5245:23, 5246:9, 5247:4, 5248:8, 5248:22, 5251:18, 5252:5, 5255:9, 5256:16, 5259:7, 5261:9, 5262:4, 5264:5, 5264:14, 5265:20, 5266:24, 5270:11, 5275:16, 5281:20, 5296:17, 5301:23, 5302:10, 5302:12, 5313:12, 5313:16, 5320:17, 5323:11, 5359:4
**remind** [3] - 5253:25, 5259:3, 5259:9
**reminders** [1] - 5365:21
**removed** [1] - 5300:21
**removing** [1] - 5265:16
**renew** [2] - 5367:5
**repeating** [1] - 5348:13

**rephrase** [5] - 5244:20, 5255:22, 5262:2, 5264:24, 5333:22
**replay** [2] - 5345:5, 5355:3
**report** [4] - 5267:1, 5270:21, 5273:2, 5330:22
**reported** [2] - 5221:3, 5273:3
**REPORTER** [4] - 5250:16, 5269:16, 5274:3, 5361:3
**REPORTER'S** [1] - 5221:2
**reporting** [2] - 5250:3, 5251:11
**reports** [1] - 5279:5
**represent** [2] - 5327:21, 5340:25
**representation** [4] - 5223:2, 5331:12, 5337:6, 5337:10
**request** [7] - 5221:14, 5225:18, 5225:22, 5236:2, 5367:5, 5273:3
**required** [1] - 5282:21
**requirement** [1] - 5255:19
**research** [1] - 5365:22
**reserve** [2] - 5360:15, 5360:17
**Reserves** [1] - 5269:12
**reserves** [1] - 5360:12
**respect** [1] - 5366:24
**respond** [2] - 5285:23, 5338:16
**responded** [3] - 5221:11, 5255:5, 5328:9
**responding** [7] - 5222:1, 5248:21, 5248:23, 5251:15, 5251:16, 5251:21, 5251:23
**response** [1] - 5285:20
**responsible** [1] - 5328:11
**rest** [5] - 5278:4, 5282:10, 5284:11, 5311:12, 5336:4
**restricted** [1] - 5246:20
**result** [1] - 5283:15
**resume** [1] - 5302:22
**retreating** [2] - 5284:4,

5287:7
**return** [2] - 5257:20, 5257:24
**review** [6] - 5242:20, 5245:8, 5249:11, 5249:21, 5256:6, 5259:20
**reviewed** [5] - 5242:10, 5242:23, 5245:25, 5246:18, 5255:25
**Rhodes** [28] - 5238:19, 5238:23, 5240:7, 5240:10, 5241:4, 5241:20, 5242:7, 5246:7, 5246:11, 5246:14, 5246:17, 5247:3, 5247:6, 5248:8, 5248:18, 5248:19, 5248:21, 5251:13, 5251:21, 5252:20, 5253:4, 5253:9, 5261:1, 5367:14, 5367:16, 5367:17, 5367:21
**Rhodes's** [11] - 5238:5, 5241:10, 5241:21, 5241:22, 5241:25, 5244:3, 5245:21, 5246:7, 5247:2, 5251:17, 5251:18
**rid** [1] - 5259:23
**rides** [1] - 5354:16
**ridiculous** [1] - 5313:17
**rifleman** [1] - 5269:20
**right-hand** [8] - 5277:5, 5277:13, 5278:13, 5278:20, 5279:18, 5281:17, 5284:17, 5285:4
**riot** [9] - 5293:6, 5302:3, 5315:7, 5316:11, 5326:16, 5332:14, 5358:14, 5358:22, 5365:1
**rioters** [9] - 5242:1, 5280:4, 5289:9, 5296:7, 5301:6, 5301:9, 5307:13, 5322:3, 5326:23
**rip** [1] - 5302:13
**ripping** [1] - 5312:7
**roads** [2] - 5245:22, 5246:2
**Rohde** [33] - 5228:5, 5230:25, 5231:16, 5232:15, 5237:20,

5387

5239:9, 5243:25,
5246:24, 5249:25,
5251:25, 5252:8,
5252:24, 5254:3,
5254:21, 5260:16,
5263:6, 5263:16,
5266:16, 5266:17,
5277:1, 5277:19,
5279:15, 5285:10,
5286:22, 5299:11,
5303:17, 5308:4,
5313:25, 5314:22,
5317:23, 5323:14,
5325:25, 5364:1
**roles** [1] - 5269:14
**rolled** [1] - 5237:16
**room** [4] - 5222:17,
5342:19, 5344:6,
5359:19
**rooms** [1] - 5361:20
**ROTC** [1] - 5360:8
**Rotunda** [10] - 5224:6,
5283:17, 5289:16,
5303:23, 5314:7,
5340:11, 5341:2,
5341:6, 5341:10,
5364:8
**roughly** [1] - 5230:16
**round** [4] - 5272:17,
5358:1, 5358:17
**rule** [1] - 5254:7
**run** [1] - 5350:24
**rung** [1] - 5225:4
**running** [3] - 5283:19,
5351:9, 5362:7
**runs** [1] - 5258:23
**Ryan** [3] - 5220:6,
5268:10, 5269:4
**RYAN** [1] - 5269:4

