1            **UNITED STATES DISTRICT COURT**
             **FOR THE DISTRICT OF COLUMBIA**
2

UNITED STATES OF AMERICA,        ) Criminal Action
3                                ) No. 1:22-cr-00015-APM
                    Plaintiff,   )
4                                ) **Jury Trial - Day 29**
vs.                              ) (afternoon session)
5                                )
ELMER STEWART RHODES III,        )
6 et al.,                        ) Washington, D.C.
                                 ) **November 14, 2022**
7                   Defendants.  ) Time:  1:45 p.m.
   _____
8
             **Transcript of** Jury Trial - Day 29
9                        **Held Before**
             **The Honorable Amit P. Mehta**
10            **United States District Judge**
   _____
11
                   A P P E A R A N C E S
12

For the Government:      **Kathryn L. Rakoczy**
13                       **Troy A. Edwards, Jr.**
                         **Jeffrey S. Nestler**
14                       UNITED STATES ATTORNEY'S OFFICE
                         FOR THE DISTRICT OF COLUMBIA
15                       601 D Street, Northwest
                         Washington, D.C. 20579
16
                         **Alexandra S. Hughes**
17                       **Louis J. Manzo**
                         U.S. DEPARTMENT OF JUSTICE
18                       950 Pennsylvania Avenue, Northwest
                         Washington, D.C. 20530
19
For the Defendant Elmer Stewart Rhodes III:
20                       **James Lee Bright**
                         **Edward L. Tarpley, Jr.**
21                       BARRETT BRIGHT LASSITER LINDER
                         3300 Oak Lawn Avenue, Suite 700
22                       Dallas, Texas 75219

23 For the Defendant Kelly Meggs:
                         **Stanley E. Woodward, Jr.**
24                       BRAND WOODWARD LAW
                         1808 Park Road, Northwest
25                       Washington, D.C. 20010

1               A P P E A R A N C E S, continued

2       For the Defendant Kelly Meggs:
                         **Juli Z. Haller**
3                        LAW OFFICES OF JULIA HALLER
                         601 Pennsylvania Avenue, Northwest
4                        Washington, D.C. 20036

5       For the Defendant Kenneth Harrelson:
                         **Bradford L. Geyer**
6                        FORMERFEDSGROUP.COM LCC
                         141 I Route 130 South, Suite 303
7                        Cinnaminson, New Jersey 08077

8       For the Defendant Jessica Watkins:
                         **Jonathan W. Crisp**
9                        CRISP AND ASSOCIATES, LLC
                         4031 North Front Street
10                       Harrisburg, Pennsylvania 17110

11      For the Defendant Thomas Caldwell:
                         **David W. Fischer, Sr.**
12                       FISCHER & PUTZI, P.A.
                         7310 Governor Ritchie Highway
13                       Glen Burnie, Maryland 21061-3065

14      _____

        Stenographic Official Court Reporter:
15                       Nancy J. Meyer
                         Registered Diplomate Reporter
16                       Certified Realtime Reporter
                         333 Constitution Avenue, Northwest
17                       Washington, D.C. 20001
                         202-354-3118
18

19

20

21

22

23

24

25

1                    **I N D E X**

2                                                        <u>PAGE</u>:

3    <u>**Witnesses:**</u>

4    <u>Sharon Caldwell</u>

5        Direct Examination, Continuing, By Mr. Fischer... 8590
         Cross-Examination By Mr. Manzo................... 8626
6        Redirect Examination By Mr. Fischer............. 8665

7

8    <u>**Exhibits Admitted**</u>:

9        Government Exhibit 9318.......................... 8660

10
         Defendant Caldwell Exhibit 47................... 8604
11       Defendant Caldwell Exhibit 57................... 8606
         Defendant Caldwell Exhibit 61-A through 61-C..... 8613
12       Defendant Caldwell Exhibit 62-A through 62-K..... 8616
         Defendant Caldwell Exhibit 78................... 8591
13       Defendant Caldwell Exhibit 150.1................ 8619

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          (REPORTER'S NOTE:  The morning session of the jury

3   trial was reported by William P. Zaremba who prepared said

4   transcript.)

5          (Proceedings held outside of the jury.)

6          MR. BRIGHT:  Your Honor, Mr. Rhodes has asked one

7   additional time to have direct access with his own cell phone.

8   The government has historically provided that, I believe, four

9   times now, and he's had a good number of hours with it.

10          He thinks that if he could have access to it for an hour

11   or two that there's some very specific message that he believes

12   he sent someone that he would be able to find that he's not

13   previously found.  I know you've already several times

14   admonished him as to getting that one more time and made it

15   clear that you believe that he's had unprecedented access to

16   the evidence in a direct fashion.

17          THE COURT:  Can I just ask everybody to quiet down a

18   little bit so our court reporter can hear Mr. Bright.

19          MR. BRIGHT:  I have communicated this request to the

20   government.  It's actually gone so far as that he would -- if

21   they would bring it and he could sit in the basement, he would

22   waive his presence before the jury during the period of time he

23   was looking for this one text message.

24          I've relayed that to the government, and I believe they

25   said they're just not inclined -- if I could quote -- to do so

8583

1    at this time, and I just made it clear that for the sake of

2    Mr. Rhodes that we would ask if the Court had the ability to

3    move that request forward; is that correct, Mr. Tarpley?

4            MR. TARPLEY:  That is correct, Your Honor.  We have

5    spoken to him.  He's actually made this request repeatedly over

6    the last two weeks.  We did -- we did make a request to

7    Ms. Rakoczy about a week and a half ago.  And at that point, we

8    didn't pursue it, but he insists on it.  Mr. Bright and I both

9    met and conferred, and we just feel like we need to bring it

10   before the Court.

11           MR. BRIGHT:  It's just a request of Mr. Rhodes.  I

12   know you've already ruled on this previously, Your Honor,

13   but --

14           THE COURT:  Well --

15           MR. BRIGHT:  Just so I can assure him that we've

16   addressed it with the Court, as I'm sure you understand.

17           THE COURT:  Ms. Rakoczy.

18           MS. RAKOCZY:  Your Honor, the defense has had the

19   full extraction from the phone since relatively shortly after

20   Mr. Rhodes's arrest last winter.  They have both the scoped

21   version of the phone -- and then because this is Mr. Rhodes's

22   own phone, they have the raw extraction of all the data pulled

23   off their phone that I understand their expert cell phone

24   person has had access to.  So they have access to the entirety

25   of the phone in -- in a different format than when one scrolls

1    through the phone, but they do have that access.

2         Notwithstanding that, we have made four opportunities

3    for the defendant to view the phone.  It is challenging.  The

4    evidence has to be retrieved and the agent who is uninvolved

5    with this case, on the off chance that anything is said, has to

6    supervise the matter.  I think each viewing has been at least

7    several hours up until this point, and so from our perspective,

8    there just -- there's really not much more that we can do.  And

9    we don't think that there's really much more that we should be

10   asked to do in light of where we are in the case.  The defense

11   has -- for Mr. Rhodes has rested.

12             THE COURT:  Right.

13             MS. RAKOCZY:  We have provided all in discovery

14   previously.  So that's our response.

15             MR. BRIGHT:  That's correct.

16             THE COURT:  Okay.  Well, I mean, if you're asking me

17   to order the government to make it available mid-trial, I'm

18   disinclined to do that.  If the government is prepared to

19   accommodate the request, that's a different issue --

20             MR. BRIGHT:  Understood, sir.

21             THE COURT:  -- but it seems to me the access that's

22   being requested -- let's put it this way:  The actual data

23   has -- available to counsel and has been available to counsel

24   --

25             MR. BRIGHT:  Yes, sir.

8585

1            THE COURT:  -- and you-all have an expert.  And if

2    Mr. Rhodes believes there's a message that hasn't been located,

3    then presumably he could describe it, you know, in such a way

4    that your expert could try and find it.

5            MR. BRIGHT:  And we have reached out to Mr. Ingram,

6    again, within the past hour to do so, Your Honor.

7            THE COURT:  Okay.

8            MR. BRIGHT:  I was merely forwarding the request of

9    my client to the Court and to the government.

10            THE COURT:  Understood.

11        So I think we'll do it that way.  There's still the

12    issue that you've rested your case.  So we'd have to --

13            MR. BRIGHT:  Understood.  I implicit- --

14            THE COURT:  Hope you found what you're looking for.

15            MR. BRIGHT:  I implicitly understand.

16            THE COURT:  Okay.

17            MR. TARPLEY:  Your Honor, just for the Court's

18    information, I would like to say that of the four

19    times Ms. Rakoczy mentioned --

20            THE COURT REPORTER:  Mr. Tarpley, could you just go

21    to the microphone.

22            MR. TARPLEY:  Yes.  Thank you.

23        I would like to say that of the four times that Ms.

24    Rakoczy mentioned that we had been provided with the phone, on

25    the third occasion, the FBI brought -- brought us the wrong

1     phone so we were not able to really get any information.

2          And then on the fourth occasion, when they did bring the

3     right phone, we -- we had it for about an hour and 45 minutes,

4     and we did find a very important message that he was able to

5     locate in the first half hour, but we -- there's another very

6     important message that he was not able to locate.  So -- but --

7     I mean, I do acknowledge that they have brought it.  And, you

8     know, we specifically made that request in view of the fact

9     that I had not had a chance to work with him on the phone,

10    but -- but it is a request made in good faith.

11         I mean, I don't think this is to unduly burden the

12    government in bringing us the phone, but if we could do that,

13    if the government could see fit to bring it, I'm willing to sit

14    with him downstairs in the room outside of court in order to --

15    to review this, in order to get it out, because one of us would

16    have to be there.  So I know that's how it works.

17         So we're willing to do whatever we could do to try to

18    achieve the goal of looking at it one more time.

19         THE COURT:  Okay.  As I said, I -- you know, you-all

20    have access to the data.  You've got a forensic expert that can

21    search the hard data.  Mr. Rhodes, presumably, knows what he's

22    looking for or thinks he knows what he's looking for.  He can

23    provide you search terms, date ranges, potentially even what

24    chat it's on.  So there's a lot there that's available to you

25    without demanding of the government that -- you know, this is

1    what's, hopefully, the last week of trial -- they make this

2    accommodation.

3            As I also said, I might have a slightly different view

4    if you-all hadn't rested, but you rested.  And if this had been

5    an issue, then that might've been something you might have

6    wanted to tell me before you rested.

7            So I think that's where we are.

8            MR. TARPLEY:  Thank you.

9            THE COURT:  All right.  Mr. Geyer.

10           MR. GEYER:  Your Honor, I had hoped that Mr. Nichols

11   was -- would have been able to get in to testify through

12   Mr. Meggs, but I'd like to just bring something to your

13   attention regarding the full context of Officer Tarik Jackson

14   [sic] bringing the column of police into the Capitol and then

15   exiting.  They were escorted on the way in and on the way out.

16           And I think part of the confusion may be related to

17   there's a very shortened video that was Government Exhibit 1500

18   that leaves out some important contextual information at the

19   beginning of the exchange when Oath Keepers James, Minuta, and

20   Walden come in and then end the video, I would argue,

21   prematurely.

22           But that -- that -- if we're going to call it a stack --

23   which I don't like to call it that -- but we all know what I'm

24   talking about.  There were Oath Keepers escorting that in and

25   then escorting it out.  And their assistance was solicited both

8588

1    times, and this goes -- you know, whether it's rule of

2    completeness --

3            THE COURT:  Well, let me -- if I could interrupt you,

4    Mr. Geyer.  If what you're suggesting is that there's evidence

5    where Mr. Walden or Mr. Minuta went in, they assisted police

6    officers to enter the building?

7            MR. GEYER:  Yes.

8            THE COURT:  I don't think there's anything preventing

9    you from presenting such evidence, if it exists.

10           MR. GEYER:  Well, I believe it's a reasonable

11   inference from the video, if the full video is played, the rule

12   of completeness, and also -- just like they were assisted on

13   the way in, they were assisted on the way out by -- by

14   Mr. Nichols.  And this goes to -- we've heard testimony about

15   how there were missions, but there were also standing orders.

16   And no one will dispute that the Oath Keepers had a standing

17   order that they should provide medical assistance and help

18   police in any instance where they could.

19       That's what motivated my client to do what he did.

20   That's what motivated Mr. Nichols to do what -- what he did,

21   and there's -- there's two short video clips that I could

22   show -- show the Court that could frame this out, but I

23   understand we have a jury waiting.  It's up to you, Your Honor.

24           THE COURT:  No.  Let's -- let's bring our jury in,

25   and then if this is something you want to take up after

```
 1    5 o'clock, we can do that.
 2              MR. GEYER:  Okay.  Thank you, Your Honor.
 3              MS. HALLER:  Your Honor, if I may, real quickly.
 4    Sorry.  I lost my voice.
 5         Your Honor, there are two exhibits we were going to
 6    bring in through the witness, Michael Nichols, and so now we
 7    can't bring those exhibits in through him.  We can put
 8    Stewart Rhodes back on the stand and seek to bring in those
 9    exhibits through Mr. Stewart Rhodes.  They're two announcements
10    that were on the Oath Keepers website, and I had sent those to
11    Mr. Nestler as exhibits for Michael Nichols's testimony, but
12    since we can't call Michael Nichols at this point, we can
13    either put Rhodes on the stand to do it or we can ask the
14    government if they'll stipulate to the admission of those
15    documents.
16              MR. NESTLER:  That's correct, Your Honor.  Ms. Haller
17    sent those to us at the lunch break -- just before the lunch
18    break, and we're reviewing that request, about whether to
19    stipulate to the admissibility of those two documents.
20              THE COURT:  Okay.
21              MS. HALLER:  But just for the record, I sent the
22    exhibits earlier.  The -- the request for stipulation was at
23    lunch.
24              (Proceedings held in the presence of the jury.)
25              THE COURT:  All right.  Please be seated, everybody.
```

1    Welcome back, ladies and gentlemen.  I hope you had a nice

2    lunch break.

3          Why don't we bring Ms. Caldwell back to the stand.

4                DIRECT EXAMINATION, continuing

5    BY MR. FISCHER:

6    Q.  Mrs. Caldwell, I remind you you're still under oath.  Okay?

7    A.  Yes.

8    Q.  Mrs. Caldwell, before we left, we were teeing up Caldwell

9    Exhibit No. 78, which is a voice mail.  Do you recall that?

10   A.  Yes, I do.

11   Q.  And, ma'am, just to quickly remind the jury and set the

12   stage, this is a voice mail that was recorded on November 14th

13   of 2020 at your farm; is that correct?

14   A.  January 14th of 2021.

15   Q.  My apologies.  January 14th, 2021.

16         And, ma'am, my understanding is that you were pulling

17   out of your garage; is that correct?

18   A.  That's correct.

19   Q.  You placed a phone call to your husband on your cell phone;

20   is that correct?

21   A.  That's right.

22   Q.  Okay.  You never hung the phone call up; is that correct?

23   A.  That's right.  Did not.

24   Q.  You pulled out of your garage.  I know you saw your husband

25   in the driveway; is that correct?

```
 1   A.  Yes.

 2   Q.  Did you have a conversation with your husband at that time?

 3   A.  Yes, I did.

 4   Q.  Where were you and your husband located at that time?

 5   A.  We were both in our separate cars talking to each other via

 6   the windows being rolled down.

 7   Q.  Okay.  Did you hang up your phone at that time?

 8   A.  No, I did not.

 9   Q.  Okay.  And did somehow -- did the conversation between you

10   and your husband get recorded on -- on your husband's voice

11   mail?

12   A.  That's correct.

13   Q.  All right.  And through discovery, you've been able to

14   listen to this voice mail; is that correct?

15   A.  Yes.

16           MR. FISCHER:  Your Honor, we move in Caldwell

17   Exhibit 78 at this time.

18           THE COURT:  All right.  Caldwell 78 is admitted.

19           (Defendant Caldwell Exhibit 78 admitted into

20   evidence.)

21           THE COURT:  Mr. Fischer, just for the benefit of our

22   court reporter, if you would slow your questions down.

23   BY MR. FISCHER:

24   Q.  Ma'am, I'm going to play Caldwell Exhibit 78 at this time.

25           (An audio recording was played.)
```

1          MR. FISCHER:  We can stop it right there.

2     BY MR. FISCHER:

3     Q.  Mrs. Caldwell, can you tell us whose voices are recorded on

4     that voice mail?

5     A.  That's my husband Tom's and myself.

6     Q.  Okay.  And what -- what -- what was your husband saying in

7     the voice mail?

8     A.  He was saying that Donovan and Jessica were being hounded

9     by the media.  Jessica's mom had to flee to Florida, I guess,

10    and she was being hounded by the media and Antifa, and they

11    were wondering if they can come and stay with us for a few days

12    to just get away from the media.

13    Q.  Okay.

14          MR. MANZO:  I would ask for a limiting instruction.

15    BY MR. FISCHER:

16    Q.  At any time during this -- or this recording to your

17    husband ever indicate anything about the police or law

18    enforcement?

19    A.  No.

20    Q.  And so -- is Mr. Crowl's voice on this voice mail?

21    A.  No.

22    Q.  And did your husband -- what -- what, if anything, did your

23    husband have in his hand at the time this recording was made?

24    A.  He had his phone in his hand.

25    Q.  Okay.  Who was he speaking with?

1    A.  Mr. Crowl.

2    Q.  And as a result of what your husband told you, you had some

3    conversation.  I believe you mentioned the names Dee and

4    George; is that correct?

5    A.  Yes.

6    Q.  Who were Dee and George?

7    A.  Dee and George was another couple, neighbors of ours that

8    we -- I had planned to have over for dinner on Saturday night.

9    So I asked him, "What about Dee and George?"  Because I'm like,

10   wait a minute, if people are coming up, what am I going to do

11   with our dinner party?  And he says:  Hey, we'll work it out.

12   And I said, "Okay.  We'll work it out."  And then I proceeded

13   to tell him there was cottage cheese and salad and hamburger in

14   the fridge.

15   Q.  Okay.  Did -- did -- did Donovan Crowl and Jessica Watkins

16   eventually come up to your farm at some point?

17            THE COURT:  I'm sorry to interrupt.  Jurors, I'm

18   going to give you a quick instruction about Caldwell 78, which

19   is the recording.  That recording is being admitted not for the

20   truth of the contents of that recording or what's said on the

21   recording but, rather, to explain the effect on the listeners

22   of the recording who were on the recording.  Okay?

23            MR. FISCHER:  Thank you.

24   BY MR. FISCHER:

25   Q.  Mrs. Caldwell, so as a result of hearing the information

1    from your husband, you responded something about Dee and George

2    and a dinner party?

3    A.  Yes.

4    Q.  And some cottage cheese in the fridge?

5    A.  Yes.

6    Q.  Did you have any concern when -- you said Donovan -- let me

7    backtrack.

8         Donovan Crowl and Jessica Watkins eventually came to

9    your farm that day; is that correct?

10   A.  Yes.

11   Q.  When did they arrive?

12   A.  Late.  I don't know.  Maybe like 8- -- 8:30, 9:00 at night,

13   something like that.

14   Q.  Okay.  When they arrived, did you have any reason to

15   believe they were fleeing from the police?

16   A.  No.

17   Q.  Okay.  In fact, to your knowledge, had they been charged at

18   that time with anything?

19   A.  They had not yet been charged, no.

20   Q.  Okay.  Ma'am, when they were -- when they were at your

21   farm, what, if anything, did they do in public view?

22   A.  They went with Tom to Lowe's to get paint.  They walked

23   into the Lowe's.  They came out.  They actually painted our

24   barn.  We have a barn -- obviously, it's outside.  They painted

25   the side of our -- outside of our barn, and there's -- it's

1    right in full view of a pretty major road.  So they did that.

2    Q.  Did at any time it appear they were trying to hide or

3    conceal themselves?

4    A.  No, they did not.

5    Q.  Okay.  Thank you.

6         MR. FISCHER:  We're going to pull up Caldwell 4580,

7    please, and be ready with Caldwell -- I'm sorry, 45-80, and

8    then be ready with Caldwell 46-43, please, for the witness.

9         Actually, this is in evidence.  We can pull this up for

10   the jury.  It's in evidence.  45-80.

11   BY MR. FISCHER:

12   Q.  Ma'am, while you were on the inaugural stage -- first of

13   all, how long were you up on the inaugural stage on

14   January 6th?

15   A.  Not long.  Five minutes, 10 minutes.  Not very long.

16   Maybe.

17   Q.  And, ma'am, I'm showing you what's been marked as Caldwell

18   45-80.  Are you familiar with that photograph?

19   A.  Yes.

20        MR. FISCHER:  Can we kind of blow up the upper part

21   of this, please.

22   BY MR. FISCHER:

23   Q.  Okay.  Ma'am, do you see police officers on -- on the

24   balcony, which is above the inaugural balcony?

25   A.  Yes.

1   Q.  And you can circle -- I don't know if you have -- have a

2   circle on your screen there.  If you can circle some of the

3   police officers that you see.

4   A.  I'm not sure if that's one.  I'm not sure.  I think I'm --

5   these guys over here, I think, are police guys with green.  I'm

6   sure there's more.

7   Q.  Okay.

8   A.  It's hard for me to see them, but I know they're up there.

9   Q.  Okay.  In that picture, do you see any officers being

10  assaulted or otherwise being attacked by the crowd?

11  A.  No.

12  Q.  Okay.  I'm going to pull up 46 -- Caldwell 46-43, please.

13  All right.

14          Ma'am, we'll disregard the woman with the smirk on her

15  face to the right, but you see the inaugural stage?

16  A.  Yes.

17  Q.  Can you kind of draw where the inaugural stage is in that

18  photograph?

19  A.  I think it's right around here.

20  Q.  Okay.  And where were you positioned on the inaugural

21  stage?  I know you circled on the right.  Where were you guys

22  positioned on the --

23  A.  We were over by the stairs on the left.  Probably somewhere

24  around here.

25  Q.  Okay.

1           MR. FISCHER:  All right.  Thank you.  You can pull

2    that down.

3           Court's indulgence.

4    BY MR. FISCHER:

5    Q.  Ma'am, I'm going to direct your attention -- did there come

6    a time when -- I'm going to go back to -- to January 19th -- or

7    fast-forward to January 19th.  Did there come a time when the

8    FBI did a raid on your farm in Berryville?

9    A.  Yes.

10   Q.  Who was home at that time?

11   A.  Just Tom and myself.

12   Q.  Can you tell us what happened.

13   A.  Do I have to?  It was a very traumatic day.  I guess it

14   was -- it was still dark.  It was -- I don't know -- maybe

15   close to 6:00, and we were in bed.  And I hear this booming

16   voice, you know.  Tom Caldwell, come on out.  Tom Caldwell,

17   come on out.

18          And I was having a hard time waking my husband up.  He

19   sleeps with a CPAP machine.  And I was just shaking, and

20   shaking.  I finally said to him, "Honey, the FBI is at the door

21   and I'm not kidding."  And he finally woke up and, you know,

22   toddled out there and got out there just in time because I

23   guess there was a battering ram up against the house.  I mean,

24   you know, a moment later and I don't know what would have

25   happened, but he got out there on the front porch, and then

8598

1    later they called me out.

2    Q.  Okay.  Did they place him under arrest at some point?

3    A.  Yes.

4             MR. FISCHER:  I'm going to pull up Caldwell

5    Exhibit 167, please, for the witness only.

6    BY MR. FISCHER:

7    Q.  And, ma'am, can I tell you, do you recognize this

8    photograph?

9             MR. MANZO:  Objection as to relevance, Your Honor.

10            THE COURT:  Mr. Fischer, you want to --

11            (Bench conference on the record.)

12            THE COURT:  Go ahead, Mr. Fischer.

13            MR. FISCHER:  Your Honor, as to relevance, there's

14   already evidence in about the interview he gave with the FBI

15   that day.  This is before the interview was taken.  It shows

16   him, you know -- it shows just a picture of him while he's, you

17   know, in FBI custody.  I think it goes to his condition at that

18   time.

19            THE COURT:  How long before the interview was this

20   photograph taken?

21            MR. FISCHER:  Your Honor, I think it was just -- I

22   think it was about a half hour before.

23            THE COURT:  Okay.

24            MR. MANZO:  We are not introducing evidence of the

25   interview.  So, again, this is all hearsay.  And other than

1    just trying to dirty up the government's -- we do not know what

2    the relevance of the picture of a man who had just been woken

3    out of bed would be to show the jury.

4            THE COURT:  I do think -- I'm trying to remember when

5    this came up, but it -- it came up with Agent Palian's

6    cross-examination, and we didn't permit statements that were

7    made by Mr. Caldwell to come in.

8            MR. MANZO:  Correct, Your Honor.

9            THE COURT:  I think, if memory serves.

10           MR. FISCHER:  Your Honor, I think we did, because

11   there was an issue.  Agent Palian had suggested that

12   Mr. Caldwell was not being truthful, and we did bring

13   statements in.

14           THE COURT:  Right.  I think that's right.  But that

15   said, I mean, the statements were brought in not -- let's put

16   it this way:  If what the photograph would be meant to do is to

17   suggest that somehow the statements were inaccurate given his

18   condition, that would be one thing; but you're just seeking to

19   introduce what he looked like about a half hour before he made

20   the statement.  So it's not clear to me the connection between

21   the two.

22           MR. FISCHER:  I think it's relevant as to his

23   condition.  It's also relevant as to his general physical

24   condition as well, the backup testimony that's been out there

25   that he has difficulty even getting out of bed.

8600

1    MR. MANZO:  Again, Your Honor, this is why we filed

2    this extensive pretrial litigation to keep all this out, and we

3    have never once sought to elicit any statement from

4    Mr. Caldwell.

5    THE COURT:  Can you just put the photograph back up,

6    please.

7    Okay.  So, look, I think I'm going to keep that out.  I

8    mean, the photograph shows Mr. Caldwell.  Clearly, he's been

9    woken up recently by the FBI.  He's in handcuffs.  He looks a

10   little disheveled.  It's not being admitted for the purpose of,

11   you know, trying to suggest that anything Mr. Caldwell said

12   during that FBI interview was inaccurate or problematic, and so

13   I don't think there's much probative value.  And there's some

14   prejudicial quality to it, substantial prejudicial quality to

15   it, it seems to me --

16   MR. FISCHER:  Understood.

17   THE COURT:  -- that somehow he was mistreated.

18   MR. FISCHER:  Understood.

19   (Proceedings held in open court.)

20   BY MR. FISCHER:

21   Q.  Mrs. Caldwell, we're going to move along to another topic.

22   During the -- did the FBI -- during the service of the search

23   warrant at your house, did they seize items from your house?

24   A.  Yes, they did.

25   Q.  Did they seize every single item from your house?

```
 1    A.  No.

 2    Q.  Did they seize some of the electronics?

 3    A.  They seized some of the electronics, yes.

 4    Q.  Did they seize all of the electronics?

 5    A.  No.

 6    Q.  And, ma'am, did there come a time during -- while you and

 7    your husband -- while the FBI was in your house, did -- did you

 8    receive a phone call on your landline phone?

 9    A.  Yes.

10    Q.  Okay.  Who -- can you tell the ladies and gentlemen of the

11    jury --

12            MR. MANZO:  Objection, Your Honor.

13            THE COURT:  Let's hear the question.

14    BY MR. FISCHER:

15    Q.  Can you tell the ladies and gentlemen of the jury who --

16    who -- not what they said but who called you.

17            MR. MANZO:  Objection, Your Honor.  Hearsay.

18         Can we get on the phone, please?

19            THE COURT:  Okay.

20            (Bench conference on the record.)

21            MR. MANZO:  So I believe what Mr. Fischer is

22    eliciting is that The Washington Post called the house, and I

23    think it's to try to infer the government did some type of

24    wrongdoing here.  First, it's hearsay; and second, it's not

25    correct.
```

1          THE COURT:  What's not correct?

2          MR. MANZO:  That the government did something wrong

3     here.  Do you want what's unsealed at arrest?  That is common

4     practice.  We complied with all conditions set by a judge, and

5     there's absolutely no relevance that there would be a call to

6     Ms. Caldwell pertaining -- that would pertain to the defense

7     guilt or innocence in this case.

8          THE COURT:  Mr. Fischer.

9          MR. FISCHER:  Your Honor, it goes to -- I mean, she

10    received -- they receive a phone call from the media just

11    within an hour or so after, you know, his arrest.  It's,

12    obviously, been out there, and it goes to how the FBI would

13    have conducted their investigation.  They know it's already

14    been released and a national publication is already on the

15    phone with her.

16         MR. MANZO:  But it just -- nothing was improper

17    and --

18         THE COURT:  I mean, I guess that's the point, which

19    is that if it's already been made public, then what's the point

20    of bringing it out?  In other words, once it's made public, the

21    press has every right to reach out to speak to her.

22         MR. FISCHER:  Well, I think it goes to the point

23    that -- well, the FBI had already -- I mean, this is at 6:00 in

24    the morning.  So it's not like -- and -- and it's filed out of

25    the Western District of Virginia.  So it's not like *The*

8603

1    *Washington Post* was sitting at the courthouse.  It was

2    obviously --

3              THE COURT:  Well, I think we're speculating then.  If

4    the point of this is to suggest that the government somehow

5    leaked the information to Mr. Caldwell -- excuse me -- leaked

6    the information to *The Washington Post* and absent some reason

7    that, in fact, happened, I mean, I think this is -- there's no

8    real relevance to the line of questioning.

9              MR. FISCHER:  I'll move on.

10             THE COURT:  Thank you.

11             (Proceedings held in open court.)

12   BY MR. FISCHER:

13   Q.  All right.  Ma'am, I'm going to pull up a different

14   exhibit --

15             MR. FISCHER:  Actually, Exhibit 47 for the witness

16   only.

17   BY MR. FISCHER:

18   Q.  Mrs. Caldwell, I'm going to show you what's been marked as

19   Caldwell Exhibit 47.  Do you recognize that document?

20   A.  Yes, I do.

21   Q.  What is the document?

22   A.  It's an email that I sent to the organizers of the rally

23   that Tom and I attended on November 8th in Purcellville,

24   Virginia.  I wanted to say thank you to them for organizing the

25   rally.

1   Q.  Okay.  And is it an email from you to somebody named Dave

2   LaRock?

3   A.  Yes.

4   Q.  Okay.  And what was the purpose of you sending the email?

5   A.  Well, I wanted to thank them for doing such a great job in

6   organizing this rally on the 8th, five days after the election,

7   and doing such a great job.  And, also, too, they had a speaker

8   at this rally who spoke about -- it was encouraging people to

9   get off of Facebook.  And she said:  Hey, if you have any

10  questions, contact me, but I didn't have her contact info.  So

11  I asked him, "Hey, can you help me get in contact with the

12  speaker who talked about getting off Facebook?"

13  Q.  Can you tell the ladies and gentlemen of the jury, why were

14  you interested in getting off Facebook in the first part of

15  November of 2020 -- yeah, November of 2020?

16  A.  Well, many of our friends were being suspended or censored

17  or something on Facebook.  It was getting to be kind of

18  ridiculous.  And I thought, I don't need this anymore, you

19  know.

20  Q.  Okay.  And so --

21          MR. FISCHER:  Your Honor, at this time we ask to move

22  in Caldwell Exhibit 47.

23          MR. MANZO:  No objection.

24          THE COURT:  All right.  Caldwell 47 will be admitted.

25          (Defendant Caldwell Exhibit 47 admitted into

```
 1   evidence.)
 2   BY MR. FISCHER:
 3   Q.  And so, ma'am -- Mrs. Caldwell, does it indicate that you
 4   were trying to find out the name of the woman, Lisa, who was a
 5   speaker regarding Facebook at the rally; is that right?
 6   A.  That's right.
 7   Q.  Okay.  And what was your intention regarding Facebook at
 8   that point?
 9   A.  Well, I wanted to get completely off of it.
10   Q.  Okay.  Did you discuss that with your husband as well?
11   A.  I did.
12   Q.  And your husband, did he attend that same rally?
13   A.  He did.
14   Q.  And was he there when that same speaker spoke?
15   A.  Yes.
16   Q.  Okay.
17           MR. FISCHER:  You can pull that down.
18       If we can pull up Caldwell Exhibit 57, please.
19   BY MR. FISCHER:
20   Q.  Ma'am, I'm pulling up for the record, for your eyes only,
21   Caldwell No. 57.
22       Okay.  And, ma'am, do you recognize what's in Caldwell
23   57?
24   A.  Yes.
25           MR. FISCHER:  Go to the second page of this
```

8606

1     Exhibit 57.

2     BY MR. FISCHER:

3     Q.  Ma'am, can you tell us what's in this exhibit, please.

4     A.  Yes.  It's an email that I got from Women for America

5     First, one of the organizers of the Million MAGA March in

6     November, and they were complaining about problems they were

7     having with Facebook, for example, and this page deleting their

8     group.  She says that Facebook deleted our group on Facebook;

9     that it added more than 350,000 new members in 24 hours.  So

10    this was another thing that made me mad and I have to get off.

11    Q.  Ma'am, I understand you and your husband are registered

12    Republicans; is that correct?

13    A.  Well, you don't register by party in Virginia, but we're

14    Republicans, yes.

15    Q.  Okay.  You were Trump supporters; is that right?

16    A.  Yes.

17    Q.  Were you -- were you upset regarding Facebook and how --

18    what they were doing vis-á-vis people on the right side of the

19    political aisle?

20    A.  Yes.

21    Q.  Okay.

22              MR. FISCHER:  We move in Caldwell 57 at this time.

23              MR. MANZO:  No objection.

24              (Defendant Caldwell Exhibit 57 admitted into

25    evidence.)

```
 1    BY MR. FISCHER:

 2    Q.  Ma'am, we're going to pull up at this time Caldwell

 3    Exhibit 61-A through C.

 4         Ma'am, during that FBI raid we talked about, did there

 5    come a time when the FBI seized a computer that was in your

 6    kitchen?

 7    A.  Yes.

 8    Q.  Okay.  And what's in 61-A, do you recognize the photo?

 9    A.  Yes.  That's the desktop for my husband's computer that was

10    seized.

11         MR. FISCHER:  Can we go to 61-B, please.

12    BY MR. FISCHER:

13    Q.  Do you recognize the photo in the -- what's depicted in

14    this photo?

15    A.  Yes.

16    Q.  What is that?

17    A.  That's a --

18         MR. MANZO:  Objection, Your Honor.  Hearsay.

19         MR. FISCHER:  It's a photo.

20         MR. MANZO:  If it's a photo, fine.  If it's a

21    statement, it's hearsay.

22         THE COURT:  Let's just describe what the photo is.

23    BY MR. FISCHER:

24    Q.  Can you describe --

25         MR. FISCHER:  Excuse me.
```

```
 1              THE COURT:  Go ahead.
 2   BY MR. FISCHER:
 3   Q.  Can you describe what's in 61-B, please.
 4   A.  It is a folder on the desktop.  Picture.
 5   Q.  Okay.  And that's a photograph?
 6   A.  It's a photograph.
 7   Q.  So it's a photograph of the monitor of a computer; is that
 8   right?
 9   A.  Yes.  And one -- one folder on that desktop.
10   Q.  And what -- what is -- and, ma'am, are you familiar with
11   this monitor, obviously?
12   A.  Yes.
13   Q.  Okay.  And where was the monitor located at in your home?
14   A.  In our dining room area next to our kitchen.
15   Q.  Okay.  And did the FBI seize the monitor and the computer?
16   A.  Yes.
17   Q.  Okay.
18              MR. FISCHER:  Let's go to 61-C, please.
19   BY MR. FISCHER:
20   Q.  Can you tell us what's in 61-C.
21              MR. MANZO:  Objection.  Hearsay.
22              THE COURT:  Let's go ahead and finish the
23   questioning, and then we'll get on the phone.
24   BY MR. FISCHER:
25   Q.  Can you tell what's in 61-C.  Can you -- Mrs. Caldwell, can
```

```
 1    you tell us what's depicted in 61-C.

 2    A.  It's another picture of -- of the properties of that

 3    particular folder.

 4    Q.  Okay.  And, ma'am, obviously, you used that computer before

 5    the FBI raided your home; is that correct?

 6    A.  Yes.

 7    Q.  Okay.  Are you familiar with the file folder that the --

 8    that -- depicted on 61-B?

 9    A.  Yes.

10    Q.  Okay.  And, ma'am --

11              MR. FISCHER:  And at this time we move in Caldwell

12    61-A through C.

13              MR. MANZO:  General objection, Your Honor.

14              (Bench conference on the record.)

15              THE COURT:  Okay.  Go ahead, Mr. Fischer.

16              MR. FISCHER:  Your Honor, 61-A is just a picture of

17    the computer monitor.

18              THE COURT:  That's not the issue.  It's -- the

19    government is objecting to the file title being hearsay.

20              MR. MANZO:  Correct.  The -- if he's trying to -- I'm

21    sorry.  If Mr. Fischer is trying to assert that the file title

22    Taken Down From Facebook is meant for the truth of the matter

23    asserted, it's an out-of-court statement and it's just hearsay.

24    So.

25              THE COURT:  Well --
```

1    MR. MANZO:  I don't know what the relevance would be

2    if it wasn't for the truth of the matter asserted.

3    THE COURT:  Well, I don't know what Mr. Fischer

4    intends to elicit beyond just what the title of the file is.

5    Is there a suggestion that somehow the items that were deleted

6    from Mr. Caldwell's Facebook ended up in this file folder?

7    MR. FISCHER:  That's correct.  And Mrs. Caldwell is

8    prepared to testify that the photos that were taken from

9    Facebook are in this file that's labeled Taken Down From

10   Facebook.

11   MR. MANZO:  That's why we're objecting, because it's

12   a folder titled Taken Down From Facebook.  So it's for the

13   truth of the matter.  It's out-of-court.  She can testify that,

14   you know -- she can testify to something else.  I'm not sure

15   how she can testify to this folder as a statement.

16   MR. FISCHER:  Your Honor, the FBI took the second

17   picture.  They took the picture of the close-up that was taken

18   down from Facebook.

19   THE COURT:  So let me ask a question:  Was the --

20   this was a desktop.  So was there a hard drive that was taken

21   too or no?

22   MR. FISCHER:  Yes, there was, Your Honor.

23   THE COURT:  And so what's in the contents of the file

24   folder?  Presumably, the government has it and looked at it.

25   And so what's in there?

1          MR. FISCHER:  Your Honor, there are 11 pictures that

2    Mr. Caldwell took down from Facebook that are in this file

3    folder.  The FBI has charged him with taking photos down from

4    his Facebook account.  They took the close-up picture of the

5    file folder, and the contents of the file folder are what we

6    want to introduce, which are the pictures that were taken down

7    from Facebook.