## S

**S-a-l-k-e** [1] - 5269:4
**safe** [2] - 5293:6,
5365:8
**safer** [1] - 5257:17
**safety** [4] - 5293:4,
5293:7, 5302:4,
5328:12
**sake** [1] - 5316:21
**Salke** [17] - 5220:6,
5268:10, 5268:17,
5269:4, 5280:25,
5288:22, 5290:24,
5295:4, 5302:25,
5303:8, 5303:10,
5319:12, 5321:17,
5335:10, 5335:12,
5365:7
**satisfies** [1] - 5224:3

**saw** [17] - 5233:19,
5244:25, 5245:19,
5287:9, 5287:10,
5301:6, 5301:22,
5305:9, 5307:11,
5307:13, 5308:17,
5309:4, 5313:20,
5315:8, 5326:13,
5334:20, 5358:10
**scale** [1] - 5349:12
**scanned** [1] - 5313:5
**scanning** [1] - 5230:2
**scenarios** [1] -
5361:15
**scene** [2] - 5223:1,
5344:15
**scheduled** [1] -
5331:24
**school** [4] - 5269:24,
5311:5, 5362:7,
5363:14
**scope** [4] - 5233:5,
5233:24, 5234:15,
5236:20
**screaming** [5] -
5222:19, 5276:16,
5280:10, 5296:12,
5296:16
**screams** [3] - 5276:7,
5276:12, 5282:18
**screen** [25] - 5228:3,
5229:4, 5229:20,
5230:12, 5233:3,
5251:6, 5251:7,
5252:7, 5253:22,
5259:25, 5277:10,
5279:18, 5290:7,
5290:16, 5295:20,
5303:19, 5306:5,
5308:10, 5308:13,
5308:15, 5343:22,
5347:9, 5347:13,
5347:20
**screenshot** [5] -
5249:5, 5250:8,
5260:3, 5260:6,
5260:19
**screenshots** [1] -
5248:20
**screwed** [1] - 5267:24
**se** [1] - 5315:4
**seat** [5] - 5226:7,
5268:12, 5268:17,
5303:13, 5366:1
**seated** [1] - 5303:7
**second** [12] - 5234:6,
5271:15, 5277:2,
5285:10, 5306:1,
5314:20, 5323:18,
5324:9, 5328:19,

5341:17, 5342:24,
5351:10
**seconds** [52] - 5230:8,
5230:10, 5230:25,
5231:5, 5231:19,
5232:2, 5244:13,
5253:2, 5254:23,
5291:18, 5292:13,
5294:2, 5295:5,
5295:15, 5295:21,
5296:6, 5296:13,
5296:20, 5296:24,
5297:14, 5304:25,
5305:1, 5305:6,
5305:19, 5306:2,
5306:5, 5307:4,
5308:5, 5308:8,
5309:9, 5310:1,
5310:4, 5314:25,
5315:1, 5316:5,
5316:7, 5316:16,
5319:19, 5326:2,
5339:3, 5339:9,
5340:10, 5340:19,
5340:21, 5342:10,
5343:5, 5343:15,
5343:25, 5346:19,
5346:21, 5348:8
**Secret** [2] - 5291:25,
5366:5
**secure** [8] - 5293:6,
5321:7, 5321:18,
5324:6, 5324:25,
5325:9, 5326:8,
5358:22
**secured** [1] - 5323:13
**security** [7] - 5271:21,
5283:3, 5291:24,
5293:4, 5293:7,
5313:8, 5357:3
**see** [81] - 5222:9,
5222:13, 5222:18,
5231:13, 5233:6,
5241:6, 5242:1,
5245:12, 5251:23,
5274:14, 5278:2,
5278:3, 5281:10,
5284:14, 5285:14,
5286:4, 5287:7,
5289:18, 5290:9,
5292:6, 5294:7,
5300:23, 5300:24,
5301:9, 5301:19,
5302:22, 5303:5,
5305:6, 5305:21,
5306:3, 5307:22,
5308:15, 5308:21,
5310:24, 5312:11,
5313:21, 5314:4,
5317:11, 5318:17,

5319:21, 5323:20,
5326:22, 5330:4,
5330:11, 5330:13,
5332:21, 5333:25,
5335:5, 5336:8,
5336:17, 5341:20,
5342:5, 5342:22,
5342:24, 5343:9,
5343:11, 5343:23,
5344:3, 5344:5,
5344:8, 5346:5,
5346:18, 5347:22,
5348:15, 5349:6,
5350:24, 5351:23,
5352:20, 5352:23,
5353:2, 5354:12,
5354:13, 5354:20,
5354:23, 5354:25,
5355:4, 5355:7,
5355:8, 5355:12,
5364:17
**seeing** [2] - 5313:18,
5365:23
**seek** [13] - 5287:24,
5288:17, 5289:24,
5294:20, 5304:7,
5307:25, 5314:9,
5317:12, 5321:9,
5322:10, 5323:1,
5323:23, 5364:9
**sees** [1] - 5328:25
**selected** [1] - 5272:4
**semper** [2] - 5252:17,
5252:18
**Senate** [3] - 5221:19,
5275:11, 5291:16
**senators** [1] - 5356:21
**send** [6] - 5228:7,
5228:14, 5238:19,
5244:6, 5258:2,
5258:15
**sense** [1] - 5349:18
**sent** [4] - 5232:24,
5233:16, 5240:4,
5243:17
**sentence** [2] -
5239:11, 5254:2
**sentiment** [1] -
5251:21
**sergeant** [5] - 5297:2,
5297:18, 5297:20,
5298:11, 5305:11
**sergeants** [1] - 5297:1
**series** [1] - 5304:14
**serve** [1] - 5360:15
**served** [2] - 5269:11,
5360:11
**Service** [2] - 5291:25,
5366:5
**service** [7] - 5258:1,