8          THE COURT:  And so do we -- to what extent do we know

9    those are the photographs that match up with the deleted

10   material -- or the unsent material on Facebook?

11         MR. FISCHER:  We -- Your Honor, this allegation has

12   been here almo- -- yeah, I think it was in the first

13   indictment.  So this was the first thing that they -- this was

14   the first -- they took this during the raid.  They took a

15   close-up, and they were using this to try to hold Mr. Caldwell

16   as far as evidence tampering, Taken Down From Facebook.  That's

17   why they took the photograph, the close-up photograph.

18         THE COURT:  Okay.

19         MR. MANZO:  And I'm confused.  This is an FBI

20   photograph, not a photograph from the defense?

21         MR. FISCHER:  That's correct.  It's in discovery.

22         MR. MANZO:  So the point still stands that it does

23   not matter who is saying a statement out of court and putting

24   it forward for the truth; it's still hearsay.  It would be no

25   different if there was an email that said, you know, Dear

1    Sharon, I took these photos down from Facebook.  Here they are,

2    which would clearly be hearsay.  It's the same thing.

3         MR. FISCHER:  Your Honor, the allegation in the

4    indictment is specifically that Mr. Caldwell deleted

5    photographs from his Facebook account.

6         THE COURT:  No, I'm aware of that.  I think the

7    question is:  What's the answer to the hearsay objection?

8         MR. FISCHER:  It's just a file folder name.  I mean,

9    it's not for the truth of the matter asserted.  I mean, the --

10   it's a file folder name, and it has pictures, and, you know,

11   that's -- that's it in a nutshell.  I mean, it's not a

12   statement.  I mean, it's not really -- it's not a statement.

13   It's not an out-of-court statement; it's a file folder name.

14        THE COURT:  Well, it depends.  It depends on how

15   you're going to use it.  So if you're going to say, you know

16   these -- you know, the contents of this file folder were taken

17   down from Facebook by Mr. Caldwell because that's the name of

18   the file, that's -- then it is hearsay.  Then it is coming in

19   for the truth of the matter asserted.

20        On the other hand, if you're just, you know, wanting to

21   bring it in to identify there was a file with this title and

22   there were Facebook photos in there, then that's a different

23   issue.

24        MR. FISCHER:  That's what I'm going to do.

25        THE COURT:  Okay.  All right.  So what I'll tell the

 1    jury is that, you know, the file title is coming in simply as

 2    the title of the file, and it's not coming in for the truth of

 3    the contents of the file name.  Okay?

 4            MR. MANZO:  Your Honor, did we ever -- sorry.  I may

 5    have lost --

 6            (Proceedings held in open court.)

 7    BY MR. FISCHER:

 8    Q.  Mrs. Caldwell --

 9            MR. FISCHER:  Well, first of all, at this time I move

10    in Caldwell 61-A through C.

11            THE COURT:  Okay.  They'll be admitted.

12            (Defendant Caldwell Exhibit 61-A through 61-C

13    admitted into evidence.)

14            MR. FISCHER:  Let's publish to the jury.  Can we go

15    to 61-A, please.

16         Thank you.

17    BY MR. FISCHER:

18    Q.  Can you tell the jury what's on 61-A.

19    A.  Yes.  That's a picture of my husband's desktop on his

20    computer.

21            MR. FISCHER:  Okay.  And down -- can we go to 61-B,

22    please.

23    BY MR. FISCHER:

24    Q.  What's depicted in 61-B?

25    A.  It's a picture of a folder on that screen, on the monitor.

8614

1    Q.  Okay.  And do you know who took that -- that close-up

2    picture?

3    A.  The FBI.

4    Q.  Okay.  And where did you get that picture from?

5    A.  You gave it to me.  You had it from discovery.

6           MR. FISCHER:  Okay.  Can we go to 61-C.

7    BY MR. FISCHER:

8    Q.  Do you know when the file folder Taken Down From Facebook

9    was -- was created?

10   A.  It was created January 7th, 2021.

11          MR. FISCHER:  Okay.  And at this time, if we can then

12   move along to 62 -- Caldwell 62-A through K.

13          THE COURT:  Mr. Fischer --

14          Ladies and gentlemen, just a limiting instruction.  The

15   title of the file folder is providing -- being provided to you

16   simply as the title of the file folder, not for the truth of

17   the content -- not for the truth of what the file folder's

18   title is.

19          Mr. Fischer.

20   BY MR. FISCHER:

21   Q.  Mrs. Caldwell --

22          MR. FISCHER:  We're just showing for the witness 62-A

23   through K.

24   BY MR. FISCHER:

25   Q.  I know we've gone over these photos with you this weekend.

1    Do you recognize the photos in 62-A through K?

2    A.  Yes.

3    Q.  Okay.  And do -- where do these photos come from?

4    A.  They were in Tom's Facebook account, but they are -- and he

5    put them into this folder called Taken Down From Facebook.

6    Q.  And, ma'am, the photographs are 62-A through K.  Besides

7    those photographs, were there any other photos in the Taken

8    Down From Facebook file folder on your computer?

9    A.  No.  Just these.

10   Q.  And, ma'am, to be clear, the FBI seized this computer on

11   January 19th, 2021; is that correct?

12   A.  That's correct.

13   Q.  And I understand -- did you get it back some months later?

14   A.  Yes.

15   Q.  Okay.  And are you aware whether the FBI took a mirrored

16   Cellebrite copy of the computer contents?

17   A.  Yes, they did.

18           MR. MANZO:  Objection, Your Honor.  Personal

19   knowledge.

20           THE COURT:  Sorry.  It's not disputed.

21      Go ahead.

22           MR. FISCHER:  At this time, we move in Caldwell 62-A

23   through K.

24           MR. MANZO:  No objection.

25           THE COURT:  All right.  62-A through K will be

1    admitted.

2              (Defendant Caldwell Exhibit 62-A through 62-K

3    admitted into evidence.)

4    BY MR. FISCHER:

5    Q.  Ma'am, what's depicted in Photo No. 1?

6    A.  That's my husband, Tom, with a glass of wine.

7    Q.  Okay.  That's A.  Let's move to B.

8    A.  That's LiMu Emu.

9    Q.  Let's go to C.

10   A.  Another photo of Tom with a glass of wine.

11   Q.  Let's go to D.

12   A.  That's Tom and I at the CPAC conference.

13   Q.  Let's go to E.

14   A.  That's Tom and a daughter of a friend of his, Bella.

15   Q.  Let's go to F, please.  Same thing?

16   A.  Tom and Bella.

17   Q.  G.

18   A.  That's our 1963 T-Bird convertible, which we had to sell to

19   pay legal expenses.

20   Q.  Ma'am -- well, that's fine.

21        Next.

22   A.  That's Tom on the USS Bunker Hill many years ago.  He's

23   very handsome.

24   Q.  Next, please.

25   A.  That's a scripture passage.

```
1    Q.  Next, please.

2    A.  That's Tom and some friends of his from many years ago.

3    Q.  Next.

4    A.  And that's Tom and I in the Berryville Christmas parade

5    with Bob the Bear in our classic car.

6    Q.  Okay.  Ma'am, do any of those pictures depict -- have

7    anything to do with January 6th?

8    A.  No.

9           MR. FISCHER:  Okay.  You can pull that down, please.

10   BY MR. FISCHER:

11   Q.  Ma'am, I understand at some point you indicated you retired

12   from your job in Berryville, Virginia; is that correct?

13   A.  That's correct.

14   Q.  When did you officially retire?

15   A.  January 4th, 2021.

16   Q.  Okay.  And before that, did you submit a resignation or

17   retirement letter?

18   A.  I did.

19   Q.  When did you submit that?

20   A.  It was in December, early December 2020.

21   Q.  Okay.  Ma'am, did you make retirement plans before you

22   ended up retiring?

23          MR. MANZO:  Objection.  Relevance.

24          THE COURT:  Mr. Fischer, where is this going?

25          MR. FISCHER:  If I can, Your Honor, if I may speak
```

1    with the government for just one moment.

2              If we can get on the phone for just 10 seconds.

3                    (Bench conference on the record.)

4              THE COURT:  Okay.  Go ahead, Mr. Fischer.

5              MR. FISCHER:  Your Honor, I'm not sure -- and I guess

6    I could ask -- I know -- I'll ask Ms. Rakoczy.  She's on the

7    line right now.  The government introduced an exhibit.  It was,

8    like, a pad of paper, I think, and I don't know if it had some

9    -- I think it may have had something about Mr. and

10   Mrs. Caldwell researching moves overseas.  So if I could ask

11   the government if that was part of what they introduced.

12             MR. MANZO:  Not that I'm aware of, and we're happy to

13   redact it if it is on a piece of paper.  I have not seen it.

14             MR. FISCHER:  That solves the issue.

15             THE COURT:  Okay.  Great.  Thank you.

16             (Proceedings held in open court.)

17   BY MR. FISCHER:

18   Q.  Mrs. Caldwell, I'm going to pull up -- this is going to

19   be -- I'm going to pull up Caldwell 150.1.  Mrs. Caldwell,

20   again, you remember back in January 5th, 6th, and 7th, you were

21   at the Comfort Inn in Ballston, Arlington; is that right?

22   A.  That's right.

23   Q.  Okay.  And we're pulling up video -- or closed-circuit TV

24   video from the Comfort Inn.  It will be up in one minute.

25             MR. FISCHER:  Court's indulgence.

```
 1    BY MR. FISCHER:

 2    Q.  Okay.  All right.  Ma'am, I'm going to show this to you

 3    first before I show it to the jury --

 4              MR. FISCHER:  Actually, is there any objection,

 5    government, to the --

 6              MR. MANZO:  No objection.

 7    BY MR. FISCHER:

 8    Q.  Ma'am, I'm going to show you what's been marked as Caldwell

 9    150.1.

10              MR. FISCHER:  We move to admit at this time.

11              THE COURT:  150.1 will be admitted.

12              (Defendant Caldwell Exhibit 150.1 admitted into

13    evidence.)

14    BY MR. FISCHER:

15    Q.  Ma'am, we're going to play this forward a little bit, and

16    tell me if and when you see your husband come into the picture.

17              (A video recording was played.)

18    A.  There he is.

19    BY MR. FISCHER:

20    Q.  Okay.

21              (A video recording was played.)

22              MR. FISCHER:  All right.  Can we get the time on

23    here.

24    BY MR. FISCHER:

25    Q.  Ma'am, you'll see at the bottom, it looks like he went up
```

1    against the wall at about 48 seconds; is that right?

2    A.  Yes.

3    Q.  And I understand this appears to be a motion-sensitive

4    closed-circuit TV video.  Do you agree with that?

5    A.  Yes.

6    Q.  For the record, what's your husband doing at this time?

7    A.  He's leaning up against the wall.

8    Q.  And you see the timer at the bottom is moving?

9    A.  Yes.

10   Q.  And just let me know if you -- if and when he moves

11   again.

12             (A video recording was played.)

13   A.  Right there.

14   BY MR. FISCHER:

15   Q.  Okay.  So it looks at 1:22 he got off against the wall.

16   Did you see that, ma'am?

17   A.  Yes.

18   Q.  Okay.  Ma'am, is -- what your husband did in leaning

19   against the wall, is that anything unusual, any -- unusual for

20   his conduct that you witnessed over the months leading up to

21   January 6th?

22   A.  No.  I mean, he will do that to kind of take some of the

23   pressure and the weight off of his back and legs.

24             MR. FISCHER:  Thank you.  You can take that down,

25   Ms. Boomersbach.  Thank you.

1    BY MR. FISCHER:

2    Q.  Mrs. Caldwell, did either you or your husband, quote,

3    storm, unquote, the Capitol on January 6th?

4    A.  No.

5    Q.  Were you with -- I know you said you were with your husband

6    on January 6th.  But when you left Berryville, Virginia, on

7    January 5th to go to Washington, D.C., and you left on

8    January 7th, were you with him -- how often were you with him

9    from that whole entire time?

10   A.  Almost the entire time.  Almost.  Maybe -- except for

11   maybe -- I don't know -- half an hour.

12   Q.  Okay.  Fair enough.

13        And, ma'am, you're familiar with -- I'm not going to

14   play it, but there's a video when you're walking down

15   Constitution Avenue and your husband says something -- you said

16   something about Vice President Pence, and he said, I know where

17   he lives, on Wisconsin Avenue.  You're familiar with that

18   video?

19   A.  Yes.

20   Q.  When your husband said that, how did you take that?

21   A.  He's just joking around.

22   Q.  Ma'am, did either you or your husband handle or steal a

23   police shield on January 6th?

24   A.  No.

25   Q.  Okay.  And, ma'am, at the time of -- of your husband's

8622

1    arrest, I know he was disabled.  He wasn't working.  Did he

2    have a hobby?

3        Well, let me ask you this:  Did he have a hobby that

4    involved writing?

5    A.  Oh, sure.  Yeah.  He -- he --

6            MR. MANZO:  Objection.  Relevance.

7            THE COURT:  Just answer yes or no and then see where

8    this goes.

9    A.  Yes.

10   BY MR. FISCHER:

11   Q.  What was his hobby?

12   A.  Screenwriting and writing in general.

13   Q.  Okay.  And do you know how long he had been doing that for?

14   A.  Since the '80s, 1980s.

15   Q.  Ma'am, I'm just going to end this.  At -- at any time

16   during the year 2020 or in 2021, did you witness any behavior

17   on the part of your husband to do anything to plan to illegally

18   stop the election on January 6th?

19           MR. MANZO:  Objection.  Calls for a legal conclusion.

20           THE COURT:  Rephrase the question, please.

21   BY MR. FISCHER:

22   Q.  Ma'am, did you witness any conduct on behalf of your

23   husband that you believe that was nefarious as far as trying to

24   stop an election?

25   A.  No.

```
1    Q.  Did you witness any conduct after January 6th that you

2    believe was something to try to stop the election?

3    A.  No.

4    Q.  And just a couple more questions, ma'am.

5            I understand -- you're, obviously, familiar with

6    Paul Stamey; is that right?

7    A.  Yes.

8    Q.  Did there come a time in early January when -- you know,

9    without what he said, did there come a time when Mr. Stamey

10   called your house?

11   A.  Yes.

12   Q.  Did he have a conversation with your husband?

13   A.  Yes.

14   Q.  And as a result of that conversation -- what, if anything,

15   happened?

16   A.  As a result --

17           MR. MANZO:  Calls for hearsay.

18           MR. FISCHER:  It's going to be state of mind,

19   Your Honor.

20           THE COURT:  I'm not sure --

21           MR. MANZO:  Can we get on the phone, please.

22           (Bench conference on the record.)

23           THE COURT:  Go ahead, Mr. Fischer.

24           MR. FISCHER:  Your Honor, Mr. Stamey called

25   Mr. Caldwell and asked him to procure a boat to cross the
```

1    Potomac for the quick reaction force.  So as a result,

2    when he -- when Mr. Caldwell got off the phone, he told his

3    wife that Mr. Stamey wanted him to try to go out and find a

4    boat and that's -- you know, so it goes to the state of mind.

5            MR. MANZO:  I don't think it goes to state of mind.

6    I think you're trying to back into hearsay here.

7            MR. FISCHER:  It --

8            MR. MANZO:  Mr. Caldwell took actions to go find a

9    boat.  I don't know why it would be relevant that Mr. Stamey

10   specifically asked him.  That's still just hearsay,

11   if Mr. Stamey's out-of-court statement is meant for the truth

12   of the matter.

13           THE COURT:  Well --

14           MR. MANZO:  And, also, it's a double layer; right?

15   That it's Stamey told Caldwell to --

16           THE COURT:  No.  Right.  I agree with that.  I mean,

17   she can't testify as to what Stamey told Caldwell.  She could,

18   in theory, testify what her husband said to her.  I guess the

19   question is:  What is she going to say she heard him say?

20           MR. FISCHER:  Your Honor, I guess I can phrase it in

21   such a way:  As a result of that telephone conversation, did

22   your husband take action -- did your husband take some sort of

23   action.

24           THE COURT:  How is she going to know that he took

25   action in response to that phone call?

8625

1          MR. FISCHER:  I -- I mean, he's -- when -- when he

2     got the phone call, he got off the phone call and said, you

3     know, basically, Stamey wants to ask -- me to ask around about

4     a boat.

5          THE COURT:  Right.  But does she know that he looked

6     around for a boat?  Does she know that he looked around for a

7     boat?

8          MR. FISCHER:  Yes.  I mean, I think everybody knows

9     by now.

10         THE COURT:  I mean at the time.  Mr. Fischer, at the

11    time.

12         MR. FISCHER:  I'm fairly confident -- yeah.  I mean,

13    she -- yeah.

14         MR. MANZO:  It's still three layers of hearsay.

15         THE COURT:  Well, hang on.  It's not three layers of

16    hearsay if what he's trying to elicit is what he said.  She

17    can't clearly testify about what -- what Mr. Stamey said.  So

18    the problem was -- is that if he's -- just ask her if Stamey

19    called and then what came as a result of that, it -- that's not

20    going to work.  So -- because it's not clear to me how she

21    would know exactly the result of that phone call and what

22    happened with the conduct that immediately followed -- or

23    followed.

24         So, I mean, if you want to ask her, generally, did

25    she -- was she aware of him trying to get a boat and -- him

1    trying to do that, that's different, but I don't know that

2    she's able to testify about that.

3                 MR. FISCHER:  I think I'll withdraw.

4                 THE COURT:  Okay.

5                 (Proceedings held in open court.)

6                 THE COURT:  All right.  So the objection will be

7    sustained.

8    BY MR. FISCHER:

9    Q.  Mrs. Caldwell, I'm going to finally -- after -- at some

10   point the Oath Keepers left your property in November 2020; is

11   that correct?

12   A.  Yes.

13   Q.  When they left, how did they leave your property?

14   A.  In perfect condition.  They were wonderful guests.

15                MR. FISCHER:  I have no further questions,

16   Your Honor.  Thank you.

17                THE COURT:  All right.  Thank you.

18          All right.  Any requested examination from the defense?

19                MR. CRISP:  No, Your Honor.

20                THE COURT:  Okay.  All right.  So we'll hear

21   cross-examination from the government.

22                            CROSS-EXAMINATION

23   BY MR. MANZO:

24   Q.  Good afternoon, ma'am.

25   A.  Good afternoon.

8627

1    Q.  Were you aware that after the Million MAGA March that

2    Mr. Caldwell started planning for a much bigger op?

3    A.  I was not aware of that, no.  He did not.

4    Q.  And were you aware that he coordinated with Three

5    Percenters?

6    A.  He doesn't know any Three Percenters.

7    Q.  And you're aware that Three Percenters were a militia group

8    that was active on January 6th?

9    A.  No, I'm not.

10   Q.  Are you aware that -- that -- Ranger Doug, you testified to

11   him before; right?

12   A.  I'm aware of who he is, yes.

13   Q.  That he was calling for armed combat against the

14   government?

15   A.  No, I'm not -- I'm not aware of that.

16   Q.  You're aware that your husband tried to procure a boat to

17   bring heavy weapons into Washington, D.C.?

18   A.  He tried to do what?  Excuse me?

19   Q.  Procure a boat to cross the Potomac to bring heavy weapons

20   into Washington, D.C.

21   A.  No, that's not true.

22   Q.  Were you on Signal, ma'am?

23   A.  Very briefly.

24   Q.  Were you on any of the Oath Keeper chats?

25   A.  No, I was not.

1    Q.   Did you exchange messages with Mr. Stamey?

2    A.   No.

3    Q.   Did you exchange messages with Ranger Doug?

4    A.   No.

5    Q.   Did you ever delete electronic evidence pertaining to

6    January 6th?

7    A.   No.

8    Q.   Did you ever unsend messages pertaining to January 6th?

9    A.   No.

10   Q.   Okay.  At the tail end of your testimony just now, you

11   mentioned that there was a folder on the computer of deleted

12   pictures from Facebook; is that correct?

13   A.   They're taken down from Facebook.

14   Q.   And that was on January 7th?

15   A.   The folder was created on January 7th by my husband.

16   Q.   And all those photos had his face pretty recognizable; is

17   that fair to say?

18   A.   Yes, many of them did.  Yes.

19   Q.   And those were photos that he took down on January 7th;

20   right?

21   A.   That's not correct.

22   Q.   Okay.  When did they come down?

23   A.   Most of them in December.

24   Q.   Okay.  They came down in December?

25   A.   Yes.

1    Q.  Are you aware that he deleted messages with Donovan Crowl
2    soon after Donovan Crowl made it to your farm after
3    January 6th?
4    A.  I don't think he deleted messages.  From what I've heard,
5    he unsent some messages.
6    Q.  Okay.  Are you also aware that he unsent 180 additional
7    messages?
8    A.  Yes, I heard that.
9    Q.  Did you watch him do that?
10   A.  No.
11   Q.  And those weren't photos; correct?
12   A.  I don't know what they were.
13   Q.  Okay.  Let's go now to Mr. Bennie Parker.  You described
14   him as an elderly gentleman; is that correct?
15   A.  That's correct.
16   Q.  And he was in the car that was behind you as you entered
17   the city on January 6th?
18   A.  That's correct.
19            MR. MANZO:  Can we pull up 9335 and go to 40 seconds.
20   You can keep the sound off for a moment here.  Forty seconds,
21   please.
22   BY MR. MANZO:
23   Q.  Do you recognize on your screen in front of you, the
24   individual, Mr. Bennie Parker?
25   A.  I do not.

1    Q.  Do you know what Mr. Bennie Parker looks like?

2    A.  I had seen him in the parking lot for, like, 2 seconds, and

3    so I just recall that he was elderly.  But I couldn't pick him

4    out of a crowd; I saw him so briefly.

5    Q.  So the elderly man in front of you is not the person you

6    know as Bennie Parker?

7    A.  I'm not sure.

8    Q.  Okay.  Okay.  We'll move on.

9         You said that you had 70 firearms at your residence; is

10   that fair?

11   A.  That's correct.

12   Q.  And you said on direct that the FBI didn't seize those

13   weapons?

14   A.  They did not.

15   Q.  You were given a search warrant at the time of the FBI

16   search, and you're aware that a court did not grant at the time

17   the FBI the authority to seize those weapons?

18   A.  Yes, I understand that.

19   Q.  And you're aware that you were subsequently ordered by --

20   by the Court here to prohibit Mr. Caldwell from having access

21   to those weapons?

22   A.  That's correct.

23             MR. MANZO:  Let's go to 22.V.3, please, which is

24   already in evidence.

25             (An audio-visual recording was played.)

1           MR. MANZO:  And we can stop it right there.

2      Actually, go back 1 second here.

3      BY MR. MANZO:

4      Q.  And do you recognize this person here at 40 seconds?

5      A.  I do now.  If you would have asked me a month ago, I

6      probably wouldn't have, but I do now.

7      Q.  What's his name?

8      A.  I believe that's Mr. Kelly Meggs.

9      Q.  Okay.  And can we go to the -- and you were here the

10     morning of January 6th with the Florida Oath Keepers and

11     Jessica Watkins and Mr. Crowl and all?

12     A.  Yes, I was.

13          MR. MANZO:  Can we go to 29.P.2.

14          And this has already been moved into evidence, I

15     believe.

16     BY MR. MANZO:

17     Q.  This is you outside of the Washington Monument area on the

18     morning of January 6th; correct?

19     A.  Correct.

20     Q.  And this is you wearing an Oath Keepers shirt?

21     A.  Yes.

22     Q.  And that's the shirt that Kelly Meggs gave you; right?

23     A.  Someone gave it to me, yes.

24     Q.  But it's Kelly Meggs from Florida; correct?

25     A.  Kelly Meggs, as far as I know, is from Florida.  I don't

1    remember who handed me the shirt.

2    Q.  And he gave you and your husband the Oath Keepers shirts

3    that morning; is that fair?

4    A.  Yes, somebody gave us -- from the Oath Keepers gave us the

5    T-shirts that morning when we were with them.

6    Q.  Okay.

7            MR. MANZO:  Let's go now to Government Exhibit 1500

8    at 18 seconds.  And we'll play it forward here once.

9            (An audio-visual recording was played.)

10   BY MR. MANZO:

11   Q.  Okay.  Ma'am, is that what you said, "Stop the Steal.  Stop

12   the Steal" repeatedly, and "We're marching to the Capitol"?

13   A.  Yes.

14   Q.  "We better do the right thing today"?

15   A.  Yes.

16   Q.  What was going on at the Capitol?

17   A.  The certification of the election.

18   Q.  How did you know that?

19   A.  I think most people knew that from television and

20   everything else.

21   Q.  And what was the "right thing" in your mind?

22   A.  Well, the right thing was for the certification process to

23   proceed as it should.

24   Q.  How -- can you describe what that means.

25   A.  I guess Congress meets and they discuss things and somehow

1    it gets certified.

2    Q.  Does the certification process involve being driven from

3    Congress?

4    A.  Of course not.

5    Q.  So the certification process is a legal mechanism where

6    people hear objections and it's peaceful; correct?

7    A.  That's correct.

8    Q.  And then Mr. Caldwell says in response to this, "I know

9    where Pence lives up on Wisconsin Avenue.  That punk ass better

10   do what he's supposed to do."  Is that correct?

11   A.  That's correct.

12   Q.  And the Vice President's residence is up off Wisconsin

13   Avenue; correct?

14   A.  I believe so.  I don't know.

15   Q.  And so you're more than a mile from the Capitol at this

16   point, and you're heading toward it; is that fair to say?

17   A.  Yes.

18   Q.  What were you thinking at that time?

19   A.  I was just having fun.  I was just having a good time.  At

20   that time I was, let's see, 61.  Tom was -- what? -- 66.  This

21   was literally -- this protesting thing was new to us.  And I

22   thought this is -- everybody around me was chanting "Stop the

23   Steal," and I chimed in, and I was having a good time.

24   Q.  And you're -- Mr. Caldwell threatened Mr. Pence as part of

25   your good time?

```
 1              MR. FISCHER:  Objection.

 2   A.  He --

 3              THE COURT:  It's overruled.

 4   A.  May I answer?

 5   BY MR. MANZO:

 6   Q.  Yes.

 7   A.  Oh, okay.

 8        I see what he said.  I believe he thought he was saying

 9   it to me and to me only.  I think it's -- you know, it's Tom

10   being Tom, and I think he was kind of trying to joke around

11   with me.  But I don't -- I don't think anybody else even heard

12   him.

13   Q.  But he's just joking around about the Vice President

14   being -- I don't know -- assaulted?

15   A.  He's just joking around.  That's just Tom being Tom.

16   Q.  So then you continue walking, and you get to the Peace

17   Circle; correct?

18   A.  Yes.

19   Q.  And you wait there for about an hour, you said?

20   A.  An hour or so, yeah.

21   Q.  And when you're waiting there, you could hear flash-bangs

22   going off?

23   A.  I did not know what they were, to be honest with you.  I

24   heard -- I kept asking, "What are those booming things?"  And I

25   didn't know what they were, and I couldn't see anything.  I
```

1    couldn't see anything going off where I was.

2    Q.  And you could smell tear gas?

3    A.  No, not where I was.

4    Q.  And you could hear lots of shouting?

5    A.  No, not -- most of the time we were there, I did not hear a

6    lot of shouting, no.

7    Q.  Well, you could see barriers being pushed over?

8    A.  No.

9    Q.  You didn't see any barriers?

10   A.  No.  When we got there, things were peaceful.

11              MR. MANZO:  Okay.  Can we just pull up -- I believe

12   it's Caldwell 45-57.  I believe this is already in evidence.

13   BY MR. MANZO:

14   Q.  I'm just circling here.  What are those?

15   A.  Those were bicycle racks around the Peace monument, but

16   when we got there, they were open.  Like, there were openings

17   in them so you could just walk right through them.

18   Q.  So -- but you never saw barriers being pushed over?

19   A.  I did not, no.

20   Q.  And then, eventually, you said that you heard Congress had

21   been driven from the building?

22   A.  I heard they were gone.  That's what I heard.  Congress is

23   gone.

24   Q.  Why did you think Congress was gone?

25   A.  Because I thought the certification was over.

1    Q.  So you thought the certification was over and --

2    A.  Right, and that they left.  That it was done.

3    Q.  And so you thought the legal mechanisms that had gone on

4    that day had happened as usual?

5    A.  Yes.

6    Q.  And then at that point, you decided -- well, let me ask you

7    a couple more questions about that.

8         You were happy that the legal mechanisms that had gone

9    on normally, you know, every four years had taken place, in

10   your mind?

11   A.  Yes.  Happy that the process was completed, but it didn't

12   go the way I had hoped.

13   Q.  So at that point you thought that Mr. Biden had been

14   certified as the winner of the election?

15   A.  Yes.  It was just pretty much what I expected would happen.

16   Q.  And you didn't know that anyone had -- that there had been

17   heavy rioting?

18   A.  No.

19   Q.  So you thought Congress had just kind of said -- punched

20   out for the day?

21   A.  I thought they had finished and gone and left.  That's what

22   I was hearing.

23   Q.  And so -- but you were a big Trump supporter; right?

24   A.  I was -- I would say so, yes.

25   Q.  Were you sad that President Biden had, at that point in

1    your mind, made it through and been certified?

2    A.  Well, I was disappointed, but I was disappointed, really,

3    on November 3rd.  So -- and that was it.  It was done, but --

4    you know, I was hoping for what would happen through recounts

5    or whatever.  Maybe it would change, but, you know,

6    realistically, I didn't think it was going to.

7    Q.  So at that point you're just -- think that everything is

8    normal, Congress has done their work, and you decide at that

9    point to push forward, though; correct?

10   A.  Yes, we did.

11   Q.  But why would you be pushing forward if you thought

12   everything was done?

13   A.  Well, Tom and I kind of said, you think we should go up

14   there or not?  The reason we went up was because we saw people

15   going out on the balcony, climbing the scaffolding, and kind of

16   spreading out.  The people were already up there, and I

17   thought, well, let's -- let's just try to go up on that

18   lower-level balcony.  I had never been up there.  I thought,

19   let's just try it.

20   Q.  When you're saying "lower-level balcony," you mean the

21   inauguration stage?

22   A.  Yes.  I'm sorry.  I call it the lower terrace, but yes.

23   Q.  In your mind, did you think you could just walk right up

24   onto the inauguration stage?

25   A.  Normally, no.  But people were already up there.  People

8638

1    were walking up there.  So I thought, well, let's try it.

2    Q.  Well, is it fair to say you were observing a riot?

3    A.  I didn't see any violence.  So I don't know.

4    Q.  You could hear what you now know as flash-bangs; correct?

5    A.  I didn't hear flash-bangs.  I --

6    Q.  So did you hear any noise at all?

7    A.  I'm sure -- there was yelling in the crowd, that type of

8    thing, yes.

9    Q.  Did it seem like kind of a normal day?

10   A.  No, of course not.

11   Q.  What made it seem abnormal?

12   A.  Just so many people at the Capitol.  I mean, you know,

13   spilling out onto the balconies, that was abnormal.

14   Q.  But, more or less, just a peaceful occasion?

15   A.  What I saw was peaceful, yes.

16   Q.  And so now Congress has been -- has left for the day under

17   normal means; correct?

18   A.  That was my assumption.

19   Q.  And you decide to move forward?

20   A.  Yes.

21   Q.  Walk the jury through how you were moving forward.

22   A.  We just very slowly -- once we did decide to try moving

23   forward, we just did.  We went up a sidewalk, and it took us a

24   long time, seemed like a long time to get up there, just

25   because there were a lot of people and we were just walking

1   slowly.  There were no barricades.  There were no barriers.

2   There were no police.  We just very slowly walked up.  Tom took

3   quite a few photos of our trip up there, and we eventually made

4   it up to the top of the stairs.

5          MR. MANZO:  All right.  Let's pull up a couple of

6   those photos.  Can we go to 45-69.  When I say "45-69," I mean

7   Mr. Caldwell 45-69.

8   BY MR. MANZO:

9   Q.  This is one of the photos that you took; right?

10  A.  I believe Tom took that, yes.

11  Q.  And this is just what you thought was a normal, peaceful

12  process?

13  A.  It certainly was not normal.  I mean, these -- you know,

14  people climbing on everything was not normal.  But, like I

15  said, I thought the election was -- or the certification was

16  over, and we just decided to go up on that lower level -- the

17  inaugural stage or whatever you want to call it, take a few

18  photos, and go down.  It looked like people were up there.  I

19  thought we would try it.  If we'd encountered any resistance,

20  we would not have gone up.  But I said, let's just try.

21  We did.  And we got up, took a few photos, and left.

22         But I would not call this normal, no.

23  Q.  These people here who were climbing on the inauguration

24  stage -- and it looks like the inauguration stage has been

25  ripped apart; that didn't give you a heads-up that you were in

8640

1    the middle of a riot?

2    A.  People were still being very friendly and considerate

3    towards each other.  So, you know, it just didn't -- it didn't

4    concern me at the time.

5    Q.  Did you ever consider that the police might have been

6    driven in by the rest of the people into the building?

7    A.  I did not consider that.  No, I didn't.

8                MR. MANZO:  Can we go to 45-71.

9    BY MR. MANZO:

10    Q.  And this is another photo that Mr. Caldwell took; correct?

11    A.  That's right.

12    Q.  And now you're still advancing up; right?

13    A.  Yes.

14    Q.  And, again, more people hanging on the inauguration stage;

15    is that fair?

16    A.  That's fair.

17    Q.  Again, no idea that this was the middle of a riot?

18    A.  At that point I didn't -- I still didn't feel like it was a

19    riot, but.

20    Q.  Have you ever seen a presidential inauguration before on

21    TV?

22    A.  I'm trying to think -- I may have years ago, but it isn't

23    something I typically watch.

24    Q.  At any point, have you ever seen people climbing on the

25    inauguration stage and ripping it apart?

1    A.  No, but this wasn't the inauguration either.

2    Q.  Have you ever seen, prior to an inauguration, individuals

3    climbing on the inauguration stage and ripping it apart?

4    A.  No.

5    Q.  But this didn't clue you in that it's not somewhere you

6    should be?

7    A.  People were up there.  We decided to go up.

8    Q.  Well, that's a little different question.

9         Did you have an understanding here that this was

10   somewhere where you shouldn't be given that other individuals

11   were climbing through the inauguration stage and ripping it

12   apart?

13   A.  Actually, no.  I mean, I feel like the Capitol is -- is for

14   everybody.  It's -- it is our house, and I thought that once

15   the certification was over, I truly did not see the harm of

16   going up on that lower-level terrace.  I didn't see the harm in

17   going up there.

18   Q.  Because other people would just clean up the inauguration

19   stage after you left?

20   A.  What Tom and I did that day was entirely peaceful.  We went

21   there to have a good time, to hear the President speak, and to

22   peacefully protest; and I honestly feel that that is what we

23   did that day.

24   Q.  And, again, at this time, you thought that Biden had been

25   certified as the President and --

```
1    A.   Yep.

2    Q.   -- everything had happened as normal; correct?

3    A.   Yep.  And we were just going to go up and take some

4    pictures and go home, and that was it.

5              MR. MANZO:  Can we go to 45-76.

6    BY MR. MANZO:

7    Q.   So now we're still advancing upward here; is that correct?

8    And this is another --

9    A.   That's correct.

10   Q.   And at this point, there's an individual, looks like, on

11   the railing here.  There's a giant American flag, and at this

12   point still you don't have any perception that you're in the

13   middle of a riot?

14   A.   Well, that's when my perception started to change.

15   Q.   Walk me through that.

16   A.   Well, we got to the top of the stairs, and a lot of things

17   happened simulta- -- almost at the same time.  That's when I

18   heard that the Capitol had been breached, which I did not

19   expect it to be breached.  I thought people would go up onto

20   those balconies, wave flags, chant, sing, that type of thing;

21   USA, sing "The Star Spangled Banner," all that kind of stuff.

22   I did not anticipate people going actually in.

23            I certainly did not intend to do that.  So I --

24   Q.   So you found --

25   A.   So we got up to the top of the stage --
```

```
 1                    (Indiscernible simultaneous cross-talk.)

 2                    THE COURT REPORTER:  Hold on.

 3                    THE COURT:  Hang on.

 4                    THE WITNESS:  Sorry.

 5                    THE COURT:  Let's not talk over each other.

 6     A.   And I heard that the Capitol had been breached, and I

 7     heard -- and, again, I didn't know if this was true or not.  I

 8     heard somebody had been shot.  I did not know at that point in

 9     time if that was true or not.  I was hoping and praying it was

10     a rumor.  So when we got to the top --

11     BY MR. MANZO:

12     Q.   Let me stop you right there for a second.  You were hoping

13     and praying --

14     A.   That nobody had been shot.

15     Q.   -- because you abhor violence; correct?

16     A.   Yes.

17     Q.   Violence in our political system is terrible?

18     A.   It is terrible.

19                    MR. MANZO:  All right.  So let's go to 1500 at 13:25.

20                    (An audio-visual recording was played.)

21                    MR. MANZO:  Can you pause for a second and just go

22     back to 3 seconds earlier.

23     BY MR. MANZO:

24     Q.   And, ma'am, that is you saying these statements; correct?

25     A.   Yes, it is.
```

1    Q.  And that is your husband, Mr. Caldwell, saying the other

2    statements?

3    A.  It is.

4    Q.  So you testified before that you didn't sense tear gas at

5    all; correct?

6    A.  That's correct.

7    Q.  But here you do say that you've gone through tear gas?

8    A.  Yeah, other people had.  It wasn't --

9    Q.  But you say "we"?

10   A.  Yes.  I said we.  We, the generic.  We the people.

11   Q.  "We" as in all the people rioting at the Capitol?

12   A.  I was having a good time, yes.  But --

13   Q.  You were having a good time?

14   A.  But -- but --

15   Q.  Walk me through what it is to have a good time, in your

16   mind.

17               (Indiscernible simultaneous cross-talk.)

18               THE COURT:  Hang on.  Let's not talk over each other,

19   please.

20   BY MR. MANZO:

21   Q.  What is -- sorry.

22   A.  I'm not sure if I'm supposed to speak or not.

23   Q.  What does it mean to be having a good time at the Capitol?

24   A.  As you probably know by now, I've gone -- went to all three

25   of these marches, November, December, and January.  I had a

8645

1    great time at all three.

2    Q.  Did any of those marches involve tear gas, smoke bombs --

3    A.  No.

4    Q.  -- or rubber bullets?

5    A.  No.  But especially the second one where Tom and I went

6    together, we had a fantastic day.  We had a beautiful day, just

7    the two of us.  We enjoyed it.  We were having a lot of fun.