5259:11, 5328:1,
5328:2, 5355:19,
5357:11, 5359:22
**services** [1] - 5326:24
**Session** [2] - 5244:17,
5245:13
**session** [3] - 5221:2,
5235:6, 5245:16
**set** [6] - 5235:10,
5268:23, 5274:16,
5274:17, 5274:24,
5281:3
**setup** [1] - 5235:12
**seven** [1] - 5333:6
**several** [5] - 5238:7,
5242:6, 5244:3,
5266:6, 5271:8
**Sharon** [2] - 5231:6,
5237:16
**sharp** [1] - 5272:25
**Sheriff's** [1] - 5288:25
**shield** [10] - 5265:23,
5266:1, 5296:5,
5357:19, 5357:22,
5358:6, 5358:7,
5358:10, 5358:11,
5358:17
**shields** [8] - 5295:22,
5295:23, 5305:17,
5358:9, 5358:14,
5358:15, 5358:16,
5358:22
**shifted** [1] - 5278:24
**shirt** [4] - 5229:12,
5229:15, 5229:19,
5320:12
**shitting** [2] - 5253:10,
5253:11
**shooter** [1] - 5362:7
**short** [3] - 5298:9,
5346:9, 5366:10
**shortly** [3] - 5262:14,
5302:23, 5303:5
**shot** [1] - 5358:1
**shoulder** [2] -
5264:17, 5363:6
**show** [25] - 5224:21,
5225:2, 5225:11,
5228:17, 5250:5,
5267:3, 5272:9,
5288:12, 5330:3,
5330:6, 5330:7,
5330:10, 5334:22,
5336:16, 5338:23,
5339:23, 5339:25,
5340:2, 5340:5,
5344:15, 5351:8,
5351:9, 5352:12,
5353:15, 5354:6
**showed** [12] - 5230:2,

5262:3, 5262:6, 5311:15, 5319:3, 5332:2, 5332:25, 5338:20, 5350:10, 5364:24, 5364:25
**showing** [5] - 5225:18, 5246:14, 5260:20, 5261:18, 5331:6
**shown** [4] - 5335:12, 5340:2, 5341:4, 5352:7
**shows** [6] - 5224:24, 5260:6, 5267:4, 5347:3, 5350:3, 5353:14
**shut** [3] - 5322:24, 5325:19, 5325:20
**Sic** [1] - 5252:17
**sic** [3] - 5252:18, 5277:12, 5361:4
**side** [28] - 5241:25, 5242:4, 5244:10, 5251:9, 5268:23, 5273:5, 5273:6, 5278:3, 5278:4, 5278:19, 5279:6, 5279:9, 5279:11, 5280:6, 5281:24, 5284:9, 5286:15, 5297:21, 5316:19, 5324:23, 5337:3, 5337:7, 5337:8, 5337:12, 5344:13, 5349:2, 5355:23
**sides** [1] - 5310:9
**Signal** [14] - 5238:20, 5249:20, 5255:8, 5258:15, 5259:12, 5259:15, 5259:16, 5259:19, 5259:20, 5259:21, 5260:6, 5260:19, 5260:20, 5261:3
**signed** [2] - 5307:5, 5330:20
**similar** [3] - 5286:1, 5332:25, 5338:11
**simple** [1] - 5334:14
**simply** [3] - 5334:3, 5345:16, 5367:13
**singing** [1] - 5295:9
**single** [5] - 5255:11, 5281:16, 5344:5, 5351:15, 5360:22
**single-file** [1] - 5360:22
**sit** [1] - 5339:7
**sitting** [1] - 5327:21
**situation** [6] - 5283:2,

5283:6, 5300:21, 5328:10, 5349:14, 5367:6
**situations** [2] - 5282:25, 5349:10
**six** [2] - 5293:18, 5333:6
**skylight** [1] - 5275:18
**skylights** [11] - 5274:2, 5274:3, 5274:6, 5275:4, 5277:6, 5277:7, 5277:13, 5277:16, 5335:20, 5335:21, 5335:22
**slate** [1] - 5251:14
**slated** [1] - 5271:24
**slide** [2] - 5228:4, 5257:22
**Slide** [12] - 5228:4, 5228:12, 5238:8, 5239:2, 5244:1, 5246:24, 5247:6, 5248:14, 5253:23, 5254:8, 5258:5, 5267:13
**slightly** [2] - 5226:11, 5264:8
**slowly** [2] - 5276:14, 5322:5
**small** [1] - 5281:13
**smile** [1] - 5313:15
**smiled** [1] - 5313:15
**smoke** [1] - 5348:16
**social** [1] - 5256:18
**soft** [5] - 5272:7, 5272:8, 5273:15, 5295:25, 5297:2
**Sol** [1] - 5258:23
**someone** [8] - 5265:9, 5265:17, 5298:23, 5312:13, 5326:15, 5328:8, 5341:24, 5345:20
**something's** [1] - 5343:1
**sometimes** [1] - 5255:14
**somewhat** [1] - 5361:24
**song** [2] - 5295:4, 5295:7
**soon** [2] - 5293:3, 5300:8
**sophomore** [1] - 5360:5
**SoRelle** [3] - 5241:11, 5241:14, 5241:19
**SoRelle's** [1] - 5241:17