8    That is what I anticipated this day would be as well.

9    Q.  But let me ask a question.

10   A.  But -- but --

11   Q.  Ma'am, let me ask you a question.

12       But then when you started hitting tear gas, smoke bombs,

13   and rubber bullets --

14   A.  Right.

15   Q.  -- you didn't think this was -- that you were participants

16   in a riot?

17   A.  Well, I -- I was feeling at that point -- when I got -- we

18   were having fun, having fun, having fun.  We get to the top,

19   and I'm starting to hear, you know, about a person being shot.

20   I'm starting to get uncomfortable.  Now, this is after that.

21   I'm still having fun.  For me, personally, it was hard to flip

22   that switch.

23       We went up there.  We're having a good time.  We're

24   taking a few photos.  I'm having fun the entire day, but we are

25   beginning to feel that things are going south.

1    Q.  Ma'am, respectfully, there's no evidence that you think

2    anything is going on here, is there?

3    A.  Well, that's your opinion.

4    Q.  Well, ma'am, let's play it again.

5    A.  You do not know what is in my mind.

6              (An audio-visual recording was played.)

7    BY MR. MANZO:

8    Q.  Ma'am, were you feeling uncomfortable when you were making

9    this statement?

10   A.  I was enjoying making the statement, but I was beginning to

11   feel uncomfortable being up there.  I was having a good time,

12   but we went down immediately after this, as you -- as I think

13   you know.

14   Q.  Let me ask you a question --

15   A.  And I wanted to document what I was observing.  I wanted to

16   document the vibe up there.  When I listen to myself doing

17   this, I hear myself doing one video, being up there for maybe

18   3 minutes, trying to document for posterity what I felt was

19   going on up there.

20   Q.  You thought this was a historic moment, this riot?

21   A.  I didn't think the riot was a historic moment, but I felt

22   that -- I do feel it was sort of a historic day, yes.

23   Q.  Do you think it's something we should be proud of?

24              MR. FISCHER:  Objection.

25              THE COURT:  Sustained.  Let's -- it's getting a

1    little argumentative.  Let's move forward, Mr. Manzo, please.

2    BY MR. MANZO:

3    Q.  Ma'am, you said earlier that you didn't sense any smoke

4    bombs when you were at the Peace Circle; correct?

5    A.  That's correct.

6    Q.  But here you say that you've gone through smoke bombs?

7    A.  That's what I said; although I personally did not do that.

8    Q.  But you observed smoke bombs prior to getting up to the

9    inauguration stage?

10   A.  I heard people talking about it, that --

11   Q.  So were you having conversations with people as you were

12   going up and they were telling you we've been hit with tear

13   gas, smoke bombs, and rubber bullets?

14   A.  People didn't say they were hit, but people are reporting

15   that.  Everybody's on their phone.  People are talking to

16   people at home.  They were watching things on TV.  We're just

17   hearing certain things from people around us.

18   Q.  So even if you didn't actually get hit with tear gas, smoke

19   bombs, and rubber bullets, you knew they were being fired;

20   correct?

21   A.  Somewhere, but I didn't see that.

22   Q.  And despite that, you pushed forward?

23   A.  That's right.

24   Q.  So earlier on your direct examination, you said that you

25   believed that Congress had certified the vote and it had been a

1    normal, peaceful transition on the -- for January 6th; correct?

2    A.  Right.  Right.

3    Q.  But here you're saying Congress has gone because they're

4    pussies; correct?

5    A.  Yes.

6    Q.  So you knew that Congress had been evacuated -- forcefully

7    evacuated from the chambers because of the riot?

8    A.  No, I didn't know that.

9    Q.  Well, what did you mean when you said "Congress is gone

10   because they're pussies"?

11   A.  I'm not really sure, but I will say this:  I think that

12   Congress -- many people in Congress are pussies, even today.

13   They need to develop a backbone, and it's okay for me to say

14   it, and it's okay for me to think it.  It's not a crime.

15   Q.  Tell us why.

16   A.  Because there is a degree of freedom of speech, and I think

17   I can say whatever I want to say.

18   Q.  Do you think storming up to the inauguration stage is

19   freedom of speech?

20   A.  I didn't storm up the inauguration stage.  It took us

21   forever to get up there.  I walked very slowly.  There was

22   nothing impeding my path.

23   Q.  But you did hear or see tear gas, smoke bombs, and rubber

24   bullets?

25            MR. FISCHER:  Objection.

1          THE COURT:  Sustained.  I think we've been over this,

2    Mr. Manzo.  Let's move forward, please.

3          MR. MANZO:  All right.  Can we go to 22.P.8.

4      This is already in evidence as well.

5    BY MR. MANZO:

6    Q.  Ma'am, is that you in the foreground here?

7    A.  It is.

8    Q.  And in back of you is a tunnel.  Are you aware of that?

9    A.  Not at the time.

10   Q.  Did you see rioters pulling shields out of officers and

11   pushing them back through that tunnel?

12   A.  No, I did not.

13   Q.  Were you uncomfortable when you took this picture?

14   A.  Not really.  As you can see, there are a lot people just

15   kind of standing around taking pictures.  I'm not seeing any

16   violence around me.

17          MR. MANZO:  All right.  Let's go to 6318 at 1:25.

18      Your Honor, if we could take our 3 o'clock break now.

19   We're just having little a technical difficulty.

20          THE COURT:  Okay.  All right.  So let's take our

21   afternoon break, ladies and gentlemen.  It's a little bit --

22   it's 3:07.  Why don't we plan to resume at 3:25.  We'll see

23   everybody in a moment.  Thank you, everyone.

24          (Proceedings held outside the presence of the jury.)

25          THE COURT:  All right.  Mrs. Caldwell, you can step

1    down.  I'll just ask you not to discuss your testimony during

2    the break.

3         Actually, I'll ask you to step outside for a moment,

4    please.

5         Have a seat, everyone.

6         All right.  Mr. Manzo, how much longer of a

7    cross-examination do you anticipate?

8              MR. MANZO:  Half an hour.

9              THE COURT:  Okay.  And redirect, Mr. Fischer?

10             MR. FISCHER:  Twenty minutes to a half hour.

11             THE COURT:  And then do you have another witness?

12             MR. FISCHER:  I'm going to have to have a discussion.

13             THE COURT:  Understood.

14             MR. FISCHER:  I'm going to have to have a discussion.

15             THE COURT:  No.  Okay.  Maybe she didn't hear you.  I

16    heard you.

17             MR. GEYER:  Mr. Nichols is close by.  A change --

18    Mr. Nichols has three small children at home.  His wife is

19    expecting.  If the Court would consider changing his decision

20    about his testimony based on the rule of completeness,

21    escorting the way in, escorting the way out -- on the way out,

22    and also just in terms of state of mind and that there was a

23    common understanding among Oath Keepers that they would respond

24    to help police and provide medical equipment where possible; I

25    have 2 minutes of video.  If the Court wanted to see it, I

1      would play it.  But it's -- it's up to the Court.

2            THE COURT:  Mr. Geyer, I understand what you're

3      saying, but it hasn't changed my mind about the relevance of

4      it.  I mean, again, for all the reasons I articulated earlier,

5      that video is not relevant to the states of minds of any of

6      these defendants or how they acted or didn't act on that day.

7      There's not a completeness issue because you're not seeking to

8      complete any other video that's been introduced that would

9      otherwise be incomplete by adding this video.

10           It is an effort -- I understand why you want to

11     introduce it, but it's an effort to, essentially, bolster the

12     reputation of the organization and these defendants by -- by

13     virtue of their relationship to the organization because some

14     member did something that was helpful to the police that day.

15           And the actions of -- the actions of these defendants on

16     that day and before and after that are at issue and not

17     Mr. Nichols and what he may or may not have done that day.

18     Okay?

19           MR. GEYER:  The -- the government in Exhibit 1500

20     played a tiny little snippet that left out the fact that

21     Mr. James, Mr. Minuta, and Mr. Walden were at the tail end of

22     the column, escorting the column in, and at the front was

23     Officer Johnson.  So they cut out the front end, and they cut

24     out the back end.

25           THE COURT:  So as I said earlier, if there's video

1    that you think the government left out of Mr. Minuta, Walden,

2    et cetera, entering the building, I haven't precluded you from

3    showing that.

4              MR. GEYER:  Okay.

5              THE COURT:  Obviously, talk to the government.  If

6    they have no objection, all the better.  But that is a

7    different request to me than it would be to put Mr. Nichols on

8    the stand to introduce video of his actions, which, as I've

9    ruled, I don't think are relevant.

10             MR. GEYER:  Even if they were still the -- the

11   substance of the motivation, these standing orders to help

12   police --

13             THE COURT:  Again, that -- that's Mr. Nichols's

14   motivation and not the defendants'.

15             MR. GEYER:  I appreciate it.  Thank you.

16             THE COURT:  Thank you.

17             MR. MANZO:  Your Honor, one final question about the

18   opioid limiting instruction that we had discussed pretrial.

19             THE COURT:  So I looked back at the -- first of all,

20   I'm not sure there's been any reference to opioids.  There was

21   reference to painkillers.

22             MR. MANZO:  Opana.

23             THE COURT:  I don't know.  Did anybody talk about

24   Opana?

25             MR. MANZO:  Yes.

1          THE COURT:  Okay.  I'm not sure what Opana is.

2          MR. MANZO:  Mrs. Caldwell testified to Opana.

3     Mr. Woodward can testify.

4          THE COURT:  Okay.

5          MR. WOODWARD:  I have not -- not right now.

6          THE COURT:  I'm happy -- look, I'll consider a

7     limiting instruction, but I don't understand Mr. Fischer to be

8     wanting to use it for the purpose that I had concerns about,

9     which is reflected in the transcript, which was that he would

10    argue that somehow Mr. Caldwell was unable to form the

11    requisite state of mind to join the conspiracy or participate

12    in the conspiracy by virtue of being under the influence of

13    prescription medication.

14        I don't understand Mr. Fischer to be arguing -- to be

15    intending to argue that.

16         MR. MANZO:  I think he's going to argue -- I believe

17    he's --

18         THE COURT:  I'm correct.  What I just said is

19    correct.

20         MR. FISCHER:  I'm sorry, Your Honor.

21         THE COURT:  What I just said is correct.  I just want

22    to --

23         MR. FISCHER:  That's correct.

24         THE COURT:  Right.

25         MR. MANZO:  But I believe the argument is -- is, you

 1    know, hand in hand that Mr. Caldwell did not have the adequate

 2    mental state to understand what he was saying in the messages

 3    after he took the Opana when he got home and so those messages

 4    should be disregarded as a drug-induced haze.  And I don't

 5    think that would be appropriate because then we would have

 6    called an expert to say that Opana does not cause you to

 7    hallucinate what you did.

 8          It has nothing to do with altering that sense of -- of

 9    mind, and I think it leaves the jury with the misimpression

10    that that opioid would cause hallucinations or something like

11    that, where it just --

12          THE COURT:  Mr. Fischer, are you intending to argue

13    that the messages he sent that evening were the product of his

14    being under the influence of -- of painkillers?

15          MR. FISCHER:  Your Honor, it's definitely -- yes, I

16    mean, that's -- that's a different kettle of fish.  I mean,

17    being intoxicated or being under the influence can explain

18    messages, but we're not using it to like envision the intent,

19    like the Court indicated.

20          THE COURT:  Right.  I think the question is --

21          MR. MANZO:  Your Honor, if it was just alcohol, we

22    wouldn't --

23          THE COURT:  I think the question is whether -- I

24    guess I have to think about this -- is that whether the jury

25    can draw the inference that you're asking them to, which is

1    that he took the painkillers and it was the painkillers that

2    caused him to write what he wrote.

3         Frankly, it's not clear to me the time line.  The time

4    line wasn't terribly well -- is not clear.  Because what she

5    testified to is they got him back to the hotel.  They had food.

6    He took the additional pain medicines.  Then he was out.  So I

7    don't know when the messages were sent relative to when the

8    pain medication was taken.  So it'd probably be helpful to

9    understand that.

10        MR. MANZO:  A number of the messages were, I believe,

11   from the, kind of, 7:00 p.m. to 8:00 p.m. period.

12        THE COURT:  And what time did they get back to the

13   hotel?

14        MR. FISCHER:  Your Honor, I think her testimony was

15   they crashed.  I didn't hear her say that they were asleep; I

16   thought she said crashed.

17        THE COURT:  She did say that.  Maybe I understood

18   that to mean they went to sleep.  Maybe that's wrong.

19        MR. MANZO:  I'm looking right now, but my computer is

20   a little slow.

21        So if you go to 30 seconds in here on 1510.10.  So they

22   get back to the hotel at about 5:12 p.m.

23        (A video recording was played.)

24        MR. MANZO:  Give or take 20 minutes.  I believe

25   the upstairs --

8656

1            THE COURT:  What time were the messages sent, at

2    issue?

3            MR. MANZO:  6734.8.

4       Sent at approximately -- some of the messages were sent

5    at about 7:46 p.m., and I'm looking at 6734, page 8.

6            THE COURT:  What are you asking then, Mr. Manzo?  At

7    the end of the day, what is it you want me to do or say to the

8    jury?

9            MR. MANZO:  I would just like -- we would like a

10   limiting instruction that -- that the jury should not infer the

11   defendant's use of prescription opioids altered his mental

12   state.  I don't think there's any problem with alcohol because

13   I think that's in the common parlance.  People know that

14   alcohol can make you say things.  But I do think --

15           THE COURT:  I guess I want to be clear.  I mean,

16   there is no evidence that his mental state was altered.  None.

17   So, I mean, there's no -- I mean, we do know she said that he

18   took a fair amount before the day began.  That's the

19   explanation for his being able to overcome his physical

20   challenges to be able to walk, but there's been no evidence or

21   testimony from Ms. Caldwell that his mental state was otherwise

22   impaired by virtue of taking the medication.

23       So I think -- now that we talked about this some more,

24   the inference that Mr. Caldwell somehow sent those out because

25   he was mentally -- his mental state was impaired, I'm not sure

1      there's a basis to make that argument.

2            MR. MANZO:  If there's no basis, then we don't need

3      any limiting instruction, but we would ask that Mr. Fischer be

4      prohibited from arguing that in closing.

5            THE COURT:  Why don't we hear from Mr. Fischer.

6            MR. FISCHER:  Your Honor, I would submit, it's common

7      knowledge that both alcohol and opioids can cause people to act

8      differently.  And especially in combination they can act --

9      they can cause people -- I think that's common knowledge.  So I

10     don't understand -- again, it's -- this isn't a situation

11     where -- it's not a situation where -- like in a murder case

12     where you're trying to knock down a first-degree murder case

13     based on voluntary intoxication.

14           THE COURT:  Right.

15           MR. FISCHER:  But it certainly goes to -- it -- it --

16     if the jury wants to consider it.  If they think Mr. Manzo is

17     right, so be it.  But I disagree with Mr. Manzo.  I think it's

18     common knowledge that both the opioids and alcohol can cause

19     people to act differently, and the combination of the -- them

20     two definitely can.  As my file cabinet in my office can attest

21     from the DUIs we get in Maryland, that's a fairly common thing.

22           MR. MANZO:  But the common -- opioids make you --

23     opioids combined with alcohol put you to sleep.  They don't

24     cause you to -- to say -- to hallucinate or lie over text

25     message, and I think that's what the defense wants to bring

1    out.  It's the exact thing that we're trying to prevent is a

2    common perception that opioids and alcohol would cause you to

3    be in a mental state that you could not perceive reality.

4    That's not true.  Opioids and alcohol cause DUIs because they

5    put you to sleep behind the wheel.  So that's -- that's why we

6    tried to litigate this pretrial and why we're seeking to

7    prevent that misapprehension to the jury.

8            THE COURT:  All right.  I'm going to think about it.

9    I thought the pretrial was largely about how the use of the

10   medication of -- affected his ability or allowed him to walk

11   that day, and I guess I just didn't focus on this latter issue,

12   that it would be relevant or -- at least Mr. Fischer's argument

13   is relevant to the nature of the messages that went out that

14   evening.

15           So let me just think about it, and then I'll let

16   everybody know.  Okay?

17           Thanks, everyone.

18               (Recess taken.)

19           THE COURT:  So what I'd like to do -- I don't know

20   when we'll end today, but I'd like to have a conversation with

21   our jurors, if everybody is okay with it, outside the

22   courtroom -- outside the presence of counsel, just to talk to

23   them about scheduling once I get a sense from you-all of where

24   we are so that I can go back and talk to them, and then we'll

25   figure out what the schedule is going to be once I have a

```
 1    discussion with you.  Okay?
 2            MR. FISCHER:  Your Honor, Mrs. Caldwell can take a
 3    seat up there.
 4            THE COURT:  Thank you.
 5            (Proceedings held in the presence of the jury.)
 6            THE COURT:  All right.  Please be seated, everyone.
 7        Mr. Manzo.
 8            MR. MANZO:  Thank you, Your Honor.
 9            Can we pull up 9318 at 1:25 here.
10    BY MR. MANZO:
11    Q.  And, Ms. Caldwell, I'm going to direct your attention to a
12    picture of yourself right here --
13    A.  Okay.
14    Q.  -- with your purple sleeve.
15            MR. MANZO:  And, Ms. Rohde, can you play it forward
16    for about 3 seconds.
17            (An audio-visual recording was played.)
18    BY MR. MANZO:
19    Q.  And do you recognize that as yourself, ma'am?
20    A.  Yes.
21    Q.  And is this Mr. Caldwell here in the blue hat?
22    A.  Yes.  I believe so, yes.
23    Q.  And this is January 6th outside the Capitol?
24    A.  Yes.
25            MR. MANZO:  Your Honor, we'd seek to move 9318 into
```

8660

1    evidence.

2              THE WITNESS:  Yep.  We're leaving.

3              MR. FISCHER:  No objection.

4              THE COURT:  All right.  9318 will be admitted.

5              (Government Exhibit 9318 admitted into evidence.)

6              MR. MANZO:  And can we go back to 53 seconds and then

7    just play it forward to 1:33.

8              (An audio-visual recording was played.)

9              MR. MANZO:  And we're pausing here at 1:17.

10   BY MR. MANZO:

11   Q.  This is Mr. Caldwell here?

12   A.  Yes.

13   Q.  Did you just climb over that wall?

14   A.  We had to to get out, yes.  We wanted to leave.  We were

15   going back to our car, and that was the only way we could get

16   out and back to our car.

17   Q.  Okay.  And then when you got back to the hotel at the

18   Comfort Inn, you went inside and went up to your room; right?

19   A.  Yes.

20              MR. MANZO:  And can we pull up 1510.10 and go to

21   30 seconds.

22              (A video recording was played.)

23   BY MR. MANZO:

24   Q.  I'll pause it here.  Is that Mr. Caldwell in the orange

25   hat?

1    A.  I believe so.  It's a fuzzy picture, but I think so.

2    Q.  And is that him smiling, walking back normally to his hotel

3    room?

4    A.  I don't know what time it is -- 5:13 and 6 -- I guess so,

5    yes.

6    Q.  And that's you behind him; correct?

7    A.  Yes.

8    Q.  And this is you after being out all day long, walking

9    miles, climbing stairs?

10   A.  Yes.

11   Q.  And then climbing a wall to get out?

12   A.  Yep.

13          MR. MANZO:  All right.  Can we go to 6734, Slide 1,

14   which is already in evidence.

15   BY MR. MANZO:

16   Q.  Mr. Caldwell wrote, "Post em up, pls.  Sharon and I

17   assaulted the Capitol."  Is that correct?

18   A.  I'm not familiar with this.  I haven't seen it.

19   Q.  Well, did you assault the Capitol?

20   A.  No.

21   Q.  So Mr. Caldwell was not telling the truth here?

22   A.  No.  He's exaggerating a lot.

23          MR. MANZO:  Okay.  Can we go to 6734-8.

24   BY MR. MANZO:

25   Q.  And then -- which is already in evidence.  And it reads,

1    "This is [a] view from the west balcony after ee broke through

2    all of the construction and made it upstairs and inside.  Came

3    out . . . Sharon helped people rinse tear gas out of their

4    eyes.  If we'd had [a hundred] guns I guarantee we would have

5    killed 100 politicians."

6    A.  I'm not familiar with this one.

7    Q.  Did you help wash tear gas out of people's eyes?

8    A.  I did give some water to a gentleman I saw that had had

9    tear gas.  Or something.  I gave him a bottle of water when we

10   were up on the balcony, which is another reason I wanted to

11   leave.

12   Q.  When you got up to the balcony after you made the video,

13   you realized there was a riot?

14           THE COURT:  Mr. Manzo, I think we've gone through

15   this.

16   A.  Everything Tom and I did that day was entirely peaceful.  I

17   helped someone who I thought needed some help.  But we were

18   concerned that things were getting out of hand.  Yes, I was

19   having fun, but we were concerned that things were getting out

20   of hand.  Of all the hundreds and hundreds --

21   BY MR. MANZO:

22   Q.  I didn't ask you a question, ma'am, respectfully.

23           Ma'am, you bragged that Congress had been driven out

24   because they're pussies; correct?

25   A.  No, I was -- I said that but --

1    Q.  You weren't bragging?

2    A.  No, I wasn't bragging.  I was documenting what --

3    Q.  Ma'am, I'll ask you a question in a minute.  Okay?  I'm

4    sorry.

5    A.  Okay.

6              MR. MANZO:  Can we go to 6734-10.

7    BY MR. MANZO:

8    Q.  "Us storming the castle.  Please share.  Sharon was right

9    with me!  I am such an instigator!  She was ready for it man!

10   Didn't even mind the tear gas."

11             Ma'am, did you mind the tear gas?

12   A.  We did not -- we were not personally tear-gassed.  I saw

13   one -- one person that looked like he -- I don't know if it was

14   tear gas or pepper spray.  One person when we were up there, I

15   gave him some water to wash out his eyes.

16   Q.  Okay.  And then go to 6734-12.  And, again, here he writes,

17   "Sharon is exhausted and will give you the long version later

18   but suffice to say I am a rabble rouser of the first order."

19   Were you exhausted that day?

20   A.  Yes.  After being on our feet for, like, 12 hours, yeah.

21   Q.  Okay.  And then we'll go to 6734-23 [sic].  And now we're

22   at 1/8.  So two days later here.

23             And Mr. Caldwell writes, "We were stuck on the west side

24   and fought our way up."  Again --

25   A.  I haven't seen these; so I don't -- I'm not familiar with

1    this stuff.

2    Q.  Ma'am, respectfully, I'm going to ask you a question.  Is

3    it your testimony today that you did not fight your way up?

4    A.  We did not.

5    Q.  Okay.  So you said that the next morning at breakfast is

6    when you met up again with Ms. Watkins and Mr. Crowl; correct?

7    A.  Correct.

8    Q.  And that's when they told you that they had breached the

9    Capitol on the east side?

10   A.  They told us -- they showed a video of them in the Rotunda.

11   So, yes, from the east side.

12   Q.  And you were pleased with what they did?

13   A.  No, I wasn't.

14   Q.  Why not?

15   A.  I was shocked that they had gone in.  I don't think anybody

16   should have gone in.  We had no intention to go in.  We didn't

17   go in.

18   Q.  Fair to say Mr. Caldwell was pleased?

19   A.  No.

20   Q.  So I'm going to pull up 1510.11.  And do you recognize here

21   Mr. Caldwell?

22          (A video recording was played.)

23   A.  Yes.

24   BY MR. MANZO:

25   Q.  And then Ms. Watkins and Mr. Crowl?

1    A.  I can't really tell who that -- from the back, I'm not sure

2    because I don't -- I don't know.  It could be them, yes.

3    Q.  So this is the morning of January 7th?

4    A.  Okay.

5    Q.  And as he's leaving, Mr. Caldwell salutes Mr. Caldwell --

6    or Mr. Crowl?

7    A.  That's what veterans tend to do to each other, yes -- with

8    each other.

9              MR. MANZO:  No further questions, ma'am.

10              THE COURT:  Mr. Fischer, redirect.

11                        REDIRECT EXAMINATION

12    BY MR. FISCHER:

13    Q.  Mrs. Caldwell, I'm going to pull up on the screen Caldwell

14    Exhibit No. 14.  It's already in evidence.

15         Ma'am, Mr. Manzo was asking you something about your

16    husband wanting to do a much bigger op.  Do you remember that

17    question?

18    A.  I do.

19    Q.  Ma'am, I'm going to pull up on the screen -- this is

20    Exhibit 14.  Give us one second here.

21              MR. FISCHER:  Go to the second page.  Go to the --

22    BY MR. FISCHER:

23    Q.  Ma'am, you see the paragraph -- this is for the

24    jury also -- you see the paragraph under Mission

25    Definition?

1    A.  Yes.

2    Q.  Okay.  At the top, what does it say above Mission

3    Definition?

4    A.  It says, "The mission is to confront Antifa and other

5    criminal elements operating unrestrained in an urban

6    environment as they commit, attempt to commit or engage in

7    marshalling forces in preparation to commit acts of violence

8    against innocent people and/or private property or publicly

9    owned property."

10   Q.  And, ma'am, at the very top, does it say a couple words up

11   there?  What are they?

12   A.  Operations plan.

13   Q.  Okay.  Did your husband have an op?

14   A.  Not that I'm aware of.  This --

15        MR. FISCHER:  Let's go down to -- let's go -- or go

16   up, please.

17   BY MR. FISCHER:

18   Q.  There's an email here, ma'am.  It's regarding your husband;

19   is that correct?

20   A.  Yes.

21   Q.  Okay.  And it appears he emailed -- at the bottom, do you

22   see an attachment that says "OP PLAN D.C."?

23   A.  Yes.

24        MR. MANZO:  Objection.  Personal knowledge.

25        THE COURT:  It's already in evidence.

8667

1    BY MR. FISCHER:

2    Q.  Did your husband send that email with the attachment?

3    A.  I -- I'm assuming he did.  It looks like he did.

4    Q.  Okay.  Thank you.

5        MR. FISCHER:  Can we pull up Caldwell Exhibit 45-79,

6    please.

7    BY MR. FISCHER:

8    Q.  Ma'am, you identified this picture already?

9    A.  Yes.

10       MR. FISCHER:  Can we blow it up, please.

11   BY MR. FISCHER:

12   Q.  In the back -- just down a little bit -- where the arrow is

13   pointing -- I don't know if you can see -- right where the

14   arrow is pointing on the screen --

15   A.  Uh-huh.

16   Q.  -- does that appear to be steps to you?

17   A.  Perhaps.  It's hard to tell.

18       MR. FISCHER:  Can we move the picture down a little

19   bit, please.  The other way.  Other way.

20   A.  Yes, I -- there are -- I think those are stairs.

21       MR. FISCHER:  Okay.  Thank you.

22   BY MR. FISCHER:

23   Q.  Ma'am, did your husband ever bring a boat to Washington,

24   D.C., or Virginia on January 6th?

25   A.  No.

1    Q.  Was there -- was there actually a boat, to your knowledge,

2    in Virginia or D.C.?

3    A.  No.

4    Q.  The Oath Keepers -- on January 6th, you saw the

5    Oath Keepers down at the Ellipse that morning; is that correct?

6    A.  That's correct.

7    Q.  After you and your husband left the Ellipse, did you see an

8    Oath Keeper the rest of the day?

9    A.  No, we did not.

10   Q.  Did you ever see an Oath Keeper at the Peace fountain?

11   A.  No.

12   Q.  And there was something about the T-shirts you got.  Do you

13   specifically remember the person who actually gave you and your

14   husband the T-shirts?

15   A.  I don't specifically remember the person.  I'm sure it was

16   somebody, you know, in the Oath Keeper group there at the

17   Ellipse, but I don't remember exactly who it was.

18         MR. FISCHER:  Caldwell 46-36, please.

19   BY MR. FISCHER:

20   Q.  All right.  Ma'am, obviously, at some point you were at the

21   Peace fountain for a lengthy period of time; is that correct?

22   A.  Yes.

23         MR. FISCHER:  Okay.  Move it right there.  And

24   can you pull it up.  I want to see -- can you pull that up,

25   please.

8669

1    BY MR. FISCHER:

2    Q.  All right.  Ma'am, in the bottom right corner, does there

3    appear to be something that's tied to a bike rack?

4    A.  Yes.  It's --

5    Q.  What is that?

6    A.  It's a bicycle.

7        MR. FISCHER:  Okay.  Thank you.  You can pull that

8    down.

9    BY MR. FISCHER:

10   Q.  Did you or your husband ever climb up scaffolding during

11   the events of January 6th?

12   A.  No.

13   Q.  What's your understanding at the time of the accessibility

14   of the Capitol Grounds?

15   A.  I thought it was open.

16   Q.  Okay.  Did you actually ever see anyone get shot that day?

17   A.  No.

18   Q.  Well, how do you know that then?

19   A.  How do I know what?  I'm sorry.

20   Q.  How -- when you were up on the stage, how did you know --

21   or heard somebody got shot?

22   A.  We -- just from the people around us.  People were

23   reporting that somebody had been shot.  People were talking to

24   each other, and everybody was on their phones to family members

25   and acquaintances back home.  So I think people were watching

8670

1    on TV and reporting to people, but I didn't know if it was true

2    or not.

3    Q.  Okay.  The prosecutor talked about a lot of statements

4    that -- I know you indicated it was Tom being Tom and it may

5    not have been serious.  But let's talk about some serious

6    statements with consequences, ma'am.  Was your -- was your

7    husband ever a member of the Oath Keepers?

8    A.  No.

9    Q.  Was your husband ever the commander of the Oath Keepers?

10   A.  No.

11   Q.  Did your husband lead a stack of Oath Keepers into the

12   United States Capitol?

13   A.  No.

14   Q.  Did your husband ever train up a tactical band of fighters

15   on your farm for the purpose of attacking the United States

16   Capitol?

17   A.  No.

18   Q.  And, ma'am, did your husband ever coordinate with the

19   Oath Keepers to breach the Capitol over Zello?

20   A.  No.

21   Q.  Are all those statements false that I just read out?

22   A.  They are -- they are all false, yes.

23   Q.  And who made those statements?

24              MR. MANZO:  Objection, Your Honor.

25              THE COURT:  It's sustained.

1    BY MR. FISCHER:

2    Q.  Ma'am, there were 70 firearms in your house.  What did you

3    end up having to do with those 70 firearms?

4    A.  I sold them all through legal means, along with our T-Bird,

5    which I think you've seen pictures of, and all of our farm

6    equipment, to pay expenses.

7    Q.  The government just showed you a picture -- or there was a

8    video that had -- there was a wall, and your husband is on the

9    other side of the wall; is that correct?

10   A.  That's correct.

11   Q.  Was your husband able to get over that wall by himself?

12   A.  No.  We had to have some assistance.

13   Q.  So, in other words, the government -- the video they showed

14   doesn't tell the whole story, does it?

15   A.  No, it does not.

16   Q.  Okay.  Ma'am, did you ever assault the Capitol on

17   January 6th?

18   A.  No.

19   Q.  Did your husband ever assault the Capitol?

20   A.  No.

21   Q.  All right.

22         MR. FISCHER:  Your Honor, I have nothing else.  Thank

23   you.

24         THE COURT:  All right.  Thank you.

25         Ms. Caldwell, thank you for your time and testimony.

```
 1    You may step down, ma'am.
 2              (Witness excused.)
 3              THE COURT:  All right.  If we can get on the phones,
 4    everybody.
 5              (Bench conference held on the record.)
 6              THE COURT:  Okay, Mr. Fischer.  Where are we?
 7              MR. FISCHER:  Well, first of all, if I can solicit
 8    comment from my co-counsel, does -- if I can ask, does anybody
 9    have another witness ready?
10              MR. WOODWARD:  I have Mr. Nichols.
11              MR. GEYER:  You've got to give it to him for trying,
12    Judge.
13              MR. FISCHER:  Your Honor, I think he has Casper, the
14    ghost, also, but that's about the same.
15              THE COURT:  Other than Mr. Nichols, do we have
16    another witness available?
17              MS. HALLER:  Rico La Starza, but he was part of the
18    same ruling where you didn't allow the -- you know, you said it
19    was not relevant.  So no.
20              THE COURT:  So let me -- let me frame the question.
21    Does anybody have a witness who has not otherwise been excluded
22    so far?
23              MR. CRISP:  Negative, Judge, not from -- the Watkins
24    camp is ready to go first thing in the morning, but not right
25    now.
```

8673

```
 1              MR. WOODWARD:  Not for Mr. Meggs.
 2              THE COURT:  Okay.  And I take it, Mr. Fischer, this
 3    is -- you want to have a conversation with Mr. Caldwell?
 4              MR. FISCHER:  Your Honor, if we could have
 5    20 minutes.  If he is going to testify, we could start him this
 6    afternoon.  And after he's done, I would have one character
 7    witness who will take 15 minutes after him.
 8              THE COURT:  All right.  Let's do this.  Let's --
 9    let's dismiss the jury.  I want to have a conversation with
10    you-all about scheduling, talk to them about scheduling.  We
11    have a number of loose matters that we need to -- loose ends we
12    need to tie up on a handful of things.  So let's go ahead and
13    do that instead of forging ahead.  Okay?
14              (Proceedings held in open court.)
15              THE COURT:  Okay.  Ladies and gentlemen, we have come
16    to the end of the day in terms of the presentation of evidence,
17    but I'm hopeful to provide you with some good news soon.
18              Now, that said, I'm going to ask all of you not to leave
19    immediately.  I need to talk to the parties about their plans
20    so that we can talk to you about the plans for the remainder of
21    this week and next week.  So give me a few minutes, and then
22    I'll come back and talk to you-all about where we go from here.
23    Okay?
24              Thank you, everyone.
25              (Proceedings held outside the presence of the jury.)
```

```
1              THE COURT:  All right.  Please be seated, everybody.
2         Okay.  So let's game this out, Mr. Fischer.  If
3    Mr. Caldwell declines to testify, I take it you will then rest?
4              MR. FISCHER:  That's correct, Your Honor.
5              THE COURT:  All right.  Then we are up to Mr. Crisp.
6    You'll have witnesses tomorrow?
7              MR. CRISP:  I will, Judge.  I'll have two.  So one
8    will be Kate Cain.  She's the forensic cell phone examiner.  I
9    expect my direct will be an hour.  I expect Ms. Rakoczy's will
10   be three.  If I have to guess, I'll be objecting furiously
11   to --
12             MS. RAKOCZY:  Not anticipating that, Your Honor.
13             MR. CRISP:  And then my other witness will be about
14   20 to 30 minutes, so.
15             THE COURT:  Okay.  And Mr. Geyer?
16             MR. GEYER:  I anticipate the Harrelson defense will
17   rest.
18             THE COURT:  So if we are here -- if Mr. Caldwell does
19   not testify, is the government prepared to move to its rebuttal
20   case tomorrow?
21             MR. NESTLER:  Yes, Your Honor.
22             THE COURT:  So I can tell the jury that we are likely
23   to be finished, if not tomorrow, then, no later than Wednesday;
24   right?
25             MR. FISCHER:  I think that's correct.
```

1    THE COURT:  Okay.  So then we're looking at either

2    Wednesday or Thursday to start with closings; correct?  Or

3    final instructions and then closings.

4    All right.  Let me go talk to them.  Be back in about,

5    say, 15 minutes.  We'll talk about the schedule, and we have a

6    number of loose items we need to take care of before 5 o'clock.

7    MR. NESTLER:  Your Honor, are you discussing with

8    them plans for next week?  I got the email from Mr. Linder,

9    just in case you were going to ask them about it.  We oppose

10    the idea of not sitting at all next week and having the jury

11    deliberating.

12    THE COURT:  I would like to sit as well, at least for

13    two days.

14    MR. CRISP:  And that was my question, because I

15    wasn't sure -- earlier you had said a couple of them had things

16    the entire week and that was precluding our ability to sit.  So

17    I wanted clarity on that as well.

18    THE COURT:  I'm going to get clarity on that right

19    now, and -- and then when I return, we'll have a better -- I'll

20    have -- I'll let you-all know what the schedule is going to be.

21    I, obviously, want to be sensitive to their -- with their

22    plans, but let's find out what's going on.  And, frankly, they

23    may say, you know what?  We'll push our plans back if it means

24    we can get started by deliberating.

25    MR. CRISP:  Someone whispered in my ear Rule 29s.

1    When did you want to do them?

2              THE COURT:  I'm sorry?

3              MR. CRISP:  The Rule 29s, when did you want to do

4    them?

5              THE COURT:  If by that you mean just making your

6    record, I assume we'll just do that --

7              MR. CRISP:  We're just going to do them on brief

8    then, predominantly?

9              THE COURT:  I mean, unless you have --

10             MR. CRISP:  No.  And that's fine.  I just wanted to

11   make sure I understood logistically how you wanted to conduct

12   it.  So I'm fine making oral and then the substantive being on

13   brief.

14             THE COURT:  Yes.  Again --

15             MR. CRISP:  Speaking for myself.

16             THE COURT:  To be clear, we have the written Rule 29s

17   after the close of the government's case.  If the defense

18   thinks there's anything to say or add, in addition to what

19   you've already put in writing -- because, obviously, now, you

20   know, you get to move again -- I think we can -- you can put

21   that in writing as well.  I'm not sure -- well, anyway.  The

22   bottom line is you've had an opportunity to continue to add to

23   your argument if you think there's something in the defense

24   case that warrants a Rule 29.  So.

25             Okay.  Be back at 4:15.  Thank you, everyone.

8677

```
 1                    (Recess taken.)
 2              THE COURT:  Okay.  I think we have everyone.
 3              MR. FISCHER:  Mr. Caldwell will be in momentarily.
 4              THE COURT:  Okay.  Here he comes.
 5         Okay.  So here is what the jury is available to do with
 6    one caveat.  So if we require all day Friday to complete
 7    closings, they're prepared to stay all Friday to do that.  So
 8    that's one.
 9         Two, they are prepared to come in next Monday and
10    Tuesday to deliberate, with one exception, and that is this
11    Juror 16 who needs to be in Houston to receive her belongings.
12    The movers are coming Saturday.  Monday, Tuesday, the movers
13    will be arriving in Houston, and she does not have anybody on
14    the Houston end to receive her belongings.
15         We will be off Wednesday, Thursday, Friday.  And they
16    understand that they -- I mean, I will tell you, they asked me,
17    you know, how long will we be deliberating?  I said, I can't
18    tell you.  But what I did say to them is that in cases of
19    comparable length and complexity, it would not be unusual for
20    them to have to come back the following Monday.  They
21    understand that.  I didn't want to say to them I think it's --
22    anyway, so that's the schedule.
23         Now, what that means is -- well, I guess, Mr. Fischer,
24    do you have any -- do you need overnight to tell us what
25    Mr. Caldwell determined, or has that decision been made?  I'm
```

8678

```
 1      not holding you to tell me now.
 2              MR. FISCHER:  We're going to at least need a couple
 3      hours to discuss after court today.
 4              THE COURT:  Okay.  That's fine.  Understood.
 5              Okay.  So we'll find out tomorrow, obviously, what the
 6      schedule will be.  So if we get the case to the jury by
 7      Thursday afternoon, evening, they're prepared to come in Friday
 8      morning for half a day to deliberate.  We can't get them the
 9      case until Friday, we'll sit the full day until they have it in
10      hand, and they'll come back on Monday, Tuesday.
11              What I think all of this means is -- in my view, is that
12      we need to excuse Juror 16 and bring in the next alternate
13      who -- who is Seat 7, who's Juror 0481.
14              Thoughts?
15              MR. NESTLER:  The government's suggestion is to not
16      inform Juror 16 that she's being excused and have her sit
17      through closings.
18              THE COURT:  Of course.  I'm not proposing that we
19      excuse her until we get to the end of the road.  I'm not
20      suggesting that we tell her now.  She'll sit through Friday or
21      whatever it may be, but that she would then be rotated in as an
22      alternate.
23              MR. NESTLER:  That's fine with the government.  And
24      if anything happens, we need to call somebody back from
25      wherever they are, several weeks from now, we want to make sure
```

1    that's an option.  So, yes, she's now going to be an alternate;

2    that's fine with the government.