**sorry** [32] - 5224:5, 5229:11, 5232:23, 5235:1, 5236:23, 5247:18, 5249:13, 5256:14, 5258:6, 5264:24, 5269:16, 5300:14, 5318:7, 5332:1, 5332:8, 5335:10, 5340:13, 5340:25, 5345:22, 5346:6, 5346:23, 5348:13, 5349:21, 5350:9, 5351:22, 5356:7, 5356:11, 5357:4, 5360:1, 5360:7, 5361:10, 5366:22
**sort** [1] - 5261:11
**sound** [5] - 5230:22, 5263:12, 5290:20, 5311:23, 5333:3
**sounds** [1] - 5329:6
**south** [1] - 5241:23
**South** [4] - 5269:9, 5269:13, 5269:21, 5270:2
**space** [2] - 5315:3, 5315:10
**speaking** [5] - 5246:15, 5275:11, 5345:20, 5345:23, 5362:3
**Special** [2] - 5366:5, 5366:11, 5366:24
**specific** [5] - 5222:16, 5271:2, 5331:23, 5334:4, 5352:6
**specifically** [11] - 5230:4, 5230:21, 5241:13, 5241:22, 5247:25, 5248:23, 5256:18, 5271:2, 5271:10, 5275:16, 5338:8
**spelling** [1] - 5269:3
**spent** [1] - 5312:1
**split** [1] - 5251:7
**spots** [1] - 5271:8
**spray** [12] - 5272:14, 5297:8, 5297:9, 5297:10, 5298:3, 5298:4, 5298:5, 5301:5, 5306:17, 5322:5, 5322:6
**sprayed** [11] - 5294:9, 5297:6, 5297:7, 5298:6, 5298:8, 5298:11, 5299:23, 5306:19, 5307:12, 5325:7, 5344:13

**spraying** [1] - 5312:1
**squad** [20] - 5272:7, 5272:8, 5273:15, 5295:24, 5295:25, 5296:1, 5297:2, 5308:16, 5308:18, 5308:20, 5309:5, 5325:17, 5349:7, 5349:9, 5349:11, 5349:13, 5349:15, 5349:22, 5349:23
**squeezing** [1] - 5265:16
**stab** [2] - 5272:17, 5272:23
**Stack** [2] - 5253:20, 5266:1
**stack** [21] - 5243:2, 5264:14, 5265:10, 5265:20, 5311:3, 5311:4, 5311:10, 5359:10, 5360:21, 5360:25, 5361:19, 5362:2, 5362:3, 5362:5, 5362:8, 5362:14, 5362:20, 5362:22, 5363:7, 5363:10
**stacks** [1] - 5359:18
**stairs** [7] - 5333:11, 5333:20, 5335:13, 5335:23, 5335:25, 5336:8, 5338:21
**Stamey** [2] - 5228:8, 5228:9
**stamp** [3] - 5261:11, 5261:14, 5342:17
**stanchions** [1] - 5284:9
**stand** [9] - 5239:12, 5263:9, 5268:11, 5316:3, 5351:14, 5357:9, 5365:2, 5365:15, 5365:17
**stand-down** [1] - 5357:9
**standard** [1] - 5271:11
**standby** [1] - 5349:12
**standing** [23] - 5244:9, 5274:10, 5275:17, 5275:18, 5278:11, 5280:5, 5291:5, 5301:1, 5306:10, 5307:3, 5311:21, 5317:21, 5321:4, 5324:22, 5354:10, 5354:22, 5354:25, 5355:6, 5355:8, 5355:10, 5359:2, 5363:16

**stands** [1] - 5361:14
**standstill** [1] - 5310:11
**start** [13] - 5226:11, 5226:23, 5275:22, 5277:2, 5281:7, 5284:10, 5286:13, 5293:1, 5295:23, 5309:25, 5319:17, 5320:25, 5365:19
**started** [9] - 5261:23, 5276:14, 5279:1, 5279:5, 5281:1, 5281:2, 5289:3, 5334:25, 5335:18
**starting** [4] - 5287:4, 5291:2, 5304:14, 5352:4
**starts** [2] - 5340:16, 5348:11
**state** [5] - 5252:5, 5252:13, 5259:1, 5270:2, 5270:3
**statement** [1] - 5251:23
**statement/bio** [1] - 5257:23
**States** [3] - 5291:20, 5291:22, 5366:5
**stating** [1] - 5269:3
**stationed** [1] - 5273:24
**stay** [3] - 5279:10, 5287:5, 5362:8
**step** [2] - 5268:5, 5302:25
**steps** [18] - 5283:17, 5284:6, 5285:15, 5286:3, 5286:12, 5286:14, 5286:19, 5287:8, 5287:23, 5289:16, 5289:22, 5292:18, 5293:19, 5294:18, 5295:13, 5326:11, 5359:2
**Stewart** [20] - 5238:5, 5238:19, 5240:7, 5240:10, 5241:4, 5241:20, 5241:22, 5241:25, 5242:7, 5246:11, 5246:14, 5246:17, 5247:6, 5248:8, 5248:18, 5251:13, 5253:4, 5253:9, 5260:23, 5261:1
**stick** [1] - 5300:9
**still** [10] - 5224:6, 5279:21, 5297:19, 5299:5, 5303:25,