3          MR. CRISP:  I'm sorry.  Can I have a sidebar with the

4    government?

5          THE COURT:  Sure.

6          MR. CRISP:  Understood, Judge.  Yes, I would concur

7    with that course of action.  I still think there's an outlet

8    under the -- and I can pull up the statutory cite, but I don't

9    think we can cause her to miss her household goods, quite

10   frankly; so I think it's sort of a moot point at this point.

11   But as an alternate, I would concur.

12         THE COURT:  Okay.  So what that will mean is 16 will

13   be -- well, I'll put it differently, which is that the juror in

14   Seat 7 will become a deliberating juror.  Then do we make 16

15   our third alternate in the event somebody -- in the event of

16   recall?

17         MR. NESTLER:  Yes, Your Honor.

18         THE COURT:  Everybody in agreement with that?

19         MR. CRISP:  Yes, Your Honor.

20         THE COURT:  Okay.  All right.  So what I will tell

21   her is that we will have an answer for her by the end of the

22   week as to what her circumstances will be and we can't tell her

23   any earlier than that.

24         So in terms of lineup, what that means then is, as I

25   said, the juror in Seat 7 is now a deliberating juror.  Juror

1    in Seat 11 will be the first alternate, juror in Seat 14 is the

2    second alternate, and our current juror in 16 will be the third

3    alternate.  Okay?  Is everybody on board with that?

4         Okay.  Perfect.  So that will be our schedule.

5         All right.  So let's talk about what needs to still be

6    talked about.

7         MR. NESTLER:  Your Honor, on scheduling, just so

8    we're all clear.  Tomorrow, I know Mr. Crisp has two witnesses,

9    and sounds like Mr. Caldwell may testify, and that should be

10   it.  So we ought -- and we have a rebuttal witness; should take

11   not more than 20 minutes.  And so we think we're going to close

12   evidence tomorrow.  Is that --

13        THE COURT:  Well, it depends on whether Mr. Caldwell

14   testifies or not.

15        MR. NESTLER:  Even with his testimony, it still might

16   be --

17        THE COURT:  It's still possible -- well, yes, bottom

18   line is everybody should be prepared to have whatever witnesses

19   they still plan to call tomorrow.  He should be here tomorrow.

20        MR. NESTLER:  And if we do finish tomorrow, does

21   Your Honor want to go straight into instructions?  Are we going

22   to -- if we finish early -- if Mr. Caldwell does not testify,

23   we only have Mr. Crisp's two witnesses and then one short

24   government rebuttal, but we could be done early.

25        THE COURT:  I think I will probably -- I think there

 1    may be just a few more things to talk about in terms of

 2    instructions, which is -- let's talk about that right now.  So

 3    bottom line is, I think -- let's say we finish midday.  I

 4    propose just to dismiss them, because I don't think they will

 5    be upset about that knowing what they will then know at that

 6    point.  So we can use the afternoon to just finalize everything

 7    and, you know, button it all down.

 8                MR. BRIGHT:  Start closings on Wednesday, Your Honor?

 9                THE COURT:  And then we'll start with final

10    instructions and then the government's opening, and then we

11    just go down the list in terms of the defense openings.

12                MR. BRIGHT:  Thanks, Judge.  That's helpful in terms

13    of planning.

14                MS. HALLER:  Your Honor, may we ask who the rebuttal

15    witness will be, since we know it's not Mr. Nichols at this

16    point.

17                MR. NESTLER:  We'll let the defense know later this

18    evening.

19                MS. HALLER:  Well, that was 24 hour -- I --

20                THE COURT:  Well, I assume the government will let

21    you know after we're done here.

22           Okay.  So here's my list of open-ended items.  I've got

23    the tax return issue, jury instructions.  There's one exhibit I

24    need to deal with in terms of redactions; that's the FBI tip

25    log document, which I still need to look at.

1        There's Mr. Fischer's 801 statements.  I don't know

2    where things stand on that.  And that's my sort of to-do list.

3    I guess I also need to add whether to include a limiting

4    instruction about the painkillers used by Mr. Caldwell.

5        MS. HALLER:  Sorry, Your Honor.  We added the

6    objection that I spoke about the other day regarding

7    Exhibit 1555, which is a government exhibit as to who was a

8    participant on the Old Leadership chat versus Exhibit 1556,

9    which is a government exhibit that was not moved in.  So we are

10   requesting they move in 1556 in the place of 1555, since 1555

11   is mistaken, as reflected by 1556.  And we object to 1555.

12       MR. NESTLER:  On behalf of the government, no.  We --

13   we proposed -- we sent to defense counsel proposed

14   Exhibit 1556.  We elected to not move it in.  We do not believe

15   it's accurate.  We moved in Exhibit 1555.  That's what we

16   believe is accurate.  It's already been admitted into evidence.

17   We don't believe the other exhibit should be admitted.

18       MS. HALLER:  Well, just to be clear, Your Honor, the

19   second exhibit from the government that they decided not to

20   move in shows the dates that people left chats or were not in

21   chats, which is consistent with what our evidence shows; that

22   on 12/18 Mr. Meggs left this Old Leadership chat.  Their

23   document that they have moved in, 1555, which we've been

24   pointing out, shows that he's still in the Old Leadership chat.

25   That was the representation, which he wasn't.

1          So if they could either redact that piece of information

2     as far as Mr. Meggs goes, then we would -- we would, you know,

3     not object.  But right now, the -- the issue is that

4     discrepancy.

5          MR. NESTLER:  Exhibit 1556 does not say that

6     Mr. Meggs left the chat.  It says that -- the last date of his

7     post, which we have already told defense counsel, we agree.

8     The last date of his post was December 18th.  Defense somehow

9     believes that means that he left the chat after December 18th.

10    There's no evidence of that.

11         Exhibit 1555 says that as of January 6th, he was a

12    member of that chat.  That's it.  We're not planning to

13    introduce 1556 to say that's the date of his last post, but

14    we've told the defense that we agree that was the date of his

15    last post in that chat.

16         THE COURT:  Okay.  So bottom line is this:  Absent a

17    rule of completeness issue, it's not for me to say what the

18    government needs to move in or not move in in their case.  1555

19    has been admitted.  I don't remember whether there was any

20    objection, but, in any event, it is now admitted into evidence.

21         If you believe that 1556 should be admitted as a defense

22    exhibit, your case still remains open, and that remains a

23    possibility for you to do, preferably by stipulation, because I

24    don't know whether that would otherwise mean to have an FBI

25    agent -- for you-all to call an FBI agent to get it admitted.

1    So that's where we are on that.

2            MS. HALLER:  Thank you, Your Honor.

3            And we would also request an opportunity to question

4    Ms. Cain when she's on the stand.

5            THE COURT:  I don't know who Ms. Cain is.

6            MS. HALLER:  She's going to be called by Mr. Crisp.

7    She's the government cell phone expert witness.

8            THE COURT:  Oh.  This is the CART expert?

9            MS. RAKOCZY:  Yes, Your Honor.

10           THE COURT:  Okay.  Well, we'll just wait and see.

11           MS. HALLER:  Just because I know it's not our turn

12   necessarily, so we would request the opportunity to be able to

13   ask questions.

14           THE COURT:  Well, as -- as I said all along, if the

15   defense calls a witness who inculpates another defendant, that

16   gives rise to a right to confrontation.  If that witness does

17   not inculpate the defendant, then there's no right to

18   cross-examine.

19           MS. HALLER:  Understood.  But I would like to do a

20   direct.  If she does not inculpate my client, we would like the

21   opportunity to ask some questions on direct.

22           THE COURT:  We'll see.  I mean, I --

23           MS. HALLER:  Thank you, Your Honor.

24           THE COURT:  Okay.

25           MR. NESTLER:  To add to Your Honor's list of

1    outstanding issues is our -- the government transcripts for

2    audio, video transcripts.

3              THE COURT:  Right, right, right.  All right.  So

4    that's an easy place to start.  So with respect to the

5    transcripts, I have gone through all of the transcripts that

6    the government has sent me, and I have reviewed each transcript

7    and compared the transcript against the audio on the -- in the

8    video file and have confirmed that those transcripts are

9    accurate.  So I will send those transcripts back.

10        The defense continues to have an opportunity, if it

11   believes anything is inaccurate about those transcripts, to

12   submit an alternative transcript that the jury can ultimately

13   use as guidance to determine what's actually on the call --

14   excuse me, on the audio.  So I'm making my findings that the

15   transcripts as they've been presented to me match the audio and

16   are accurate.  And so they will go back.  And, again, if any

17   defense -- if there's any alternative transcript or different

18   transcript, then that still remains open for the defense to

19   present.

20        All right.  Mr. Fischer, where are you and Mr. Manzo on

21   your 801 statements?

22             MR. FISCHER:  Your Honor, it's going to depend on

23   whether Mr. Caldwell testifies tomorrow because I would

24   introduce any statements through him.  If there are 801

25   statements, it would likely be one or two, and I would get it

```
 1    to Mr. Manzo and the Court by 8 or 9 o'clock tonight.

 2              THE COURT:  And if he doesn't testify, then --

 3              MR. FISCHER:  I -- it's unlikely that I'll have an

 4    801 statement.

 5              THE COURT:  I'm sorry?

 6              MR. FISCHER:  It's unlikely that -- that I'll have

 7    any 801 statements --

 8              THE COURT:  Okay.

 9              MR. FISCHER:  -- if he does not testify.

10              THE COURT:  Okay.  All right.

11              MR. MANZO:  And I understand that.  I'll speak to

12    Mr. Fischer tonight, and I think we can probably litigate it in

13    the break tomorrow, if we need to.  I don't -- I think the

14    issue would be the same.  I guess it's just Mr. Fischer's

15    choice whether he wants to try and introduce this evidence, but

16    we don't think there's a substantive difference in terms of the

17    determination of admissibility for the 801 statements based on

18    whether Mr. Caldwell testifies or not.

19              THE COURT:  I would agree with that.

20         So bottom line is, Mr. Fischer, it's up to you whether

21    you want to admit them or not.  And in my view, it's not

22    contingent upon whether Mr. Caldwell testifies or not.

23              MR. FISCHER:  Understood.  And I will give the Court

24    and Mr. Manzo some time to consider it.

25              THE COURT:  Okay.  All right.
```

1          All right.  Tax returns.  The defense had requested an

2     opportunity to think about the government's request to put into

3     evidence an IRS letter confirming Mr. Rhodes had not filed tax

4     returns -- I can't remember for what period of time, but --

5          So defense position on that.

6          MR. BRIGHT:  Your Honor, while I was working on our

7     closings, Mr. Linder was handling that.  Is there a chance that

8     we can defer that to the first thing in the morning so I can

9     speak with him this evening?

10          THE COURT:  Sure.

11          MR. BRIGHT:  I'm not trying to delay.  I don't want

12     to speak out of turn, and in this case, we have

13     compartmentalized a good amount to be more efficient.

14          THE COURT:  So let me just share with you my

15     thoughts, and we can finalize this in the morning.

16          MR. BRIGHT:  Yes, sir.

17          THE COURT:  Based upon my review of the case law, I

18     don't think there's any doubt -- well, let's put it this way.

19     There are a number of circuits that have held the failure to

20     file tax returns is admissible under Rule 608 for

21     cross-examination purposes on the issue of trustworthiness, an

22     individual's credibility.  The government had forwarded two

23     cases -- I don't have -- I can find them.  One was from the

24     Sixth Circuit.  The other was from, I think, the Fifth.

25          The Sixth Circuit case I didn't think was actually

1    relevant because it actually allowed the gaps in some filings

2    to go to the question of bias and not the question of

3    credibility.

4         However, the Fifth Circuit case did stand for the

5    proposition that it come in on the issue of credibility.

6         The Second Circuit has held the same in the case of

7    *Chnapkova* -- let me just spell it.  C-h-n-a-p-k-o-v-a -- *v.*

8    *Koh*, K-o-h, 985 F.2d 49 [sic].

9              MR. BRIGHT:  Can you spell the first name again,

10   please.

11             THE COURT:  Yeah.  Sure.  It's C-h-n-a-p-k-o-v-a.

12   *Chnapkova*.

13             MR. BRIGHT:  And what was that cite number again?

14             THE COURT:  985 F.2d 79.  Page 83 says:  Because the

15   plaintiff's credibility in this unusual case was of such

16   crucial importance and because her failure to file tax returns

17   bore directly on her credibility, the district court's decision

18   to exclude testimony regarding that failure was an abuse of

19   discretion.

20        Similarly, the Tenth Circuit in an unpublished decision

21   called *United States v. Fairchild*, 46 F.3d 1152, has said:

22   Clearly, evidence of the appellant's failure to file tax

23   returns is probative of truthfulness or untruthfulness.

24   Clearly, evidence of the appellant's failure to file tax

25   returns is probative of truthfulness or untruthfulness and,

 1        therefore, is admissible under Rule 608.

 2              So in terms of its relevance, I think that is

 3        established.

 4              Here's the problem.  Rule 608 does not permit the use of

 5        extrinsic evidence to cross-examine for prior bad acts.  So

 6        because I sustained the objection incorrectly and, arguably,

 7        without the benefit of these cases, we're in a bit of a box in

 8        terms of where we stand.

 9              Now, that said, I also think that the absence of the tax

10        returns or the nonfiling of the tax returns also arguably goes

11        to the issue of law abidingness that has been put at issue in

12        this case as to Mr. Rhodes.  And so there's no prohibition

13        under Rule 608 to allow extrinsic evidence for a different

14        purpose than to challenge the credibility of a witness -- of --

15        of a testifying witness or a testifying defendant.

16              So in theory, it could be admissible for that reason as

17        well and come in through extrinsic evidence, but I've not seen

18        a case or figured out what to do about the situation that I've

19        created, which is to not have permitted the cross-examination

20        when it occurred and now to only be in a position to have the

21        evidence introduced through extrinsic evidence.

22              Because if the government had crossed and Mr. Rhodes had

23        answered, if he had denied it, in that case, there actually

24        might have been a basis to bring in the evidence extrinsically

25        to contradict his testimony, but not knowing what Mr. Rhodes's

8690

1     answer would have been puts us in a difficult position.

2          MR. NESTLER:  Our position is that it comes in

3     extrinsically, Your Honor, because it comes in for a separate

4     purpose other than to just attack Mr. Rhodes's capacity for

5     truthfulness.

6          THE COURT:  Would you then agree to use it to

7     challenge his truthfulness in closing?

8          MR. NESTLER:  Yes.

9          THE COURT:  Okay.

10         MR. NESTLER:  To at least challenge his law

11    abidingness.

12         THE COURT:  Okay.  So that's the current thinking.

13    Talk to Mr. Linder about it, and we'll resolve it tomorrow.

14         MR. BRIGHT:  I had trouble hearing Mr. Nestler

15    regarding the agreement in closing.  Can you repeat that.

16         MR. CRISP:  Challenge law abidingness.

17         THE COURT:  So that's that.  We'll resolve that

18    tomorrow.

19         Okay.  Jury instructions.  So we will circulate tonight

20    the near-final version of the jury instructions.  That will

21    include all the standard instructions you-all agreed to as we

22    were going back through.  There were a handful of small

23    instructions that we -- you-all did not list that we'll

24    include.

25         You will see in those instructions there will be some

1    gaps that the parties will need to fill in, including -- we

2    should have been a little bit better -- I should have been a

3    little bit better about this in terms of, for example, identify

4    witnesses as to whom prior inconsistent statements were

5    introduced.  You know, at least the standard instruction

6    actually contemplates that we would list the witnesses that had

7    prior inconsistent statements, either under oath or otherwise,

8    listed in the instruction itself.  I suppose you-all could

9    agree not to do that, but I have to confess I did not -- I did

10   not track that in the way that we, perhaps, should have.

11        So that will be at least one thing you will all need to

12   take a look at tonight.  But as I said, we'll send -- we'll

13   circulate the final -- near-final instructions this evening.

14   And everybody should have a look at them.

15        The order of the standard instructions won't necessarily

16   track the order in which they appear in *The Red Book* because I

17   don't think *The Red Book*'s sequencing is logical.  And so I've

18   moved some -- some will be moved around a little bit, but, rest

19   assured, they're all there.  Make sure that's the case, but

20   they will all be there.

21        The seditious conspiracy instruction, we'll make sure

22   the parties' positions that were sent by email over the weekend

23   are docketed, among other things.

24        But I sent a revision out last night that I thought

25   tracked the *Baldwin* language quite faithfully and fairly.  The

1    government has objected to one of those sentences in that

2    revised instruction, which is a quote from United States v.

3    Anderson -- or *Anderson v. United States,* 273 F. 20, from 1921.

4    I think I know why the government is objecting to it, but I

5    will talk about that in a minute.

6          Mr. Fischer, do you have any thoughts, reactions to what

7    was sent yesterday?

8          MR. FISCHER:  Yes, Your Honor.  First of all, I thank

9    the Court for actually reading my filings because, obviously,

10   the Court has spent a lot of time looking at this and --

11         THE COURT:  I read everything you send me,

12   Mr. Fischer.

13         MR. FISCHER:  Your Honor, that's not the usual

14   practices -- I can't speak to this district, but I will say the

15   Court does spend a lot of time, and I can tell you all the

16   defense lawyers and I know the prosecutors certainly appreciate

17   it as well.

18         THE COURT:  Thank you.

19         MR. FISCHER:  Your Honor, the only -- the quibble

20   that we would have from the defense is we -- we believe that

21   the -- the *Black's Law Dictionary* at 1891, which was published

22   four years after the *Baldwin* decision, that the definition of

23   resistance should be, quote, The employment of forcible means

24   to prevent the execution of an endeavor in which force is

25   employed.  We believe that would have been the definition that

1    the Supreme Court would have likely been focused on in the

2    *Baldwin* case.

3         I would also point out that in *Bouvier's* dictionary of

4    1856 -- I know there was another edition -- I think it was just

5    after the Civil War -- resistance is defined as, quote, the

6    opposition of force to force.

7         So I believe in reading *Baldwin* that what the Court in

8    *Baldwin* is saying, for seditious conspiracy -- to have a

9    seditious conspiracy, there has to be a positive assertion or

10   actual exercise of authority.  In other words, I don't believe

11   that it means that the federal government has to go out and be

12   physically shooting a gun at somebody.  There can be compulsion

13   or -- I think that type of force, but I think it has to be a

14   proactive attempt to enforce the law or compel obedience.

15        The word authority, likewise, we prefer the word -- the

16   definition from *Bouvier's* dictionary of 1856 where in -- in

17   authority it says in relation to the government, quote, the --

18   this is cited in -- in the -- one of the emails I sent to the

19   Court in an attachment.  Quote, The right and power which an

20   officer has in the exercise of a public function to compel

21   obedience to its lawful commands.

22        And that's what we believe -- to have a seditious

23   conspiracy, I used the example in one of my filings that,

24   hypothetically, if the defendants had retained a kamikaze pilot

25   to -- to -- to obviously to do something, to fly into the

8694

1    Capitol on January 6th, that would not have been resistance to

2    a positive assertion of authority because it's -- it's --

3    it's -- that would be an attack, is what it would be.

4         And that would be levying war against the government,

5    which is another section of the seditious conspiracy statute.

6    But I think under *Baldwin* that it requires the government --

7    the conspiracy has to be aimed at a -- an assertion of

8    authority, a show of authority, an exercise of authority

9    basically to enforce or compel obedience to the law, which the

10   conspirators fight back against or resist.

11        An example would be this law was passed at the beginning

12   of the Civil War.  What was going on?  There was martial law.

13   Obviously, by definition, confederate sympathizers were

14   resisting a positive assertion of authority.  We believe that's

15   the intent of the law.

16        Thank you, Your Honor.

17        THE COURT:  All right.  So, look, it's an interesting

18   issue.  But I think, ultimately, I respectfully disagree,

19   Mr. Fischer, I think, for two reasons.

20        One is that we're not reading a statute here, but we're

21   reading the Supreme Court's opinion, and it seems fair to me --

22   typically when we interpret statutes, it's to use the common

23   understanding of the ordinary definition of the term at the

24   time the statute is enacted.

25        I think by the same token, using the ordinary, common,

1   everyday definition of those two terms, resistance and

2   authority, is -- is apt here.  And I think that's why I'm using

3   the *Webster's Dictionary* definitions instead of the *Black's Law*

4   *Dictionary* and the *Bouvier* legal dictionary definition.

5        I also think that the notion of force, resisting force,

6   is not consistent with *Baldwin*.  And I say that because it's

7   been quite contemplated in *Baldwin* that if the facts were

8   slightly different, that it could have made a seditious

9   conspiracy charge.  And that is, if the defendants there,

10  instead of having attacked the Chinese immigrants and, in fact,

11  attacked the government workers or whoever it may have been who

12  were protecting them, then that would have risen to a seditious

13  conspiracy -- or potentially.

14       And so I don't think that would have required as an

15  element that those who were protecting the immigrants would

16  have had to have used force to resist force and that the attack

17  on those who were protecting -- I think that would constitute a

18  positive assertion of authority, but it doesn't necessarily

19  mean the government acting as the government has to resist with

20  force or being -- forcing a law, in my view.  And I think

21  that's what the common definition of those terms reflects.  So

22  it's for that reason I respectfully disagree with what I think

23  is an interesting argument and --

24       MR. FISCHER:  Your Honor, if I may.  Just for the

25  record, I also cited in -- in some of the filings and emails

1    regarding the -- the quote from *Baldwin* about carrying the laws

2    in execution.  I do believe the dictionaries that we cited

3    are -- are unanimous that the -- only the Executive Branch --

4    it's the body that carries the laws into effect, carries the

5    law into execution, and that's another -- it goes back to my

6    motion to dismiss.

7          I know the Court considered that a while ago as to the

8    one branch of -- of seditious conspiracy but not as to the

9    authority branch or the opposing authority of, but I would,

10   once again, just for the record, make that argument as well,

11   remember.

12         Thank you.

13         THE COURT:  Thank you, Mr. Fischer.

14         And I'll, again, respectfully disagree with the same

15   reasons I have previously, which is the statute is not specific

16   to any branch and simply speaks in terms of opposing the

17   force -- by force the authority of the government of the

18   United States and the execution of any law of the

19   United States.

20         And I think -- as I previously held, I think the term

21   execution in this context means to carry out, which is the sort

22   of common, everyday definition of that term.  And I think it is

23   reasonable -- well, let's put it this way:  It falls within the

24   four corners of the statute to conclude that Congress and

25   members of Congress were carrying out the law on January 6th,

1    as we've discussed and I've held.  So the government asked that

2    I change the words from *Anderson* slightly to substitute -- I

3    can't remember what it was.

4         And, Mr. Nestler, I assume you made that request because

5    of the pretrial litigation that we had about whether the

6    statute or the indictment required the government -- or the

7    grand jury to allege that a particular individual who was

8    executing the laws was interfered with?

9         MR. NESTLER:  That's accurate, Your Honor.  And we

10   believe that Your Honor's Rule 12 decision actually cited this

11   sentence from Haywood, which was going back to *Baldwin*.

12        THE COURT:  *Anderson*; right.

13        MR. NESTLER:  I'm sorry.  *Anderson*.

14        And our position is based on Your Honor's prior ruling,

15   focusing on the individuals charged in executing the laws would

16   not be the appropriate focus of the sentence, but the concept,

17   I think, is still there, which is the United States in

18   executing the law.

19        THE COURT:  Right.  Okay.  I think that's a fair

20   change, and I -- something that I thought about when I sent out

21   the draft, and -- and I think it's accurate to have that change

22   reflected.  So with the reflected change the government has

23   requested, that will be the final part of the final seditious

24   conspiracy instruction what was sent out yesterday.  And I

25   think that takes care of all the substantive instructions.

```
 1            Am I missing anything?
 2            MR. NESTLER:  Not from the government's perspective.
 3   I believe Your Honor has a copy of the verdict form, which
 4   should be all --
 5            THE COURT:  Yes.  That's the one thing we have not
 6   discussed, and I don't know whether the defense has any
 7   objections to the revised verdict form.  Take a look tonight
 8   and let me know.
 9            MR. NESTLER:  It was consistent with what the parties
10   had jointly proposed pretrial, and then we simply modified it
11   to get rid of the lesser included offense and the unanimity for
12   the final obstruction offenses.  Otherwise, it's the same.
13            THE COURT:  Okay.  All right.
14            MR. WOODWARD:  Can you hear me okay?
15       The observation we would make is that in light of the
16   Court's inclusion of a conspiracy theory of -- theory of
17   liability in the 1512(c)(2) is whether we -- forgive me for
18   thinking out loud, Your Honor -- whether we would include a
19   specific requirement that the jury articulate whether its
20   finding that the defendants are guilty of 1512(c)(2) based on a
21   conspiracy.
22       There's a world in which they would acquit on 1512(k)
23   and then come back under 1512(c)(2) and convict under the
24   theory of conspiracy, which it would be hard to reconcile that
25   result.  And so that was the only thought I had.
```

1        Otherwise, I don't think, on behalf of Mr. Meggs, we had

2   any objections to the current --

3        THE COURT:  Talk to the government about it.  I mean,

4   that gets a little tricky because, then, does that mean you're

5   asking for a special interrogatory as to each defendant under

6   each theory of liability of which there are four; right?

7   Substantive liability, aiding and abetting liability,

8   co-conspirator liability, and the fourth is --

9        MR. NESTLER:  Attempt.

10        THE COURT:  -- attempt.

11        MR. WOODWARD:  No, we don't want that.  The easy

12   approach here would not be to include the conspiracy theory of

13   liability in the -- actually, when they've been separately

14   charged with the conspiracy under the same.

15        THE COURT:  And to be clear, I think, at least my

16   thinking, why I'm including it is I can see a world -- I don't

17   think it's necessarily inconsistent, but I can see a world in

18   which the jury rejects the government's theory as to the

19   1512(k) conspiracy that's been charged; however, finds that an

20   individual defendant did conspire with another person.

21        MR. WOODWARD:  And so I have to concede that that --

22   that's -- I -- that's a fair observation.  I've just circulated

23   the draft multiple conspiracy instruction and the defense

24   theory of the case to the defense team.  We'll get that to the

25   government today.

1          THE COURT:  Is there a single defense?

2          MR. WOODWARD:  It's drafted as a single defense

3    theory, with the only exception being that there are breakouts

4    for when there are individual charges as against the individual

5    defendants.  So it's a singular theory with respect to the

6    conspiracy and the obstructing an official proceeding.  And

7    then not to get over my skis here, but with respect to the

8    individual, it says we disagree with the government that

9    anything was destroyed or what have you.

10         THE COURT:  Okay.  All right.  We'll take a look at

11    it and then we can figure that out tomorrow.

12         MR. FISCHER:  Your Honor, while Mr. Woodward is

13    talking, I think he wanted to serve as my expert witness on the

14    issue of opioids and alcohol.  I think he had a definite

15    opinion on that.

16         MR. WOODWARD:  I only observed -- the Court did

17    comment that I seemed fine when we were talking the other

18    night.  I think it was the day I was hospitalized, and -- and

19    so, sure, if -- happy to serve as an expert for the Court in

20    any capacity.

21         THE COURT:  So I don't think I made any observations

22    about your condition when you went into the hospital.

23         MR. WOODWARD:  Well, I don't remember.

24         THE COURT:  And I actually refrained from commenting

25    on your condition when you came back, so.  But, more

8701

1   importantly, we're glad you're better, and that's all -- that's

2   what matters.

3           MR. WOODWARD:  If I can get my arm back.

4       There were two evidentiary objections that we reserved

5   until the end.  The one was whether the Zello compilation was,

6   in fact, a summary exhibit or whether that was a demonstrative

7   exhibit.  The Court observed, when it was presented, that the

8   Zello exhibit was simply the transcript of the call with -- and

9   the government has highlighted the words as they are -- as they

10  are being spoken.  And then how the Court wants us to proceed

11  with the presentation of the individual statements to the

12  jurors with respect to whether they are admissible as against

13  the entire -- entirety of the defendants or -- or just

14  individually.

15          THE COURT:  So I don't think it's a summary exhibit.

16  It's not a summary of anything.  It is what it purports to be;

17  right?  It's the audio plus the transcript.  And there's

18  some -- at least there's a photograph or two in there, and it

19  identifies the speaker.  But it's certainly not a summary

20  exhibit.  And then -- I mean, I think it's a substantive

21  exhibit.  Is it anything other than that?  It's certainly not a

22  demonstrative exhibit either, so.  I mean, I think it comes in

23  as a substantive piece of evidence.

24      In terms of instructing the jury as to individual

25  statements, I mean, we can just do it generally.  If anybody --

1      or if you'd like me to, to do it for a particular piece of

2      evidence.  For example, I mean, I think it was -- really the

3      Zello chat was really the only one.  Maybe there was one other

4      communication as to whom we limited to a specific defendant.

5      There may have been one other.

6              MR. WOODWARD:  I -- I do think there were some of the

7      Caldwell exhibits that would be admissible only as against

8      Mr. Caldwell and -- but we can speak to the government tonight

9      and --

10             THE COURT:  If you would.  That would be -- I mean,

11     if you would.  That would be helpful, and then we can fashion

12     something that everybody can agree upon.

13         Okay.  Just a reminder, again, to have your exhibit

14     lists at least in the works, if not quite ready to go, for --

15     to provide to the jury on Friday, if that's when we get there,

16     if they get the case on Friday.

17             MR. WOODWARD:  And will the jury have -- right now

18     all of our -- for Mr. Meggs, our exhibits are electronic.  Is

19     that how they are presented to the --

20             THE COURT:  They will be -- JC can give you-all the

21     details, but they will have the ability.  They will have a

22     laptop and a large monitor and will be able to pull things up

23     electronically.

24             MR. WOODWARD:  Perfect.

25             MR. CRISP:  I've seen it in other trials.  Do we know

 1    what's on the laptop?  Do we know it's been scrubbed, there's

 2    no internet access?  Nothing like that?  I've had cases where

 3    stuff from other cases went back and -- yeah.

 4              THE COURT:  Right.  Bottom line is we'll make sure

 5    that that's taken care of, Mr. Crisp, but we haven't had a

 6    problem with it in the past.

 7              MR. CRISP:  Okay.

 8              MR. NESTLER:  Timing-wise, Your Honor, we expect the

 9    jury will have the case by midday on Thursday, just so -- we'll

10    have our exhibit list ready to go.  We think by midday Thursday

11    we ought to be done, at the latest.  If we plan that we're

12    going to start instructions and closings on Wednesday morning,

13    we think by end of the -- by lunch on Thursday, we should be

14    ready.

15              THE COURT:  Okay.  Again, that will depend a little

16    bit on Mr. Caldwell's decision.  So -- but that's, I think, the

17    earliest that everybody should anticipate being -- having the

18    case to the jury.

19         Mr. Bright, maybe we can talk about this.  Mr. Linder

20    had sent a note over the weekend about how we deal with jury

21    notes and the need for defense counsel to be present for them.

22    You want to save that until tomorrow or --

23              MR. BRIGHT:  If I may, Your Honor.  I had -- I was

24    out of the loop on that part of the discussion, but Mr. Linder

25    and I were communicating.  If I recall correctly, that had to

1    do primarily with the presence of somebody on Monday and

2    Tuesday, if we'd come back that week.  I'm here.

3                    THE COURT:  Okay.

4                    MR. BRIGHT:  So it's not a nonissue in terms of

5    presence of me being here.  If I recall correctly, that was the

6    context of that email; is that correct?

7                    THE COURT:  I think the context was whether we

8    could -- whether there would be a world in which I didn't bring

9    the jurors back in to answer any notes, which would obviate the

10   need for counsel to be physically present.  I think that was

11   the upshot of his email, at least that's what I understood it

12   to be.

13         So we can talk about that tomorrow, but as I said

14   previously, my preference -- my strong preference is to deliver

15   any answers in open court to the jurors as opposed to in an

16   ex parte fashion, even with a court reporter.

17         And, frankly, you know, we all make mistakes, and I

18   would rather have counsel to tell me I made one if I delivered

19   an incorrect answer.  Okay?

20         All right.  Is there anything else that is on our to-do

21   list?

22         Okay.  I'll see everybody tomorrow morning.  Thanks,

23   everyone.

24                    (Proceedings were concluded at 4:57 p.m.)

25

1    <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3         I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                   Dated this 14th day of November, 2022.