5389

5315:19, 5322:3, 5322:23, 5324:23, 5335:4

**stop** [15] - 5230:25, 5244:17, 5271:15, 5273:1, 5280:23, 5281:11, 5302:18, 5308:25, 5314:25, 5315:20, 5315:24, 5325:3, 5357:25, 5358:2, 5358:17

**stopped** [1] - 5281:23

**stopping** [2] - 5304:15, 5310:24

**storm** [2] - 5247:3, 5266:9

**stormed** [2] - 5247:10, 5295:13

**storming** [3] - 5247:7, 5247:14, 5247:25

**straight** [1] - 5263:15

**stream** [3] - 5298:3, 5298:4, 5298:5

**strength** [1] - 5345:16

**stretch** [3] - 5339:7, 5365:15, 5365:17

**strictly** [2] - 5358:14, 5362:11

**string** [1] - 5250:19

**strong** [1] - 5345:15

**struck** [1] - 5342:25

**stuck** [2] - 5299:23, 5306:14

**stuff** [5] - 5222:25, 5271:18, 5311:19, 5325:1, 5351:23

**stupid** [1] - 5311:23

**subject** [4] - 5325:22, 5290:1, 5313:12, 5323:2

**substantial** [1] - 5301:13

**substitute** [1] - 5343:9

**suggest** [1] - 5351:13

**suggesting** [3] - 5238:12, 5329:15, 5333:10

**suit** [5] - 5345:25, 5346:3, 5346:5, 5348:20, 5348:22

**summary** [1] - 5259:7

**sung** [1] - 5295:4

**sunroofs** [1] - 5335:19

**suppose** [1] - 5236:13

**supposed** [1] - 5312:24

**surveillance** [7] - 5242:11, 5243:3, 5244:25, 5245:6, 5245:8, 5245:12,

5246:18

**sustained** [5] - 5227:22, 5245:4, 5255:17, 5266:12, 5337:19

**swamp** [1] - 5279:3

**SWAT** [2] - 5285:21, 5358:8

**switch** [1] - 5333:15

**sympathetic** [1] - 5367:9

---

# T

**T-shirt** [4] - 5229:12, 5229:15, 5229:19, 5320:12

**tactical** [4] - 5315:4, 5316:1, 5355:8, 5359:15

**talkie** [1] - 5359:7

**tap** [1] - 5366:2

**tarred** [1] - 5247:11

**taught** [1] - 5327:4

**tax** [1] - 5247:11

**team** [6] - 5257:19, 5258:23, 5259:2, 5285:20, 5285:21, 5287:9, 5295:25, 5296:1, 5297:2, 5311:13, 5358:8

**teargassing** [1] - 5267:25

**tearing** [1] - 5283:22

**technicians** [1] - 5326:25

**technique** [2] - 5307:15, 5311:7

**ten** [2] - 5360:23, 5365:18

**terms** [6] - 5227:8, 5236:19, 5255:2, 5272:19, 5273:17, 5321:14

**terrace** [1] - 5231:22

**terrible** [1] - 5367:10

**testified** [7] - 5221:23, 5255:12, 5264:22, 5337:20, 5338:20, 5349:9, 5354:17

**testify** [1] - 5264:21

**testimony** [8] - 5221:7, 5235:22, 5264:20, 5268:5, 5288:13, 5303:1, 5362:21, 5365:8

**text** [3] - 5228:7, 5233:9, 5267:17

**themselves** [2] - 5339:8, 5356:19

---

**theories** [1] - 5256:3

**theory** [1] - 5225:15

**therefore** [3] - 5234:18, 5235:18, 5288:6

**they've** [1] - 5347:16

**thinking** [15] - 5243:9, 5248:8, 5281:20, 5284:4, 5291:6, 5292:19, 5295:9, 5300:12, 5300:17, 5307:3, 5308:17, 5309:4, 5312:12, 5315:22, 5323:11

**thousand** [1] - 5336:21

**thousands** [1] - 5328:18

**thread** [1] - 5251:14

**threat** [2] - 5315:9, 5362:10

**threats** [1] - 5315:22

**three** [7] - 5221:17, 5221:21, 5221:22, 5270:19, 5270:24, 5326:17, 5328:7

**three-month** [2] - 5270:19, 5270:24

**threshold** [2] - 5311:8, 5363:15

**thresholds** [1] - 5361:20

**threw** [1] - 5306:20

**throughout** [3] - 5271:9, 5275:9, 5293:21

**throw** [1] - 5306:17

**thrown** [2] - 5293:23, 5306:16

**Thursday** [2] - 5255:12, 5255:13

**timing** [2] - 5235:20, 5347:2

**today** [3] - 5271:18, 5313:3, 5327:24

**together** [4] - 5223:14, 5274:20, 5291:3, 5302:16

**Tom** [1] - 5267:4

**tomorrow** [6] - 5366:2, 5366:8, 5366:11, 5366:17, 5366:25, 5367:1

**took** [7] - 5229:23, 5324:25, 5333:8, 5345:6, 5345:10, 5346:8, 5357:4

**top** [15] - 5275:19, 5278:13, 5280:2, 5284:13, 5285:14,

---

5287:8, 5290:9, 5290:15, 5291:8, 5291:9, 5291:10, 5293:19, 5305:14, 5305:16, 5359:2