10

11              /s/ Nancy J. Meyer
                Nancy J. Meyer
12              Official Court Reporter
                Registered Diplomate Reporter
13              Certified Realtime Reporter
                333 Constitution Avenue Northwest
14              Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

8706

**'**

**'80s** [1] - 8622:14

**0**

**0481** [1] - 8678:13

**1**

**1** [3] - 8616:5, 8631:2, 8661:13
**1/8** [1] - 8663:22
**10** [2] - 8595:15, 8618:2
**100** [1] - 8662:5
**11** [2] - 8611:1, 8680:1
**1152** [1] - 8688:21
**12** [2] - 8663:20, 8697:10
**12/18** [1] - 8682:22
**13:25** [1] - 8643:19
**14** [3] - 8665:14, 8665:20, 8680:1
**14th** [3] - 8590:12, 8590:14, 8590:15
**15** [2] - 8673:7, 8675:5
**150.1** [4] - 8618:19, 8619:9, 8619:11, 8619:12
**150.1**................ [1] - 8581:13
**1500** [4] - 8587:17, 8632:7, 8643:19, 8651:19
**1510.10** [2] - 8655:21, 8660:20
**1510.11** [1] - 8664:20
**1512(c)(2** [1] - 8698:17, 8698:20, 8698:23
**1512(k** [2] - 8698:22, 8699:19
**1555** [8] - 8682:7, 8682:10, 8682:11, 8682:15, 8682:23, 8683:11, 8683:18
**1556** [7] - 8682:8, 8682:10, 8682:11, 8682:14, 8683:5, 8683:13, 8683:21
**16** [6] - 8677:11, 8678:12, 8678:16, 8679:12, 8679:14, 8680:2
**167** [1] - 8598:5
**18** [1] - 8632:8
**180** [1] - 8629:6
**1856** [2] - 8693:4, 8693:16
**1891** [1] - 8692:21

**18th** [2] - 8683:8, 8683:9
**1921** [1] - 8692:3
**1963** [1] - 8616:18
**1980s** [1] - 8622:14
**19th** [3] - 8597:6, 8597:7, 8615:11
**1:17** [1] - 8660:9
**1:22** [1] - 8620:15
**1:25** [2] - 8649:17, 8659:9
**1:33** [1] - 8660:7

**2**

**2** [2] - 8630:2, 8650:25
**20** [5] - 8655:24, 8673:5, 8674:14, 8680:11, 8692:3
**2020** [6] - 8590:13, 8604:15, 8617:20, 8622:16, 8626:10
**2021** [6] - 8590:14, 8590:15, 8614:10, 8615:11, 8617:15, 8622:16
**22.P.8** [1] - 8649:3
**22.V.3** [1] - 8630:23
**24** [2] - 8606:9, 8681:19
**273** [1] - 8692:3
**29** [1] - 8676:24
**29.P.2** [1] - 8631:13
**29s** [3] - 8675:25, 8676:3, 8676:16

**3**

**3** [4] - 8643:22, 8646:18, 8649:18, 8659:16
**30** [3] - 8655:21, 8660:21, 8674:14
**350,000** [1] - 8606:9
**3:07** [1] - 8649:22
**3:25** [1] - 8649:22
**3rd** [1] - 8637:3

**4**

**40** [2] - 8629:19, 8631:4
**45** [1] - 8586:3
**45-57** [1] - 8635:12
**45-69** [3] - 8639:6, 8639:7
**45-71** [1] - 8640:8
**45-76** [1] - 8642:5
**45-79** [1] - 8667:5
**45-80** [3] - 8595:7, 8595:10, 8595:18

**4580** [1] - 8595:6
**46** [2] - 8596:12, 8688:21
**46-36** [1] - 8668:18
**46-43** [2] - 8595:8, 8596:12
**47** [5] - 8603:15, 8603:19, 8604:22, 8604:24, 8604:25
**47**.................... [1] - 8581:10
**48** [1] - 8620:1
**49** [1] - 8688:8
**4:15** [1] - 8676:25
**4:57** [1] - 8704:24
**4th** [1] - 8617:15

**5**

**5** [2] - 8589:1, 8675:6
**53** [1] - 8660:6
**57** [6] - 8605:18, 8605:21, 8605:23, 8606:1, 8606:22, 8606:24
**57**.................... [1] - 8581:11
**5:12** [1] - 8655:22
**5:13** [1] - 8661:4
**5th** [2] - 8618:20, 8621:7

**6**

**6** [1] - 8661:4
**608** [4] - 8687:20, 8689:1, 8689:4, 8689:13
**61** [1] - 8633:20
**61-A** [9] - 8581:11, 8607:3, 8607:8, 8609:12, 8609:16, 8613:10, 8613:12, 8613:15, 8613:18
**61-B** [5] - 8607:11, 8608:3, 8609:8, 8613:21, 8613:24
**61-C** [6] - 8608:18, 8608:20, 8608:25, 8609:1, 8613:12, 8614:6
**61-C....** [1] - 8581:11
**62** [1] - 8614:12
**62-A** [8] - 8581:12, 8614:12, 8614:22, 8615:1, 8615:6, 8615:22, 8615:25, 8616:2
**62-K** [1] - 8616:2
**62-K....** [1] - 8581:12

**6318** [1] - 8649:17
**66** [1] - 8633:20
**6734** [2] - 8656:5, 8661:13
**6734-10** [1] - 8663:6
**6734-12** [1] - 8663:16
**6734-23** [1] - 8663:21
**6734-8** [1] - 8661:23
**6734.8** [1] - 8656:3
**6:00** [2] - 8597:15, 8602:23
**6th** [25] - 8595:14, 8617:7, 8618:20, 8620:21, 8621:3, 8621:6, 8621:23, 8622:18, 8623:1, 8627:8, 8628:6, 8628:8, 8629:3, 8629:17, 8631:10, 8631:18, 8648:1, 8659:23, 8667:24, 8668:4, 8669:11, 8671:17, 8683:11, 8694:1, 8696:25

**7**

**7** [3] - 8678:13, 8679:14, 8679:25
**70** [3] - 8630:9, 8671:2, 8671:3
**78** [6] - 8590:9, 8591:17, 8591:18, 8591:19, 8591:24, 8593:18
**78**.................... [1] - 8581:12
**79** [1] - 8688:14
**7:00** [1] - 8655:11
**7:46** [1] - 8656:5
**7th** [7] - 8614:10, 8618:20, 8621:8, 8628:14, 8628:15, 8628:19, 8665:3

**8**

**8** [3] - 8594:12, 8656:5, 8686:1
**801** [6] - 8682:1, 8685:21, 8685:24, 8686:4, 8686:7, 8686:17
**83** [1] - 8688:14
**8590** [1] - 8581:5
**8591** [1] - 8581:12
**8604** [1] - 8581:10
**8606** [1] - 8581:11
**8613** [1] - 8581:11
**8616** [1] - 8581:12

**8619** [1] - 8581:13
**8626** [1] - 8581:5
**8660** [1] - 8581:9
**8665** [1] - 8581:6
**8:00** [1] - 8655:11
**8:30** [1] - 8594:12
**8th** [2] - 8603:23, 8604:6

**9**

**9** [1] - 8686:1
**9318** [4] - 8659:9, 8659:25, 8660:4, 8660:5
**9318**........................ [1] - 8581:9
**9335** [1] - 8629:19
**985** [2] - 8688:8, 8688:14
**9:00** [1] - 8594:12

**A**

**abetting** [1] - 8699:7
**abhor** [1] - 8643:15
**abidingness** [3] - 8689:11, 8690:11, 8690:16
**ability** [4] - 8583:2, 8658:10, 8675:16, 8702:21
**able** [12] - 8582:12, 8586:1, 8586:4, 8586:6, 8587:11, 8591:13, 8626:2, 8656:19, 8656:20, 8671:11, 8684:12, 8702:22
**abnormal** [2] - 8638:11, 8638:13
**absence** [1] - 8689:9
**absent** [2] - 8603:6, 8683:16
**absolutely** [1] - 8602:5
**abuse** [1] - 8688:18
**access** [10] - 8582:7, 8582:10, 8582:15, 8583:24, 8584:1, 8584:21, 8586:20, 8630:20, 8703:2
**accessibility** [1] - 8669:13
**accommodate** [1] - 8584:19
**accommodation** [1] - 8587:2
**account** [3] - 8611:4, 8612:5, 8615:4

**accurate** [6] - 8682:15, 8682:16, 8685:9, 8685:16, 8697:9, 8697:21
**achieve** [1] - 8586:18
**acknowledge** [1] - 8586:7
**acquaintances** [1] - 8669:25
**acquit** [1] - 8698:22
**act** [4] - 8651:6, 8657:7, 8657:8, 8657:19
**acted** [1] - 8651:6
**acting** [1] - 8695:19
**action** [4] - 8624:22, 8624:23, 8624:25, 8679:7
**actions** [4] - 8624:8, 8651:15, 8652:8
**active** [1] - 8627:8
**acts** [2] - 8666:7, 8689:5
**actual** [2] - 8584:22, 8693:10
**add** [4] - 8676:18, 8676:22, 8682:3, 8684:25
**added** [2] - 8606:9, 8682:5
**adding** [1] - 8651:9
**addition** [1] - 8676:18
**additional** [3] - 8582:7, 8629:6, 8655:6
**addressed** [1] - 8583:16
**adequate** [1] - 8654:1
**admissibility** [2] - 8589:19, 8686:17
**admissible** [5] - 8687:20, 8689:1, 8689:16, 8701:12, 8702:7
**admission** [1] - 8589:14
**admit** [2] - 8619:10, 8686:21
**Admitted** [1] - 8581:8
**admitted** [21] - 8591:18, 8591:19, 8593:19, 8600:10, 8604:24, 8604:25, 8606:24, 8613:11, 8613:13, 8616:1, 8616:3, 8619:11, 8619:12, 8660:4, 8660:5, 8682:16, 8682:17, 8683:19, 8683:20, 8683:21,

8683:25
**admonished** [1] - 8582:14
**advancing** [2] - 8640:12, 8642:7
**affected** [1] - 8658:10
**afternoon** [6] - 8626:24, 8626:25, 8649:21, 8673:6, 8678:7, 8681:6
**Agent** [2] - 8599:5, 8599:11
**agent** [3] - 8584:4, 8683:25
**ago** [6] - 8583:7, 8616:22, 8617:2, 8631:5, 8640:22, 8696:7
**agree** [8] - 8620:4, 8624:16, 8683:7, 8683:14, 8686:19, 8690:6, 8691:9, 8702:12
**agreed** [1] - 8690:21
**agreement** [2] - 8679:18, 8690:15
**ahead** [9] - 8598:12, 8608:1, 8608:22, 8609:15, 8615:21, 8618:4, 8623:23, 8673:12, 8673:13
**aiding** [1] - 8699:7
**aimed** [1] - 8694:7
**aisle** [1] - 8606:19
**alcohol** [9] - 8654:21, 8656:12, 8656:14, 8657:7, 8657:18, 8657:23, 8658:2, 8658:4, 8700:14
**allegation** [2] - 8611:11, 8612:3
**allege** [1] - 8697:7
**allow** [2] - 8672:18, 8689:13
**allowed** [2] - 8658:10, 8688:1
**almo** [1] - 8611:12
**almost** [3] - 8621:10, 8642:17
**altered** [2] - 8656:11, 8656:16
**altering** [1] - 8654:8
**alternate** [8] - 8678:12, 8678:22, 8679:1, 8679:11, 8679:15, 8680:1, 8680:2, 8680:3
**alternative** [2] - 8685:12, 8685:17
**America** [1] - 8606:4

**American** [1] - 8642:11
**amount** [2] - 8656:18, 8687:13
**Anderson** [5] - 8692:3, 8697:2, 8697:12, 8697:13
**announcements** [1] - 8589:9
**answer** [7] - 8612:7, 8622:7, 8634:4, 8679:21, 8690:1, 8704:9, 8704:19
**answered** [1] - 8689:23
**answers** [1] - 8704:15
**anticipate** [4] - 8642:22, 8650:7, 8674:16, 8703:17
**anticipated** [1] - 8645:8
**anticipating** [1] - 8674:12
**Antifa** [2] - 8592:10, 8666:4
**anyway** [2] - 8676:21, 8677:22
**apart** [4] - 8639:25, 8640:25, 8641:3, 8641:12
**apologies** [1] - 8590:15
**appear** [4] - 8595:2, 8667:16, 8669:3, 8691:16
**appellant's** [2] - 8688:22, 8688:24
**appreciate** [2] - 8652:15, 8692:16
**approach** [1] - 8699:12
**appropriate** [2] - 8654:5, 8697:16
**apt** [1] - 8695:2
**area** [2] - 8608:14, 8631:17
**arguably** [2] - 8689:6, 8689:10
**argue** [5] - 8587:20, 8653:10, 8653:15, 8653:16, 8654:12
**arguing** [2] - 8653:14, 8657:4
**argument** [6] - 8653:25, 8657:1, 8658:12, 8676:23, 8695:23, 8696:10
**argumentative** [1] - 8647:1
**Arlington** [1] -

8618:21
**arm** [1] - 8701:3
**armed** [1] - 8627:13
**arrest** [3] - 8583:20, 8598:2, 8602:3, 8602:11, 8622:1
**arrive** [1] - 8594:11
**arrived** [1] - 8594:14
**arriving** [1] - 8677:13
**arrow** [2] - 8667:12, 8667:14
**articulate** [1] - 8698:19
**articulated** [1] - 8651:4
**asleep** [1] - 8655:15
**ass** [1] - 8633:9
**assault** [3] - 8661:19, 8671:16, 8671:19
**assaulted** [3] - 8596:10, 8634:14, 8661:17
**assert** [1] - 8609:21
**asserted** [4] - 8609:23, 8610:2, 8612:9, 8612:19
**assertion** [5] - 8693:9, 8694:2, 8694:7, 8694:14, 8695:18
**assistance** [3] - 8587:25, 8588:17, 8671:12
**assisted** [3] - 8588:5, 8588:12, 8588:13
**assume** [3] - 8676:6, 8681:20, 8697:4
**assuming** [1] - 8667:3
**assumption** [1] - 8638:18
**assure** [1] - 8583:15
**assured** [1] - 8691:19
**attachment** [3] - 8666:22, 8667:2, 8693:19
**attack** [3] - 8690:4, 8694:3, 8695:16
**attacked** [3] - 8596:10, 8695:10, 8695:11
**attacking** [1] - 8670:15
**attempt** [4] - 8666:6, 8693:14, 8699:9, 8699:10
**attend** [1] - 8605:12
**attended** [1] - 8603:23
**attention** [3] - 8587:13, 8597:5, 8659:11
**attest** [1] - 8657:20
**audio** [12] - 8591:25,

8618:21
8630:25, 8632:9, 8643:20, 8646:6, 8659:17, 8660:8, 8685:2, 8685:7, 8685:14, 8685:15, 8701:17
**audio-visual** [6] - 8630:25, 8632:9, 8643:20, 8646:6, 8659:17, 8660:8
**authority** [14] - 8630:17, 8693:10, 8693:15, 8693:17, 8694:2, 8694:8, 8694:14, 8695:2, 8695:18, 8696:9, 8696:17
**available** [6] - 8584:17, 8584:23, 8586:24, 8672:16, 8677:5
**Avenue** [4] - 8621:15, 8621:17, 8633:9, 8633:13
**aware** [18] - 8612:6, 8615:15, 8618:12, 8625:25, 8627:1, 8627:3, 8627:4, 8627:7, 8627:10, 8627:12, 8627:15, 8627:16, 8629:1, 8629:6, 8630:16, 8630:19, 8649:8, 8666:14

## B

**backbone** [1] - 8648:13
**backtrack** [1] - 8594:7
**backup** [1] - 8599:24
**bad** [1] - 8689:5
**balconies** [2] - 8638:13, 8642:20
**balcony** [8] - 8595:24, 8637:15, 8637:18, 8637:20, 8662:1, 8662:10, 8662:12
**Baldwin** [10] - 8691:25, 8692:22, 8693:2, 8693:7, 8693:8, 8694:6, 8695:6, 8695:7, 8696:1, 8697:11
**Ballston** [1] - 8618:21
**band** [1] - 8670:14
**bangs** [3] - 8634:21, 8638:4, 8638:5
**Banner** [1] - 8642:21
**barn** [3] - 8594:24,

8708

8594:25

**barricades** [1] - 8639:1

**barriers** [4] - 8635:7, 8635:9, 8635:18, 8639:1

**based** [6] - 8650:20, 8657:13, 8686:17, 8687:17, 8697:14, 8698:20

**basement** [1] - 8582:21

**basis** [3] - 8657:1, 8657:2, 8689:24

**battering** [1] - 8597:23

**Bear** [1] - 8617:5

**beautiful** [1] - 8645:6

**become** [1] - 8679:14

**bed** [3] - 8597:15, 8599:3, 8599:25

**began** [1] - 8656:18

**beginning** [4] - 8587:19, 8645:25, 8646:10, 8694:11

**behalf** [3] - 8622:22, 8682:12, 8699:1

**behavior** [1] - 8622:16

**behind** [3] - 8629:16, 8658:5, 8661:6

**believes** [4] - 8582:11, 8585:2, 8683:9, 8685:11

**Bella** [2] - 8616:14, 8616:16

**belongings** [2] - 8677:11, 8677:14

**Bench** [6] - 8598:11, 8601:20, 8609:14, 8618:3, 8623:22, 8672:5

**benefit** [2] - 8591:21, 8689:7

**Bennie** [4] - 8629:13, 8629:24, 8630:1, 8630:6

**Berryville** [4] - 8597:8, 8617:4, 8617:12, 8621:6

**better** [7] - 8632:14, 8633:9, 8652:6, 8675:19, 8691:2, 8691:3, 8701:1

**between** [2] - 8591:9, 8599:20

**beyond** [1] - 8610:4

**bias** [1] - 8688:2

**bicycle** [2] - 8635:15, 8669:6

**Biden** [3] - 8636:13, 8636:25, 8641:24

**big** [1] - 8636:23

**bigger** [2] - 8627:2, 8665:16

**bike** [1] - 8669:3

**Bird** [2] - 8616:18, 8671:4

**bit** [10] - 8582:18, 8619:15, 8649:21, 8667:12, 8667:19, 8689:7, 8691:2, 8691:3, 8691:18, 8703:16

**Black's** [2] - 8692:21, 8695:3

**blow** [2] - 8595:20, 8667:10

**blue** [1] - 8659:21

**board** [1] - 8680:3

**boat** [11] - 8623:25, 8624:4, 8624:9, 8625:4, 8625:6, 8625:7, 8625:25, 8627:16, 8627:19, 8667:23, 8668:1

**Bob** [1] - 8617:5

**body** [1] - 8696:4

**bolster** [1] - 8651:11

**bombs** [8] - 8645:2, 8645:12, 8647:4, 8647:6, 8647:8, 8647:13, 8647:19, 8648:23

**Book** [1] - 8691:16

**Book's** [1] - 8691:17

**Boomersbach** [1] - 8620:25

**booming** [2] - 8597:15, 8634:24

**bore** [1] - 8688:17

**bottle** [1] - 8662:9

**bottom** [10] - 8619:25, 8620:8, 8666:21, 8669:2, 8676:22, 8680:17, 8681:3, 8683:16, 8686:20, 8703:4

**Bouvier** [1] - 8695:4

**Bouvier's** [2] - 8693:3, 8693:16

**box** [1] - 8689:7

**bragged** [1] - 8662:23

**bragging** [2] - 8663:1, 8663:2

**Branch** [1] - 8696:3

**branch** [3] - 8696:8, 8696:9, 8696:16

**breach** [1] - 8670:19

**breached** [4] - 8642:18, 8642:19, 8643:6, 8664:8

**break** [7] - 8589:17, 8589:18, 8590:2, 8649:18, 8649:21, 8650:2, 8686:13

**breakfast** [1] - 8664:5

**breakouts** [1] - 8700:3

**brief** [2] - 8676:7, 8676:13

**briefly** [2] - 8627:23, 8630:4

**Bright** [2] - 8582:18, 8583:8

**bright** [1] - 8703:19

**BRIGHT** [21] - 8582:6, 8582:19, 8583:11, 8583:15, 8584:15, 8584:20, 8584:25, 8585:5, 8585:8, 8585:13, 8585:15, 8681:8, 8681:12, 8687:6, 8687:11, 8687:16, 8688:9, 8688:13, 8690:14, 8703:23, 8704:4

**bring** [19] - 8582:21, 8583:9, 8586:2, 8586:13, 8587:12, 8588:24, 8589:6, 8589:7, 8589:8, 8590:3, 8599:12, 8612:21, 8627:17, 8627:19, 8657:25, 8667:23, 8687:12, 8689:24, 8704:8

**bringing** [3] - 8586:12, 8587:14, 8602:20

**broke** [1] - 8662:1

**brought** [4] - 8585:25, 8586:7, 8599:15

**building** [4] - 8582:8, 8635:21, 8640:6, 8652:2

**bullets** [5] - 8645:4, 8645:13, 8647:13, 8647:19, 8648:24

**Bunker** [1] - 8616:22

**burden** [1] - 8586:11

**button** [1] - 8681:7

## C

**C-h-n-a-p-k-o-v-a** [1] - 8688:11

**cabinet** [1] - 8657:20

**Cain** [3] - 8674:8, 8684:4, 8684:5

**Caldwell** [118] - 8581:4, 8581:10, 8581:11, 8581:11, 8581:12, 8581:12,

8581:13, 8590:3, 8590:6, 8590:8, 8591:16, 8591:18, 8591:19, 8591:24, 8592:3, 8593:18, 8593:25, 8595:6, 8595:7, 8595:8, 8595:17, 8596:12, 8597:16, 8598:4, 8599:7, 8599:12, 8600:4, 8600:8, 8600:11, 8600:21, 8602:6, 8603:5, 8603:18, 8603:19, 8604:22, 8604:24, 8604:25, 8605:3, 8605:18, 8605:21, 8605:22, 8606:22, 8606:24, 8607:2, 8608:25, 8609:11, 8610:7, 8611:2, 8611:15, 8612:4, 8612:17, 8613:8, 8613:10, 8613:12, 8614:12, 8614:21, 8615:22, 8616:2, 8618:10, 8618:18, 8618:19, 8619:8, 8619:12, 8621:2, 8623:25, 8624:2, 8624:8, 8624:15, 8624:17, 8626:9, 8627:2, 8630:20, 8633:8, 8633:24, 8635:12, 8639:7, 8640:10, 8644:1, 8649:25, 8653:2, 8653:10, 8654:1, 8656:21, 8656:24, 8659:2, 8659:11, 8659:21, 8660:11, 8660:24, 8661:16, 8661:21, 8663:23, 8664:18, 8664:21, 8665:5, 8665:13, 8667:5, 8668:18, 8671:25, 8673:3, 8674:3, 8674:18, 8677:3, 8677:25, 8680:9, 8680:13, 8680:22, 8682:4, 8685:23, 8686:18, 8686:22, 8702:7, 8702:8

**Caldwell's** [2] - 8610:6, 8703:16

**camp** [1] - 8672:24

**capacity** [2] - 8690:4, 8700:20

**Capitol** [22] - 8587:14, 8621:3, 8632:12,

8632:16, 8633:15, 8638:12, 8641:13, 8642:18, 8643:6, 8644:11, 8644:23, 8659:23, 8661:17, 8661:19, 8664:9, 8669:14, 8670:12, 8670:16, 8670:19, 8671:16, 8671:19, 8694:1

**car** [4] - 8617:5, 8629:16, 8660:15, 8660:16

**care** [3] - 8675:6, 8697:25, 8703:5

**carries** [2] - 8696:4

**carry** [1] - 8696:21

**carrying** [2] - 8696:1, 8696:25

**cars** [1] - 8591:5

**CART** [1] - 8684:8

**case** [29] - 8584:5, 8584:10, 8585:12, 8602:7, 8657:11, 8657:12, 8674:20, 8675:9, 8676:17, 8676:24, 8678:6, 8678:9, 8683:18, 8683:22, 8687:12, 8687:17, 8687:25, 8688:4, 8688:6, 8688:15, 8689:12, 8689:18, 8689:23, 8691:19, 8693:2, 8699:24, 8702:16, 8703:9, 8703:18

**cases** [5] - 8677:18, 8687:23, 8689:7, 8703:2, 8703:3

**Casper** [1] - 8672:13

**castle** [1] - 8663:8

**caused** [1] - 8655:2

**caveat** [1] - 8677:6

**cell** [5] - 8582:7, 8583:23, 8590:19, 8674:8, 8684:7

**Cellebrite** [1] - 8615:16

**censored** [1] - 8604:16

**certain** [1] - 8647:17

**certainly** [6] - 8639:13, 8642:23, 8657:15, 8692:16, 8701:19, 8701:21

**certification** [8] - 8632:17, 8632:22, 8633:2, 8633:5, 8635:25, 8636:1, 8639:15, 8641:15

**certified** [5] - 8633:1, 8636:14, 8637:1, 8641:25, 8647:25
**cetera** [1] - 8652:2
**challenge** [4] - 8689:14, 8690:7, 8690:10, 8690:16
**challenges** [1] - 8656:20
**challenging** [1] - 8584:3
**chambers** [1] - 8648:7
**chance** [3] - 8584:5, 8586:9, 8687:7
**change** [7] - 8637:5, 8642:14, 8650:17, 8697:2, 8697:20, 8697:21, 8697:22
**changed** [1] - 8651:3
**changing** [1] - 8650:19
**chant** [1] - 8642:20
**chanting** [1] - 8633:22
**character** [1] - 8673:6
**charge** [1] - 8695:9
**charged** [6] - 8594:17, 8594:19, 8611:3, 8697:15, 8699:14, 8699:19
**charges** [1] - 8700:4
**chat** [9] - 8586:24, 8682:8, 8682:22, 8682:24, 8683:6, 8683:9, 8683:12, 8683:15, 8702:3
**chats** [3] - 8627:24, 8682:20, 8682:21
**cheese** [2] - 8593:13, 8594:4
**children** [1] - 8650:18
**chimed** [1] - 8633:23
**Chinese** [1] - 8695:10
**Chnapkova** [2] - 8688:7, 8688:12
**CHNAPKOVA** [1] - 8688:7
**choice** [1] - 8686:15
**Christmas** [1] - 8617:4
**circle** [3] - 8596:1, 8596:2
**Circle** [2] - 8634:17, 8647:4
**circled** [1] - 8596:21
**circling** [1] - 8635:14
**Circuit** [5] - 8687:24, 8687:25, 8688:4, 8688:6, 8688:20
**circuit** [2] - 8618:23, 8620:4
**circuits** [1] - 8687:19

**circulate** [2] - 8690:19, 8691:13
**circulated** [1] - 8699:22
**circumstances** [1] - 8679:22
**cite** [2] - 8679:8, 8688:13
**cited** [4] - 8693:18, 8695:25, 8696:2, 8699:10
**city** [1] - 8629:17
**Civil** [2] - 8693:5, 8694:12
**clarity** [2] - 8675:17, 8675:18
**classic** [1] - 8617:5
**clean** [1] - 8641:18
**clear** [12] - 8582:15, 8583:1, 8599:20, 8615:10, 8625:20, 8655:3, 8655:4, 8656:15, 8676:16, 8680:8, 8682:18, 8699:15
**clearly** [5] - 8600:8, 8612:2, 8625:17, 8688:22, 8688:24
**client** [3] - 8585:9, 8588:19, 8684:20
**climb** [2] - 8660:13, 8669:10
**climbing** [8] - 8637:15, 8639:14, 8639:23, 8640:24, 8641:3, 8641:11, 8661:9, 8661:11
**clips** [1] - 8588:21
**close** [9] - 8597:15, 8610:17, 8611:4, 8611:15, 8611:17, 8614:1, 8650:17, 8676:17, 8680:11
**close-up** [5] - 8610:17, 8611:4, 8611:15, 8611:17, 8614:1
**closed** [2] - 8618:23, 8620:4
**closed-circuit** [2] - 8618:23, 8620:4
**closing** [3] - 8657:4, 8690:7, 8690:15
**closings** [7] - 8675:2, 8675:3, 8677:7, 8678:17, 8681:8, 8687:7, 8703:12
**clue** [1] - 8641:5
**co** [2] - 8672:8, 8699:8
**co-conspirator** [1] -

8699:8
**co-counsel** [1] - 8672:8
**column** [3] - 8587:14, 8651:22
**combat** [1] - 8627:13
**combination** [2] - 8657:8, 8657:19
**combined** [1] - 8657:23
**Comfort** [3] - 8618:21, 8618:24, 8660:18
**coming** [5] - 8593:10, 8612:18, 8613:1, 8613:2, 8677:12
**commander** [1] - 8670:9
**commands** [1] - 8693:21
**comment** [2] - 8672:8, 8700:17
**commenting** [1] - 8700:24
**commit** [3] - 8666:6, 8666:7
**common** [13] - 8602:3, 8650:23, 8656:13, 8657:6, 8657:9, 8657:18, 8657:21, 8657:22, 8658:2, 8694:22, 8694:25, 8695:21, 8696:22
**communicated** [1] - 8582:19
**communicating** [1] - 8703:25
**communication** [1] - 8702:4
**comparable** [1] - 8677:19
**compared** [1] - 8685:7
**compartmentalized** [1] - 8687:13
**compel** [3] - 8693:14, 8693:20, 8694:9
**compilation** [1] - 8701:5
**complaining** [1] - 8606:6
**complete** [2] - 8651:8, 8677:6
**completed** [1] - 8636:11
**completely** [1] - 8605:9
**completeness** [5] - 8588:2, 8588:12, 8650:20, 8651:7, 8683:17
**complexity** [1] -

8677:19
**complied** [1] - 8602:4
**compulsion** [1] - 8693:12
**computer** [12] - 8607:5, 8607:9, 8608:7, 8608:15, 8609:4, 8609:17, 8613:20, 8615:8, 8615:10, 8615:16, 8628:11, 8655:19
**conceal** [1] - 8595:3
**concede** [1] - 8699:21
**concept** [1] - 8697:16
**concern** [2] - 8594:6, 8640:4
**concerned** [2] - 8662:18, 8662:19
**concerns** [1] - 8653:8
**conclude** [1] - 8696:24
**concluded** [1] - 8704:24
**conclusion** [1] - 8622:19
**concur** [2] - 8679:6, 8679:11
**condition** [7] - 8598:17, 8599:18, 8599:23, 8599:24, 8626:14, 8700:22, 8700:25
**conditions** [1] - 8602:4
**conduct** [5] - 8620:20, 8622:22, 8623:1, 8625:22, 8676:11
**conducted** [1] - 8602:13
**confederate** [1] - 8694:13
**conference** [7] - 8598:11, 8601:20, 8609:14, 8616:12, 8618:3, 8623:22, 8672:5
**conferred** [1] - 8583:9
**confess** [1] - 8691:9
**confident** [1] - 8625:12
**confirmed** [1] - 8685:8
**confirming** [1] - 8687:3
**confront** [1] - 8666:4
**confrontation** [1] - 8684:16
**confused** [1] - 8611:19
**confusion** [1] - 8587:16

**Congress** [17] - 8632:25, 8633:3, 8635:20, 8635:22, 8635:24, 8636:19, 8637:8, 8638:16, 8647:25, 8648:3, 8648:6, 8648:9, 8648:12, 8662:23, 8696:24, 8696:25
**connection** [1] - 8599:20
**consequences** [1] - 8670:6
**consider** [6] - 8640:5, 8640:7, 8650:19, 8653:6, 8657:16, 8686:24
**considerate** [1] - 8640:2
**considered** [1] - 8696:7
**consistent** [3] - 8682:21, 8695:6, 8698:9
**conspiracy** [20] - 8653:11, 8653:12, 8691:21, 8693:8, 8693:9, 8693:23, 8694:5, 8694:7, 8695:9, 8695:13, 8696:8, 8697:24, 8698:16, 8698:21, 8698:24, 8699:12, 8699:14, 8699:19, 8699:23, 8700:6
**conspirator** [1] - 8699:8
**conspirators** [1] - 8694:10
**conspire** [1] - 8699:20
**constitute** [1] - 8695:17
**Constitution** [1] - 8621:15
**construction** [1] - 8662:2
**contact** [3] - 8604:10, 8604:11
**contemplated** [1] - 8695:7
**contemplates** [1] - 8691:6
**content** [1] - 8614:17
**contents** [6] - 8593:20, 8610:23, 8611:5, 8612:16, 8613:3, 8615:16
**context** [4] - 8587:13, 8696:21, 8704:6, 8704:7

8710

**contextual** [1] - 8587:18
**contingent** [1] - 8686:22
**continue** [2] - 8634:16, 8676:22
**continues** [1] - 8685:10
**Continuing** [1] - 8581:5
**continuing** [1] - 8590:4
**contradict** [1] - 8689:25
**conversation** [9] - 8591:2, 8591:9, 8593:3, 8623:12, 8623:14, 8624:21, 8658:20, 8673:3, 8673:9
**conversations** [1] - 8647:11
**convertible** [1] - 8616:18
**convict** [1] - 8698:23
**coordinate** [1] - 8670:18
**coordinated** [1] - 8627:4
**copy** [2] - 8615:16, 8698:3
**corner** [1] - 8669:2
**corners** [1] - 8696:24
**correct** [79] - 8583:3, 8583:4, 8584:15, 8589:16, 8590:13, 8590:17, 8590:18, 8590:20, 8590:22, 8590:25, 8591:12, 8591:14, 8593:4, 8594:9, 8599:8, 8601:25, 8602:1, 8606:12, 8609:5, 8609:20, 8610:7, 8611:21, 8615:11, 8615:12, 8617:12, 8617:13, 8626:11, 8628:12, 8628:21, 8629:11, 8629:14, 8629:15, 8629:18, 8630:11, 8630:22, 8631:18, 8631:19, 8631:24, 8633:6, 8633:7, 8633:10, 8633:11, 8633:13, 8634:17, 8637:9, 8638:4, 8638:17, 8640:10, 8642:2, 8642:7, 8642:9, 8643:15, 8643:24,

8644:5, 8644:6, 8647:4, 8647:5, 8647:20, 8648:1, 8648:4, 8653:18, 8653:19, 8653:21, 8653:23, 8661:6, 8661:17, 8662:24, 8664:6, 8664:7, 8666:19, 8668:5, 8668:6, 8668:21, 8671:9, 8671:10, 8674:4, 8674:25, 8675:2, 8704:6
**correctly** [2] - 8703:25, 8704:5
**cottage** [2] - 8593:13, 8594:4
**counsel** [4] - 8584:23, 8658:22, 8672:8, 8682:13, 8683:7, 8703:21, 8704:10, 8704:18
**couple** [7] - 8593:7, 8623:4, 8636:7, 8639:5, 8666:10, 8675:15, 8678:2
**course** [4] - 8633:4, 8638:10, 8678:18, 8679:7
**COURT** [199] - 8582:17, 8583:14, 8583:17, 8584:12, 8584:16, 8584:21, 8585:1, 8585:7, 8585:10, 8585:14, 8585:16, 8585:20, 8586:19, 8587:9, 8588:3, 8588:8, 8588:24, 8589:20, 8589:25, 8591:18, 8591:21, 8593:17, 8598:10, 8598:12, 8598:19, 8598:23, 8599:4, 8599:9, 8599:14, 8600:5, 8600:17, 8601:13, 8601:19, 8602:1, 8602:8, 8602:18, 8603:3, 8603:10, 8604:24, 8607:22, 8608:1, 8608:22, 8609:15, 8609:18, 8609:25, 8610:3, 8610:19, 8610:23, 8611:8, 8611:18, 8612:6, 8612:14, 8612:25, 8613:11, 8614:13, 8615:20, 8615:25, 8617:24, 8618:4, 8618:15,

8619:11, 8622:7, 8622:20, 8623:20, 8623:23, 8624:13, 8624:16, 8624:24, 8625:5, 8625:10, 8625:15, 8626:4, 8626:6, 8626:17, 8626:20, 8634:3, 8643:2, 8643:3, 8643:5, 8644:18, 8646:25, 8649:1, 8649:20, 8649:25, 8650:9, 8650:11, 8650:13, 8650:15, 8651:2, 8651:25, 8652:5, 8652:13, 8652:16, 8652:19, 8652:23, 8653:1, 8653:4, 8653:6, 8653:18, 8653:21, 8653:24, 8654:12, 8654:20, 8654:23, 8655:12, 8655:17, 8656:1, 8656:6, 8656:15, 8657:5, 8657:14, 8658:8, 8658:19, 8659:4, 8659:6, 8660:4, 8662:14, 8665:10, 8666:25, 8670:25, 8671:24, 8672:3, 8672:6, 8672:15, 8672:20, 8673:2, 8673:8, 8673:15, 8674:1, 8674:5, 8674:15, 8674:18, 8674:22, 8675:1, 8675:12, 8675:18, 8676:2, 8676:5, 8676:9, 8676:14, 8676:16, 8677:2, 8677:4, 8678:4, 8678:18, 8679:5, 8679:12, 8679:18, 8679:20, 8680:13, 8680:17, 8680:25, 8681:9, 8681:20, 8683:16, 8684:5, 8684:8, 8684:10, 8684:14, 8684:22, 8684:24, 8685:3, 8686:2, 8686:5, 8686:8, 8686:10, 8686:19, 8686:25, 8687:10, 8687:14, 8687:17, 8688:11, 8688:14, 8690:6, 8690:9, 8690:12, 8690:17, 8692:11, 8692:18, 8694:17, 8696:13, 8697:12,

8697:19, 8698:5, 8698:13, 8699:3, 8699:10, 8699:15, 8700:1, 8700:10, 8700:21, 8700:24, 8701:15, 8702:10, 8702:20, 8703:4, 8703:15, 8704:3, 8704:7
**court** [18] - 8582:18, 8586:14, 8591:22, 8600:19, 8603:11, 8609:23, 8610:13, 8611:23, 8612:13, 8613:6, 8618:16, 8624:11, 8626:5, 8630:16, 8673:14, 8678:3, 8704:15, 8704:16
**Court** [23] - 8583:2, 8583:10, 8583:16, 8585:9, 8588:22, 8630:20, 8650:19, 8650:25, 8651:1, 8654:19, 8686:1, 8686:23, 8692:9, 8692:10, 8692:15, 8693:1, 8693:7, 8693:19, 8696:7, 8700:16, 8700:19, 8701:7, 8701:10
**court's** [1] - 8688:17
**Court's** [5] - 8585:17, 8597:3, 8618:25, 8694:21, 8698:16
**courthouse** [1] - 8603:1
**courtroom** [1] - 8658:22
**CPAC** [1] - 8616:12
**CPAP** [1] - 8597:19
**crashed** [2] - 8655:15, 8655:16
**created** [4] - 8614:9, 8614:10, 8628:15, 8689:19
**credibility** [6] - 8687:22, 8688:3, 8688:5, 8688:15, 8688:17, 8689:14
**crime** [1] - 8648:14
**criminal** [1] - 8666:5
**crisp** [3] - 8674:5, 8680:8, 8684:6
**CRISP** [16] - 8626:19, 8672:23, 8674:7, 8674:13, 8675:14, 8675:25, 8676:3, 8676:7, 8676:10, 8676:15, 8679:3,

8679:6, 8679:19, 8690:16, 8702:25, 8703:7
**Crisp** [1] - 8703:5
**crisp's** [1] - 8680:23
**Cross** [1] - 8581:5
**cross** [11] - 8599:6, 8623:25, 8626:21, 8627:19, 8643:1, 8644:17, 8650:7, 8684:18, 8687:21, 8689:5, 8689:19
**CROSS** [1] - 8626:22
**cross-examination** [5] - 8599:6, 8626:21, 8650:7, 8687:21, 8689:19
**Cross-Examination** [1] - 8581:5
**CROSS-EXAMINATION** [1] - 8626:22
**cross-examine** [2] - 8684:18, 8689:5
**cross-talk** [2] - 8643:1, 8644:17
**crossed** [1] - 8689:22
**crowd** [3] - 8596:10, 8630:4, 8638:7
**Crowl** [9] - 8593:1, 8593:15, 8594:8, 8629:1, 8629:2, 8631:11, 8664:6, 8664:25, 8665:6
**Crowl's** [1] - 8592:20
**crucial** [1] - 8688:16
**current** [3] - 8680:2, 8690:12, 8699:2
**custody** [1] - 8598:17
**cut** [2] - 8651:23

**D**

**D.C** [6] - 8621:7, 8627:17, 8627:20, 8666:22, 8667:24, 8668:2
**dark** [1] - 8597:14
**data** [4] - 8583:22, 8584:22, 8586:20, 8586:21
**date** [5] - 8586:23, 8683:6, 8683:8, 8683:13, 8683:14
**dates** [1] - 8682:20
**daughter** [1] - 8616:14
**Dave** [1] - 8604:1
**days** [4] - 8592:11, 8604:6, 8663:22, 8675:13

8711

**deal** [2] - 8681:24, 8703:20
**Dear** [1] - 8611:25
**December** [7] - 8617:20, 8628:23, 8628:24, 8644:25, 8683:8, 8683:9
**decide** [3] - 8637:8, 8638:19, 8638:22
**decided** [4] - 8636:6, 8639:16, 8641:7, 8682:19
**decision** [7] - 8650:19, 8677:25, 8688:17, 8688:20, 8692:22, 8697:10, 8703:16
**declines** [1] - 8674:3
**Dee** [5] - 8593:3, 8593:6, 8593:7, 8593:9, 8594:1
**defendant** [7] - 8584:3, 8684:17, 8684:17, 8689:15, 8699:5, 8699:20, 8702:4
**Defendant** [12] - 8581:10, 8581:11, 8581:11, 8581:12, 8581:12, 8581:13, 8591:19, 8604:25, 8606:24, 8613:12, 8616:2, 8619:12
**defendant's** [1] - 8656:11
**defendants** [8] - 8651:6, 8651:12, 8651:15, 8693:24, 8695:9, 8698:20, 8700:5, 8701:13
**defendants'** [1] - 8652:14
**defense** [30] - 8583:18, 8584:10, 8602:6, 8611:20, 8626:18, 8657:25, 8674:16, 8676:17, 8676:23, 8681:11, 8681:17, 8682:13, 8683:7, 8683:8, 8683:14, 8683:21, 8684:15, 8685:10, 8685:17, 8685:18, 8687:1, 8687:5, 8692:16, 8692:20, 8698:6, 8699:23, 8699:24, 8700:1, 8700:2, 8703:21
**defer** [1] - 8687:8
**defined** [1] - 8693:5

**definite** [1] - 8700:14
**definitely** [2] - 8654:15, 8657:20
**definition** [9] - 8692:22, 8692:25, 8693:16, 8694:13, 8694:23, 8695:1, 8695:4, 8695:21, 8696:22
**Definition** [2] - 8665:25, 8666:3
**definitions** [1] - 8695:3
**degree** [2] - 8648:16, 8657:12
**delay** [1] - 8687:11
**delete** [1] - 8628:5
**deleted** [7] - 8606:8, 8610:5, 8611:9, 8612:4, 8628:11, 8629:1, 8629:4
**deleting** [1] - 8606:7
**deliberate** [2] - 8677:10, 8678:8
**deliberating** [5] - 8675:11, 8675:24, 8677:17, 8679:14, 8679:25
**deliver** [1] - 8704:14
**delivered** [1] - 8704:18
**demanding** [1] - 8586:25
**demonstrative** [2] - 8701:6, 8701:22
**denied** [1] - 8689:23
**depict** [1] - 8617:6
**depicted** [5] - 8607:13, 8609:1, 8609:8, 8613:24, 8616:5
**describe** [5] - 8585:3, 8607:22, 8607:24, 8608:3, 8632:24
**described** [1] - 8629:13
**desktop** [5] - 8607:9, 8608:4, 8609:9, 8610:20, 8613:19
**despite** [1] - 8647:22
**destroyed** [1] - 8700:9
**details** [1] - 8702:21
**determination** [1] - 8686:17
**determine** [1] - 8685:13
**determined** [1] - 8677:25
**develop** [1] - 8648:13
**dictionaries** [1] -