**topic** [1] - 5255:20

**topics** [1] - 5256:2

**torso** [3] - 5229:11, 5272:15, 5320:14

**tossed** [1] - 5357:20

**touch** [5] - 5277:9, 5319:24, 5320:5, 5324:12, 5359:9

**touched** [1] - 5320:13

**towards** [3] - 5262:21, 5362:7, 5362:10

**traffic** [2] - 5271:12, 5271:13

**trained** [4] - 5308:20, 5331:9, 5361:19, 5362:18

**training** [9] - 5269:22, 5269:23, 5270:1, 5270:21, 5308:20, 5308:22, 5360:17, 5360:19, 5362:12

**Training** [3] - 5270:17, 5311:6, 5362:5

**trampled** [2] - 5309:8, 5316:23

**transcript** [1] - 5221:4

**transfer** [1] - 5247:24

**transportation** [2] - 5246:1, 5246:5

**travels** [1] - 5365:8

**treating** [1] - 5361:24

**tree** [1] - 5254:16

**trial** [3] - 5221:3, 5367:8, 5367:11

**tried** [6] - 5282:3, 5312:14, 5316:19, 5334:20, 5344:9, 5352:18

**tries** [1] - 5343:23

**true** [3] - 5223:19, 5233:18, 5234:18

**Trump** [3] - 5275:11, 5276:3, 5290:16

**truthfully** [1] - 5222:24

**try** [10] - 5281:13, 5284:18, 5301:15, 5307:6, 5309:20, 5312:8, 5315:12, 5316:18, 5322:8, 5358:24

**trying** [34] - 5250:4, 5251:12, 5264:10, 5267:21, 5281:1, 5281:3, 5287:5, 5291:3, 5291:7,

---

5299:5, 5300:10, 5302:15, 5309:9, 5310:9, 5312:2, 5312:3, 5312:12, 5315:18, 5315:19, 5315:20, 5315:21, 5321:5, 5322:4, 5325:3, 5329:10, 5329:20, 5334:13, 5335:15, 5345:14, 5345:17, 5348:20, 5350:3, 5351:7, 5363:2

**turn** [1] - 5310:10

**turned** [3] - 5276:16, 5283:16, 5301:5

**turning** [2] - 5224:14, 5289:4

**two** [29] - 5221:10, 5221:11, 5221:21, 5221:22, 5228:17, 5234:17, 5255:20, 5274:6, 5275:4, 5277:13, 5284:9, 5297:19, 5298:12, 5299:23, 5300:19, 5301:12, 5309:22, 5310:24, 5313:19, 5324:7, 5324:18, 5325:1, 5335:19, 5346:21, 5347:24, 5360:22, 5367:22

**type** [6] - 5269:14, 5269:22, 5269:25, 5272:15, 5293:25, 5340:17

**types** [4] - 5285:25, 5331:5, 5333:23, 5334:14

**typically** [3] - 5265:19, 5361:2, 5363:18

**tyrannical** [1] - 5255:4

**tyrannis** [2] - 5252:17, 5252:18

**tyrants** [7] - 5252:19, 5252:22, 5253:21, 5254:6, 5254:7, 5254:17, 5254:18

---

# U

**U.S** [21] - 5270:8, 5270:11, 5270:22, 5270:23, 5270:24, 5271:3, 5271:7, 5286:7, 5295:22, 5299:3, 5299:4, 5313:7, 5316:24, 5320:24, 5329:5, 5330:2, 5330:10, 5331:8, 5336:22,

5390

5355:17, 5358:19
**unable** [2] - 5283:14, 5302:2
**under** [2] - 5282:8, 5320:12
**understood** [3] - 5338:24, 5367:19, 5368:4
**unduly** [2] - 5225:15, 5288:13
**unfortunately** [1] - 5353:21
**unholstering** [2] - 5293:20, 5309:13
**UNIDENTIFIED** [1] - 5245:3
**uniform** [5] - 5272:9, 5272:11, 5320:15, 5354:15
**uniformed** [1] - 5270:20
**unit** [16] - 5269:21, 5272:7, 5272:8, 5273:18, 5280:8, 5285:17, 5285:19, 5285:20, 5295:25, 5296:1, 5297:3, 5308:16, 5325:17, 5349:7, 5349:12
**United** [3] - 5291:19, 5291:22, 5366:5
**units** [7] - 5271:14, 5295:24, 5349:10, 5349:15, 5349:17, 5349:22, 5349:23
**university** [1] - 5269:8
**unknown** [1] - 5311:8
**unless** [1] - 5283:1
**unlock** [1] - 5274:21
**unpack** [2] - 5275:23, 5276:9
**unusable** [1] - 5280:9
**unusual** [1] - 5274:11
**up** [99] - 5221:6, 5228:3, 5228:11, 5229:4, 5229:20, 5231:13, 5233:3, 5233:24, 5234:13, 5235:7, 5235:10, 5236:3, 5236:4, 5236:10, 5236:11, 5236:21, 5242:8, 5242:22, 5246:23, 5248:14, 5248:25, 5250:17, 5252:7, 5252:23, 5253:22, 5259:25, 5263:6, 5263:22, 5266:13, 5268:23, 5270:25, 5272:4, 5272:9,