8696:2
**Dictionary** [3] - 8692:21, 8695:3, 8695:4
**dictionary** [3] - 8693:3, 8693:16, 8695:4
**difference** [1] - 8686:16
**different** [13] - 8583:25, 8584:19, 8587:3, 8603:13, 8611:25, 8612:22, 8626:1, 8641:8, 8652:7, 8654:16, 8685:17, 8689:13, 8695:8
**differently** [3] - 8657:8, 8657:19, 8679:13
**difficult** [1] - 8690:1
**difficulty** [2] - 8599:25, 8649:19
**dining** [1] - 8608:14
**dinner** [3] - 8593:8, 8593:11, 8594:2
**DIRECT** [1] - 8590:4
**Direct** [1] - 8581:5
**direct** [9] - 8582:7, 8582:16, 8597:5, 8630:12, 8647:24, 8659:11, 8674:9, 8684:20, 8684:21
**directly** [1] - 8688:17
**dirty** [1] - 8599:1
**disabled** [1] - 8622:1
**disagree** [5] - 8657:17, 8694:18, 8695:22, 8696:14, 8700:8
**disappointed** [2] - 8637:2
**discovery** [4] - 8584:13, 8591:13, 8611:21, 8614:5
**discrepancy** [1] - 8683:4
**discretion** [1] - 8688:19
**discuss** [4] - 8605:10, 8632:25, 8650:1, 8678:3
**discussed** [3] - 8652:18, 8697:1, 8698:6
**discussing** [1] - 8675:7
**discussion** [4] - 8650:12, 8650:14, 8659:1, 8703:24

**disheveled** [1] - 8600:10
**disinclined** [1] - 8584:18
**dismiss** [3] - 8673:9, 8681:4, 8696:6
**dispute** [1] - 8588:16
**disputed** [1] - 8615:20
**disregard** [1] - 8596:14
**disregarded** [1] - 8654:4
**district** [2] - 8688:17, 8692:14
**District** [1] - 8602:25
**docketed** [1] - 8691:23
**document** [7] - 8603:19, 8603:21, 8646:15, 8646:16, 8646:18, 8681:25, 8682:23
**documenting** [1] - 8663:2
**documents** [2] - 8589:15, 8589:19
**done** [9] - 8636:2, 8637:3, 8637:8, 8637:12, 8651:17, 8673:6, 8680:24, 8681:21, 8703:11
**Donovan** [6] - 8592:8, 8593:15, 8594:6, 8594:8, 8629:1, 8629:2
**door** [1] - 8597:20
**double** [1] - 8624:14
**doubt** [1] - 8687:18
**Doug** [2] - 8627:10, 8628:3
**down** [31] - 8582:17, 8591:6, 8591:22, 8597:2, 8605:17, 8610:18, 8611:2, 8611:3, 8611:6, 8612:1, 8612:17, 8613:21, 8617:9, 8620:24, 8621:14, 8628:13, 8628:19, 8628:22, 8628:24, 8639:18, 8646:12, 8650:1, 8657:12, 8666:15, 8667:12, 8667:18, 8668:5, 8669:8, 8672:1, 8681:7, 8681:11
**Down** [7] - 8609:22, 8610:9, 8610:12, 8611:16, 8614:8, 8615:5, 8615:8

**downstairs** [1] - 8586:14
**draft** [2] - 8697:21, 8699:23
**drafted** [1] - 8700:2
**draw** [2] - 8596:17, 8654:25
**drive** [1] - 8610:20
**driven** [4] - 8633:2, 8635:21, 8640:6, 8662:23
**driveway** [1] - 8590:25
**drug** [1] - 8654:4
**drug-induced** [1] - 8654:4
**DUIs** [2] - 8657:21, 8658:4
**during** [9] - 8582:22, 8592:16, 8600:12, 8600:22, 8601:6, 8607:4, 8611:14, 8622:16, 8650:1, 8669:10

**E**

**ear** [1] - 8675:25
**earliest** [1] - 8703:17
**early** [4] - 8617:20, 8623:8, 8680:22, 8680:24
**east** [2] - 8664:9, 8664:11
**easy** [2] - 8685:4, 8699:11
**edition** [1] - 8693:4
**ee** [1] - 8662:1
**effect** [2] - 8593:21, 8696:4
**efficient** [1] - 8687:13
**effort** [2] - 8651:10, 8651:11
**either** [8] - 8589:13, 8621:2, 8621:22, 8641:1, 8675:1, 8683:1, 8691:7, 8701:22
**elderly** [3] - 8629:14, 8630:3, 8630:5
**elected** [1] - 8682:14
**election** [7] - 8604:6, 8622:18, 8622:24, 8623:2, 8632:17, 8636:14, 8639:15
**electronic** [2] - 8628:5, 8702:18
**electronically** [1] - 8702:23
**electronics** [3] - 8601:2, 8601:3,

8601:4
**element** [1] - 8695:15
**elements** [1] - 8666:5
**elicit** [3] - 8600:3,
8610:4, 8625:16
**eliciting** [1] - 8601:22
**Ellipse** [3] - 8668:5,
8668:7, 8668:17
**em** [1] - 8661:16
**email** [11] - 8603:22,
8604:1, 8604:4,
8606:4, 8611:25,
8666:18, 8667:2,
8675:8, 8691:22,
8704:6, 8704:11
**emailed** [1] - 8666:21
**emails** [2] - 8693:18,
8695:25
**employed** [1] -
8692:25
**employment** [1] -
8692:23
**Emu** [1] - 8616:8
**enacted** [1] - 8694:24
**encountered** [1] -
8639:19
**encouraging** [1] -
8604:8
**end** [15] - 8587:20,
8622:15, 8628:10,
8651:21, 8651:23,
8651:24, 8656:7,
8658:20, 8671:3,
8673:16, 8677:14,
8678:19, 8679:21,
8701:5, 8703:13
**endeavor** [1] -
8692:24
**ended** [3] - 8610:6,
8617:22, 8681:22
**ends** [1] - 8673:11
**enforce** [2] - 8693:14,
8694:9
**enforcement** [1] -
8592:18
**engage** [1] - 8666:6
**enjoyed** [1] - 8645:7
**enjoying** [1] - 8646:10
**enter** [1] - 8588:6
**entered** [1] - 8629:16
**entering** [1] - 8652:2
**entire** [5] - 8621:9,
8621:10, 8645:24,
8675:16, 8701:13
**entirely** [2] - 8641:20,
8662:16
**entirety** [2] - 8583:24,
8701:13
**environment** [1] -
8666:6

**envision** [1] - 8654:18
**equipment** [2] -
8650:24, 8671:6
**escorted** [1] - 8587:15
**escorting** [5] -
8587:24, 8587:25,
8650:21, 8651:22
**especially** [2] -
8645:5, 8657:8
**essentially** [1] -
8651:11
**established** [1] -
8689:3
**et** [1] - 8652:2
**evacuated** [2] -
8648:6, 8648:7
**evening** [6] - 8654:13,
8658:14, 8678:7,
8681:18, 8687:9,
8691:13
**event** [2] - 8679:15,
8683:20
**events** [1] - 8669:11
**eventually** [4] -
8593:16, 8594:8,
8635:20, 8639:3
**everyday** [2] - 8695:1,
8696:22
**evidence** [47] -
8582:16, 8584:4,
8588:4, 8588:9,
8591:20, 8595:9,
8595:10, 8598:14,
8598:24, 8605:1,
8606:25, 8611:16,
8613:13, 8616:3,
8619:13, 8628:5,
8630:24, 8631:14,
8635:12, 8646:1,
8649:4, 8656:16,
8656:20, 8660:1,
8660:5, 8661:14,
8661:25, 8665:14,
8666:25, 8673:16,
8680:12, 8682:16,
8682:21, 8683:10,
8683:20, 8686:15,
8687:3, 8688:22,
8688:24, 8689:5,
8689:13, 8689:17,
8689:21, 8689:24,
8701:23, 8702:2
**evidentiary** [1] -
8701:4
**ex** [1] - 8704:16
**exact** [1] - 8658:1
**exactly** [2] - 8625:21,
8668:17
**exaggerating** [1] -
8661:22

**examination** [7] -
8599:6, 8626:18,
8626:21, 8647:24,
8650:7, 8687:21,
8689:19
**Examination** [3] -
8581:5, 8581:5,
8581:6
**EXAMINATION** [3] -
8590:4, 8626:22,
8665:11
**examine** [2] - 8684:18,
8689:5
**examiner** [1] - 8674:8
**example** [5] - 8606:7,
8691:3, 8693:23,
8694:11, 8702:2
**except** [1] - 8621:10
**exception** [2] -
8677:10, 8700:3
**exchange** [3] -
8587:19, 8628:1,
8628:3
**exclude** [1] - 8688:18
**excluded** [1] -
8672:21
**excuse** [6] - 8603:5,
8607:25, 8627:18,
8678:12, 8678:19,
8685:14
**excused** [2] - 8672:2,
8678:16
**executing** [3] -
8697:8, 8697:15,
8697:18
**execution** [5] -
8692:24, 8696:2,
8696:5, 8696:18,
8696:21
**Executive** [1] - 8696:3
**exercise** [3] - 8693:10,
8693:20, 8694:8
**exhausted** [2] -
8663:17, 8663:19
**exhibit** [18] - 8603:14,
8606:3, 8618:7,
8681:23, 8682:7,
8682:9, 8682:17,
8682:19, 8683:22,
8701:6, 8701:7,
8701:8, 8701:15,
8701:20, 8701:21,
8701:22, 8702:13,
8703:10
**Exhibit** [36] - 8581:9,
8581:10, 8581:11,
8581:11, 8581:12,
8581:12, 8581:13,
8587:17, 8590:9,
8591:17, 8591:19,

8591:24, 8598:5,
8603:15, 8603:19,
8604:22, 8604:25,
8605:18, 8606:1,
8606:24, 8607:3,
8613:12, 8616:2,
8619:12, 8632:7,
8651:19, 8660:5,
8665:14, 8665:20,
8667:5, 8682:7,
8682:8, 8682:14,
8682:15, 8683:5,
8683:11
**exhibits** [7] - 8589:5,
8589:7, 8589:9,
8589:11, 8589:22,
8702:7, 8702:18
**Exhibits** [1] - 8581:8
**exists** [1] - 8588:9
**exiting** [1] - 8587:15
**expect** [4] - 8642:19,
8674:9, 8703:8
**expected** [1] - 8636:15
**expecting** [1] -
8650:19
**expenses** [2] -
8616:19, 8671:6
**expert** [9] - 8583:23,
8585:1, 8585:4,
8586:20, 8654:6,
8684:7, 8684:8,
8700:13, 8700:19
**explain** [2] - 8593:21,
8654:17
**explanation** [1] -
8656:19
**extensive** [1] - 8600:2
**extent** [1] - 8611:8
**extraction** [2] -
8583:19, 8583:22
**extrinsic** [4] - 8689:5,
8689:13, 8689:17,
8689:21
**extrinsically** [2] -
8689:24, 8690:3
**eyes** [4] - 8605:20,
8662:4, 8662:7,
8663:15

## F

**F.2d** [2] - 8688:8,
8688:14
**F.3d** [1] - 8688:21
**face** [2] - 8596:15,
8628:16
**Facebook** [31] -
8604:9, 8604:12,
8604:14, 8604:17,
8605:5, 8605:7,

8606:7, 8606:8,
8606:17, 8609:22,
8610:6, 8610:9,
8610:10, 8610:12,
8610:18, 8611:2,
8611:4, 8611:7,
8611:10, 8611:16,
8612:1, 8612:5,
8612:17, 8612:22,
8614:8, 8615:4,
8615:5, 8615:8,
8628:12, 8628:13
**fact** [6] - 8586:8,
8594:17, 8603:7,
8651:20, 8695:10,
8701:6
**facts** [1] - 8695:7
**failure** [5] - 8687:19,
8688:16, 8688:18,
8688:22, 8688:24
**fair** [13] - 8621:12,
8628:17, 8630:10,
8632:3, 8633:16,
8638:2, 8640:15,
8640:16, 8656:18,
8664:18, 8694:21,
8697:19, 8699:22
**Fairchild** [1] - 8688:21
**fairly** [3] - 8625:12,
8657:21, 8691:25
**faith** [1] - 8586:10
**faithfully** [1] - 8691:25
**falls** [1] - 8696:23
**false** [2] - 8670:21,
8670:22
**familiar** [9] - 8595:18,
8608:10, 8609:7,
8621:13, 8621:17,
8623:5, 8661:18,
8662:6, 8663:25
**family** [1] - 8669:24
**fantastic** [1] - 8645:6
**far** [8] - 8582:20,
8611:16, 8622:23,
8631:25, 8672:22,
8683:2
**farm** [8] - 8590:13,
8593:16, 8594:9,
8594:21, 8597:8,
8629:2, 8670:15,
8671:5
**fashion** [3] - 8582:16,
8702:11, 8704:16
**fast** [1] - 8597:7
**fast-forward** [1] -
8597:7
**FBI** [27] - 8585:25,
8597:8, 8597:20,
8598:14, 8598:17,
8600:9, 8600:12,

8713

8600:22, 8601:7,
8602:12, 8602:23,
8607:4, 8607:5,
8608:15, 8609:5,
8610:16, 8611:3,
8611:19, 8614:3,
8615:10, 8615:15,
8630:12, 8630:15,
8630:17, 8681:24,
8683:24, 8683:25
**federal** [1] - 8693:11
**feet** [1] - 8663:20
**felt** [2] - 8646:18,
8646:21
**few** [7] - 8592:11,
8639:3, 8639:17,
8639:21, 8645:24,
8673:21, 8681:1
**Fifth** [2] - 8687:24,
8688:4
**fight** [2] - 8664:3,
8694:10
**fighters** [1] - 8670:14
**figure** [2] - 8658:25,
8700:11
**figured** [1] - 8689:18
**file** [30] - 8609:7,
8609:19, 8609:21,
8610:4, 8610:6,
8610:9, 8610:23,
8611:2, 8611:5,
8612:8, 8612:10,
8612:13, 8612:16,
8612:18, 8612:21,
8613:1, 8613:2,
8613:3, 8614:8,
8614:15, 8614:16,
8614:17, 8615:4,
8657:20, 8685:8,
8687:20, 8688:16,
8688:22, 8688:24
**filed** [3] - 8600:1,
8602:24, 8687:3
**filings** [4] - 8688:1,
8692:9, 8693:23,
8695:25
**fill** [1] - 8691:1
**final** [9] - 8652:17,
8675:3, 8681:9,
8690:20, 8691:13,
8697:23, 8698:12
**finalize** [2] - 8681:6,
8687:15
**finally** [3] - 8597:20,
8597:21, 8626:9
**findings** [1] - 8685:14
**fine** [8] - 8607:20,
8616:20, 8676:10,
8676:12, 8678:4,
8678:23, 8679:2,

8700:17
**finish** [4] - 8608:22,
8680:20, 8680:22,
8681:3
**finished** [2] - 8636:21,
8674:23
**firearms** [3] - 8630:9,
8671:2, 8671:3
**fired** [1] - 8647:19
**first** [18] - 8586:5,
8595:12, 8601:24,
8604:14, 8611:12,
8611:13, 8611:14,
8613:9, 8619:3,
8652:19, 8657:12,
8663:18, 8672:7,
8672:24, 8680:1,
8687:8, 8688:9,
8692:8
**First** [1] - 8606:5
**first-degree** [1] -
8657:12
**FISCHER** [154] -
8590:5, 8591:16,
8591:23, 8592:1,
8592:2, 8592:15,
8593:23, 8593:24,
8595:6, 8595:11,
8595:20, 8595:22,
8597:1, 8597:4,
8598:4, 8598:6,
8598:13, 8598:21,
8599:10, 8599:22,
8600:16, 8600:18,
8600:20, 8601:14,
8602:9, 8602:22,
8603:9, 8603:12,
8603:15, 8603:17,
8604:21, 8605:2,
8605:17, 8605:19,
8605:25, 8606:2,
8606:22, 8607:1,
8607:11, 8607:12,
8607:19, 8607:23,
8607:25, 8608:2,
8608:18, 8608:19,
8608:24, 8609:11,
8609:16, 8610:7,
8610:16, 8610:22,
8611:1, 8611:11,
8611:21, 8612:3,
8612:8, 8612:24,
8613:7, 8613:9,
8613:14, 8613:17,
8613:21, 8613:23,
8614:6, 8614:7,
8614:11, 8614:20,
8614:22, 8614:24,
8615:22, 8616:4,
8617:9, 8617:10,

8617:25, 8618:5,
8618:14, 8618:17,
8618:25, 8619:1,
8619:4, 8619:7,
8619:10, 8619:14,
8619:19, 8619:22,
8619:24, 8620:14,
8620:24, 8621:1,
8622:10, 8622:21,
8623:18, 8623:24,
8624:7, 8624:20,
8625:1, 8625:8,
8625:12, 8626:3,
8626:8, 8626:15,
8634:1, 8646:24,
8648:25, 8650:10,
8650:12, 8650:14,
8653:20, 8653:23,
8654:15, 8655:14,
8657:6, 8657:15,
8659:2, 8660:3,
8665:12, 8665:21,
8665:22, 8666:15,
8666:17, 8667:1,
8667:5, 8667:7,
8667:10, 8667:11,
8667:18, 8667:21,
8667:22, 8668:18,
8668:19, 8668:23,
8669:1, 8669:7,
8669:9, 8671:1,
8671:22, 8672:7,
8672:13, 8673:4,
8674:4, 8674:25,
8677:3, 8678:2,
8685:22, 8686:3,
8686:6, 8686:9,
8686:23, 8692:8,
8692:13, 8692:19,
8695:24, 8700:12
**Fischer** [32] - 8591:21,
8598:10, 8598:12,
8601:21, 8602:8,
8609:15, 8609:21,
8610:3, 8614:13,
8614:19, 8617:24,
8618:4, 8623:23,
8625:10, 8650:9,
8653:7, 8653:14,
8654:12, 8657:3,
8657:5, 8665:10,
8672:6, 8673:2,
8674:2, 8677:23,
8685:20, 8686:12,
8686:20, 8692:6,
8692:12, 8694:19,
8696:13
**Fischer's** [3] -
8658:12, 8682:1,
8686:14
**Fischer..** [1] - 8581:5

**Fischer.............** [1] -
8581:6
**fish** [1] - 8654:16
**fit** [1] - 8586:13
**five** [2] - 8595:15,
8604:6
**flag** [1] - 8642:11
**flags** [1] - 8642:20
**flash** [3] - 8634:21,
8638:4, 8638:5
**flash-bangs** [3] -
8634:21, 8638:4,
8638:5
**flee** [1] - 8592:9
**fleeing** [1] - 8594:15
**flip** [1] - 8645:21
**Florida** [4] - 8592:9,
8631:10, 8631:24,
8631:25
**fly** [1] - 8693:25
**focus** [2] - 8658:11,
8697:16
**focused** [1] - 8693:1
**focusing** [1] - 8697:15
**folder** [23] - 8608:4,
8608:9, 8609:3,
8609:7, 8610:6,
8610:12, 8610:15,
8610:24, 8611:3,
8611:5, 8612:8,
8612:10, 8612:13,
8612:16, 8613:25,
8614:8, 8614:15,
8614:16, 8615:5,
8615:8, 8628:11,
8628:15
**folder's** [1] - 8614:17
**followed** [2] -
8625:22, 8625:23
**following** [1] -
8677:20
**food** [1] - 8655:5
**force** [12] - 8624:1,
8692:24, 8693:6,
8693:13, 8695:5,
8695:16, 8695:20,
8696:17
**forcefully** [1] - 8648:6
**forces** [1] - 8666:7
**forcible** [1] - 8692:23
**forcing** [1] - 8695:20
**foreground** [1] -
8649:6
**forensic** [2] - 8586:20,
8674:8
**forever** [1] - 8648:21
**forging** [1] - 8673:13
**forgive** [1] - 8698:17
**form** [3] - 8653:10,
8698:3, 8698:7

**format** [1] - 8583:25
**forty** [1] - 8629:20
**forward** [15] - 8583:3,
8597:7, 8611:24,
8619:15, 8632:8,
8637:9, 8637:11,
8638:19, 8638:21,
8638:23, 8647:1,
8647:22, 8649:2,
8659:15, 8660:7
**forwarded** [1] -
8687:22
**forwarding** [1] -
8585:8
**fought** [1] - 8663:24
**fountain** [2] - 8668:10,
8668:21
**four** [8] - 8582:8,
8584:2, 8585:18,
8585:23, 8636:9,
8692:22, 8696:24,
8699:6
**fourth** [2] - 8586:2,
8699:8
**frame** [2] - 8588:22,
8672:20
**frankly** [4] - 8655:3,
8675:22, 8679:10,
8704:17
**freedom** [2] - 8648:16,
8648:19
**Friday** [8] - 8677:6,
8677:7, 8677:15,
8678:7, 8678:9,
8678:20, 8702:15,
8702:16
**fridge** [2] - 8593:14,
8594:4
**friend** [1] - 8616:14
**friendly** [1] - 8640:2
**friends** [2] - 8604:16,
8617:2
**front** [5] - 8597:25,
8629:23, 8630:5,
8651:22, 8651:23
**full** [5] - 8583:19,
8587:13, 8588:11,
8595:1, 8678:9
**fun** [8] - 8633:19,
8645:7, 8645:18,
8645:21, 8645:24,
8662:19
**function** [1] - 8693:20
**furiously** [1] - 8674:10
**fuzzy** [1] - 8661:1

**G**

**game** [1] - 8674:2
**gaps** [2] - 8688:1,

8714

8691:1
**garage** [2] - 8590:17, 8590:24
**gas** [14] - 8635:2, 8644:4, 8644:7, 8645:2, 8645:12, 8647:13, 8647:18, 8648:23, 8662:3, 8662:7, 8662:9, 8663:10, 8663:11, 8663:14
**gassed** [1] - 8663:12
**general** [3] - 8599:23, 8609:13, 8622:12
**generally** [2] - 8625:24, 8701:25
**generic** [1] - 8644:10
**gentleman** [2] - 8629:14, 8662:8
**gentlemen** [7] - 8590:1, 8601:10, 8601:15, 8604:13, 8614:14, 8649:21, 8673:15
**George** [5] - 8593:4, 8593:6, 8593:7, 8593:9, 8594:1
**Geyer** [4] - 8587:9, 8588:4, 8651:2, 8674:15
**GEYER** [11] - 8587:10, 8588:7, 8588:10, 8589:2, 8650:17, 8651:19, 8652:4, 8652:10, 8652:15, 8672:11, 8674:16
**ghost** [1] - 8672:14
**giant** [1] - 8642:11
**given** [3] - 8599:17, 8630:15, 8641:10
**glad** [1] - 8701:1
**glass** [2] - 8616:6, 8616:10
**goal** [1] - 8586:18
**goods** [1] - 8679:9
**Government** [4] - 8581:9, 8587:17, 8632:7, 8660:5
**government** [60] - 8582:8, 8582:20, 8582:24, 8584:17, 8584:18, 8585:9, 8586:12, 8586:13, 8586:25, 8589:14, 8601:23, 8602:2, 8603:4, 8609:19, 8610:24, 8618:1, 8618:7, 8618:11, 8619:5, 8626:21, 8627:14, 8651:19,

8652:1, 8652:5, 8671:7, 8671:13, 8674:19, 8678:23, 8679:2, 8679:4, 8680:24, 8681:20, 8682:7, 8682:9, 8682:12, 8682:19, 8683:18, 8684:7, 8685:1, 8685:6, 8687:22, 8689:22, 8692:1, 8692:4, 8693:11, 8693:17, 8694:4, 8694:6, 8695:11, 8695:19, 8696:17, 8697:1, 8697:6, 8697:22, 8699:3, 8699:25, 8700:8, 8701:9, 8702:8
**government's** [7] - 8599:1, 8676:17, 8678:15, 8681:10, 8687:2, 8698:2, 8699:18
**grand** [1] - 8697:7
**grant** [1] - 8630:16
**great** [4] - 8604:5, 8604:7, 8618:15, 8645:1
**green** [1] - 8596:5
**Grounds** [1] - 8669:14
**group** [4] - 8606:8, 8627:7, 8668:16
**guarantee** [1] - 8662:4
**guess** [16] - 8592:9, 8597:13, 8597:23, 8602:18, 8618:5, 8624:18, 8624:20, 8632:25, 8654:24, 8656:15, 8658:11, 8661:4, 8674:10, 8677:23, 8682:3, 8686:14
**guests** [1] - 8626:14
**guidance** [1] - 8685:13
**guilt** [1] - 8602:7
**guilty** [1] - 8698:20
**gun** [1] - 8693:12
**guns** [1] - 8662:4
**guys** [3] - 8596:5, 8596:21

---

# H

**half** [8] - 8583:7, 8586:5, 8598:22, 8599:19, 8621:11, 8650:8, 8650:10, 8678:8

**HALLER** [12] - 8589:3, 8589:21, 8672:17, 8681:14, 8681:19, 8682:5, 8682:18, 8684:2, 8684:6, 8684:11, 8684:19, 8684:23
**Haller** [1] - 8589:16
**hallucinate** [2] - 8654:7, 8657:24
**hallucinations** [1] - 8654:10
**hamburger** [1] - 8593:13
**hand** [8] - 8592:23, 8592:24, 8612:20, 8654:1, 8662:18, 8662:20, 8678:10
**handcuffs** [1] - 8600:9
**handed** [1] - 8632:1
**handful** [2] - 8673:12, 8690:22
**handle** [1] - 8621:22
**handling** [1] - 8687:7
**handsome** [1] - 8616:23
**hang** [4] - 8591:7, 8625:15, 8643:3, 8644:18
**hanging** [1] - 8640:14
**happy** [5] - 8618:12, 8636:8, 8636:11, 8653:6, 8700:19
**hard** [7] - 8586:21, 8596:8, 8597:18, 8610:20, 8645:21, 8667:17, 8698:24
**harm** [2] - 8641:15, 8641:16
**Harrelson** [1] - 8674:16
**hat** [2] - 8659:21, 8660:25
**Haywood** [1] - 8697:11
**haze** [1] - 8654:4
**heading** [1] - 8633:16
**heads** [1] - 8639:25
**heads-up** [1] - 8639:25
**hear** [19] - 8582:18, 8597:15, 8601:13, 8626:20, 8633:6, 8634:21, 8635:4, 8635:5, 8638:4, 8638:5, 8638:6, 8641:21, 8645:19, 8646:17, 8648:23, 8650:15, 8655:15, 8657:5, 8698:14

**heard** [16] - 8588:14, 8624:19, 8629:4, 8629:8, 8634:11, 8634:24, 8635:20, 8635:22, 8642:18, 8643:6, 8643:7, 8643:8, 8647:10, 8650:16, 8669:21
**hearing** [4] - 8593:25, 8636:22, 8647:17, 8690:14
**hearsay** [17] - 8598:25, 8601:17, 8601:24, 8607:18, 8607:21, 8608:21, 8609:19, 8609:23, 8611:24, 8612:2, 8612:7, 8612:18, 8623:17, 8624:6, 8624:10, 8625:14, 8625:16
**heavy** [3] - 8627:17, 8627:19, 8636:14
**held** [16] - 8582:5, 8589:24, 8600:19, 8603:11, 8613:6, 8618:16, 8626:5, 8649:24, 8659:5, 8672:5, 8673:14, 8673:25, 8687:19, 8688:6, 8696:20, 8697:1
**help** [6] - 8588:17, 8604:11, 8650:24, 8652:11, 8662:7, 8662:17
**helped** [2] - 8662:3, 8662:17
**helpful** [4] - 8651:14, 8655:8, 8681:12, 8702:11
**hide** [1] - 8595:2
**highlighted** [1] - 8701:9
**Hill** [1] - 8616:22
**himself** [1] - 8671:11
**historic** [3] - 8646:20, 8646:21, 8646:22
**historically** [1] - 8582:8
**hit** [3] - 8647:12, 8647:14, 8647:18
**hitting** [1] - 8645:12
**hobby** [3] - 8622:2, 8622:3, 8622:11
**Hold** [1] - 8643:2
**hold** [1] - 8611:15
**holding** [1] - 8678:1
**home** [8] - 8597:10, 8608:13, 8609:5,

8642:4, 8647:16, 8650:18, 8654:3, 8669:25
**honest** [1] - 8634:23
**honestly** [1] - 8641:22
**Honey** [1] - 8597:20
**Honor** [83] - 8582:6, 8583:4, 8583:12, 8583:18, 8585:6, 8585:17, 8587:10, 8588:23, 8589:2, 8589:3, 8589:5, 8589:16, 8591:16, 8598:9, 8598:13, 8598:21, 8599:8, 8599:10, 8600:1, 8601:12, 8601:17, 8602:9, 8604:21, 8607:18, 8609:13, 8609:16, 8610:16, 8610:22, 8611:1, 8611:11, 8612:3, 8613:4, 8615:18, 8617:25, 8618:5, 8623:19, 8623:24, 8624:20, 8626:16, 8626:19, 8649:18, 8652:17, 8653:20, 8654:15, 8654:21, 8655:14, 8657:6, 8659:2, 8659:8, 8659:25, 8670:24, 8671:22, 8672:13, 8673:4, 8674:4, 8674:12, 8674:21, 8675:7, 8679:17, 8679:19, 8680:7, 8680:21, 8681:8, 8681:14, 8682:5, 8682:18, 8684:2, 8684:9, 8684:23, 8685:22, 8687:6, 8690:3, 8692:8, 8692:13, 8692:19, 8694:16, 8695:24, 8697:9, 8698:3, 8698:18, 8700:12, 8703:8, 8703:23
**Honor's** [3] - 8684:25, 8697:10, 8697:14
**hope** [2] - 8585:14, 8590:1
**hoped** [2] - 8587:10, 8636:12
**hopeful** [1] - 8673:17
**hopefully** [1] - 8587:1
**hoping** [3] - 8637:4, 8643:9, 8643:12
**hospital** [1] - 8700:22
**hospitalized** [1] -

8700:18
**hotel** [5] - 8655:5,
8655:13, 8655:22,
8660:17, 8661:2
**hounded** [2] - 8592:8,
8592:10
**hour** [14] - 8582:10,
8585:6, 8586:3,
8586:5, 8598:22,
8599:19, 8602:11,
8621:11, 8634:19,
8634:20, 8650:8,
8650:10, 8674:9,
8681:19
**hours** [5] - 8582:9,
8584:7, 8606:9,
8663:20, 8678:3
**house** [9] - 8597:23,
8600:23, 8600:25,
8601:7, 8601:22,
8623:10, 8641:14,
8671:2
**household** [1] -
8679:9
**Houston** [3] -
8677:11, 8677:13,
8677:14
**hundred** [1] - 8662:4
**hundreds** [2] -
8662:20
**hung** [1] - 8590:22
**husband** [52] -
8590:19, 8590:24,
8591:2, 8591:4,
8591:10, 8592:5,
8592:6, 8592:17,
8592:22, 8592:23,
8593:2, 8594:1,
8597:18, 8601:7,
8605:10, 8605:12,
8606:11, 8616:6,
8619:16, 8620:6,
8620:18, 8621:2,
8621:5, 8621:15,
8621:20, 8621:22,
8622:17, 8622:23,
8624:22, 8627:16,
8628:15, 8632:2,
8644:1, 8665:16,
8666:13, 8666:18,
8667:2, 8667:23,
8668:7, 8668:14,
8669:10, 8670:7,
8670:9, 8670:11,
8670:14, 8670:18,
8671:8, 8671:11,
8671:19
**husband's** [4] -
8591:10, 8607:9,

8613:19, 8621:25
**hypothetically** [1] -
8693:24

---

**I**

**idea** [2] - 8640:17,
8675:10
**identified** [1] - 8667:8
**identifies** [1] -
8701:19
**identify** [2] - 8612:21,
8691:3
**illegally** [1] - 8622:17
**immediately** [3] -
8625:22, 8646:12,
8673:19
**immigrants** [2] -
8695:10, 8695:15
**impaired** [2] -
8656:22, 8656:25
**impeding** [1] -
8648:22
**implicit** [1] - 8585:13
**implicitly** [1] - 8585:15
**importance** [1] -
8688:16
**important** [5] -
8586:4, 8586:6,
8587:18
**importantly** [1] -
8701:1
**improper** [1] - 8602:16
**inaccurate** [3] -
8599:17, 8600:12,
8685:11
**inaugural** [7] -
8595:12, 8595:13,
8595:24, 8596:15,
8596:17, 8596:20,
8639:17
**inauguration** [15] -
8637:21, 8637:24,
8639:23, 8639:24,
8640:14, 8640:20,
8640:25, 8641:1,
8641:2, 8641:3,
8641:11, 8641:18,
8647:9, 8648:18,
8648:20
**inclined** [1] - 8582:25
**include** [5] - 8682:3,
8690:21, 8690:24,
8698:18, 8699:12
**included** [1] - 8698:11
**including** [2] - 8691:1,
8699:16
**inclusion** [1] -
8698:16
**incomplete** [1] -

8651:9
**inconsistent** [3] -
8691:4, 8691:7,
8699:17
**incorrect** [1] - 8704:19
**incorrectly** [1] -
8689:6
**inculpate** [2] -
8684:17, 8684:20
**inculpates** [1] -
8684:15
**indicate** [2] - 8592:17,
8605:3
**indicated** [3] -
8617:11, 8654:19,
8670:4
**indictment** [3] -
8611:13, 8612:4,
8697:6
**Indiscernible** [2] -
8643:1, 8644:17
**individual** [9] -
8629:24, 8642:10,
8697:7, 8699:20,
8700:4, 8700:8,
8701:11, 8701:24
**individual's** [1] -
8687:22
**individually** [1] -
8701:14
**individuals** [3] -
8641:2, 8641:10,
8697:15
**induced** [1] - 8654:4
**indulgence** [2] -
8597:3, 8618:25
**infer** [2] - 8601:23,
8656:10
**inference** [3] -
8588:11, 8654:25,
8656:24
**influence** [3] -
8653:12, 8654:14,
8654:17
**info** [1] - 8604:10
**inform** [1] - 8678:16
**information** [7] -
8585:18, 8586:1,
8587:18, 8593:25,
8603:5, 8603:6,
8683:1
**Ingram** [1] - 8585:5
**Inn** [3] - 8618:21,
8618:24, 8660:18
**innocence** [1] -
8602:7
**innocent** [1] - 8666:8
**inside** [2] - 8660:18,
8662:2
**insists** [1] - 8583:8

**instance** [1] - 8588:18
**instead** [3] - 8673:13,
8695:3, 8695:10
**instigator** [1] - 8663:9
**instructing** [1] -
8701:24
**instruction** [14] -
8592:14, 8593:18,
8614:14, 8652:18,
8653:7, 8656:10,
8657:3, 8682:4,
8691:5, 8691:8,
8691:21, 8692:2,
8697:24, 8699:23
**instructions** [14] -
8675:3, 8680:21,
8681:2, 8681:10,
8681:23, 8690:19,
8690:20, 8690:21,
8690:23, 8690:25,
8691:13, 8691:15,
8697:25, 8703:12
**intend** [1] - 8642:23
**intending** [2] -
8653:15, 8654:12
**intends** [1] - 8610:4
**intent** [2] - 8654:18,
8694:15
**intention** [2] - 8605:7,
8664:16
**interested** [1] -
8604:14
**interesting** [2] -
8694:17, 8695:23
**interfered** [1] - 8697:8
**internet** [1] - 8703:2
**interpret** [1] - 8694:22
**interrogatory** [1] -
8699:5
**interrupt** [2] - 8588:3,
8593:17
**interview** [5] -
8598:14, 8598:15,
8598:19, 8598:25,
8600:12
**intoxicated** [1] -
8654:17
**intoxication** [1] -
8657:13
**introduce** [2] -
8599:19, 8611:6,
8651:11, 8652:8,
8683:13, 8685:24,
8686:15
**introduced** [5] -
8618:7, 8618:11,
8651:8, 8689:21,
8691:5
**introducing** [1] -
8598:24

**investigation** [1] -
8602:13
**involve** [2] - 8633:2,
8645:2
**involved** [1] - 8622:4
**IRS** [1] - 8687:3
**issue** [21] - 8584:19,
8585:12, 8587:5,
8599:11, 8609:18,
8612:23, 8618:14,
8651:7, 8651:16,
8656:2, 8658:11,
8681:23, 8683:3,
8683:17, 8686:14,
8687:21, 8688:5,
8689:11, 8694:18,
8700:14
**issues** [1] - 8685:1
**it'd** [1] - 8655:8
**item** [1] - 8600:25
**items** [4] - 8600:23,
8610:5, 8675:6,
8681:22
**itself** [1] - 8691:8

---

**J**

**Jackson** [1] - 8587:13
**James** [2] - 8587:19,
8651:21
**January** [40] -
8590:14, 8590:15,
8595:14, 8597:6,
8597:7, 8614:10,
8615:11, 8617:7,
8617:15, 8618:20,
8620:21, 8621:3,
8621:6, 8621:7,
8621:8, 8621:23,
8622:18, 8623:1,
8623:8, 8627:8,
8628:6, 8628:8,
8628:14, 8628:15,
8628:19, 8629:3,
8629:17, 8631:10,
8631:18, 8644:25,
8648:1, 8659:23,
8665:3, 8667:24,
8668:4, 8669:11,
8671:17, 8683:11,
8694:1, 8696:25
**JC** [1] - 8702:20
**Jessica** [4] - 8592:8,
8593:15, 8594:8,
8631:11
**Jessica's** [1] - 8592:9
**job** [3] - 8604:5,
8604:7, 8617:12
**Johnson** [1] - 8651:23
**join** [1] - 8653:11

8716

**jointly** [1] - 8698:10
**joke** [1] - 8634:10
**joking** [3] - 8621:21, 8634:13, 8634:15
**Judge** [5] - 8672:12, 8672:23, 8674:7, 8679:6, 8681:12
**judge** [1] - 8602:4
**Juror** [4] - 8677:11, 8678:12, 8678:13, 8678:16
**juror** [7] - 8679:13, 8679:14, 8679:25, 8680:1, 8680:2
**jurors** [5] - 8593:17, 8658:21, 8701:12, 8704:9, 8704:15
**jury** [45] - 8582:2, 8582:5, 8582:22, 8588:23, 8588:24, 8589:24, 8590:11, 8595:10, 8599:3, 8601:11, 8601:15, 8604:13, 8613:1, 8613:14, 8613:18, 8619:3, 8638:21, 8649:24, 8654:9, 8654:24, 8656:8, 8656:10, 8657:16, 8658:7, 8659:5, 8665:24, 8673:9, 8673:25, 8674:22, 8675:10, 8677:5, 8678:6, 8681:23, 8685:12, 8690:19, 8690:20, 8697:7, 8698:19, 8699:18, 8701:24, 8702:15, 8702:17, 8703:9, 8703:18, 8703:20