5274:16, 5274:17, 5274:21, 5274:24, 5276:15, 5276:20, 5278:11, 5279:15, 5280:2, 5281:4, 5284:7, 5286:16, 5287:11, 5288:2, 5289:2, 5292:5, 5292:6, 5292:8, 5292:10, 5292:18, 5300:8, 5303:10, 5303:17, 5305:21, 5306:16, 5307:5, 5307:15, 5308:24, 5309:2, 5309:3, 5309:7, 5313:25, 5315:10, 5317:3, 5319:3, 5321:2, 5322:19, 5323:14, 5324:5, 5324:24, 5326:14, 5333:11, 5337:23, 5338:18, 5338:21, 5341:16, 5342:17, 5343:1, 5343:19, 5343:24, 5347:5, 5347:8, 5347:13, 5347:15, 5349:17, 5351:21, 5352:8, 5352:24, 5363:17, 5364:1, 5364:24, 5364:25, 5365:13, 5365:15, 5365:17
**upper** [1] - 5261:11
**USCP** [1] - 5305:17
**uses** [1] - 5259:17
**UTC** [1] - 5346:19
**utilized** [1] - 5280:9

# V

**Vallejo** [2] - 5242:7, 5244:4
**vantage** [1] - 5242:3
**various** [2] - 5223:16, 5333:6
**vast** [1] - 5316:23
**verbally** [3] - 5265:12, 5274:25, 5304:2
**versions** [1] - 5249:5
**vest** [3] - 5315:5, 5320:6, 5320:12
**vetting** [3] - 5257:18, 5257:19, 5257:20
**vettingokfl@ protonmail.com** [2] - 5257:21, 5257:24
**via** [3] - 5259:12, 5259:14, 5259:18
**Vice** [3] - 5291:19,

5291:22, 5292:2
**video** [140] - 5221:20, 5223:8, 5224:9, 5224:24, 5225:18, 5225:23, 5229:23, 5230:2, 5230:5, 5230:7, 5230:15, 5230:17, 5230:20, 5230:23, 5231:14, 5231:21, 5232:1, 5232:6, 5232:10, 5232:18, 5242:11, 5242:20, 5243:3, 5244:25, 5245:6, 5245:8, 5245:12, 5245:19, 5246:14, 5246:18, 5252:8, 5252:24, 5253:1, 5253:17, 5254:21, 5261:8, 5262:3, 5262:6, 5262:20, 5263:7, 5263:16, 5264:2, 5277:6, 5278:7, 5279:14, 5279:20, 5280:12, 5280:18, 5280:21, 5280:22, 5281:6, 5281:9, 5283:9, 5284:13, 5284:17, 5285:5, 5286:24, 5287:3, 5287:21, 5289:12, 5289:17, 5290:17, 5290:20, 5290:24, 5290:25, 5291:18, 5292:14, 5305:9, 5307:7, 5307:22, 5310:5, 5311:17, 5313:20, 5314:3, 5314:5, 5314:16, 5314:22, 5314:23, 5316:6, 5316:13, 5317:10, 5317:24, 5319:18, 5320:8, 5320:9, 5323:19, 5325:12, 5325:16, 5325:20, 5325:23, 5328:1, 5334:22, 5335:12, 5336:10, 5337:25, 5338:9, 5338:13, 5338:18, 5338:23, 5339:23, 5340:1, 5340:7, 5340:8, 5340:18, 5340:19, 5341:18, 5342:12, 5342:17, 5343:2, 5343:5, 5343:9, 5344:1, 5345:12, 5345:20, 5346:10, 5346:13, 5347:16, 5347:18, 5348:17,

5348:23, 5350:1, 5350:3, 5350:6, 5350:7, 5350:10, 5350:12, 5350:16, 5350:19, 5350:25, 5352:2, 5352:6, 5352:7, 5352:18, 5353:4, 5353:16, 5353:18, 5358:10, 5359:16
**videos** [23] - 5221:11, 5221:15, 5221:21, 5222:8, 5223:11, 5225:2, 5231:13, 5261:18, 5262:24, 5263:2, 5263:3, 5275:10, 5292:9, 5311:16, 5333:25, 5334:2, 5334:8, 5334:10, 5337:21, 5338:8, 5338:20, 5351:8, 5351:11
**view** [5] - 5307:20, 5342:22, 5342:23, 5345:4, 5353:7
**Virginia** [4] - 5242:11, 5252:5, 5252:13, 5253:4
**visible** [4] - 5231:23, 5232:4, 5232:5, 5305:21
**vision** [1] - 5298:9
**Visitors** [1] - 5277:7
**visual** [23] - 5230:9, 5231:1, 5231:17, 5232:16, 5263:17, 5263:24, 5290:21, 5292:15, 5294:12, 5295:2, 5295:16, 5296:9, 5296:21, 5297:15, 5298:18, 5299:9, 5304:17, 5305:2, 5305:24, 5308:6, 5310:2, 5310:14, 5310:21
**voice** [1] - 5230:22
**vote** [2] - 5244:18, 5291:15