**K**

**kamikaze** [1] - 8693:24
**Kate** [1] - 8674:8
**keep** [3] - 8600:2, 8600:7, 8629:20
**Keeper** [4] - 8627:24, 8668:8, 8668:10, 8668:16
**Keepers** [16] - 8587:19, 8587:24, 8588:16, 8589:10, 8626:10, 8631:10, 8631:20, 8632:2, 8632:4, 8650:23, 8668:4, 8668:5, 8670:7, 8670:9, 8670:11, 8670:19
**Kelly** [4] - 8631:8,

8631:22, 8631:24, 8631:25
**kept** [1] - 8634:24
**kettle** [1] - 8654:16
**kidding** [1] - 8597:21
**killed** [1] - 8662:5
**kind** [12] - 8595:20, 8596:17, 8604:17, 8620:22, 8634:10, 8636:19, 8637:13, 8637:15, 8638:9, 8642:21, 8649:15, 8655:11
**kitchen** [2] - 8607:6, 8608:14
**knock** [1] - 8657:12
**knowing** [2] - 8681:5, 8689:25
**knowledge** [7] - 8594:17, 8615:19, 8657:7, 8657:9, 8657:18, 8666:24, 8668:1
**knows** [3] - 8586:21, 8586:22, 8625:8
**Koh** [1] - 8688:8
**KOH** [1] - 8688:8

**L**

**labeled** [1] - 8610:9
**ladies** [7] - 8590:1, 8601:10, 8601:15, 8604:13, 8614:14, 8649:21, 8673:15
**landline** [1] - 8601:8
**language** [1] - 8691:25
**laptop** [2] - 8702:22, 8703:1
**large** [1] - 8702:22
**largely** [1] - 8658:9
**LaRock** [1] - 8604:2
**last** [8] - 8583:6, 8583:20, 8587:1, 8683:6, 8683:8, 8683:13, 8683:15, 8691:24
**late** [1] - 8594:12
**latest** [1] - 8703:11
**latter** [1] - 8658:11
**law** [15] - 8592:17, 8687:17, 8689:11, 8690:10, 8690:16, 8693:14, 8694:9, 8694:11, 8694:12, 8694:15, 8695:20, 8696:5, 8696:18, 8696:25, 8697:18
**Law** [2] - 8692:21,

8695:3
**lawful** [1] - 8693:21
**laws** [4] - 8696:1, 8696:4, 8697:8, 8697:15
**lawyers** [1] - 8692:16
**layer** [1] - 8624:14
**layers** [2] - 8625:14, 8625:15
**lead** [1] - 8670:11
**Leadership** [3] - 8682:8, 8682:22, 8682:24
**leading** [1] - 8620:20
**leaked** [2] - 8603:5
**leaning** [2] - 8620:7, 8620:18
**least** [11] - 8584:6, 8658:12, 8675:12, 8678:2, 8690:10, 8691:5, 8691:11, 8699:15, 8701:18, 8702:14, 8704:11
**leave** [4] - 8626:13, 8660:14, 8662:11, 8673:18
**leaves** [2] - 8587:18, 8654:9
**leaving** [2] - 8660:2, 8665:5
**left** [18] - 8590:8, 8596:23, 8621:6, 8621:7, 8626:10, 8626:13, 8636:2, 8636:21, 8638:16, 8639:21, 8641:19, 8651:20, 8652:1, 8668:7, 8682:20, 8682:22, 8683:6, 8683:9
**legal** [7] - 8616:19, 8622:19, 8633:5, 8636:3, 8636:8, 8671:4, 8695:4
**legs** [1] - 8620:23
**length** [1] - 8677:19
**lengthy** [1] - 8668:21
**less** [1] - 8638:14
**lesser** [1] - 8698:11
**letter** [2] - 8617:17, 8687:3
**level** [4] - 8637:18, 8637:20, 8639:16, 8641:16
**levying** [1] - 8694:4
**liability** [6] - 8698:17, 8699:6, 8699:7, 8699:8, 8699:13
**lie** [1] - 8657:24
**light** [2] - 8584:10,

8698:15
**likely** [3] - 8674:22, 8685:25, 8693:1
**likewise** [1] - 8693:15
**limited** [1] - 8702:4
**limiting** [7] - 8592:14, 8614:14, 8652:18, 8653:7, 8656:10, 8657:3, 8682:3
**LiMu** [1] - 8616:8
**Linder** [5] - 8675:8, 8687:7, 8690:13, 8703:19, 8703:24
**line** [10] - 8603:8, 8618:7, 8655:3, 8655:4, 8676:22, 8680:18, 8681:3, 8683:16, 8686:20, 8703:4
**lineup** [1] - 8679:24
**Lisa** [1] - 8605:4
**list** [8] - 8681:11, 8681:22, 8682:2, 8684:25, 8690:23, 8691:6, 8703:10, 8704:21
**listed** [1] - 8691:8
**listen** [2] - 8591:14, 8646:16
**listeners** [1] - 8593:21
**lists** [1] - 8702:14
**literally** [1] - 8633:21
**litigate** [2] - 8658:6, 8686:12
**litigation** [2] - 8600:2, 8697:5
**lives** [2] - 8621:17, 8633:9
**locate** [2] - 8586:5, 8586:6
**located** [3] - 8585:2, 8591:4, 8608:13
**log** [1] - 8681:25
**logical** [1] - 8691:17
**logistically** [1] - 8676:11
**look** [8] - 8600:7, 8653:6, 8681:25, 8691:12, 8691:14, 8694:17, 8698:7, 8700:10
**looked** [7] - 8599:19, 8610:24, 8625:5, 8625:6, 8639:18, 8652:19, 8663:13
**looking** [9] - 8582:23, 8585:14, 8586:18, 8586:22, 8655:19, 8656:5, 8675:1, 8692:10

**looks** [7] - 8600:9, 8619:25, 8620:15, 8630:1, 8639:24, 8642:10, 8667:3
**loop** [1] - 8703:24
**loose** [3] - 8673:11, 8675:6
**lost** [2] - 8589:4, 8613:5
**loud** [1] - 8698:18
**Lowe's** [2] - 8594:22, 8594:23
**lower** [5] - 8637:18, 8637:20, 8637:22, 8639:16, 8641:16
**lower-level** [3] - 8637:18, 8637:20, 8641:16
**lunch** [5] - 8589:17, 8589:23, 8590:2, 8703:13

**M**

**ma'am** [72] - 8590:11, 8590:16, 8591:24, 8594:20, 8595:12, 8595:17, 8595:23, 8596:14, 8597:5, 8598:7, 8601:6, 8603:13, 8605:3, 8605:20, 8605:22, 8606:3, 8606:11, 8607:2, 8607:4, 8608:10, 8609:4, 8609:10, 8615:6, 8615:10, 8616:5, 8616:20, 8617:6, 8617:11, 8617:21, 8619:2, 8619:8, 8619:15, 8619:25, 8620:16, 8620:18, 8621:13, 8621:22, 8621:25, 8622:15, 8622:22, 8623:4, 8626:24, 8627:22, 8632:11, 8643:24, 8645:11, 8646:1, 8646:4, 8646:8, 8647:3, 8649:6, 8659:19, 8662:22, 8662:23, 8663:3, 8663:11, 8664:2, 8665:9, 8665:15, 8665:19, 8665:23, 8666:10, 8666:18, 8667:8, 8667:23, 8668:20, 8669:2, 8670:6, 8670:18, 8671:2, 8671:16, 8672:1

**machine** [1] - 8597:19
**mad** [1] - 8606:10
**MAGA** [2] - 8606:5, 8627:1
**mail** [7] - 8590:9, 8590:12, 8591:11, 8591:14, 8592:4, 8592:7, 8592:20
**major** [1] - 8595:1
**man** [3] - 8599:2, 8630:5, 8663:9
**Manzo** [12] - 8647:1, 8649:2, 8650:6, 8656:6, 8657:16, 8657:17, 8659:7, 8662:14, 8665:15, 8685:20, 8686:1, 8686:24
**MANZO** [101] - 8592:14, 8598:9, 8598:24, 8599:8, 8600:1, 8601:12, 8601:17, 8601:21, 8602:2, 8602:16, 8604:23, 8606:23, 8607:18, 8607:20, 8608:21, 8609:13, 8609:20, 8610:1, 8610:11, 8611:19, 8611:22, 8613:4, 8615:18, 8615:24, 8617:23, 8618:12, 8619:6, 8622:6, 8622:19, 8623:17, 8623:21, 8624:5, 8624:8, 8624:14, 8625:14, 8626:23, 8629:19, 8629:22, 8630:23, 8631:1, 8631:3, 8631:13, 8631:16, 8632:7, 8632:10, 8634:5, 8635:11, 8635:13, 8639:5, 8639:8, 8640:8, 8640:9, 8642:5, 8642:6, 8643:11, 8643:19, 8643:21, 8643:23, 8644:20, 8646:7, 8647:2, 8649:3, 8649:5, 8649:17, 8650:8, 8652:17, 8652:22, 8652:25, 8653:2, 8653:16, 8653:25, 8654:21, 8655:10, 8655:19, 8655:24, 8656:3, 8656:9, 8657:2, 8657:22, 8659:8, 8659:10, 8659:15,

8659:18, 8659:25, 8660:6, 8660:9, 8660:10, 8660:20, 8660:23, 8661:13, 8661:15, 8661:23, 8661:24, 8662:21, 8663:6, 8663:7, 8664:24, 8665:9, 8666:24, 8670:24, 8686:11
**Manzo**................... [1] - 8581:5
**March** [2] - 8606:5, 8627:1
**marches** [2] - 8644:25, 8645:2
**marching** [1] - 8632:12
**marked** [3] - 8595:17, 8603:18, 8619:8
**marshalling** [1] - 8666:7
**martial** [1] - 8694:12
**Maryland** [1] - 8657:21
**match** [2] - 8611:9, 8685:15
**material** [2] - 8611:10
**matter** [8] - 8584:6, 8609:22, 8610:2, 8610:13, 8611:23, 8612:9, 8612:19, 8624:12
**matters** [2] - 8673:11, 8701:2
**mean** [49] - 8584:16, 8586:7, 8586:11, 8597:23, 8599:15, 8600:8, 8602:9, 8602:18, 8602:23, 8603:7, 8612:8, 8612:9, 8612:11, 8612:12, 8620:22, 8624:16, 8625:1, 8625:8, 8625:10, 8625:12, 8625:24, 8637:20, 8638:12, 8639:6, 8639:13, 8641:13, 8644:23, 8648:9, 8651:4, 8654:16, 8655:18, 8656:15, 8656:17, 8676:5, 8676:9, 8677:16, 8679:12, 8683:24, 8684:22, 8695:19, 8699:3, 8699:4, 8701:20, 8701:22, 8701:25, 8702:2, 8702:10
**means** [11] - 8632:24,

8638:17, 8671:4, 8675:23, 8677:23, 8678:11, 8679:24, 8683:9, 8692:23, 8693:11, 8696:21
**meant** [3] - 8599:16, 8609:22, 8624:11
**mechanism** [1] - 8633:5
**mechanisms** [2] - 8636:3, 8636:8
**media** [4] - 8592:9, 8592:10, 8592:12, 8602:10
**medical** [2] - 8588:17, 8650:24
**medication** [4] - 8653:13, 8655:8, 8656:22, 8658:10
**medicines** [1] - 8655:6
**meets** [1] - 8632:25
**Meggs** [11] - 8587:12, 8631:8, 8631:22, 8631:24, 8631:25, 8673:1, 8682:22, 8683:2, 8683:6, 8699:1, 8702:18
**member** [3] - 8651:14, 8670:7, 8683:12
**members** [3] - 8606:9, 8669:24, 8696:25
**memory** [1] - 8599:9
**mental** [6] - 8654:2, 8656:11, 8656:16, 8656:21, 8656:25, 8658:3
**mentally** [1] - 8656:25
**mentioned** [4] - 8585:19, 8585:24, 8593:3, 8628:11
**merely** [1] - 8585:8
**message** [6] - 8582:11, 8582:23, 8585:2, 8586:4, 8586:6, 8657:25
**messages** [16] - 8628:1, 8628:3, 8628:8, 8629:1, 8629:4, 8629:5, 8629:7, 8654:2, 8654:3, 8654:13, 8654:18, 8655:7, 8655:10, 8656:1, 8656:4, 8658:13
**met** [2] - 8583:9, 8664:6
**Michael** [3] - 8589:6, 8589:11, 8589:12
**microphone** [1] -

8585:21
**mid** [1] - 8584:17
**mid-trial** [1] - 8584:17
**midday** [3] - 8681:3, 8703:9, 8703:10
**middle** [3] - 8640:1, 8640:17, 8642:13
**might** [5] - 8587:3, 8587:5, 8640:5, 8680:15, 8689:24
**might've** [1] - 8587:5
**mile** [1] - 8633:15
**miles** [1] - 8661:9
**militia** [1] - 8627:7
**Million** [2] - 8606:5, 8627:1
**mind** [15] - 8623:18, 8624:4, 8624:5, 8632:21, 8636:10, 8637:1, 8637:23, 8644:16, 8646:5, 8650:22, 8651:3, 8653:11, 8654:9, 8663:10, 8663:11
**minds** [1] - 8651:5
**Minuta** [4] - 8587:19, 8588:5, 8651:21, 8652:1
**minute** [4] - 8593:10, 8618:24, 8663:3, 8692:5
**minutes** [13] - 8586:3, 8595:15, 8646:18, 8650:10, 8650:25, 8655:24, 8673:5, 8673:7, 8673:23, 8674:14, 8675:5, 8680:11
**mirrored** [1] - 8615:15
**misapprehension** [1] - 8658:7
**misimpression** [1] - 8654:9
**miss** [1] - 8679:9
**missing** [1] - 8698:1
**Mission** [2] - 8665:24, 8666:2
**mission** [1] - 8666:4
**missions** [1] - 8588:15
**mistaken** [1] - 8682:11
**mistakes** [1] - 8704:17
**mistreated** [1] - 8600:17
**modified** [1] - 8698:10
**mom** [1] - 8592:9
**moment** [7] - 8597:24, 8618:1, 8629:20, 8646:20, 8646:21, 8649:23, 8650:3

8585:21
**momentarily** [1] - 8677:3
**Monday** [5] - 8677:9, 8677:12, 8677:20, 8678:10, 8704:1
**monitor** [7] - 8608:7, 8608:11, 8608:13, 8608:15, 8609:17, 8613:25, 8702:22
**month** [1] - 8631:5
**months** [2] - 8615:13, 8620:20
**Monument** [1] - 8631:17
**monument** [1] - 8635:15
**moot** [1] - 8679:10
**morning** [15] - 8582:2, 8602:24, 8631:10, 8631:18, 8632:3, 8632:5, 8664:5, 8665:3, 8668:5, 8672:24, 8678:8, 8687:8, 8687:15, 8703:12, 8704:22
**most** [3] - 8628:23, 8632:19, 8635:5
**motion** [2] - 8620:3, 8696:6
**motion-sensitive** [1] - 8620:3
**motivated** [2] - 8588:19, 8588:20
**motivation** [2] - 8652:11, 8652:14
**move** [26] - 8583:3, 8591:16, 8600:21, 8603:9, 8604:21, 8606:22, 8609:11, 8613:9, 8614:12, 8615:22, 8616:7, 8619:10, 8630:8, 8638:19, 8647:1, 8649:2, 8659:25, 8667:18, 8668:23, 8674:19, 8676:20, 8682:10, 8682:14, 8682:20, 8683:18
**moved** [6] - 8631:14, 8632:9, 8682:15, 8682:23, 8691:18
**movers** [2] - 8677:12
**moves** [2] - 8618:10, 8620:10
**moving** [3] - 8620:8, 8638:21, 8638:22
**multiple** [1] - 8699:23
**murder** [2] - 8657:11, 8657:12

8718

## N

name [8] - 8605:4,
8612:8, 8612:10,
8612:13, 8612:17,
8613:3, 8631:7,
8688:9
named [1] - 8604:1
names [1] - 8593:3
national [1] - 8602:14
nature [1] - 8658:13
near [2] - 8690:20,
8691:13
near-final [2] -
8690:20, 8691:13
necessarily [4] -
8684:12, 8691:15,
8695:18, 8699:17
need [20] - 8583:9,
8604:18, 8648:13,
8657:2, 8673:11,
8673:12, 8673:19,
8675:6, 8677:24,
8678:2, 8678:12,
8678:24, 8681:24,
8681:25, 8682:3,
8686:13, 8691:1,
8691:11, 8703:21,
8704:10
needed [1] - 8662:17
needs [3] - 8677:11,
8680:5, 8683:18
nefarious [1] -
8622:23
negative [1] - 8672:23
neighbors [1] - 8593:7
Nestler [3] - 8589:11,
8690:14, 8697:4
NESTLER [22] -
8589:16, 8674:21,
8675:7, 8678:15,
8678:23, 8679:17,
8680:7, 8680:15,
8680:20, 8681:17,
8682:12, 8683:5,
8684:25, 8690:2,
8690:8, 8690:10,
8697:9, 8697:13,
8698:2, 8698:9,
8699:9, 8703:8
never [4] - 8590:22,
8600:3, 8635:18,
8637:18
new [2] - 8606:9,
8633:21
news [1] - 8673:17
next [11] - 8608:14,
8616:21, 8616:24,
8617:1, 8617:3,
8664:5, 8673:21,

8675:8, 8675:10,
8677:9, 8678:12
nice [1] - 8590:1
Nichols [11] - 8587:10,
8588:14, 8588:20,
8589:6, 8589:12,
8650:17, 8650:18,
8651:17, 8672:10,
8672:15, 8681:15
nichols [1] - 8652:7
Nichols's [2] -
8589:11, 8652:13
night [4] - 8593:8,
8594:12, 8691:24,
8700:18
nobody [1] - 8643:14
noise [1] - 8638:6
none [1] - 8656:16
nonfiling [1] - 8689:10
nonissue [1] - 8704:4
normal [9] - 8637:8,
8638:9, 8638:17,
8639:11, 8639:13,
8639:14, 8639:22,
8642:2, 8648:1
normally [3] - 8636:9,
8637:25, 8661:2
note [1] - 8703:20
NOTE [1] - 8582:2
notes [2] - 8703:21,
8704:9
nothing [5] - 8602:16,
8648:22, 8654:8,
8671:22, 8703:2
notion [1] - 8695:5
notwithstanding [1] -
8584:2
November [8] -
8590:12, 8603:23,
8604:15, 8606:6,
8626:10, 8637:3,
8644:25
number [6] - 8582:9,
8655:10, 8673:11,
8675:6, 8687:19,
8688:13
nutshell [1] - 8612:11

## O

o'clock [4] - 8589:1,
8649:18, 8675:6,
8686:1
oath [2] - 8590:6,
8691:7
Oath [20] - 8587:19,
8587:24, 8588:16,
8589:10, 8626:10,
8627:24, 8631:10,
8631:20, 8632:2,

8632:4, 8650:23,
8668:4, 8668:5,
8668:8, 8668:10,
8668:16, 8670:7,
8670:9, 8670:11,
8670:19
obedience [3] -
8693:14, 8693:21,
8694:9
object [2] - 8682:11,
8683:3
objected [1] - 8692:1
objecting [4] -
8609:19, 8610:11,
8674:10, 8692:4
objection [27] -
8598:9, 8601:12,
8601:17, 8604:23,
8606:23, 8607:18,
8608:21, 8609:13,
8612:7, 8615:18,
8615:24, 8617:23,
8619:4, 8619:6,
8622:6, 8622:19,
8626:6, 8634:1,
8646:24, 8648:25,
8652:6, 8660:3,
8666:24, 8670:24,
8682:6, 8683:20,
8689:6
objections [4] -
8633:6, 8698:7,
8699:2, 8701:4
observation [2] -
8698:15, 8699:22
observations [1] -
8700:21
observed [3] - 8647:8,
8700:16, 8701:7
observing [2] -
8638:2, 8646:15
obstructing [1] -
8700:6
obstruction [1] -
8698:12
obviate [1] - 8704:9
obviously [14] -
8594:24, 8602:12,
8603:2, 8608:11,
8609:4, 8623:5,
8652:5, 8668:20,
8675:21, 8676:19,
8678:5, 8692:9,
8693:25, 8694:13
occasion [3] -
8585:25, 8586:2,
8638:14
occurred [1] - 8689:20
offense [1] - 8698:11
offenses [1] - 8698:12

office [1] - 8657:20
Officer [2] - 8587:13,
8651:23
officer [1] - 8693:20
officers [5] - 8588:6,
8595:23, 8596:3,
8596:9, 8649:10
official [1] - 8700:6
officially [1] - 8617:14
often [1] - 8621:8
Old [3] - 8682:8,
8682:22, 8682:24
once [8] - 8600:3,
8602:20, 8632:8,
8638:22, 8641:14,
8658:23, 8658:25,
8696:10
one [44] - 8582:6,
8582:14, 8582:23,
8583:25, 8586:15,
8586:18, 8588:16,
8596:4, 8599:18,
8606:5, 8608:9,
8618:1, 8618:24,
8639:9, 8645:5,
8646:17, 8652:17,
8662:6, 8663:13,
8663:14, 8665:20,
8673:6, 8674:7,
8677:6, 8677:8,
8677:10, 8680:23,
8681:23, 8685:25,
8687:23, 8691:11,
8692:1, 8693:18,
8693:23, 8694:20,
8696:8, 8698:5,
8701:5, 8702:3,
8702:5, 8704:18
OP [1] - 8666:22
op [3] - 8627:2,
8665:16, 8666:13
Opana [6] - 8652:22,
8652:24, 8653:1,
8653:2, 8654:3,
8654:6
open [12] - 8600:19,
8603:11, 8613:6,
8618:16, 8626:5,
8635:16, 8669:15,
8673:14, 8681:22,
8683:22, 8685:18,
8704:15
open-ended [1] -
8681:22
opening [1] - 8681:10
openings [2] -
8635:16, 8681:11
operating [1] - 8666:5
operations [1] -
8666:12

opinion [3] - 8646:3,
8694:21, 8700:15
opioid [2] - 8652:18,
8654:10
opioids [9] - 8652:20,
8656:11, 8657:7,
8657:18, 8657:22,
8657:23, 8658:2,
8658:4, 8700:14
opportunities [1] -
8584:2
opportunity [6] -
8676:22, 8684:3,
8684:12, 8684:21,
8685:10, 8687:2
oppose [1] - 8675:9
opposed [1] - 8704:15
opposing [2] - 8696:9,
8696:16
opposition [1] -
8693:6
option [1] - 8679:1
oral [1] - 8676:12
orange [1] - 8660:24
order [7] - 8584:17,
8586:14, 8586:15,
8588:17, 8663:18,
8691:15, 8691:16
ordered [1] - 8630:19
orders [2] - 8588:15,
8652:11
ordinary [2] - 8694:23,
8694:25
organization [2] -
8651:12, 8651:13
organizers [2] -
8603:22, 8606:5
organizing [2] -
8603:24, 8604:6
otherwise [8] -
8596:10, 8651:9,
8656:21, 8672:21,
8683:24, 8691:7,
8698:12, 8699:1
ought [2] - 8680:10,
8703:11
out-of-court [4] -
8609:23, 8610:13,
8612:13, 8624:11
outlet [1] - 8679:7
outside [11] - 8582:5,
8586:14, 8594:24,
8594:25, 8631:17,
8649:24, 8650:3,
8658:21, 8658:22,
8659:23, 8673:25
outstanding [1] -
8685:1
overcome [1] -
8656:19

**overnight** [1] - 8677:24
**overruled** [1] - 8634:3
**overseas** [1] - 8618:10
**own** [2] - 8582:7, 8583:22
**owned** [1] - 8666:9

## P

**p.m** [5] - 8655:11, 8655:22, 8656:5, 8704:24
**pad** [1] - 8618:8
**PAGE** [1] - 8581:2
**page** [5] - 8605:25, 8606:7, 8656:5, 8665:21, 8688:14
**pain** [2] - 8655:6, 8655:8
**painkillers** [5] - 8652:21, 8654:14, 8655:1, 8682:4
**paint** [1] - 8594:22
**painted** [2] - 8594:23, 8594:24
**Palian** [1] - 8599:11
**Palian's** [1] - 8599:5
**paper** [2] - 8618:8, 8618:13
**parade** [1] - 8617:4
**paragraph** [2] - 8665:23, 8665:24
**Parker** [4] - 8629:13, 8629:24, 8630:1, 8630:6
**parking** [1] - 8630:2
**parlance** [1] - 8656:13
**part** [9] - 8587:16, 8595:20, 8604:14, 8618:11, 8622:17, 8633:24, 8672:17, 8697:23, 8703:24
**parte** [1] - 8704:16
**participant** [1] - 8682:8
**participants** [1] - 8645:15
**participate** [1] - 8653:11
**particular** [3] - 8609:3, 8697:7, 8702:1
**parties** [3] - 8673:19, 8691:1, 8698:9
**parties'** [1] - 8691:22
**party** [3] - 8593:11, 8594:2, 8606:13
**passage** [1] - 8616:25
**passed** [1] - 8694:11
**past** [2] - 8585:6,

8703:6
**path** [1] - 8648:22
**Paul** [1] - 8623:6
**pause** [2] - 8643:21, 8660:24
**pausing** [1] - 8660:9
**pay** [2] - 8616:19, 8671:6
**Peace** [5] - 8634:16, 8635:15, 8647:4, 8668:10, 8668:21
**peaceful** [8] - 8633:6, 8635:10, 8638:14, 8638:15, 8639:11, 8641:20, 8648:1, 8662:16
**peacefully** [1] - 8641:22
**Pence** [3] - 8621:16, 8633:9, 8633:24
**people** [46] - 8593:10, 8604:8, 8606:18, 8632:19, 8633:6, 8637:14, 8637:16, 8637:25, 8638:12, 8638:25, 8639:14, 8639:18, 8639:23, 8640:2, 8640:6, 8640:14, 8640:24, 8641:7, 8641:18, 8642:19, 8642:22, 8644:8, 8644:10, 8644:11, 8647:10, 8647:11, 8647:14, 8647:15, 8647:16, 8647:17, 8648:12, 8649:14, 8656:13, 8657:7, 8657:9, 8657:19, 8662:3, 8666:8, 8669:22, 8669:23, 8669:25, 8670:1, 8682:20
**people's** [1] - 8662:7
**pepper** [1] - 8663:14
**perceive** [1] - 8658:3
**Percenters** [3] - 8627:5, 8627:6, 8627:7
**perception** [3] - 8642:12, 8642:14, 8658:2
**perfect** [3] - 8626:14, 8680:4, 8702:24
**perhaps** [2] - 8667:17, 8691:10
**period** [4] - 8582:22, 8655:11, 8668:21, 8687:4
**permit** [2] - 8599:6, 8689:4

**permitted** [1] - 8689:19
**person** [9] - 8583:24, 8630:5, 8631:4, 8645:19, 8663:13, 8663:14, 8668:13, 8668:15, 8699:20
**personal** [2] - 8615:18, 8666:24
**personally** [3] - 8645:21, 8647:7, 8663:12
**perspective** [2] - 8584:7, 8698:2
**pertain** [1] - 8602:6
**pertaining** [3] - 8602:6, 8628:5, 8628:8
**phone** [35] - 8582:7, 8583:19, 8583:21, 8583:22, 8583:23, 8583:25, 8584:1, 8584:3, 8585:24, 8586:1, 8586:3, 8586:9, 8586:12, 8590:19, 8590:22, 8591:7, 8592:24, 8601:8, 8601:18, 8602:10, 8602:15, 8608:23, 8618:2, 8623:21, 8624:2, 8624:25, 8625:2, 8625:21, 8647:15, 8674:8, 8684:7
**phones** [2] - 8669:24, 8672:3
**photo** [8] - 8607:8, 8607:13, 8607:14, 8607:19, 8607:20, 8607:22, 8616:10, 8640:10
**Photo** [1] - 8616:5
**photograph** [15] - 8595:18, 8596:18, 8598:8, 8598:20, 8599:16, 8600:5, 8600:8, 8608:5, 8608:6, 8608:7, 8611:17, 8611:20, 8701:18
**photographs** [4] - 8611:9, 8612:5, 8615:6, 8615:7
**photos** [17] - 8610:8, 8611:3, 8612:1, 8612:22, 8614:25, 8615:1, 8615:3, 8615:7, 8628:16, 8628:19, 8629:11, 8639:3, 8639:6,

8639:9, 8639:18, 8639:21, 8645:24
**phrase** [1] - 8624:20
**physical** [2] - 8599:23, 8656:19
**physically** [2] - 8693:12, 8704:10
**pick** [1] - 8630:3
**picture** [20] - 8596:9, 8598:16, 8599:2, 8608:4, 8609:2, 8609:16, 8610:17, 8611:4, 8613:19, 8613:25, 8614:2, 8614:4, 8619:16, 8649:13, 8659:12, 8661:1, 8667:8, 8667:18, 8671:7
**pictures** [8] - 8611:1, 8611:6, 8612:10, 8617:6, 8628:12, 8642:4, 8649:15, 8671:5
**piece** [4] - 8618:13, 8683:1, 8701:23, 8702:1
**pilot** [1] - 8693:24
**place** [4] - 8592:2, 8636:9, 8682:10, 8685:4
**placed** [1] - 8590:19
**plaintiff's** [1] - 8688:15
**plan** [5] - 8622:17, 8649:22, 8666:12, 8680:19, 8703:11
**PLAN** [1] - 8666:22
**planned** [1] - 8593:8
**planning** [3] - 8627:2, 8681:13, 8683:12
**plans** [6] - 8617:21, 8673:19, 8673:20, 8675:8, 8675:22, 8675:23
**play** [8] - 8591:24, 8619:15, 8621:14, 8632:8, 8646:4, 8651:1, 8659:15, 8660:7
**played** [15] - 8588:11, 8591:25, 8619:17, 8619:21, 8620:12, 8630:25, 8632:9, 8643:20, 8646:6, 8651:20, 8655:23, 8659:17, 8660:8, 8660:22, 8664:22
**pleased** [2] - 8664:12, 8664:18
**pls** [1] - 8661:16

**plus** [1] - 8701:17
**point** [31] - 8583:7, 8584:7, 8589:12, 8593:16, 8598:2, 8602:18, 8602:19, 8602:22, 8603:4, 8605:8, 8611:22, 8617:11, 8626:10, 8633:16, 8636:6, 8636:13, 8636:25, 8637:7, 8637:9, 8640:18, 8640:24, 8642:10, 8642:12, 8643:8, 8645:17, 8668:20, 8679:10, 8681:6, 8681:16, 8693:3
**pointing** [3] - 8667:13, 8667:14, 8682:24
**police** [14] - 8587:14, 8588:5, 8588:18, 8592:17, 8594:15, 8595:23, 8596:3, 8596:5, 8621:23, 8639:2, 8640:5, 8650:24, 8651:14, 8652:12
**political** [2] - 8606:19, 8643:17
**politicians** [1] - 8662:5
**porch** [1] - 8597:25
**position** [5] - 8687:5, 8689:20, 8690:1, 8690:2, 8697:14
**positioned** [2] - 8596:20, 8596:22
**positions** [1] - 8691:22
**positive** [4] - 8693:9, 8694:2, 8694:14, 8695:18
**possibility** [1] - 8683:23
**possible** [2] - 8650:24, 8680:17
**Post** [4] - 8601:22, 8603:1, 8603:6, 8661:16
**post** [4] - 8683:7, 8683:8, 8683:13, 8683:15
**posterity** [1] - 8646:18
**potentially** [2] - 8586:23, 8695:13
**Potomac** [2] - 8624:1, 8627:19
**power** [1] - 8693:19
**practice** [1] - 8602:4
**practices** [1] -

8720

8692:14
**praying** [2] - 8643:9, 8643:13
**precluded** [1] - 8652:2
**precluding** [1] - 8675:16
**predominantly** [1] - 8676:8
**prefer** [1] - 8693:15
**preferably** [1] - 8683:23
**preference** [2] - 8704:14
**prejudicial** [2] - 8600:14
**prematurely** [1] - 8587:21
**preparation** [1] - 8666:7
**prepared** [8] - 8582:3, 8584:18, 8610:8, 8674:19, 8677:7, 8677:9, 8677:8, 8680:18
**prescription** [2] - 8653:13, 8656:11
**presence** [8] - 8582:22, 8589:24, 8649:24, 8658:22, 8659:5, 8673:25, 8704:1, 8704:5
**present** [3] - 8685:19, 8703:21, 8704:10
**presentation** [2] - 8673:16, 8701:11
**presented** [3] - 8685:15, 8701:7, 8702:19
**presenting** [1] - 8588:9
**President** [5] - 8621:16, 8634:13, 8636:25, 8641:21, 8641:25
**President's** [1] - 8633:12
**presidential** [1] - 8640:20
**press** [1] - 8602:21
**pressure** [1] - 8620:23
**presumably** [3] - 8585:3, 8586:21, 8610:24
**pretrial** [6] - 8600:2, 8652:18, 8658:6, 8658:9, 8697:5, 8698:10
**pretty** [3] - 8595:1, 8628:16, 8636:15
**prevent** [1] - 8658:1,

**prevent** [...]
8658:7, 8692:24
**preventing** [1] - 8588:8
**previously** [6] - 8582:13, 8583:12, 8584:14, 8696:15, 8696:20, 8704:14
**primarily** [1] - 8704:1
**private** [1] - 8666:8
**proactive** [1] - 8693:14
**probative** [3] - 8600:13, 8688:23, 8688:25
**problem** [4] - 8625:18, 8656:12, 8689:4, 8703:6
**problematic** [1] - 8600:12
**problems** [1] - 8606:6
**proceed** [2] - 8632:23, 8701:10
**proceeded** [1] - 8593:12
**proceeding** [1] - 8700:6
**proceedings** [1] - 8673:14
**Proceedings** [11] - 8582:5, 8589:24, 8590:19, 8603:11, 8613:6, 8618:16, 8626:5, 8649:24, 8659:5, 8673:25, 8704:24
**process** [5] - 8632:22, 8633:2, 8633:5, 8636:11, 8639:12
**procure** [3] - 8623:25, 8627:16, 8627:19
**product** [1] - 8654:13
**prohibit** [1] - 8630:20
**prohibited** [1] - 8657:4
**prohibition** [1] - 8689:12
**properties** [1] - 8609:2
**property** [4] - 8626:10, 8626:13, 8666:8, 8666:9
**propose** [1] - 8681:4
**proposed** [3] - 8682:13, 8698:10
**proposing** [1] - 8678:18
**proposition** [1] - 8688:5
**prosecutor** [1] - 8670:3
**prosecutors** [1] -

8692:16
**protecting** [3] - 8695:12, 8695:15, 8695:17
**protest** [1] - 8641:22
**protesting** [1] - 8633:21
**proud** [1] - 8646:23
**provide** [5] - 8586:23, 8588:17, 8650:24, 8673:17, 8702:15
**provided** [4] - 8582:8, 8584:13, 8585:24, 8614:15
**providing** [1] - 8614:15
**public** [4] - 8594:21, 8602:19, 8602:20, 8693:20
**publication** [1] - 8602:14
**publicly** [1] - 8666:8
**publish** [1] - 8613:14
**published** [1] - 8692:21
**pull** [26] - 8595:6, 8595:9, 8596:12, 8597:1, 8598:4, 8603:13, 8605:17, 8605:18, 8607:2, 8617:9, 8618:18, 8618:19, 8629:19, 8635:11, 8639:5, 8659:9, 8660:20, 8664:20, 8665:13, 8665:19, 8667:5, 8668:24, 8669:7, 8679:8, 8702:22
**pulled** [2] - 8583:22, 8590:24
**pulling** [4] - 8590:16, 8605:20, 8618:23, 8649:10
**punched** [1] - 8636:19
**punk** [1] - 8633:9
**Purcellville** [1] - 8603:23
**purple** [1] - 8659:14
**purports** [1] - 8701:16
**purpose** [6] - 8600:10, 8604:4, 8653:8, 8670:15, 8689:14, 8690:4
**purposes** [1] - 8687:21
**pursue** [1] - 8583:8
**push** [2] - 8637:9, 8675:23
**pushed** [3] - 8635:7, 8635:18, 8647:22

**pushing** [2] - 8637:11, 8649:11
**pussies** [4] - 8648:4, 8648:10, 8648:12, 8662:24
**puts** [1] - 8690:1
**putting** [1] - 8611:23

**Q**

**quality** [2] - 8600:14
**questioning** [2] - 8603:8, 8608:23
**questions** [8] - 8591:22, 8604:10, 8623:4, 8626:15, 8636:7, 8665:9, 8684:13, 8684:21
**quibble** [1] - 8692:19
**quick** [2] - 8593:18, 8624:1
**quickly** [2] - 8589:3, 8590:11
**quiet** [1] - 8582:17
**quite** [5] - 8639:3, 8679:9, 8691:25, 8695:7, 8702:14
**quote** [8] - 8582:25, 8621:2, 8692:2, 8692:23, 8693:5, 8693:17, 8693:19, 8696:1

**R**

**rabble** [1] - 8663:18
**rack** [1] - 8669:3
**racks** [1] - 8635:15
**raid** [3] - 8597:8, 8607:4, 8611:14
**raided** [1] - 8609:5
**railing** [1] - 8642:11
**Rakoczy** [5] - 8583:7, 8583:17, 8585:19, 8585:24, 8618:6
**RAKOCZY** [4] - 8583:18, 8584:13, 8674:12, 8684:9
**Rakoczy's** [1] - 8674:9
**rally** [6] - 8603:22, 8603:25, 8604:6, 8604:8, 8605:5, 8605:12
**ram** [1] - 8597:23
**Ranger** [2] - 8627:10, 8628:3
**ranges** [1] - 8586:23
**rather** [2] - 8593:21, 8704:18
**raw** [1] - 8583:22