# W

**waive** [2] - 5367:16, 5367:17
**walk** [7] - 5271:19, 5284:7, 5286:16, 5300:20, 5313:6, 5326:12, 5365:17
**walkie** [1] - 5359:7
**walkie-talkie** [1] - 5359:7
**walking** [2] - 5224:13,

5271:9
**wants** [1] - 5339:8
**Washington** [2] - 5231:25, 5346:20
**watch** [3] - 5345:8, 5350:1, 5354:24
**Watchdog** [1] - 5255:2
**watched** [3] - 5245:6, 5333:25, 5334:9
**watching** [5] - 5254:7, 5262:20, 5311:16, 5320:8, 5351:11
**water** [1] - 5306:11
**Watkins** [21] - 5221:19, 5222:2, 5222:9, 5222:13, 5222:20, 5222:22, 5223:3, 5223:13, 5223:18, 5223:20, 5224:6, 5224:7, 5225:7, 5225:23, 5228:16, 5255:6, 5262:17, 5266:22, 5267:8, 5267:11, 5267:22
**Watkins's** [6] - 5262:22, 5262:24, 5263:3, 5264:4, 5264:13, 5266:14
**waving** [2] - 5354:25, 5355:11
**ways** [1] - 5324:19
**weapon** [7] - 5272:14, 5293:20, 5309:13, 5309:16, 5309:17, 5312:13, 5362:22
**weapons** [5] - 5285:25, 5286:2, 5315:11, 5315:23, 5362:21
**wear** [1] - 5272:15
**wearing** [6] - 5229:1, 5229:7, 5229:11, 5229:19, 5231:4, 5320:10
**wedge** [1] - 5325:22
**Wednesday** [1] - 5255:12
**week** [3] - 5367:20, 5367:21
**welcome** [2] - 5226:8, 5303:14
**west** [4] - 5231:22, 5241:25, 5279:6, 5279:8
**West** [4] - 5276:8, 5276:10, 5276:13, 5276:16
**whacked** [1] - 5321:5
**whatnot** [4] - 5274:11,

5391

5276:17, 5308:21, 5315:7
**whippit** [1] - 5258:23
**white** [1] - 5287:19
**White** [2] - 5275:12, 5329:25
**Whitenmeyer** [2] - 5347:12, 5347:14
**Whitney** [1] - 5220:4
**whole** [6] - 5278:10, 5291:2, 5296:2, 5302:12, 5310:9, 5360:17
**William** [1] - 5221:3
**Wilmington** [1] - 5288:25
**window** [5] - 5301:21, 5322:18, 5341:24, 5342:24, 5343:1
**windows** [4] - 5300:22, 5301:16, 5341:11, 5341:13
**winter** [3] - 5308:13, 5314:21, 5317:21
**wipe** [1] - 5301:5
**withdrawn** [3] - 5247:17, 5247:19, 5256:12
**WITNESS** [9] - 5268:6, 5268:15, 5274:4, 5303:3, 5303:11, 5336:18, 5355:21, 5357:12, 5365:9
**witness** [22] - 5225:24, 5239:14, 5256:22, 5268:9, 5274:5, 5278:12, 5281:15, 5290:14, 5303:17, 5314:19, 5317:20, 5321:22, 5322:17, 5323:8, 5326:4, 5330:7, 5335:3, 5337:20, 5338:7, 5338:23, 5340:3, 5351:14
**Witness** [2] - 5268:7, 5365:10
**Witnesses** [1] - 5220:3
**witnesses** [5] - 5366:10, 5367:15, 5367:18, 5367:20, 5368:1
**woman** [2] - 5222:18, 5354:21
**women** [1] - 5356:21
**Woodward** [2] - 5367:1, 5367:9
**word** [7] - 5238:9, 5241:23, 5254:6,

5254:18, 5255:3, 5264:14, 5351:15
**word..** [1] - 5244:9
**works** [2] - 5253:15, 5342:12
**world** [1] - 5254:7
**worn** [4] - 5221:22, 5223:4, 5223:10, 5224:20
**worse** [1] - 5351:8
**write** [2] - 5250:2, 5251:9
**writes** [1] - 5251:13
**writing** [2] - 5251:14, 5274:25
**wrote** [2] - 5248:21, 5251:22

# X

**X-ray** [1] - 5271:18

# Y

**year** [3] - 5270:9, 5289:3, 5360:5
**years** [7] - 5269:12, 5293:18, 5313:19, 5328:21, 5329:5, 5360:12, 5362:13
**yell** [3] - 5298:20, 5298:22, 5298:23
**yelling** [5] - 5222:3, 5222:5, 5275:20, 5275:22, 5279:1
**you-all** [1] - 5302:23
**yourself** [20] - 5263:2, 5269:2, 5281:5, 5281:13, 5289:4, 5294:8, 5299:19, 5305:21, 5306:5, 5307:22, 5308:8, 5308:10, 5314:16, 5317:10, 5317:18, 5321:20, 5323:6, 5323:18, 5326:2, 5344:16

# Z

**Zaremba** [1] - 5221:3
**Zello** [3] - 5262:23, 5263:4, 5264:2
**zero** [2] - 5277:14, 5364:20