**reach** [1] - 8602:21
**reached** [1] - 8585:5
**reaction** [1] - 8624:1
**reactions** [1] - 8692:6
**read** [2] - 8670:21, 8692:11
**reading** [4] - 8692:9, 8693:7, 8694:20, 8694:21
**reads** [1] - 8661:25
**ready** [8] - 8595:7, 8595:8, 8663:9, 8672:9, 8672:24, 8702:14, 8703:10, 8703:14
**real** [2] - 8589:3, 8603:8
**realistically** [1] - 8637:6
**reality** [1] - 8658:3
**realized** [1] - 8662:13
**really** [10] - 8584:8, 8584:9, 8586:1, 8612:12, 8637:2, 8648:11, 8649:14, 8665:1, 8702:2, 8702:3
**reason** [6] - 8594:14, 8603:6, 8637:14, 8662:10, 8689:16, 8695:22
**reasonable** [2] - 8588:10, 8696:23
**reasons** [3] - 8651:4, 8694:19, 8696:15
**rebuttal** [4] - 8674:19, 8680:10, 8680:24, 8681:14
**receive** [4] - 8601:8, 8602:10, 8677:11, 8677:14
**received** [1] - 8602:10
**recently** [1] - 8600:9
**Recess** [2] - 8658:18, 8677:1
**recognizable** [1] - 8628:16
**recognize** [10] - 8598:7, 8603:19, 8605:22, 8607:8, 8607:13, 8615:1, 8629:23, 8631:4, 8659:19, 8664:20
**reconcile** [1] - 8698:24
**record** [12] - 8589:21, 8598:11, 8601:20, 8605:20, 8609:14, 8618:3, 8620:6, 8623:22, 8672:5,

8676:6, 8695:25, 8696:10
**recorded** [3] - 8590:12, 8591:10, 8592:3
**recording** [21] - 8591:25, 8592:16, 8592:23, 8593:19, 8593:20, 8593:21, 8593:22, 8619:17, 8619:21, 8620:12, 8630:25, 8632:9, 8643:20, 8646:6, 8655:23, 8659:17, 8660:8, 8660:22, 8664:22
**recounts** [1] - 8637:4
**Red** [2] - 8691:16, 8691:17
**redact** [2] - 8618:13, 8683:1
**redactions** [1] - 8681:24
**Redirect** [1] - 8581:6
**redirect** [2] - 8650:9, 8665:10
**REDIRECT** [1] - 8665:11
**reference** [2] - 8652:20, 8652:21
**reflected** [4] - 8653:9, 8682:11, 8697:22
**reflects** [1] - 8695:21
**refrained** [1] - 8700:24
**regarding** [9] - 8587:13, 8605:5, 8605:7, 8606:17, 8666:18, 8682:6, 8688:18, 8690:15, 8696:1
**register** [1] - 8606:13
**registered** [1] - 8606:11
**rejects** [1] - 8699:18
**related** [1] - 8587:16
**relation** [1] - 8693:17
**relationship** [1] - 8651:13
**relative** [1] - 8655:7
**relatively** [1] - 8653:19
**relayed** [1] - 8582:24
**released** [1] - 8602:14
**relevance** [10] - 8598:9, 8598:13, 8599:2, 8602:5, 8603:8, 8610:1, 8617:23, 8622:6, 8651:3, 8689:2
**relevant** [9] - 8599:22, 8599:23, 8624:9,

8651:5, 8652:9, 8658:12, 8658:13, 8672:19, 8688:1
**remainder** [1] - 8673:20
**remains** [3] - 8683:22, 8685:18
**remember** [12] - 8599:4, 8618:20, 8632:1, 8665:16, 8668:13, 8668:15, 8668:17, 8683:19, 8687:4, 8696:11, 8697:3, 8700:23
**remind** [2] - 8590:6, 8590:11
**reminder** [1] - 8702:13
**repeat** [1] - 8690:15
**repeatedly** [2] - 8583:5, 8632:12
**rephrase** [1] - 8622:20
**reported** [1] - 8582:3
**REPORTER** [2] - 8585:20, 8643:2
**reporter** [3] - 8582:18, 8591:22, 8704:16
**REPORTER'S** [1] - 8582:2
**reporting** [3] - 8647:14, 8669:23, 8670:1
**representation** [1] - 8682:25
**Republicans** [2] - 8606:12, 8606:14
**reputation** [1] - 8651:12
**request** [16] - 8582:19, 8583:3, 8583:5, 8583:6, 8583:11, 8584:19, 8585:8, 8586:8, 8586:10, 8589:18, 8589:22, 8652:7, 8684:3, 8684:12, 8687:2, 8697:4
**requested** [4] - 8584:22, 8626:18, 8687:1, 8697:23
**requesting** [1] - 8682:10
**require** [1] - 8677:6
**required** [2] - 8695:14, 8697:6
**requirement** [1] - 8698:19
**requires** [1] - 8694:6
**requisite** [1] - 8653:11
**researching** [1] - 8618:10

**reserved** [1] - 8701:4
**residence** [2] - 8630:9, 8633:12
**resignation** [1] - 8617:16
**resist** [3] - 8694:10, 8695:16, 8695:19
**resistance** [5] - 8639:19, 8692:23, 8693:5, 8694:1, 8695:1
**resisting** [2] - 8694:14, 8695:5
**resolve** [2] - 8690:13, 8690:17
**respect** [4] - 8685:4, 8700:5, 8700:7, 8701:12
**respectfully** [6] - 8646:1, 8662:22, 8664:2, 8664:18, 8695:22, 8696:14
**respond** [1] - 8650:23
**responded** [1] - 8594:1
**response** [3] - 8584:14, 8624:25, 8633:8
**rest** [5] - 8640:6, 8668:8, 8674:3, 8674:17, 8691:18
**rested** [5] - 8584:11, 8585:12, 8587:4, 8587:6
**result** [9] - 8593:2, 8593:25, 8623:14, 8623:16, 8624:1, 8624:21, 8625:19, 8625:21, 8698:25
**resume** [1] - 8649:22
**retained** [1] - 8693:24
**retire** [1] - 8617:14
**retired** [1] - 8617:11
**retirement** [2] - 8617:17, 8617:21
**retiring** [1] - 8617:22
**retrieved** [1] - 8584:4
**return** [2] - 8675:19, 8681:23
**returns** [8] - 8687:1, 8687:4, 8687:20, 8688:16, 8688:23, 8688:25, 8689:10
**review** [2] - 8586:15, 8687:17
**reviewed** [1] - 8685:6
**reviewing** [1] - 8589:18
**revised** [2] - 8692:2, 8698:7

**revision** [1] - 8691:24
**Rhodes** [12] - 8582:6, 8583:2, 8583:11, 8584:11, 8585:2, 8586:21, 8589:8, 8589:9, 8589:13, 8687:3, 8689:12, 8689:22
**Rhodes's** [4] - 8583:20, 8583:21, 8689:25, 8690:4
**Rico** [1] - 8672:17
**rid** [1] - 8698:11
**ridiculous** [1] - 8604:18
**rinse** [1] - 8662:3
**riot** [10] - 8638:2, 8640:1, 8640:17, 8640:19, 8642:13, 8645:16, 8646:20, 8646:21, 8648:7, 8662:13
**rioters** [1] - 8649:10
**rioting** [2] - 8636:17, 8644:11
**ripped** [1] - 8639:25
**ripping** [3] - 8640:25, 8641:3, 8641:11
**rise** [1] - 8684:16
**risen** [1] - 8695:12
**road** [2] - 8595:1, 8678:19
**Rohde** [1] - 8659:15
**rolled** [1] - 8591:6
**room** [4] - 8586:14, 8608:14, 8660:18, 8661:3
**rotated** [1] - 8678:21
**Rotunda** [1] - 8664:10
**rouser** [1] - 8663:18
**rubber** [5] - 8645:4, 8645:13, 8647:13, 8647:19, 8648:23
**Rule** [9] - 8675:25, 8676:3, 8676:16, 8676:24, 8687:20, 8689:1, 8689:4, 8689:13, 8697:10
**rule** [4] - 8588:1, 8588:11, 8650:20, 8683:17
**ruled** [2] - 8583:12, 8652:9
**ruling** [2] - 8672:18, 8697:14
**rumor** [1] - 8643:10

**S**

**sad** [1] - 8636:25

**sake** [1] - 8583:1
**salad** [1] - 8593:13
**salutes** [1] - 8665:5
**Saturday** [2] - 8593:8, 8677:12
**save** [1] - 8703:22
**saw** [8] - 8590:24, 8630:4, 8635:18, 8637:14, 8638:15, 8662:8, 8663:12, 8668:4
**scaffolding** [2] - 8637:15, 8669:10
**schedule** [6] - 8658:25, 8675:5, 8675:20, 8677:22, 8678:6, 8680:4
**scheduling** [4] - 8658:23, 8673:10, 8680:7
**scoped** [1] - 8583:20
**screen** [6] - 8596:2, 8613:25, 8629:23, 8665:13, 8665:19, 8667:14
**screenwriting** [1] - 8622:12
**scripture** [1] - 8616:25
**scrolls** [1] - 8583:25
**scrubbed** [1] - 8703:1
**search** [5] - 8586:21, 8586:23, 8600:22, 8630:15, 8630:16
**Seat** [5] - 8678:13, 8679:14, 8679:25, 8680:1
**seat** [2] - 8650:5, 8659:3
**seated** [3] - 8589:25, 8659:6, 8674:1
**second** [11] - 8601:24, 8605:25, 8610:16, 8631:2, 8643:12, 8643:21, 8645:5, 8665:20, 8665:21, 8680:2, 8682:19
**Second** [1] - 8688:6
**seconds** [12] - 8618:2, 8620:1, 8629:19, 8629:20, 8630:2, 8631:4, 8632:8, 8643:22, 8655:21, 8659:16, 8660:6, 8660:21
**section** [1] - 8694:5
**seditious** [9] - 8691:21, 8693:8, 8693:9, 8693:22, 8694:5, 8695:8, 8695:12, 8696:8,

8722

8697:23

**see** [40] - 8586:13, 8595:23, 8596:3, 8596:8, 8596:9, 8596:15, 8619:16, 8619:25, 8620:8, 8620:16, 8622:7, 8633:20, 8634:8, 8634:25, 8635:1, 8635:7, 8635:9, 8638:3, 8641:15, 8641:16, 8647:21, 8648:23, 8649:10, 8649:14, 8649:22, 8650:25, 8665:23, 8665:24, 8666:22, 8667:13, 8668:7, 8668:10, 8668:24, 8669:16, 8684:10, 8684:22, 8690:25, 8699:16, 8699:17, 8704:22

**seeing** [1] - 8649:15

**seek** [2] - 8589:8, 8659:25

**seeking** [3] - 8599:18, 8651:7, 8658:6

**seem** [2] - 8638:9, 8638:11

**seize** [7] - 8600:23, 8600:25, 8601:2, 8601:4, 8608:15, 8630:12, 8630:17

**seized** [4] - 8601:3, 8607:5, 8607:10, 8615:10

**sell** [1] - 8616:18

**send** [4] - 8667:2, 8685:9, 8691:12, 8692:11

**sending** [1] - 8604:4

**sense** [4] - 8644:4, 8647:3, 8654:8, 8658:23

**sensitive** [2] - 8620:3, 8675:21

**sent** [20] - 8582:12, 8589:10, 8589:17, 8589:21, 8603:22, 8654:13, 8655:7, 8656:1, 8656:4, 8656:24, 8682:13, 8685:6, 8691:22, 8691:24, 8692:7, 8693:18, 8697:20, 8697:24, 8703:20

**sentence** [2] - 8697:11, 8697:16

**sentences** [1] - 8692:1

**separate** [2] - 8591:5,

8690:3

**separately** [1] - 8699:13

**sequencing** [1] - 8691:17

**serious** [2] - 8670:5

**serve** [2] - 8700:13, 8700:19

**serves** [1] - 8599:9

**service** [1] - 8600:22

**session** [1] - 8582:2

**set** [2] - 8590:11, 8602:4

**several** [3] - 8582:13, 8584:7, 8678:25

**shaking** [2] - 8597:19, 8597:20

**share** [2] - 8663:8, 8687:14

**Sharon** [6] - 8581:4, 8612:1, 8661:16, 8662:3, 8663:8, 8663:17

**shield** [1] - 8621:23

**shields** [1] - 8649:10

**shirt** [3] - 8631:20, 8631:22, 8632:1

**shirts** [4] - 8632:2, 8632:5, 8668:12, 8668:14

**shocked** [1] - 8664:15

**shooting** [1] - 8693:12

**short** [2] - 8588:21, 8680:23

**shortened** [1] - 8587:17

**shortly** [1] - 8583:19

**shot** [6] - 8643:8, 8643:14, 8645:19, 8669:16, 8669:21, 8669:23

**shouting** [2] - 8635:4, 8635:6

**show** [8] - 8588:22, 8599:3, 8603:18, 8619:2, 8619:3, 8619:8, 8694:8

**showed** [3] - 8664:10, 8671:7, 8671:13

**showing** [3] - 8595:17, 8614:22, 8652:3

**shows** [6] - 8598:15, 8598:16, 8600:8, 8682:20, 8682:21, 8682:24

**sic** [1] - 8587:14

**sic]** [2] - 8663:21, 8688:8

**side** [6] - 8594:25,

8606:18, 8663:23, 8664:9, 8664:11, 8671:9

**sidebar** [1] - 8679:3

**sidewalk** [1] - 8638:23

**Signal** [1] - 8627:22

**similarly** [1] - 8688:20

**simply** [5] - 8613:1, 8614:16, 8696:16, 8698:10, 8701:8

**simulta** [1] - 8642:17

**simultaneous** [2] - 8643:1, 8644:17

**sing** [2] - 8642:20, 8642:21

**single** [3] - 8600:25, 8700:1, 8700:2

**singular** [1] - 8700:5

**sit** [7] - 8582:21, 8586:13, 8675:12, 8675:16, 8678:9, 8678:16, 8678:20

**sitting** [2] - 8603:1, 8675:10

**situation** [3] - 8657:10, 8657:11, 8689:18

**Sixth** [2] - 8687:24, 8687:25

**skis** [1] - 8700:7

**sleep** [3] - 8655:18, 8657:23, 8658:5

**sleeps** [1] - 8597:19

**sleeve** [1] - 8659:14

**Slide** [1] - 8661:13

**slightly** [3] - 8587:3, 8695:8, 8697:2

**slow** [2] - 8591:22, 8655:20

**slowly** [4] - 8638:22, 8639:1, 8639:2, 8648:21

**small** [2] - 8650:18, 8690:22

**smell** [1] - 8635:2

**smiling** [1] - 8661:2

**smirk** [1] - 8596:14

**smoke** [8] - 8645:2, 8645:12, 8647:3, 8647:6, 8647:8, 8647:13, 8647:18, 8648:23

**snippet** [1] - 8651:20

**sold** [1] - 8671:4

**solicit** [1] - 8672:7

**solicited** [1] - 8587:25

**solves** [1] - 8618:14

**someone** [4] - 8582:12, 8631:23, 8662:17, 8675:25

**somewhere** [4] - 8596:23, 8641:5, 8641:10, 8647:21

**soon** [2] - 8629:2, 8673:17

**sorry** [17] - 8589:4, 8593:17, 8595:7, 8609:21, 8613:4, 8615:20, 8637:22, 8643:4, 8644:21, 8653:20, 8663:4, 8669:19, 8676:2, 8679:3, 8682:5, 8686:5, 8697:13

**sort** [5] - 8624:22, 8646:22, 8679:10, 8682:2, 8696:21

**sought** [1] - 8600:3

**sound** [1] - 8629:20

**sounds** [1] - 8680:9

**south** [1] - 8645:25

**Spangled** [1] - 8642:21

**speaker** [5] - 8604:7, 8604:12, 8605:5, 8605:14, 8701:19

**speaking** [2] - 8592:25, 8676:15

**speaks** [1] - 8696:16

**special** [1] - 8699:5

**specific** [4] - 8582:11, 8696:15, 8698:19, 8702:4

**specifically** [5] - 8586:8, 8612:4, 8624:10, 8668:13, 8668:15

**speculating** [1] - 8603:3

**speech** [2] - 8648:16, 8648:19

**spell** [2] - 8688:7, 8688:9

**spend** [1] - 8692:15

**spent** [1] - 8692:10

**spilling** [1] - 8638:13

**spoken** [2] - 8583:5, 8701:10

**spray** [1] - 8663:14

**spreading** [1] - 8637:16

**stack** [2] - 8587:22, 8670:11

**stage** [21] - 8590:12, 8595:12, 8595:13, 8596:15, 8596:17, 8596:21, 8637:21, 8637:24, 8639:17, 8639:24, 8640:14, 8640:25, 8641:3,

8641:11, 8641:19, 8642:25, 8647:9, 8648:18, 8648:20, 8669:20

**stairs** [5] - 8596:23, 8639:4, 8642:16, 8661:9, 8667:20

**Stamey** [11] - 8623:6, 8623:9, 8623:24, 8624:3, 8624:9, 8624:15, 8624:17, 8625:3, 8625:17, 8625:18, 8628:1

**Stamey's** [1] - 8624:11

**stand** [8] - 8589:8, 8589:13, 8590:3, 8652:8, 8682:2, 8684:4, 8688:4, 8689:8

**standard** [3] - 8690:21, 8691:5, 8691:15

**standing** [4] - 8588:15, 8588:16, 8649:15, 8652:11

**stands** [1] - 8611:22

**Star** [1] - 8642:21

**start** [6] - 8673:5, 8675:2, 8681:8, 8681:9, 8685:4, 8703:12

**started** [4] - 8627:2, 8642:14, 8645:12, 8675:24

**starting** [2] - 8645:19, 8645:20

**Starza** [1] - 8672:17

**state** [11] - 8623:18, 8624:4, 8624:5, 8650:22, 8653:11, 8654:2, 8656:12, 8656:16, 8656:21, 8656:25, 8658:3

**statement** [13] - 8599:20, 8600:3, 8607:21, 8609:23, 8610:15, 8611:23, 8612:12, 8612:13, 8624:11, 8646:9, 8646:10, 8686:4

**statements** [20] - 8599:6, 8599:13, 8599:15, 8599:17, 8643:24, 8644:2, 8670:3, 8670:6, 8670:21, 8670:23, 8682:1, 8685:21, 8685:24, 8685:25, 8686:7, 8686:17, 8691:4, 8691:7,

8701:11, 8701:25
**States** [8] - 8670:12, 8670:15, 8688:21, 8692:2, 8692:3, 8696:18, 8696:19, 8697:17
**states** [1] - 8651:5
**statute** [6] - 8694:5, 8694:20, 8694:24, 8696:15, 8696:24, 8697:6
**statutes** [1] - 8694:22
**statutory** [1] - 8679:8
**stay** [2] - 8592:11, 8677:7
**Steal** [3] - 8632:11, 8632:12, 8633:23
**steal** [1] - 8621:22
**step** [3] - 8649:25, 8650:3, 8672:1
**steps** [1] - 8667:16
**Stewart** [2] - 8589:8, 8589:9
**still** [24] - 8585:11, 8590:6, 8597:14, 8611:22, 8611:24, 8624:10, 8625:14, 8640:2, 8640:12, 8640:18, 8642:7, 8642:12, 8645:21, 8652:10, 8679:7, 8680:5, 8680:15, 8680:17, 8680:19, 8681:25, 8682:24, 8683:22, 8685:18, 8697:17
**stipulate** [2] - 8589:14, 8589:19
**stipulation** [2] - 8589:22, 8683:23
**stop** [6] - 8592:1, 8622:18, 8622:24, 8623:2, 8631:1, 8643:12
**Stop** [3] - 8632:11, 8633:22
**storm** [2] - 8621:3, 8648:20
**storming** [2] - 8648:18, 8663:8
**story** [1] - 8671:14
**straight** [1] - 8680:21
**strong** [1] - 8704:14
**stuck** [1] - 8663:23
**stuff** [3] - 8642:21, 8664:1, 8703:3
**submit** [4] - 8617:16, 8617:19, 8657:6, 8685:12
**subsequently** [1] -

8630:19
**substance** [1] - 8652:11
**substantial** [1] - 8600:14
**substantive** [6] - 8676:12, 8686:16, 8697:25, 8699:7, 8701:20, 8701:23
**substitute** [1] - 8697:2
**suffice** [1] - 8663:18
**suggest** [3] - 8599:17, 8600:11, 8603:4
**suggested** [1] - 8599:11
**suggesting** [2] - 8588:4, 8678:20
**suggestion** [2] - 8610:5, 8678:15
**summary** [4] - 8701:6, 8701:15, 8701:16, 8701:19
**supervise** [1] - 8584:6
**supporter** [1] - 8636:23
**supporters** [1] - 8606:15
**suppose** [1] - 8691:8
**supposed** [2] - 8633:10, 8644:22
**Supreme** [2] - 8693:1, 8694:21
**suspended** [1] - 8604:16
**sustained** [5] - 8626:7, 8646:25, 8649:1, 8670:25, 8689:6
**switch** [1] - 8645:22
**sympathizers** [1] - 8694:13
**system** [1] - 8643:17

---

**T**

**T-Bird** [2] - 8616:18, 8671:4
**T-shirts** [3] - 8632:5, 8668:12, 8668:14
**tactical** [1] - 8670:14
**tail** [2] - 8628:10, 8651:21
**tampering** [1] - 8611:16
**Tarik** [1] - 8587:13
**Tarpley** [2] - 8583:3, 8585:20
**TARPLEY** [4] - 8583:4, 8585:17, 8585:22, 8587:8

**tax** [9] - 8681:23, 8687:1, 8687:3, 8687:20, 8688:16, 8688:22, 8688:24, 8689:9, 8689:10
**team** [1] - 8699:24
**tear** [15] - 8635:2, 8644:4, 8644:7, 8645:2, 8645:12, 8647:12, 8647:18, 8648:23, 8662:3, 8662:7, 8662:9, 8663:10, 8663:11, 8663:12, 8663:14
**tear-gassed** [1] - 8663:12
**technical** [1] - 8649:19
**teeing** [1] - 8590:8
**telephone** [1] - 8624:21
**television** [1] - 8632:19
**tend** [1] - 8665:7
**Tenth** [1] - 8688:20
**term** [3] - 8694:23, 8696:20, 8696:22
**terms** [17] - 8586:23, 8650:22, 8673:16, 8679:24, 8681:1, 8681:11, 8681:12, 8681:24, 8686:16, 8689:2, 8689:8, 8691:3, 8695:1, 8695:21, 8696:16, 8701:24, 8704:4
**terrace** [2] - 8637:22, 8641:16
**terrible** [2] - 8643:17, 8643:18
**terribly** [1] - 8655:4
**testified** [4] - 8627:10, 8644:4, 8653:2, 8655:5
**testifies** [4] - 8680:14, 8685:23, 8686:18, 8686:22
**testify** [17] - 8587:11, 8610:8, 8610:13, 8610:14, 8610:15, 8624:17, 8624:18, 8625:17, 8626:2, 8653:3, 8673:5, 8674:3, 8674:19, 8680:9, 8680:22, 8686:2, 8686:9
**testifying** [2] - 8689:15
**testimony** [13] - 8588:14, 8589:11,

8599:24, 8628:10, 8650:1, 8650:20, 8655:14, 8656:21, 8664:3, 8671:25, 8680:15, 8688:18, 8689:25
**text** [2] - 8582:23, 8657:24
**themselves** [1] - 8595:3
**theory** [11] - 8624:18, 8689:16, 8698:16, 8698:24, 8699:6, 8699:12, 8699:18, 8699:24, 8700:3, 8700:5
**therefore** [1] - 8689:1
**they've** [2] - 8685:15, 8699:13
**thinking** [4] - 8633:18, 8690:12, 8698:18, 8699:16
**thinks** [3] - 8582:10, 8586:22, 8676:18
**third** [3] - 8585:25, 8679:15, 8680:2
**thoughts** [3] - 8678:14, 8687:15, 8692:6
**threatened** [1] - 8633:24
**Three** [3] - 8627:4, 8627:6, 8627:7
**three** [6] - 8625:14, 8625:15, 8644:24, 8645:1, 8650:18, 8674:10
**Thursday** [6] - 8675:2, 8677:15, 8678:7, 8703:9, 8703:10, 8703:13
**tie** [1] - 8673:12
**tied** [1] - 8669:3
**timer** [1] - 8620:8
**timing** [1] - 8703:8
**timing-wise** [1] - 8703:8
**tiny** [1] - 8651:20
**tip** [1] - 8681:24
**title** [9] - 8609:19, 8609:21, 8610:4, 8612:21, 8613:1, 8613:2, 8614:15, 8614:16, 8614:18
**titled** [1] - 8610:12
**to-do** [2] - 8682:2, 8704:20
**today** [6] - 8632:14, 8648:12, 8658:20, 8664:3, 8678:3,

8699:25
**toddled** [1] - 8597:22
**together** [1] - 8645:6
**token** [1] - 8694:25
**Tom** [26] - 8594:22, 8597:11, 8597:16, 8603:23, 8616:6, 8616:10, 8616:12, 8616:14, 8616:16, 8616:22, 8617:2, 8617:4, 8633:20, 8634:9, 8634:10, 8634:15, 8637:13, 8639:2, 8639:10, 8641:20, 8645:5, 8662:16, 8670:4
**Tom's** [2] - 8592:5, 8615:4
**tomorrow** [17] - 8674:6, 8674:20, 8674:23, 8678:5, 8680:8, 8680:12, 8680:19, 8680:20, 8685:23, 8686:13, 8690:13, 8690:18, 8700:11, 8703:22, 8704:13, 8704:22
**tonight** [6] - 8686:1, 8686:12, 8690:19, 8691:12, 8698:7, 8702:8
**took** [25] - 8610:16, 8610:17, 8611:2, 8611:4, 8611:14, 8611:17, 8612:1, 8614:1, 8615:15, 8624:8, 8624:24, 8628:19, 8638:23, 8639:2, 8639:9, 8639:10, 8639:21, 8640:10, 8648:20, 8649:13, 8654:3, 8655:1, 8655:6, 8656:18
**top** [7] - 8639:4, 8642:16, 8642:25, 8643:10, 8645:18, 8666:2, 8666:10
**topic** [1] - 8600:21
**toward** [1] - 8633:16
**towards** [1] - 8640:3
**track** [2] - 8691:10, 8691:16
**tracked** [1] - 8691:25
**train** [1] - 8670:14
**transcript** [9] - 8582:4, 8653:9, 8685:6, 8685:7, 8685:12, 8685:17, 8685:18, 8701:8, 8701:17

**transcripts** [8] - 8685:1, 8685:2, 8685:5, 8685:8, 8685:9, 8685:11, 8685:15
**transition** [1] - 8648:1
**traumatic** [1] - 8597:13
**trial** [3] - 8582:3, 8584:17, 8587:1
**trials** [1] - 8702:25
**tricky** [1] - 8699:4
**tried** [3] - 8627:16, 8627:18, 8658:6
**trip** [1] - 8639:3
**trouble** [1] - 8690:14
**true** [5] - 8627:21, 8643:7, 8643:9, 8658:4, 8670:1
**truly** [1] - 8641:15
**Trump** [2] - 8606:15, 8636:23
**trustworthiness** [1] - 8687:21
**truth** [12] - 8593:20, 8609:22, 8610:2, 8610:13, 8611:24, 8612:9, 8612:19, 8613:2, 8614:16, 8614:17, 8624:11, 8661:21
**truthful** [1] - 8599:12
**truthfulness** [4] - 8688:23, 8688:25, 8690:5, 8690:7
**try** [13] - 8585:4, 8586:17, 8601:23, 8611:15, 8623:2, 8624:3, 8637:17, 8637:19, 8638:1, 8638:22, 8639:19, 8639:20, 8686:15
**trying** [19] - 8595:2, 8599:1, 8599:4, 8600:11, 8605:4, 8609:20, 8609:21, 8622:23, 8624:6, 8625:16, 8625:25, 8626:1, 8634:10, 8640:22, 8646:18, 8657:12, 8658:1, 8672:11, 8687:11
**Tuesday** [4] - 8677:10, 8677:12, 8678:10, 8704:2
**tunnel** [2] - 8649:8, 8649:11
**turn** [2] - 8684:11, 8687:12
**TV** [5] - 8618:23,

8620:4, 8640:21, 8647:16, 8670:1
**twenty** [1] - 8650:10
**two** [21] - 8582:11, 8583:6, 8588:21, 8589:5, 8589:9, 8589:19, 8599:21, 8645:7, 8657:20, 8663:22, 8674:7, 8675:13, 8677:9, 8680:8, 8680:23, 8685:25, 8687:22, 8694:19, 8695:1, 8701:4, 8701:18
**type** [4] - 8601:23, 8638:7, 8642:20, 8693:13
**typically** [2] - 8640:23, 8694:22

## U

**ultimately** [2] - 8685:12, 8694:18
**unable** [1] - 8653:10
**unanimity** [1] - 8698:11
**unanimous** [1] - 8696:3
**uncomfortable** [4] - 8645:20, 8646:8, 8646:11, 8649:13
**under** [17] - 8590:6, 8598:2, 8638:16, 8653:12, 8654:14, 8654:17, 8665:24, 8679:8, 8687:20, 8689:1, 8689:13, 8691:7, 8694:6, 8698:23, 8699:5, 8699:14
**Understood** [1] - 8585:10
**understood** [12] - 8584:20, 8585:13, 8600:16, 8600:18, 8650:13, 8655:17, 8676:11, 8678:4, 8679:6, 8684:19, 8686:23, 8704:11
**unduly** [1] - 8586:11
**uninvolved** [1] - 8584:4
**United** [8] - 8670:12, 8670:15, 8688:21, 8692:2, 8692:3, 8696:18, 8696:19, 8697:17
**unless** [1] - 8676:9
**unlikely** [2] - 8686:3,

8686:6
**unprecedented** [1] - 8582:15
**unpublished** [1] - 8688:20
**unquote** [1] - 8621:3
**unrestrained** [1] - 8666:5
**unsealed** [1] - 8602:3
**unsend** [1] - 8628:8
**unsent** [3] - 8611:10, 8629:5, 8629:6
**untruthfulness** [2] - 8688:23, 8688:25
**unusual** [4] - 8620:19, 8677:19, 8688:15
**up** [114] - 8584:7, 8588:23, 8588:25, 8590:8, 8590:22, 8591:7, 8593:10, 8593:16, 8595:6, 8595:9, 8595:13, 8595:20, 8596:8, 8596:12, 8597:18, 8597:21, 8597:23, 8598:4, 8599:1, 8599:5, 8600:5, 8600:9, 8603:13, 8605:18, 8605:20, 8607:2, 8610:6, 8610:17, 8611:4, 8611:9, 8611:15, 8611:17, 8614:1, 8617:22, 8618:18, 8618:19, 8618:23, 8618:24, 8619:25, 8620:7, 8620:20, 8629:19, 8633:9, 8633:12, 8635:11, 8637:13, 8637:14, 8637:16, 8637:17, 8637:18, 8637:23, 8637:25, 8638:1, 8638:23, 8638:24, 8639:2, 8639:3, 8639:4, 8639:5, 8639:16, 8639:18, 8639:20, 8639:21, 8639:25, 8640:12, 8641:7, 8641:16, 8641:17, 8641:18, 8642:3, 8642:19, 8642:25, 8645:23, 8646:11, 8646:16, 8646:17, 8646:19, 8647:8, 8647:12, 8648:18, 8648:20, 8648:21, 8651:1, 8659:3, 8659:9, 8660:18, 8660:20,

8661:16, 8662:10, 8662:12, 8663:14, 8663:24, 8664:3, 8664:6, 8664:20, 8665:13, 8665:19, 8666:10, 8666:16, 8667:5, 8667:10, 8669:10, 8669:20, 8670:14, 8671:3, 8673:12, 8674:5, 8679:8, 8686:20, 8702:22
**upper** [1] - 8595:20
**upset** [2] - 8606:17, 8681:5
**upshot** [1] - 8704:11
**upstairs** [2] - 8655:25, 8662:2
**upward** [1] - 8642:7
**urban** [1] - 8666:5
**USA** [1] - 8642:21
**USS** [1] - 8616:22
**usual** [2] - 8636:4, 8692:13

## V

**value** [1] - 8600:13
**verdict** [2] - 8698:3, 8698:7
**version** [3] - 8583:21, 8663:17, 8690:20
**versus** [1] - 8682:8
**veterans** [1] - 8665:7
**via** [1] - 8591:5
**vibe** [1] - 8646:16
**Vice** [3] - 8621:16, 8633:12, 8634:13
**video** [29] - 8587:17, 8587:20, 8588:11, 8588:21, 8618:23, 8618:24, 8619:17, 8619:21, 8620:4, 8620:12, 8621:14, 8621:18, 8646:17, 8650:25, 8651:5, 8651:8, 8651:9, 8651:25, 8652:8, 8655:23, 8660:22, 8662:12, 8664:10, 8664:22, 8671:8, 8671:13, 8685:2, 8685:8
**view** [9] - 8584:3, 8586:8, 8587:3, 8594:21, 8595:1, 8662:1, 8678:11, 8686:21, 8695:20
**viewing** [1] - 8584:6
**violence** [5] - 8638:3,

8643:15, 8643:17, 8649:16, 8666:7
**Virginia** [7] - 8602:25, 8603:24, 8606:13, 8617:12, 8621:6, 8667:24, 8668:2
**virtue** [3] - 8651:13, 8653:12, 8656:22
**vis-à-vis** [1] - 8606:18
**visual** [6] - 8630:25, 8632:9, 8643:20, 8646:6, 8659:17, 8660:8
**voice** [10] - 8589:4, 8590:9, 8590:12, 8591:10, 8591:14, 8592:4, 8592:7, 8592:20, 8597:16
**voices** [1] - 8592:3
**voluntary** [1] - 8657:13
**vote** [1] - 8647:25

## W

**wait** [3] - 8593:10, 8634:19, 8684:10
**waiting** [2] - 8588:23, 8634:21
**waive** [1] - 8582:22
**waking** [1] - 8597:18
**Walden** [4] - 8587:20, 8588:5, 8651:21, 8652:1
**walk** [7] - 8635:17, 8637:23, 8638:21, 8642:15, 8644:15, 8656:20, 8658:10
**walked** [3] - 8594:22, 8639:2, 8648:21
**walking** [6] - 8621:14, 8634:16, 8638:1, 8638:25, 8661:2, 8661:8
**wall** [9] - 8620:1, 8620:7, 8620:15, 8620:19, 8660:13, 8661:11, 8671:8, 8671:9, 8671:11
**wants** [5] - 8625:3, 8657:16, 8657:25, 8686:15, 8701:10
**War** [2] - 8693:5, 8694:12
**war** [1] - 8694:4
**warrant** [2] - 8600:23, 8630:15
**warrants** [1] - 8676:24
**wash** [2] - 8662:7, 8663:15

**Washington** [8] - 8601:22, 8603:1, 8603:6, 8621:7, 8627:17, 8627:20, 8631:17, 8667:23
**watch** [2] - 8629:9, 8640:23
**watching** [2] - 8647:16, 8669:25
**water** [3] - 8662:8, 8662:9, 8663:15
**Watkins** [6] - 8593:15, 8594:8, 8631:11, 8664:6, 8664:25, 8672:23
**wave** [1] - 8642:20
**weapons** [5] - 8627:17, 8627:19, 8630:13, 8630:17, 8630:21
**wearing** [1] - 8631:20
**website** [1] - 8589:10
**Webster's** [1] - 8695:3
**Wednesday** [5] - 8674:23, 8675:2, 8677:15, 8681:8, 8703:12
**week** [9] - 8583:7, 8587:1, 8673:21, 8675:8, 8675:10, 8675:16, 8679:22, 8704:2
**weekend** [3] - 8614:25, 8691:22, 8703:20
**weeks** [2] - 8583:6, 8678:25
**weight** [1] - 8620:23
**welcome** [1] - 8590:1
**west** [2] - 8662:1, 8663:23
**Western** [1] - 8602:25
**wheel** [1] - 8658:5
**whispered** [1] - 8675:25
**whole** [2] - 8621:9, 8671:14
**wife** [2] - 8624:3, 8650:18
**William** [1] - 8582:3
**willing** [2] - 8586:13, 8586:17
**windows** [1] - 8591:6
**wine** [2] - 8616:6, 8616:10
**winner** [1] - 8636:14
**winter** [1] - 8583:20
**Wisconsin** [3] - 8621:17, 8633:9, 8633:12

**wise** [1] - 8703:8
**withdraw** [1] - 8626:3
**Witness** [1] - 8672:2
**witness** [22] - 8589:6, 8595:8, 8598:5, 8603:15, 8614:22, 8622:16, 8622:22, 8623:1, 8650:11, 8672:9, 8672:16, 8672:21, 8673:7, 8674:13, 8680:10, 8681:15, 8684:7, 8684:15, 8684:16, 8689:14, 8689:15, 8700:13
**WITNESS** [2] - 8643:4, 8660:2
**witnessed** [1] - 8620:20
**witnesses** [6] - 8674:6, 8680:8, 8680:18, 8680:23, 8691:4, 8691:6
**Witnesses** [1] - 8581:3
**woke** [1] - 8597:21
**woken** [2] - 8599:2, 8600:9
**woman** [2] - 8596:14, 8605:4
**Women** [1] - 8606:4
**wonderful** [1] - 8626:14
**wondering** [1] - 8592:11
**Woodward** [2] - 8653:3, 8700:12
**WOODWARD** [13] - 8653:5, 8672:10, 8673:1, 8698:14, 8699:11, 8699:21, 8700:2, 8700:16, 8700:23, 8701:3, 8702:6, 8702:17, 8702:24
**word** [2] - 8693:15
**words** [6] - 8602:20, 8666:10, 8671:13, 8693:10, 8697:2, 8701:9
**workers** [1] - 8695:11
**works** [2] - 8586:16, 8702:14
**world** [4] - 8698:22, 8699:16, 8699:17, 8704:8
**write** [1] - 8655:2
**writes** [2] - 8663:16, 8663:23
**writing** [4] - 8622:4,

8622:12, 8676:19, 8676:21
**written** [1] - 8676:16
**wrongdoing** [1] - 8601:24
**wrote** [2] - 8655:2, 8661:16

## Y

**year** [1] - 8622:16
**years** [5] - 8616:22, 8617:2, 8636:9, 8640:22, 8692:22
**yelling** [1] - 8638:7
**yesterday** [2] - 8692:7, 8697:24
**you-all** [12] - 8585:1, 8586:19, 8587:4, 8658:23, 8673:10, 8673:22, 8675:20, 8683:25, 8690:21, 8690:23, 8691:8, 8702:20
**yourself** [2] - 8659:12, 8659:19

## Z

**Zaremba** [1] - 8582:3
**Zello** [4] - 8670:19, 8701:5, 8701:8, 8702:3